## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHARONELL FULTON, CECELIA
PAUL, TONI LYNN SIMMS-BUSCH,
and CATHOLIC SOCIAL SERVICES,

     *Plaintiffs*,

     v.

CITY OF PHILADELPHIA,
DEPARTMENT OF HUMAN
SERVICES FOR THE CITY OF
PHILADELPHIA, and PHILADELPHIA
COMMISSION ON HUMAN
RELATIONS,

     *Defendants*.

Civil No. _____

**COMPLAINT**

### INTRODUCTION

1.   Catholic Social Services exists to serve those in need, and it wants to continue serving foster children in Philadelphia. Despite a foster care crisis and a need for more foster homes, the City of Philadelphia has decided to cut off foster placements for Catholic Social Services and prioritize political grandstanding over the needs of children.

2.   Unsurprisingly, the City's actions are creating a severe human cost. Available foster homes are sitting empty. Numerous foster parents like Cecelia Paul have homes that are now vacant because the City will no longer allow Catholic Social Services to place children with these loving families. Other foster parents, such as Sharonell Fulton, may soon lose their placements, meaning that they will

1

no longer be able to care for children who rely on their foster families to help with extensive medical care for their special needs. Other foster parents, such as Toni Simms-Busch, risk losing the opportunity to foster additional children, including biological siblings of her current foster children, in the future. And many foster children will face even greater obstacles to finding a safe home. These consequences are severe, unnecessary, and illegal under state and federal law. And they are the direct consequences of the City's actions.

3.     On an average day, Catholic Social Services serves more than 120 children in foster care, and it supervises around 100 different foster homes. Through its combined programs, Catholic Social Services served more than 2,200 different at-risk children in Philadelphia last year. For decades, Catholic Social Services has partnered with the City to place foster children in stable, loving homes. It has a proven track record of compassion, quality, and success.

4.     Catholic Social Services works with foster parents like Ms. Fulton, who has cared for children with severe medical problems and trauma from past abuse. Catholic Social Services works with parents like Ms. Simms-Busch, who is fostering two biological siblings and is very open to fostering again in the future, including if additional biological siblings of her children went into foster care. Catholic Social Services works with parents like Ms. Paul, who, in her 40-plus years of foster work, has fostered more than 130 children, adopted six children, and received a Foster Parent of the Year award from the City.

5.    The City is penalizing Catholic Social Services, in violation of its contract and state and federal law, because the agency has Catholic beliefs about same-sex marriage. Catholic Social Services serves and places children regardless of their race, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, source of income, familial status, genetic information, or sexual violence victim status. Even though no LGBT couple has filed a complaint against Catholic Social Services, and the agency would not stand in the way of any couple who wished to foster a child in need, the City has decided to penalize the agency because the City disagrees with its religious beliefs. But even more importantly, the City is penalizing both the foster parents who wish to continue working with Catholic Social Services and the children they would serve.

6.    Philadelphia's actions discriminate against Plaintiffs for their religious beliefs and practices, constitute a breach of contract, unlawfully try to coerce them to speak contrary to their religious beliefs, and restrict Plaintiffs' religious exercise in violation of state law and the Pennsylvania and U.S. Constitutions.

## IDENTIFICATION OF PARTIES

7.    Plaintiff Sharonell Fulton is a foster parent who works with Catholic Social Services. She has fostered more than 40 children over 25-plus years as a foster parent. She has cared for children with significant medical needs and is currently caring for two special needs foster children.

8.    Ms. Fulton could not provide the extensive care that these special needs children require without the support she receives from Catholic Social Services.

3

Catholic Social Services has provided Ms. Fulton with training, resources, support, and professional guidance as to how to best care for special needs children. She has been able to call social workers at any hour and receive an answer from someone she knew and trusted. These social workers have become like family and have shown great love and care to her foster children. By contrast, Ms. Fulton previously received training from a government agency, and has noted the stark difference between that agency's treatment of her and Catholic Social Services' care and compassion. She is aware that other foster parents have been unsatisfied with the support they receive from other foster agencies. Ms. Fulton believes that she would not receive the kind of support she needs to serve children with serious medical problems if she were with another agency. If the City terminates its contract with Catholic Social Services, or refuses to renew the contract in June, Ms. Fulton's two current foster children will be immediately transferred away. Because of their extensive medical needs, she anticipates these children will have a very difficult time being placed, and it is very unlikely they will be placed with a foster parent that has the same capacity and training as Ms. Fulton to address these special needs.

9. Ms. Fulton shares the religious beliefs of Catholic Social Services. As an African American woman, Ms. Fulton has experienced discrimination in her life. It is insulting and hurtful for her to observe the government of the city in which she lives needlessly denigrate and publicly condemn her own religious beliefs in such a discriminatory fashion.

10. Plaintiff Cecelia Paul is a foster parent who has worked with Catholic Social Services for 46 years and who has fostered 133 children. Mrs. Paul was honored by the City as one of its Foster Parents of the Year for her excellent care. Caring for children in need is what gives life meaning for Mrs. Paul. She first began caring for children when she worked as a nurse. Her religious beliefs inspired her to make serving children her life's work. These religious beliefs also inspired Mrs. Paul to work with Catholic Social Services, and the social workers at this agency have become like family to Mrs. Paul. Mrs. Paul trusts them, relies on them, and she cannot imagine starting from scratch and fostering children without them. But because the City is no longer referring children to families who work with Catholic Social Services, as of April Mrs. Paul is no longer caring for children in need. This has left a void in Mrs. Paul's life and has left her unable to fulfill her religious commitment to give of herself and show love to those most in need. Mrs. Paul's home will remain empty of children as long as the City continues refusing to refer foster children to Catholic Social Services.

11. Plaintiff Toni Lynn Simms-Busch previously worked as a foster care social worker with a private agency, and then later as a child advocate social worker who spent four years working at the Defender Association of Philadelphia. Ms. Simms-Busch obtained her bachelor's degree in forensic psychology from Chatham University in Pittsburgh. In her prior role as a child advocate social worker with the City of Philadelphia, Ms. Simms-Busch interacted with all the foster agencies in the City. She observed some to offer high-quality services, and others at the other end of

the spectrum. She observed that Catholic Social Services consistently was among the best of any foster agency in terms of quality of services the provided, and they operated with the highest level of integrity, professionalism, responsiveness, and care.

12. Ms. Simms-Busch is now a foster parent herself, caring for two very young foster children who are biological siblings. Ms. Simms-Busch chose to work with Catholic Social Services because she observed their high-level care in the past, as well as because of her desire to raise her family with an organization that shared her religious beliefs. Ms. Simms-Busch is inspired by her religious beliefs to serve children, which is why she found work as a child advocate so rewarding. She is continuing that religiously-motivated practice of serving vulnerable children now as a foster mother. Ms. Simms-Busch relies heavily on the trusted social workers she interacts with at Catholic Social Services. Fostering is often a very emotionally exhausting process, and she could not imagine continuing on this journey without the support she receives from Catholic Social Services. In her interactions with other agencies, Ms. Simms-Busch has not received this same level of personal care and loving encouragement. It is possible that in the future, a biological sibling of her foster children would need foster care, and Ms. Simms-Busch would be very open to fostering this child if she could work with Catholic Social Services. Ms. Simms-Busch is very open to fostering other children in need in the future as well. But if Catholic Social Services were forced to close its program, Ms. Simms-Busch thinks it is highly unlikely that she would be able to continue fostering.

6

13.   Plaintiff Catholic Social Services is a non-profit religious corporation under the auspices of the Archdiocese of Philadelphia and party to a foster services contract with Defendant Department of Human Services. Catholic Social Services' foster care program currently cares for 127 children daily whom it has placed in foster arrangements through referrals from the City. Thanks to its work, last year 132 of its graduates went on to receive high school diplomas. Catholic Social Services prioritizes permanency, and the statistics demonstrate its success. Across its programs, about 50 children per year achieve permanency either by returning to their families or moving to adoption with their foster families.

14.   Catholic Social Services and the Archdiocese of Philadelphia have provided care for needy children in Pennsylvania for over a century. In 1916, the Catholic Children's Bureau was established and staffed by Missionary Sisters of the Blessed Trinity, early Catholic pioneers in social work. Their work continues today through the dedicated efforts of Catholic Social Services' foster care program. This ongoing religious mission motivates Catholic Social Services and its staff to provide exemplary services to children and families in Philadelphia.

15.   Catholic Social Services exists to transform lives and bring about a just and compassionate society where every individual is valued, families are healthy and strong, and communities are united in their commitment to the good of all. Catholic Social Services works towards a world touched by God's mercy: where poverty and need are alleviated and all people share justly in the blessings of creation. Catholic Social Services is dedicated to serving others in a spirit of humility and genuine

concern for the well-being of its neighbors and affirms the God-given dignity and worth of every person.

16. Catholic Social Services exercises its faith and carries out this religious mission through its foster work. Care for needy children and the provision of foster care services is an integral, fundamental, and central part of Plaintiffs' religious exercise. Providing these services in a manner consistent with Catholic teaching is part of its religious character and affiliation.

17. Catholic Social Services also provides important ancillary services to children and families. For example, Catholic Social Services, St. Gabriel's Hall, is certified as a Sanctuary Model of Trauma-Informed Care provider—a best practice standard now hailed nationwide. Catholic Social Services also provides educational programming via state-licensed schools at St. Gabriel's Hall, DeLaSalle Vocational School and St. Francis Homes. Last year, through Catholic Social Services programs, 132 graduates received high school diplomas. Catholic Social Services' Youth Division, including St. Gabriel's System and St. Francis & St. Vincent Homes, served 1,544 youth in placement, and approximately 1,400 families per year across all its child welfare and juvenile justice programs last year. That number includes over 120 children whom Catholic Social Services has, on an average day, placed in foster arrangements through referrals from the City.

18. Defendant City of Philadelphia is a municipality organized pursuant to Section 1 of Article XV of the Constitution and the Act of the General Assembly, approved April 21, 1949, P.L. 665, of the Commonwealth of Pennsylvania.

19.  Defendant Department of Human Services is an agency of the City of Philadelphia and party to a foster services contract ("the Contract") with Plaintiff Catholic Social Services. The Contract is attached as Exhibit A.

20.  Defendant Philadelphia Commission on Human Relations is an agency of the City of Philadelphia.

## JURISDICTION AND VENUE

21.  This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

22.  The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

23.  Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL ALLEGATIONS

### Foster Care Under Pennsylvania and Federal Law

24.  More than 5,000 children are in Philadelphia's foster care system, and experts have recognized that the City faces a "crisis" because of "the lack of qualified foster parents and other placement options for the increasing number of children in care."[1] Philadelphia relies upon state-licensed foster care agencies to help make up the shortfall.

25.  In Pennsylvania, standards for foster care providers are set out by state law. 55 Pa. Code § 3700. The Commonwealth provides funding to municipalities for

---

[1] David R. Fair, Partners for Philadelphia Families Testimony to Philadelphia City Council, Turning Points for Children (June 14, 2016), www.turningpointsforchildren.org/news/228-partners-for-philadelphia-families-testimony

foster care, and runs the Statewide Adoption Network (SWAN), under which foster care agencies may be licensed to provide adoption services to foster children.

26.   Pennsylvania sets the standards which foster agencies use to determine whether a particular foster family should be certified. Those standards include consideration of "existing family relationships" and the "[a]bility of the applicant to work in partnership with" the foster care agency. 55 Pa. Code § 3700.64.

27.   Pennsylvania laws permit religious foster care agencies to operate in a manner consistent with their faith.

28.   The City relies upon state and federal funds, including Temporary Assistance to Needy Families (TANF) block grants, to administer its foster care program. This federal funding includes requirements that states and local government bodies not discriminate against religious foster care agencies based upon their religious beliefs. *See, e.g.*, 42 U.S.C. § 604a(c) ("neither the Federal Government nor a State receiving funds under such programs shall discriminate against an organization which is or applies to be a contractor to provide assistance, or which accepts certificates, vouchers, or other forms of disbursement, on the basis that the organization has a religious character.") 45 C.F.R. § 87.3(a) ("Neither the HHS awarding agency, nor any State or local government and other pass-through entity receiving funds under any HHS awarding agency program shall, in the selection of service providers, discriminate for or against an organization on the basis of the organization's religious character or affiliation.").

### Philadelphia's Foster Care Program

29.   In Philadelphia, there are 28 state-licensed agencies who partner with the city to provide foster services. Of those agencies, eight obtained additional competitive contracts with the City to also serve as a Community Umbrella Agency (CUA), an entity that works to try to help at-risk children stay in their homes where such an option would be possible and safe for the child. Of these select agencies, the City ranked Catholic Social Services as the second highest of all agencies. This demonstrates Catholic Social Services' track record of providing both quality and value to the City's residents.

30.   When at-risk children are not able to remain in their family homes, the City refers the child to be placed in foster care. The City is the only source of foster care referrals, so any Philadelphia-area foster agency who does not receive referrals from this source cannot place new foster children with families and will quickly lose the ability to serve any foster children at all.

31.   The City has provided referrals to Catholic Social Services on a regular basis for many years and requires Catholic Social Services to report open spaces weekly so that any openings in foster homes may be filled promptly. This has been the City's consistent practice. The City has never before suspended referrals to Catholic Social Services when homes were available, and, upon information and belief, the City's longstanding practice is to provide referrals to all approved foster care agencies in the City with capacity to place children on a consistent and continuing basis.

32. State-licensed agencies in Philadelphia place children with foster families who have already undergone extensive interviews and home studies by social workers at the agency. The agency makes a determination that a particular foster family would be an appropriate family to care for foster children. After these interviews, home studies, and recommendations, an agency may certify that a foster family is approved to care for foster children.

33. State law does not prohibit foster agencies from declining to perform a home study, nor from referring families to another licensed agency to perform a home study. State law also permits waivers of provisions of the laws governing foster care agencies, so long as the waiver "[d]oes not jeopardize receipt of Federal monies." 55 Pa. Code § 3700.5.

34. After an agency licensed by the Commonwealth has taken the steps prescribed by state law, it may place a foster child referred to it with a certified foster family. The City provides per diem payments from a combination of federal, state, and city funds. That funding is provided to foster care agencies only after an agency has accepted the referral of a child and is supervising that placement with a certified foster family.

35. A foster agency provides ongoing training and support and works with the assigned CUA case manager to coordinate services to the foster family, birth family and child in order to achieve a positive outcome. Foster parents are needed not only to care for children, but to provide mentoring to the birth family and support the relationship between the child and the birth family. This collaborative approach

assesses the continued appropriateness of temporary placement and explores options for permanency through return to the birth family, placement with kin, or adoption.

## Catholic Social Services' Foster Care Program

36.   Catholic Social Services shares the City's goal of working to fill the shortage of safe foster homes for these vulnerable kids. On an average day, Catholic Social Services' foster care program cares for over 120 children who are placed with about 100 different foster families that Catholic Social Services supervises. Catholic Social Services is able to recruit many foster families, such as Ms. Simms-Busch, Ms. Fulton, and Mrs. Paul, who would not otherwise feel able to foster or adopt children. Of the select agencies who obtained additional CUA contracts, the City ranked Catholic Social Services as the second highest of all these agencies.

37.   Catholic Social Services serves and places children regardless of their race, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, source of income, familial status, genetic information, or sexual violence victim status.

38.    Catholic Social Services shares the religious beliefs and teachings of the Catholic Church regarding same-sex marriage. But Catholic Social Services would never stop a family who wants to foster from having the opportunity to complete the application and home study process, either through Catholic Social Services or another agency. If Catholic Social Services were ever unable to perform in-depth home assessments and make reports and written certifications to the State for any

reason, including consistency with religious beliefs and mission of Catholic Social Services, then it would refer the potential foster parent to one of 26 nearby agencies who can better serve their needs. Four agencies are located within just two miles of Catholic Social Services' downtown office.

39.   On information and belief, Catholic Social Services has never had a same-sex couple request that the agency perform a home study. No same-sex couples have been denied the ability to become foster parents because of Catholic Social Services, and no same-sex couples have filed complaints against Catholic Social Services regarding its foster care operations.

40.   As long as staff at Catholic Social Services can remember, and for at least 50 years, the agency has provided foster care services to the City pursuant to a contract, which is renewed annually. In reliance upon that contract, Catholic Social Services has hired 15 staff members who work exclusively on that contract, has budgeted and raised funds designed to supplement City funding on that contract, and has taken other concrete steps in expectation that it will continue to receive referrals and be able to perform its duties under the Contract. Catholic Social Services offers a significant subsidy to the City by supplementing City foster funds with private donations and volunteer hours to cover costs that City funding cannot.

41. Although Catholic Social Services provides home studies and hopes to continue doing so, there is no contractual or other requirement of a free-standing duty to offer certification services to prospective foster families. Catholic Social

Services is not obligated to provide home studies to the general public under the Contract.

42.   The City has been aware of Catholic Social Services' religious beliefs for years. For example, the City has repeatedly accepted waiver requests from Catholic Social Services pursuant to Phila. Code § 17-1904. That provision permits the City to waive the obligation for contractors to provide benefits to same-sex spouses of employees where "the contractor certifies, and the City finds, that (a) the contractor is operated, supervised, or controlled by a bona fide religious institution or organization for charitable purposes, and (b) compliance with the provisions of this Chapter would conflict with the beliefs of the religion with which the contracting organization is identified." The City's acceptance of that certification demonstrates its knowledge of Catholic Social Services' position regarding same-sex marriage. The Contract has a non-discrimination provision that has been in place for many years without material alteration, and during that time, the City has never investigated Catholic Social Services, penalized Catholic Social Services, nor otherwise indicated in any way that Catholic Social Services would be in breach of that contract if it did not perform home studies, nor if it referred a couple to another agency for home studies due to consistency with its religious mission.

**The City Targets Catholic Social Services and Breaches Its Contract**

46.   Despite this long history of serving the City and its residents, on March 15, 2018, Catholic Social Services was informed via a news article that the City was suspending foster care referrals to the agency. That same day, the Philadelphia City

15

Council passed a resolution alleging that some foster services providers "have policies that prohibit the placement of children with LGBTQ people based on religious principles" and calling for an investigation.[2] A local news agency quoted the Mayor saying, "we cannot use taxpayer dollars to fund organizations that discriminate against people because of their sexual orientation or because of their same-sex marriage status. . . . It's just not right."[3]

47.   The apparent impetus for the City's actions was a newspaper article published two days earlier. The article discussed the case of a different foster care provider which was facing a complaint from a same-sex couple. No such complaint has been made against Catholic Social Services. The article also discussed Catholic Social Services' religious beliefs.

48.   After the City passed its resolution, Catholic Social Services received a letter from the Philadelphia Human Relations Commission demanding information about the policies and practices of Catholic Social Services. A true and correct copy of the letter is attached as Exhibit C.

49.   At no time has the Human Relations Commission received a formal complaint against Catholic Social Services, notified Catholic Social Services of such a complaint as required by law, or otherwise taken the steps required by law to open a formal proceeding against Catholic Social Services.

---

[2]     Exhibit     B,     Resolution     No.     180252, http://philly.councilmatic.org/legislation/3378655.
[3] Tom MacDonald, *Philly halts foster placements with 2 faith-based agencies shutting out LGBT couples*, WHYY, Mar. 16, 2018, https://whyy.org/articles/philly-halts-foster-placements-2-faith-based-agencies-shutting-lgbt-couples/.

50.  Upon information and belief, other religious groups who contract with the City and who have different religious beliefs and practices regarding same-sex marriage have not received such letters and the City continues performance of those contracts.

51.  In its letter, the City also indicated it suspected that Catholic Social Services was in breach of its contract. But Catholic Social Services did not receive a suspension notice and was not given an opportunity to cure. The City's contract with Catholic Social Services states under the relevant nondiscrimination Paragraph 15.1 that the City may "suspend or terminate" its contract with Catholic Social Services only "[i]n the event of any breach of this Section 15.1." But the City has never set forth any clear basis for breach of contract prior to engaging in suspending additional referrals.

52.  Nor has the City provided the notice required under the contract prior to exercising its remedies. *See* Section 12.2.

53.  As such, the City is in breach of its contract with Catholic Social Services by failing to perform and for preventing Catholic Social Services from continuing to perform without any justification.

54.  On March 27, 2018, Staci Boyd, the Operations Director at the Department of Human Services, sent an email to other foster agencies in Philadelphia forbidding them from referring any additional foster intakes to Catholic Social Services. A copy of that email is attached as Exhibit D.

55.  Provision of referrals is necessary for performance and the receipt of any payment under the Contract.  Because the City is the sole source of foster care referrals, without such referrals, Catholic Social Services is unable to fully perform its duties under the Contract and, as foster children return to their birth families or other placements, will eventually be unable to perform *any* duties under the contract.

56.  Catholic Social Services has not breached its contract or otherwise acted unlawfully.

57.  Catholic Social Services informed the City it was in breach, but the City has continued to suspend referrals and impede Catholic Social Services' ability to perform under its contract without clear justification.

58.  Catholic Social Services' foster services do not constitute a "public accommodation" under the City's Fair Practices Ordinance, and therefore it cannot have violated the contract provision relating to that ordinance.

59.  Catholic Social Services is a private, religious charity. It does not offer, sell, or make available its services to the public that entail supervision of a child placed with a certified foster family. Phila., Pa., Admin. Code § 9-1102(1)(w). These services are only available to at-risk children who have been removed by the state and are in need of a loving home, and Catholic Social Services serves any child who is referred to them. The City only pays Catholic Social Services a per diem for these supervisory services, and the City is not contracted to compensate Catholic Social

Services for anything else related to the provision of foster care, including home studies and assessments of potential foster families.

60.   No individual or couple has alleged that Catholic Social Services has denied or interfered with the public accommodations opportunities of an individual. Nor could they, because Catholic Social Services is not a place of public accommodation, no allegation has been made that Catholic Social Services prevented anyone from receiving relevant city services, and Catholic Social Services has not prevented any child from being placed in a family.

61.   Upon information and belief, the City has never before interpreted and applied its contracts or non-discrimination ordinances in this manner. The novel and inconsistent application demonstrates an attempt to target and penalize a particular set of religious beliefs and practices.

62.   The City has targeted Catholic Social Services because of its religious beliefs. City officials have been open about their disagreement with Catholic teaching on marriage and their personal animosity toward the Archdiocese. Local media has chronicled Mayor Kenney's public statements criticizing the Archdiocese and Archbishop. *See, e.g.*, Patrick Kerkstra, *Jim Kenney's Long War with the Archdiocese*, Philadelphia, July 9, 2015, (compiling tweets);[4] David O'Reilly, *Chaput edict draws mixed reviews; Kenney calls it "not Christian"*, Philadelphia Inquirer,

---

[4] https://www.phillymag.com/citified/2015/07/09/jim-kenney-catholic-archdiocese-charles-chaput/.

July 6, 2016 (Mayor Kenney, "who was raised Catholic, has often been sharply critical of [Archbishop] Chaput's conservative stances on matters of faith.").[5]

63. Plaintiffs informed the Commission on April 18, 2018, that Plaintiffs' actions were lawful, the Defendants' actions were unlawful, and requested that Defendants cease their unlawful behavior and resume normal operations under the Contract. A true and correct copy of that letter is attached as Exhibit E.

64. On May 9, Plaintiffs' counsel received a response from the Commission, dated May 7, defending Defendants' actions and stating that Plaintiffs would face subpoenas and further adverse actions under the Contract 10 days after the date of the letter, which Plaintiffs calculate to be May 17. A true and correct copy of that letter is attached as Exhibit F.

65. On May 10, Plaintiffs requested a meeting with the Commission to attempt to resolve the issues prior to May 17, or in the alternative, a delay of that timeframe to allow for further discussion. The Commission has yet to respond to that request.

66. Plaintiffs' counsel received a second letter dated May 7, this one from the City's law department. A true and correct copy of that letter is attached as Exhibit G.

67. In that letter, the City confirmed that its purpose is to ensure that Catholic Social Services cannot "inform a qualified family" that they are unable to complete a home study and refer that family elsewhere. The City made it clear that same-sex marriage is a "value that must be embodied in our contractual relationships."

---

[5] http://www.philly.com/philly/news/20160707_Chaput_edict_draws_mixed_ reviews__Kenney_calls_it__not_Christian_.html.

68.   The City also indicated that it has the power to grant exemptions from certain requirements. It highlighted contract language that states that in some circumstances, "an exception is granted by the Commissioner . . . in his/her sole discretion." It also stated that it had recently granted an "exception" from the cessation of referrals "in that instance" in order to allow siblings to be placed together. However, as to the provision of home studies and other support for same-sex couples, the City stated: "the Commissioner has no intention of granting an exception."

69.   The City also stated that it believes Catholic Social Services is obligated to provide home studies to same-sex couples, and it said that "any further contracts with CSS will be explicit in that regard." This acknowledges that the City's current contract with Catholic Social Services is not currently explicit in this regard.

70.   The City indicated it would not renew the Contract after its expiration on June 30th, and would begin a transition plan, unless Catholic Social Services agreed to engage in the City's preferred form of speech and provide home studies and support services to same-sex couples.

71.   In that letter, the City also threatened to terminate the Contract for convenience.

### The City's Unlawful Actions Harm Catholic Social Services and the Children of Philadelphia

72.   The City's unlawful actions have real-world consequences. After the City informed Catholic Social Services that it would not receive any new referrals, Catholic Social Services received a request from another agency regarding a child

who had just been taken into foster care. Despite the City's announced ban, the agency wished to place that child with his siblings, who had been placed with a family through Catholic Social Services. Responding to an urgent need, Catholic Social Services immediately agreed to exercise its role as a state-licensed foster care agency to place the child with his siblings. Catholic Social Services informed DHS of the placement that same day. That placement was made in accordance with best practices and law, which favor family placement of siblings wherever possible.

73.   Had DHS successfully implemented its prohibition on referrals to Catholic Social Services, this child could not have been placed with his siblings. Immediately after this successful placement of the child, however, DHS instead doubled down on its prohibition, sending a message to its referral partners regarding Catholic Social Services and Bethany Christian Services, stating that "NO referrals are sent to these two providers effective immediately," and demanding that all its partners affirm this directive in writing. Weeks later, after Catholic Social Services pointed out to the City that its actions suggested it was not acting in the best interests of the child, the City claimed that it granted an exception "in that instance."

74.   If a similar situation happens in the future, the City's current policy means that the child would not be automatically referred to Catholic Social Services for placement in a home with his or her siblings. Catholic Social Services, and the children it hopes to serve, are at the mercy of the City.

75.   Also after the City's unlawful suspension, a court order was necessary to ensure that a child could be reunited with her former foster mother, who is a

certified foster parent working with Catholic Social Services. A foster family with Catholic Social Services had formerly cared for the girl, and the foster mother came to court to state her willingness to foster the girl once again.  The court determined that it was in the child's best interests to be placed with this family, but it was only after a direct court order and a personal appeal from Catholic Social Services that the City took the obvious—and right—step of placing the child with her former foster mother.

76.  The City has threatened to terminate the Contract "for convenience." If such a termination happened abruptly, then the City would be forced to remove foster children from their current placements, disrupting their lives at a sensitive and difficult time, and to find new homes for those children on short notice and during a time when the City is in a crisis because of the lack of available foster parents. The results would be devastating.

77.  Catholic Social Services continues to work with the families it has certified and to serve the children in their care. It is aware of at least eleven vacancies with foster families who are willing and able to take in additional children. However, due to the City's unlawful suspension, Catholic Social Services is unable to place children with those families. Mrs. Paul is one of these parents who stands ready and willing to care for more children, and she is unable to do so because of the City's current policy. Her home is currently empty. And other foster parents, like Ms. Fulton and Ms. Simms-Busch, fear they will be deprived of the ability to continue fostering children in the future. If the contract is terminated or not renewed on

June 30, then the children currently in placement may be removed from their homes.

78.   Catholic Social Services remains willing and able to continue its ministry serving children in Philadelphia. It wants to help alleviate the foster care crisis in Philadelphia, and it has not and will not prevent any qualified family from becoming a foster parent, be it through Catholic Social Services or a referral to another agency.  But because of the City's actions, Catholic Social Services is unable to place foster children with families. Its 100-year-old ministry to at-risk children is in jeopardy.

## CLAIMS

### Count I
### Violation of Religious Freedom Protection Act
### 71 Pa. Stat. Ann. § 2404

79.   Plaintiffs incorporate by reference all preceding paragraphs.

80.   Defendants are an "agency" within the meaning of 71 Pa. Stat. Ann. §§ 2403-04.

81.   Defendants' actions have substantially burdened Plaintiffs' religious exercise.

82.   Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

83.   Plaintiffs will provide Defendants with notice of the substantial burden forthwith. A full 30-day delay is not feasible because the exercise of government

authority in the form of further adverse action in its contract with the City, as well as the unlawful use of subpoena power against the Plaintiffs, is imminent. On May 7, in letters which were mailed and thus were not received by Plaintiffs until later that week, Defendants threatened adverse contract actions against Plaintiffs, including immediate termination for convenience, and threatened Plaintiffs with unlawful and unjustified subpoenas in 10 days. Defendants' threats of imminent unlawful action make formal notice 30 days in advance impracticable.

84.   The City has constructive notice of this action due to the Plaintiffs' public statements and the religious freedom arguments asserted in their letter to the Commission on April 18, 2018.

85.   Absent injunctive and declaratory relief against defendants, Plaintiffs are and will continue to be irreparably harmed.

## Count II

### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise Clause
### Not Neutral

86.   Plaintiffs incorporate by reference all preceding paragraphs.

87.   "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

88.   By suspending their contract with Plaintiffs, Defendants have targeted their religious beliefs and practices.

25

89.   The public statements of Defendants' and their officials demonstrate that hostility toward Plaintiffs and their religious beliefs was a motivation for Defendants' actions.

90.   Defendants' laws and policies have not been evenly enforced, demonstrating that the current attempt at enforcement is designed to target particular religious beliefs and practices.

91.   Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

92.   Absent injunctive and declaratory relief against Defendants, Plaintiffs are and will continue to be irreparably harmed.

**Count III**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Not Generally Applicable**

93.   Plaintiffs incorporate by reference all preceding paragraphs.

94.   "[L]aws burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542.

95.   Defendants' laws and policies have not been evenly enforced, demonstrating that the current attempt at enforcement is designed to target particular religious beliefs and practices.

96.   Defendants have never enforced their laws, policies, and contract provisions in the manner they are currently being enforced against Plaintiffs.

26

97.   The public statements of Defendants and their officials demonstrate that hostility toward Plaintiffs and their religious beliefs was a motivation for Defendants' actions.

98.   Defendants concede that they can and have made exceptions to their policies in some instances.

99.   Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

100. Absent injunctive and declaratory relief against Defendants, Plaintiffs are and will continue to be irreparably harmed.

**Count IV**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**System of Individualized Assessments**

101. Plaintiffs incorporate by reference all preceding paragraphs.

102. A law that burdens religious exercise "must satisfy strict scrutiny if it permits individualized, discretionary exemptions because such a regime creates the opportunity for a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).

103. Defendants' Resolution, calling for an investigation, demonstrates that the City is engaging in an individualized assessment of Plaintiffs' actions and the applicability of the law and of any exceptions.

27

104. The Human Relation Commission's specific inquiry into Plaintiffs' practices constitutes an individualized assessment of their practices and the application of the law.

105. The City admits that it can make exceptions to its policies in some circumstances, but it is unwilling to extend an exception to allow Catholic Social Services "freedom to express" its religious beliefs in this circumstance.

106. State law permits individualized exemptions from foster care agency requirements.

107. The contract suspension and subsequent refusal to lift that suspension are the product of a system of individualized exemptions and burden Plaintiffs' religious exercise.

108. Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

109. Absent injunctive and declaratory relief against Defendants, Plaintiffs are and will continue to be irreparably harmed.

**Count V**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**
**Compelled Speech**

110. Plaintiffs incorporate by reference all preceding paragraphs.

111. Defendants are seeking to compel Plaintiffs to make affirmative statements that contradict Plaintiffs' religious beliefs.

28

112. The City is conditioning contracts with the City, and the ongoing ability to engage in the religious exercise of helping children in need, on Plaintiffs' willingness to make such statements.

113. Such compulsion amounts to compelled speech in violation of the Free Speech Clause of the First Amendment to the United States Constitution.

114. Absent injunctive and declaratory relief against Defendants, Plaintiffs are and will continue to be irreparably harmed.

**Count VI**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Speech Clause**
**Retaliation for Protected Speech**

115. Plaintiffs incorporate by reference all preceding paragraphs.

116. Statements made by and on behalf of Plaintiffs about their religious beliefs and practices are protected speech.

117. Defendants' contract suspension and inquiry, and their threats of contract termination and subpoena power, would be sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights.

118. A causal link exists between Plaintiffs' protected speech and Defendants' adverse actions against Plaintiffs.

119. Such actions are retaliation for protected speech in violation of the First Amendment to the United States Constitution.

120. Absent injunctive and declaratory relief against defendants, Plaintiffs are and will continue to be irreparably harmed.

**Count VII**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise and Establishment Clauses**
**Denominational Preference and Discrimination**

121. Plaintiffs incorporate by reference all preceding paragraphs.

122. The Free Exercise and Establishment Clauses prohibit government from officially preferring one denomination over another or discriminating against a religious group for its religious beliefs and practices.

123. Defendants are applying their laws in a manner which penalizes Catholic Social Services for its religious beliefs. Defendants' actions also alienate, communicate disapproval to, and impose concrete harms on foster families such as Ms. Fulton, Mrs. Paul, and Ms. Simms-Busch, who share the Catholic religious beliefs of Catholic Social Services.

124. Defendants have not penalized other religious groups for their religious beliefs.

125. Defendants' preference for some religious beliefs and practices and discrimination against Plaintiffs' beliefs and practices violates the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution.

126. Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

127. Absent injunctive and declaratory relief against Defendants, Plaintiffs have been and will continue to be irreparably harmed.

## Count VIII
### 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment to the U.S. Constitution
### Equal Protection

128. Plaintiffs incorporate by reference all preceding paragraphs.

129. The Equal Protection Clause prohibits discrimination on the basis of religion.

130. Defendants' unlawful contract suspension and investigation penalizes Plaintiffs because of their religious beliefs.

131. Contractors that espouse religious beliefs contrary to those espoused by Plaintiffs are allowed to maintain recognized status.

21. Defendants' preference for one set of religious beliefs and against Plaintiffs' religious beliefs violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

132. Absent injunctive and declaratory relief, Plaintiffs have been and will continue to be irreparably harmed.

## Count IX
### Violation of the Pennsylvania Constitution Article I, § 3
### Religious Freedom

133. Plaintiffs incorporate by reference all preceding paragraphs.

134. Pennsylvania's Constitution states that Defendants may not, "in any case whatever, control or interfere with the rights of conscience," and that "no preference

shall ever be given by law to any religious establishments or modes of worship." Pa. Const. art. I, § 3.

135. Defendants' attempt to compel Plaintiffs to act contrary to their religious beliefs and teachings, and to prevent them from acting consistently with their religious beliefs, is an unlawful attempt to control or interfere with their right of conscience.

136. Defendants' decision to penalize Plaintiffs for their religious beliefs and practices constitutes a substantial burden on Plaintiffs' religious exercise; it places substantial pressure on Plaintiffs to modify their behavior and violate their religious beliefs.

137. Defendants' decision to penalize Plaintiffs, but not other religious groups which contract with the City, constitutes a preference given by law to a mode of worship.

138. Absent injunctive and declaratory relief against Defendants, Plaintiffs have been and will continue to be irreparably harmed.

### Count X
### Violation of the Pennsylvania Constitution Article I, § 7
### Freedom of Press and Speech

139. Plaintiffs incorporate by reference all preceding paragraphs.

140. The Pennsylvania Constitution guarantees that "every citizen may freely speak, write and print on any subject." Pa. Const. art. I, § 7.

141. Defendants have penalized Plaintiffs for speaking, writing, and printing their beliefs regarding marriage.

142. Defendants are conditioning contracts with the City on whether Plaintiffs make statements acceptable to the City.

143. Defendants' actions constitute retaliation against Plaintiffs for their protected speech.

144. Such penalties and compulsion violate Article I, Section 7 of the Pennsylvania Constitution.

145. Defendants have no compelling interest in penalizing Plaintiffs' speech, and their actions are not narrowly tailored to achieve their goals.

146. Absent injunctive and declaratory relief against Defendants, Plaintiffs are and will continue to be irreparably harmed.

**Count XI**
**Violation of the Pennsylvania Constitution Article I, § 26**
**Discrimination by the Commonwealth and its political subdivisions**

147. Plaintiffs incorporate by reference all preceding paragraphs.

148. Pennsylvania's Constitution states: "Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right." Pa. Const. art. I, § 26.

149. This provision is intended to protect Pennsylvania citizens from being harassed or punished for the exercise of their constitutional rights.

150. Defendants are a political subdivision of the Commonwealth for purposes of this section.

151. Defendants' unlawful actions have denied to Plaintiffs the enjoyment of their civil right to religious freedom, and punished and discriminated against them in the exercise of their civil right of religious freedom.

152. Section 26 prohibits discrimination on the basis of religion.

153. Defendants' unlawful contract suspension and investigation penalizes Plaintiffs because of their religious beliefs.

154. Contractors that espouse religious beliefs contrary to those espoused by Plaintiffs are allowed to maintain recognized status.

155. Defendants' preference for one set of religious beliefs and against Plaintiffs' religious beliefs violates Article I, Section 26 of the Pennsylvania Constitution.

156. Absent injunctive and declaratory relief, Plaintiffs have been and will continue to be irreparably harmed.

### Count XII
### Violation of the Philadelphia Charter Article X, § 10-111
### Discrimination by the City

157. Plaintiffs incorporate by reference all preceding paragraphs.

158. The Philadelphia Charter states that "no department, board or commission of the City shall in the exercise of his or its powers and the performance of his or its duties or in the granting of the use of City property discriminate against any person because of race, color, religion or national origin…."

159. Defendants are departments, boards, or commissions of the City.

160. Defendants have discriminated against Plaintiffs in the performance of Defendants' duties due to Plaintiffs' religion.

34

161. Absent injunctive and declaratory relief against Defendants, Plaintiffs have been and will continue to be irreparably harmed.

## Count XIII
## Breach of Contract

162. Plaintiffs incorporate by reference all preceding paragraphs.

163. Effective June 27, 2017, Plaintiffs entered into a renewed contract with the City to provide foster care services.

164. Under the contract, Defendants were obligated to, among other things, fill openings in existing foster homes, place children in foster homes with their siblings where possible, refer children seeking foster homes to Plaintiffs, and compensate Plaintiffs on a per diem basis for the foster placements they oversee.

165. Defendants breached this contract in at least the following ways: (1) Defendants refused to place new referrals with Plaintiffs in violation of the contract; (2) Defendants suspended performance of the contract without following the appropriate termination process outlined in Article 14.1 of the contract; (3) Defendants prevented full performance of the Contract by ordering third parties not to provide referrals to Plaintiffs; (4) Defendants prevented full performance of the Contract by refusing to make referrals to Catholic Social Services; (5) Defendants failed to fill existing vacancies in the homes of foster families working with Catholic Social Services.

166. Plaintiffs have suffered, and will continue to suffer, damages as a direct result of Defendants' breach.

167. Plaintiffs are entitled to an injunction and declaratory relief, as well as damages due to Defendants' breach.

## Count XIV
## Equitable Estoppel

168. Plaintiffs incorporate by reference all preceding paragraphs.

169. Defendants have long been aware of Catholic Social Services' religious beliefs concerning marriage.

170. Defendants, through their actions, representations, and silence, induced Plaintiffs to believe that Defendants would continue to (1) respect Plaintiffs' sincere religious beliefs, (2) provide an appropriate accommodation to Plaintiffs pursuant to Phila. Code § 17-1904 to continue their vital work, (3) continue to refer children to Catholic Social Services for foster placement on a regular basis, as Defendants have done for many years, and (4) continue to partner with Plaintiffs to provide foster care services.

171. Plaintiffs justifiably relied on Defendants' long-time practices of making referrals to Catholic Social Services and of providing an accommodation that would allow Plaintiffs to continue partnering with the City. That reliance is demonstrated by Catholic Social Services' actions in hiring staff to work on the services provided under the Contract; budgeting based upon projections and historical actions by the City under the Contract; and taking other actions showing detrimental reliance by Plaintiffs. It is also demonstrated by Mrs. Paul, Ms. Fulton, and Ms. Simms-Busch making important life decisions about their family with the expectation that they would be able to continue relying on Catholic Social Services.

172. Defendants are equitably estopped from taking a position contrary to their prior representations on which Plaintiffs relied. Accordingly, Plaintiffs are entitled to injunctive and declaratory relief to that effect.

**Count XV**
**42 U.S.C. § 1983**
**Violation of the First and Fourteenth Amendments of the U.S. Constitution**
**Free Exercise and Due Process Clauses: Parental Association**

173. Plaintiffs incorporate by reference all preceding paragraphs.

176. The liberty protected by the Due Process Clause includes the right of parents to establish a home and bring up children. This liberty interest extends to foster parents. The Supreme Court has recognized both a parental and free exercise interest in being able to raise children consistent with religious beliefs. *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972) ("[T]he values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society.").

177. Ms. Simms-Busch specifically chose to work with Catholic Social Services because this foster agency shares her religious beliefs and would make it possible for her to raise foster children consistent with her own religious values. By preventing Ms. Simms-Busch from working with Catholic Social Services, Defendants are infringing on her liberty interests to have a family consistent with her religious beliefs.

178. Mrs. Paul wants to foster more children, and she has worked with CSS for the past 46 years. Mrs. Paul also chose to work with Catholic Social Services so that she could raise her foster children consistent with her own religious values. By

preventing Mrs. Paul from working with Catholic Social Services for her next foster child, Defendants are preventing Mrs. Paul from fostering children at all, infringing her liberty interests to have a family relationship protected by the Constitution.

179. Similarly, Ms. Fulton is currently caring for two foster children. If the City terminates its contract with Catholic Social Services, or refuses to renew the contract in June, the two foster children Ms. Fulton is caring for will be immediately transferred away from Ms. Fulton. By preventing Ms. Fulton from working with Catholic Social Services to continue caring for her current foster children, Defendants are infringing on her liberty interests to have a family relationship protected by the Constitution.

180. Plaintiffs wish to associate with their chosen religious foster agency, Catholic Social Services, in order to pursue foster parenthood as protected by the Constitution.

181. Absent injunctive and declaratory relief, Plaintiffs have been and will continue to be irreparably harmed.

### Count XVI
### 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment of the U.S. Constitution
### Due Process Clause: Sibling Association

182. Plaintiffs incorporate by reference all preceding paragraphs.

183. The Fourteenth Amendment recognized the liberty interest siblings have in protecting their relationships with each other. That liberty interests extends to the foster and adoption context.

184. Ms. Simms-Busch is fostering two young children who are biological siblings. Ms. Simms-Busch would be very open to fostering and adopting a biological sibling of her children if that child needs to enter the foster care system.

185. Defendants' actions impede and may entirely prevent Ms. Simms-Busch from fostering and adopting a child and uniting biological siblings in her home, violating those siblings and Ms. Simms-Busch's constitutional rights under the 14th Amendment.

186. Absent injunctive and declaratory relief, Ms. Simms-Busch, and her children, have been and will continue to be irreparably harmed.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a. Declare that the Religious Freedom Protection Act; First and Fourteenth Amendments to the United States Constitution; Article I, Sections 3, 7, and 26 of the Pennsylvania Constitution; and Article 10, Section 10-111 of the Philadelphia Charter, require Defendants to cease discriminating against Plaintiffs and to cease their ongoing investigation and unlawful contract suspension on the basis of Plaintiffs' religious beliefs, speech, and practices;

b. Declare that Defendants have breached their contract with Plaintiffs and should be equitably estopped from applying their contract terms in a manner that would penalize Plaintiffs for their religious belief, speech, and practices regarding marriage;

c. Order Defendants to resume and continue performance of the Contract;

d. Issue preliminary and permanent injunctions prohibiting Defendants from taking retaliatory action against Plaintiffs, including cancellation or non-renewal of the foster services contract, or from otherwise penalizing Plaintiffs for their religious belief, speech, and practices regarding marriage;

e. Award Plaintiffs nominal damages for the loss of their rights as protected by law;

f. Award Plaintiffs actual damages for the costs they have incurred and the contract revenues they have lost as a result of Defendants' unlawful actions;

g. Award Plaintiffs the costs of this action and reasonable attorney's fees; and

h. Award such other and further relief as the Court deems equitable and just.

Dated: May 16, 2018                    Respectfully submitted,


/s/ Nicholas M. Centrella
Nicholas M. Centrella
Conrad O'Brien PC
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-8098
Facsimile: (215) 864-0798
ncentrella@conradobrien.com

Mark Rienzi*
Lori Windham*
Stephanie Barclay*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

*Counsel for Proposed Intervenor*
*Admission pro hac vice pending*