## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHARONELL FULTON, CECELIA PAUL, TONI LYNN SIMMS-BUSCH, and CATHOLIC SOCIAL SERVICES, | |
| *Plaintiffs*, | Civil Action No. 18-2075 |
| v. | Assigned to the Honorable Judge Tucker |
| CITY OF PHILADELPHIA, DEPARTMENT OF HUMAN SERVICES FOR THE CITY OF PHILADELPHIA, and PHILADELPHIA COMMISSION ON HUMAN RELATIONS, | **Oral Argument Requested** |
| *Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS .......................................................................................2

PROCEDURAL HISTORY......................................................................................7

STATEMENT OF THE LAW...................................................................................9

ARGUMENT ........................................................................................................10

I.   Plaintiffs have a reasonable probability of prevailing on the merits ................................10

    A.   Plaintiffs are likely to prevail on their claim under the Pennsylvania Religious Freedom Act (RFPA) claims. ................................................10

        1.   Plaintiffs are engaged in religious exercise. ................................................11

        2.   That religious exercise is substantially burdened by the City's actions excluding Catholic Social Services from providing foster care services. .....................................12

        3.   Philadelphia does not have a compelling interest in its actions and has not used the least restrictive means available to further its interest ....................................15

    B.   Plaintiffs are likely to prevail on their Free Exercise and Establishment Clause Claims ................................................17

        1.   Defendants' acts of religious targeting are subject to strict scrutiny......................................17

        2.   Defendants' scheme of individualized and discretionary exemptions is subject to strict scrutiny.......................................22

        3.   Defendants are engaging in denominational preference and targeting ...............................24

        4.   Defendants' actions cannot pass strict scrutiny .......................................25

    C.   Plaintiffs are likely to prevail on their Free Speech claims. ................................................25

        1.   Defendants are retaliating against Plaintiffs based on their speech ................................................25

2.      Defendants are conditioning government contracts on
        compelled speech that falls outside the services it compensates
        Catholic Social Services for providing ......................................................28

II.  Plaintiffs will be irreparably harmed absent an injunction .................................30

III. An injunction is in the public interest ..................................................................32

IV. The balance of the equities favors Plaintiffs ........................................................32

CONCLUSION ............................................................................................................33

## INTRODUCTION

Philadelphia has an urgent need for more families to provide foster care. Yet despite facing an acute shortage of loving homes for thousands of vulnerable children in foster care, the City is inexplicably aggravating the shortage of homes by breaking the law to discriminate against one of its best foster care agencies and the families it serves. Serious, ongoing, and urgent harms have resulted, including: (1) preventing a special-needs child from being reunited with a loving foster family, and requiring that child to languish in temporary respite homes that are not meeting his needs; (2) denying at least 26 spots currently available in foster homes to children who desperately need a home; and (3) referring multiple other children to families that were not the preferred placement for that child. This discrimination is senseless, illegal, and wrong.

The City has created these harms because it disagrees with the longstanding religious beliefs of the Catholic Church and therefore wants to stop Catholic Social Services and its families from continuing to care for foster children. And because the City will not even agree to temporarily maintain the status quo—which had been in place for more than 50 years and under which the best interests of these children would have prevailed—a temporary restraining order and preliminary injunction are urgently needed.

Thankfully, state and federal civil rights laws—including the Pennsylvania Religious Freedom Protection Act and the federal Constitution—prohibit the City's needless and discriminatory conduct. The Plaintiffs are therefore likely to prevail on their claims, and immediate injunctive relief is necessary to remedy and prevent ongoing irreparable harm, safeguard the Plaintiffs' rights, and protect at-risk children and the public interest.

For the reasons set forth herein, this Court should provide immediate relief under a temporary restraining order to permit a child to be reunited with his former foster family and ensure that other

children can receive the placements that are in their best interests. This Court should also enter a preliminary injunction requiring the City to continue referrals to Catholic Social Services and to operate under the existing contract terms during the pendency of this lawsuit. This is necessary to protect the status quo and provide needed relief to families experiencing daily harm as a result of the City's discriminatory actions.

## STATEMENT OF FACTS

The City of Philadelphia is facing a crisis because of the acute shortage of qualified families available to care for the thousands of vulnerable children who have been removed from abusive or neglectful homes and placed in foster care. Ex. 1, ¶ 2. In March of this year, the City sent out an "urgent" call that 300 additional families are needed for fostering. The City relies on private foster agencies to help fill this shortage.

Catholic Social Services exists to help fill this need. For over 100 years, the Archdiocese of Philadelphia has worked to provide loving foster homes for needy children in the City of Philadelphia (the City). Ex. 2, ¶ 3. This continues today through the work of Catholic Social Services, a non-profit religious corporation under the auspices of the Archdiocese. As a Catholic organization, CSS exercises its faith and carries out this mission through foster work. *Id*. ¶ 3. This is an integral, fundamental, and central part of Catholic Social Services' religious exercise. *Id.* ¶ 5.

On an average day, Catholic Social Services serves more than 120 children in foster care, and it supervises around 100 different foster homes. Through its contract with the City, Catholic Social Services placed these children in loving foster homes and provides ongoing support to these families—many of whom have worked exclusively with CSS for decades. *See, e.g.*, Ex. 4, ¶ 2; Ex. 5, ¶ 2. There are 28 state-licensed agencies who partner with the City to provide foster services. Of the select agencies in the City who obtained additional competitive contracts to serve foster

children and families, the City ranked CSS as the second highest of all agencies. Catholic Social Services has provided foster services consistent with its religious beliefs, without complaint, as long as it has been operating. In all this time, the City has never suspended referrals to Catholic Social Services as long as CSS had homes available. Ex. 1, ¶ 4.

Foster care services involve placing children with foster families who have already undergone extensive interviews and home studies by social workers at the agency. After these interviews, home studies, and evaluations, an agency may provide a written certification endorsing a specific foster family to care for foster children, including thorough analysis and a written endorsement of any relationships of foster parents.

State law does not prohibit foster agencies from declining to perform a home study, nor from referring families to another licensed agency to perform a home study. And in fact, foster care agencies have referred families to other agencies regularly for a number of secular reasons including 1) geographic constraints, such as proximity of an agency to the child's biological home or current school,[1] 2) the expertise of an agency for particular medical needs, 3) the expertise of an agency to address particular behavioral issues,[2] 4) agencies focused on finding foster placements for pregnant youth,[3] and 5) the expertise of an agency focused on homes under the

---

[1] Ex. 1, ¶ 7; Ex. 1, Attach. T (*Quarterly Indicators Report*, City of Philadelphia Department of Human Services (May 11, 2018)) (emphasizing the importance of geographic proximity for foster care placements).

[2] Ex. 1, ¶ 7; Ex. 1, Attach. Q (*Therapeutic Foster Care*, Pennsylvania Mentor, https://www.pa-mentor.com/who-we-serve/children-and-families/therapeutic-foster-care/ (last visited June 4, 2018)) (explaining that "[w]e carefully screen our Mentors [foster parents]" in order to provide "personalized supports" for "intellectual and developmental disabilities or emotional and behavioral challenges").

[3] Ex. 1, ¶ 7; Ex. 1 Attach. P (*Mother/Baby Host Home*, Pennsylvania Mentor, https://www.pa-mentor.com/who-we-serve/children-and-families/motherbaby-host-home/ (last visited June 4, 2018)).

City's "kin care" program.[4] Some agencies also specialize in finding families who want to foster LGBT youth, including an agency located in the Philadelphia suburbs.[5] Other agencies specialize in placing Native American children with families of Native American lineage,[6] and Native American foster agencies are generally required to place Native American children only with family members or other tribal members.[7]

Because of its religious mission, Catholic Social Services would also refer a family to one of over two dozen nearby agencies if providing a written certification for that family would violate CSS's religious beliefs. In fact, four such agencies are located within two miles of its downtown office.

---

[4] Ex. 1 ¶ 7.

[5] Ex. 1, ¶ 7; Ex. 1 Attach. L (*Project Discovery by Crossroads*, Crossroads Programs (2016), http://crossroadsprograms.org/wp-content/uploads/2016/07/Project-Discovery-Brochure.pdf); *see also* Ex. 1, Attach. M (*Crossroads Programs Inc: LGBTQ Focused Services*, MightyCause, https://www.mightycause.com/organization/Crossroads-Programs (last visited June 4, 2018)) ("Project Discovery [offers placements in] *specialized* Foster Homes for self-identified lesbian, gay, bisexual, transgender, and/or questioning (LGBTQ) youth. [It] provid[es] them with the support and sensitivity necessary to address [their] *unique* needs.") (emphasis added).

[6] Ex. 1, ¶ 7; Ex. 1, Attach. S (Council of Three Rivers American Indian Center's "Rainbow Adoptions" Program. *See Welcome to Rainbow Adoptions*, Council of Three Rivers Am. Indian Ctr., http://www.cotraic.org/adopt.html (last visited June 4, 2018)) ("Rainbow serves . . . Native American Families.").

[7] Pursuant to the Indian Child Welfare Act of 1978 ("ICWA"), Pub. L. No. 95–608, 92 Stat. 3069 (codified as amended in scattered sections of 25 U.S.C.), the Commonwealth of Pennsylvania has implemented policies that facilitate the placement of Native American children in foster homes that are licensed by their respective tribes, and with adoptive families that share their tribal affiliation. Pa. Dep't of Pub. Welfare, Office of Children, Youth, & Families Bull. No. 3130-09-01, Implementation of the Indian Child Welfare Act of 1978, at 6 (2009). For instance, the official handbook used to train direct service workers, supervisors, and administrators who provide adoption and foster care services in Pennsylvania instructs foster care and adoption placement agencies to "make active efforts" to ensure that placements of such children "follow ICWA preferences." Ex. 1, Attach. R, Pa. Child Welfare Training Program, *Pennsylvania Indian Child Welfare Handbook*, Univ. of Pitt. Sch. of Soc. Work, 18 (2006), http://www.pacwrc.pitt.edu/ICWA/Indian%20Child%20Welfare%20Handbook.pdf.

In March of this year, in response to a newspaper article discussing Catholic Social Services' religious beliefs,[8] the City abruptly cut off foster care referrals to CSS, and has threatened to make it impossible for the agency to continue providing these services as of June 30, 2018. Catholic Social Services currently provides foster care services under a contract with the City, which it has done for more than 50 years. Ex. 1, ¶ 3. The City is the only source of foster care referrals in Philadelphia, so any Philadelphia-area foster agency who does not receive referrals from this source cannot place new foster children with families and will quickly lose the ability to serve any foster children at all. Ex. 1, ¶ 17. The City's actions have resulted in a significant harm to families and vulnerable children, and even more harm will result unless this Court provides immediate relief.

For example, currently the City is preventing a young special-needs foster child, referred to as Doe Foster Child #1, from being placed with a former foster mother who wants to adopt this child. This child's background and urgent situation is detailed in the Doe Foster Mother #1 Declaration, Exhibit 3. Doe Foster Child #1 was removed from a different home due to an emergency situation, but DHS refused to allow him to be reunited with his former foster mother who is ready to adopt him. Even though no other permanent homes are available for Doe Foster Child #1, he is being bumped from one temporary respite home to another, and he is not receiving necessary care and treatment related to his special needs. *Id*. Under normal circumstances, Doe Foster Child #1 would have been placed with his former foster mother almost immediately after he was removed from the other home due to an emergency, and no court order or court determination would have been necessary. *Id*. ¶ 15; *see also* Ex. 1 ¶ 15; Pennsylvania Rules of Juvenile Court Procedure (Pa.R.J.C.P. No. 1606). But because Doe Foster Mother #1 is certified through Catholic Social

---

[8] Ex. 1, Attach. W.

Services, and because of DHS's dispute with CSS, DHS denied the placement. Ex. 1, ¶ 15; Ex. 3, ¶ 15; Ex. 1, Attach. H. In yet another case, a court order has already been necessary to place a child with her former foster mother—a mother working with Catholic Social Services. Ex. 1, ¶ 15. Catholic Social Services is aware of multiple additional children who have been referred elsewhere when CSS families should have been the preferred placement for those children. *Id.* ¶ 16.

The City's actions are also denying homes to children during a foster home shortage. Currently, Catholic Social Services has 26 available spots for foster children in need of a home, and this number will increase to about 35 spots by the end of June. Ex. 1, ¶ 13. Additionally, about a dozen foster homes currently sit completely empty because Catholic Social Services cannot receive any referrals. *Id.* The number of these families, like Mrs. Paul, *see* Ex. 5, who are willing and anxious to care for foster children and cannot do so because of the City's actions, will increase to about 20 by the end of June. *Id.* This number is expected to accelerate quickly if the City's actions continue, as Catholic Social Services would receive an average of 9 referrals from the City every month in the ordinary course. *Id.*

If the City makes it impossible to continue providing these services on June 30, then many current placements will also be in jeopardy. *Id.* ¶ 14. Children who are already at a vulnerable point in their lives stand to have those lives disrupted again, since their foster parents are certified and supported by Catholic Social Services and cannot automatically receive foster placements and support from another agency. *Id.* This may leave Ms. Fulton (and other parents like her) unable to continue caring for the children currently in her home, since they have serious medical needs and she relies upon Catholic Social Services for help and support. Ex. 4, ¶¶ 5, 7. For Ms. Simms-Busch, it would jeopardize her ability to take on more foster children, or adopt, in the future. Ex. 6, ¶ 5. For many children whose names we don't know, it would mean months or years of their already-

troubled childhoods spent someplace other than with an available and state-approved family ready to give them love and security.

If the City continues refusing to refer children to Catholic Social Services, or if the City fulfills its threat to permanently exclude Catholic Social Services on June 30th, CSS will likely have to close its foster program and immediately lay off the staff involved in this program. Ex. 1, ¶ 17. All foster care for Philadelphia children must be provided pursuant to a contract with the City, so if Catholic Social Services is unable to enter into a new contract with the City of Philadelphia on June 30, CSS will no longer be able to serve these children, and will have to close its program. *Id*. Even if the City did not immediately terminate CSS's contract on June 30, by refusing to provide additional referrals the City is progressively choking off CSS's foster program, and CSS will have likely have to begin laying off staff starting next month. Relying on its contract with the City, Catholic Social Services has hired 15 staff members dedicated exclusively to its foster services program and has budgeted and raised funds designed to supplement the City's funding for foster care. *Id*. Were Catholic Social Services forced to close this program, CSS would also lose the network of foster families it has recruited and carefully cultivated over the years. *Id*. Restarting this program later from scratch would be incredibly difficult, and likely impossible. *Id*.

## PROCEDURAL HISTORY

The City abruptly terminated foster care referrals to Catholic Social Services on March 15, the same day the Philadelphia City Council passed a resolution alleging that some foster services providers "have policies that prohibit the placement of children with LGBTQ people based on religious principles" and calling for an investigation.[9] Ex. 1, ¶¶ 8, 9. No such complaint had been

---

[9] Ex. 1, Attach. B.

made against Catholic Social Services, and the agency has not received any such complaint in its history. Id. ¶¶ 9, 10.

The following day, the Commission on Human Relations (Commission) sent a letter to Catholic Social Services, to which the agency later responded. *Id*. ¶ 11. On March 27, the Operations Director at the City's Department of Human Services (DHS), sent an email to other foster agencies in Philadelphia forbidding them from referring any additional foster intakes to Catholic Social Services. Ex. 1, Attach. E.

In its response letter, Catholic Social Services explained that the City's actions constituted unlawful discrimination and requested that the City resume referring foster children to CSS per their contract. Ex. 1, Attach. D. On May 7, the Commission and the City's Law Department responded, defending the City's actions and stating that CSS would face subpoenas and further adverse actions under the contract in 10 days. Ex. 1, Attach. F & G. The Law Department stated that the City was under no obligation to resume referrals to Catholic Social Services, but that it believes CSS is obligated to provide home studies to same-sex couples, and that "any further contracts with CSS will be explicit in this regard." Ex. 1, Attach. F. The letter then indicated that the City would not renew Catholic Social Services' contract after its expiration on June 30th unless CSS agreed to engage in the City's preferred form of speech and provide home studies and support services to same-sex couples. *Id.*

Faced with unlawful exclusion from providing foster care services, Catholic Social Services filed a complaint in this Court on May 16, 2018, to protect its right to operate and to continue serving needy children. As a result, the City stated it was suspending its investigation, but it has refused to resume foster care referrals to Catholic Social Services. On June 1, Catholic Social Services notified the City of the urgent situation discussed in the Doe Foster Mother #1 Declaration

and asked the City to resume referrals and to continue allowing CSS to provide foster care while this lawsuit proceeds. It stated that it would seek a temporary restraining order and preliminary injunctive relief if the City refused. The City would not agree to take these actions. The Plaintiffs now seek a temporary restraining order and preliminary injunctive relief.

## STATEMENT OF THE LAW

Emergency and preliminary injunctive relief is necessary here to stop ongoing, irreparable harm and preserve the status quo. "[T]he underlying *purpose* of a preliminary injunction is to ensure that the parties do not change the underlying facts of a case in an 'irreparably harmful' way before a court has the opportunity to decide a case on the merits." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 586 (E.D. Pa. 2017) (emphasis in original). Thus, "many courts have observed that the purpose of the preliminary injunction is this preservation of the status quo." *Id.*; *see Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994) ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered."). "Status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

To obtain a preliminary injunction, a plaintiff must show "a reasonable probability of eventual success in the litigation," "that [the plaintiff] will be irreparably injured . . . if relief is not granted," and the court must weigh "the possibility of harm to other interested persons . . . [and] the public interest." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919-20 (3d Cir. 1974)). "[T]he strength of the plaintiff's showing with respect to one [factor] may affect what will suffice with respect to another." *Marxe v. Jackson*, 833 F.2d 1121, 1128 (3d Cir. 1987).

Where there is significant imminent harm at stake, such as in this case, an even lesser showing is required for a claim on the merits. *See Reilly*, 858 F.3d at 179.

"If there is a possibility that irreparable injury will occur before the hearing on a preliminary injunction required by Rule 65(a) can be held, a temporary restraining order may be available under Rule 65(b)." *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 588 (W.D. Pa. 2009). "Courts within this Circuit have noted the similarities between a TRO and a preliminary injunction, and have applied the same standards in determining their application." *Harper v. Corizon*, No. CIV.A. 14-639, 2015 WL 158798, at *3 (E.D. Pa. Jan. 12, 2015).

## ARGUMENT

### I.   Plaintiffs have a reasonable probability of prevailing on the merits.

The Plaintiffs can demonstrate a reasonable probability of prevailing on their claims. For purposes of this motion, the Plaintiffs seek preliminary injunctive relief on their claims under the Pennsylvania Religious Freedom Act, the Free Exercise Clause, the Establishment Clause, and the Free Speech Clause. For all the reasons stated below, Plaintiffs are likely to prevail upon those claims, and immediate relief is needed to preserve the status quo and ensure that Plaintiffs can continue to exercise their constitutional rights to live out their faith by serving children in need while this case proceeds.

### A.   Plaintiffs are likely to prevail on their claim under the Pennsylvania Religious Freedom Act (RFPA) claims.

The Pennsylvania Religious Freedom Protection Act (RFPA), was enacted to ensure that "neither State nor local government should substantially burden the free exercise of religion without compelling justification." 71 Pa. Stat. Ann. § 2402. The statute states that "an agency shall not substantially burden a person's free exercise of religion, including any burden which results from a rule of general applicability." 71 Pa. Stat. Ann. § 2404. This application to laws of general

applicability means that RFPA provides more protection for religious exercise than the federal Free Exercise Clause. *See Holt v. Hobbs*, 135 S. Ct. 853, 859-60 (2015) (making this point under parallel federal statute). Defendants are agencies within the meaning of the statute, which applies to a "political subdivision, municipal authority or any other local government instrumentality authorized by law." 71 Pa. Stat. Ann. § 2403. Defendants' actions, which are taken under color of law, are governed by RFPA. *See id.* For all the reasons stated below, Plaintiffs are likely to prevail on their RFPA claim.

### 1. Plaintiffs are engaged in religious exercise.

Both the individual plaintiffs and Catholic Social Services are engaged in religious exercise within the meaning of RFPA. Caring for foster children in a manner consistent with Catholic teaching is a fundamental religious exercise for Plaintiffs. Ex. 2, ¶ 5. Through this work, Catholic Social Services fulfills the Biblical obligation to care for those in need. *Id.* ("*See* James 1:27: 'Religion that is pure and undefiled before God, the Father, is this: to visit orphans and widows in their affliction, and to keep oneself unstained from the world.'"). Under RFPA, courts have recognized that "Acts of charity are central to Christian worship." *Chosen 300 Ministries, Inc. v. City of Phila.*, No. CIV.A. 12-3159, 2012 WL 3235317, at \*17 (E.D. Pa. Aug. 9, 2012). Catholic Social Services strives to provide foster care services in a manner consistent with Catholic religious teaching, and has done so for decades. Ex 2. ¶¶ 9, 10; Ex. 1, ¶ 4. Caring for children in need, including specifically the provision of foster care services, is integral to Plaintiffs' religious exercise. Ex. 2, ¶¶ 7, 8, 9. Its long history of engaging in the care of foster and other at-risk children, its dedication to providing these services and going over and above to provide support, and its practice of subsidizing this work from its own resources when City payments do not cover the expense are evidence of its dedication and religious commitment to this work. This Catholic faith

11

and teaching are not incidental to this work; they provide the motivation, inspiration, and framework for it. Ex. 2, ¶ 5.

The individual plaintiffs also engage in serving foster children as an exercise of their faith. All three have given enormously of their time and resources to serve children in need. Ex. 4, ¶ 2; Ex. 5, ¶ 2; Ex. 6, ¶ 3. All three choose to work with Catholic Social Services because they share its religious beliefs. Ex. 4, ¶ 8; Ex. 5, ¶ 2; Ex. 6, ¶ 3. All this is more than sufficient to establish that Plaintiffs are engaged in religious exercise within the meaning of RFPA.

    **2.   That religious exercise is substantially burdened by the City's actions excluding Catholic Social Services from providing foster care services.**

The City's actions, both ongoing and threatened, substantially burden Plaintiffs' religious exercise. RFPA defines a substantial burden as a government action

> which does any of the following: (1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs. (2) Significantly curtails a person's ability to express adherence to the person's religious faith. (3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion. (4) Compels conduct or expression which violates a specific tenet of a person's religious faith.

71 Pa. Stat. Ann. § 2403. Although Plaintiffs need only establish one, all four types of burden are present here.

The City's actions "[s]ignificantly constrain[] or inhibit[] conduct or expression mandated by [Catholic Social Services'] religious beliefs" and "[d]en[y] [CSS] a reasonable opportunity to engage in activities which are fundamental to the [agency's] religion" because they force Catholic Social Services to choose between its religious beliefs about marriage and its religious exercise of serving vulnerable children.

The Supreme Court has long held that both "indirect" penalties and "outright prohibitions" can be a substantial burden on religious exercise. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017). An example of an "indirect" burden is *Sherbert v. Verner*, in which

a state denied unemployment compensation to a Seventh-day Adventist who declined to accept work on her Sabbath. 374 U.S. 398, 399-401 (1963). The Supreme Court held that this imposed a substantial burden on her religious exercise because it forced her "to choose" between either "abandoning one of the precepts of her religion" or else "forfeiting benefits." *Id.* at 403-04.

The Supreme Court arrived at the same conclusion when interpreting a federal statute that mirrors Pennsylvania's RFPA.[10] In *Holt v. Hobbs*, a prison required a Muslim prisoner to either shave the beard he grew for religious reasons or else face disciplinary action. 135 S. Ct. 853, 862 (2015). The Supreme Court unanimously held that "put[ting] [the prisoner] to this choice" "easily satisfied" the substantial burden test. *Id*. at 862-63.

If the City excludes Catholic Social Services from foster care, that will render CSS's religious exercise of providing foster care to Philadelphia children impossible. In a similar situation, this court noted that a city regulation "does not simply constrain plaintiffs'" charitable activity, "it terminates that activity all together." *Chosen 300 Ministries,* 2012 WL 3235317, at *18. "There can be no doubt that a regulation that completely prohibits an activity by definition 'significantly constrains or inhibits' that activity. Thus, [the regulation] is a substantial burden on plaintiffs' free exercise of religion." *Id.* Here, Philadelphia's actions would not just constrain Catholic Social Services' ability to serve foster children in Philadelphia, but terminate that activity all together. Catholic Social Services cannot provide foster care at all to vulnerable children in Philadelphia if the City fulfills its threat.

---

[10] *Brown v. City of Pittsburgh*, 586 F.3d 263, 287–88 (3d Cir. 2009) (citing federal constitutional and statutory precedent when discussing RFPA and noting that "the purpose of RFPA was to restore, under the auspices of state law, the free exercise jurisprudence that held sway under *Sherbert v. Verner*, 374 U.S. 398 (1963)").

The City's actions likewise "significantly curtail[]" Catholic Social Services' "ability to express adherence" to its faith and attempt to "[c]ompel[] conduct or expression which violates a specific tenet of [Catholic Social Services'] religious faith." The City is currently preventing foster care referrals to CSS unless it stops "expressing adherence" to its faith by changing the way it handles home studies, and seeks to "[c]ompel[] conduct or expression" by requiring written certifications contrary to Catholic Social Services' religious beliefs. The City has also threatened to make future contracts impossible. The City has stated that the Contract must be carried out "in a manner that is consistent with our conception of equality,"[11] that prospective LGBT foster parents may not be referred to another agency, and that "any further contracts with CSS will be explicit in this regard." Ex. 1, Attach. F (letter from Law Department). This action puts Catholic Social Services to an untenable choice: either it violates its faith by ceasing foster care services, or it violates its faith by engaging in conduct and expression contrary to Catholic teaching. *See* Ex. 2 ¶ 10. This constitutes a substantial burden on its religious exercise under any of the four statutory standards.

The City is also burdening the religious exercise of the individual foster parents. Each of them depends upon Catholic Social Services to provide the assistance they need to continue their religious exercise of fostering children in need. If Catholic Social Services were to lose its ability to contract, they would be left without critical support. Ex. 4, ¶ 7; Ex. 5, ¶ 2; Ex. 6, ¶ 5. They would also be inhibited, perhaps entirely prevented, in their practice of affiliating with an agency whose religious beliefs they share for the purpose of shared religious exercise. *Id.* Losing the support

---

[11] Catholic Social Services has argued and will continue to argue that the written certifications and home studies provided to prospective foster families are not "services" as that term is defined in the Contract. However, the City has taken the position that such actions are "services" and that failure to perform such services for same-sex couples will be considered breach. *See, generally,* Ex. 1, Attach. G.

which allows them to serve as foster parents, and to serve children with serious needs, would "[s]ignificantly constrain[] or inhibit[]" their ability to serve as foster mothers, which is "conduct or expression mandated by [their] sincerely held religious beliefs." 71 Pa. Stat. Ann. § 2403. The City's current action already "[d]enies [Mrs. Paul] a reasonable opportunity to engage in activities which are fundamental to [her] religion"—she is currently unable to care for foster children, something she has done as a religious exercise for 46 years. For all these reasons, the City's actions are imposing a substantial burden on Plaintiffs' religious exercise, and that burden will become not only substantial, but entire, on June 30.

### 3. Philadelphia does not have a compelling interest in its actions and has not used the least restrictive means available to further its interest.

Finally, the City cannot justify its actions under strict scrutiny. Where a substantial burden on religious exercise exists, the burden shifts to the agency to prove its actions are justified because they are "[i]n furtherance of a compelling interest of the agency" and those actions are "[t]he least restrictive means of furthering the compelling interest." 71 Pa. Stat. Ann. § 2404.

A compelling interest is an interest "of the highest order," of the type that would justify the most serious government infringements upon constitutional rights. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). Here, the City has no compelling interest in its actions: no complaint has ever been lodged against Catholic Social Services, and no same-sex couple has ever approached Catholic Social Services seeking written certifications to become foster parents. Ex. 1, ¶ 6, 8.

Furthermore, the City cannot have a compelling interest in actions that violate both state law and the City's duty to act in the best interest of children in its care. Pennsylvania's Children in Foster Care Act states that foster children have the right to be provided with the "ability to live in the least restrictive, most family-like setting that is safe, healthy and comfortable and meets the

child's needs." 11 Pa. Stat. Ann. § 2633(4). Government agencies, such as DHS, are also required to cooperate "with other providers" to "ensure the appropriateness . . . of referrals." 55 Pa. Code § 3130.31. Yet right now, the City is contravening this policy by (1) needlessly preventing children such as Doe Foster Child #1 from being moved from a temporary respite home to the only available a pre-adoptive home, (2) denying 26 available homes to foster children, simply because those homes are certified and supported by Catholic Social Services, and (3) referring multiple other children to families that were not the preferred placement for that child. The City can have no compelling interest in inflicting this type of harm on children contrary to State law.

The City has never, in at least 50 years under this contract, sought to construe the contract to require Catholic Social Services to affirmatively commit in advance to violate its religious beliefs as a condition of partnering with the City. Ex. 1, ¶ 4. In fact, foster agencies are not even obligated to provide home studies to the general public under the terms of the contract, and agencies regularly refer families to other agencies for a host of reasons. Ex. 1, ¶ 7. And the Commonwealth, which licenses Catholic Social Services, neither places this requirement upon them nor asks them to choose between one form of religious exercise and another. *Id.* Where the City is inventing a new obligation it has not enforced for decades, that it does not enforce in other secular referral contexts, and where the Commonwealth has no such requirement, the City cannot come close to demonstrating a compelling interest.

Moreover, aside from having no compelling interest, the City has not employed the least restrictive means of accomplishing its interest. Pennsylvania courts scrutinize the least restrictive means portion of the statute carefully, recognizing that plaintiffs have a "clear right to the least intrusive means" to satisfy a government interest, and requiring exploration on the feasibility of various alternatives. *Yoder v. Sugar Grove Area Sewer Auth.*, No. 1956 C.D. 2015, 2016 WL

3127351, at *8 (Pa. Commw. Ct. June 3, 2016). First, the City's chosen means—stopping referrals even to *existing* foster families—does not further its alleged diversity interest, nor any interest at all. There is no congruence between what happens with future home studies and foster placements to existing families based upon past home studies. This action would fail even rational basis scrutiny.

Second, Catholic Social Services has identified a workable less restrictive alternative: permitting it to make referrals to other agencies, thus maximizing both the number of foster parents available and the number of foster children receiving homes. This alternative would permit Catholic Social Services to serve foster children and would allow the individual foster mothers to receive new foster children into their homes. Indeed, the absence of even a single complaint against Catholic Social Services underscores the ongoing effectiveness of the existing range of agencies at meeting the needs of all prospective foster parents.

## B. Plaintiffs are likely to prevail on their Free Exercise and Establishment Clause Claims.

### 1. Defendants' acts of religious targeting are subject to strict scrutiny.

The Plaintiffs are also likely to prevail on their Free Exercise Claims (Counts II, III, IV, VII) because the City's actions violate the Free Exercise Clause on three independent grounds: (1) the City is explicitly targeting Catholic Social Services for adverse government action purely based on its religious beliefs, (2) the City is selectively enforcing its ability to suspend referrals of foster children, and (3) the City allows some agencies to refer families elsewhere for secular reasons but not for religious reasons.[12]

---

[12] The religious targeting and lack of neutrality here would be subject to strict scrutiny even if the burden on religious exercise were deemed insubstantial. "The rare cases which address acts or laws which target religious activity have never limited liability to instances where a 'substantial burden' was proved by the plaintiff. . . . Applying such a burden test to non-neutral government

17

*Explicit Targeting*. The Supreme Court has made clear that if "impermissible hostility toward the sincere religious beliefs" is the motivation for government "objection" to religious conduct, then that government action is *per se* unconstitutional and is not even subject to strict scrutiny. *Masterpiece Cakeshop Ltd. v. Colo. Civil Rights Comm'n*, No. 16-111, slip op. 12, 584 U.S. ___ (June 4, 2018). In the recently decided *Masterpiece* case, the Court noted that the government body had "disparage[d] [the baker's] religion in at least two distinct ways: by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere." *Id.* at 13-14.

In an opinion joined by seven Justices, the Court held that "[t]his sentiment is inappropriate for a Commission charged with the solemn responsibility of fair and neutral enforcement of . . . anti-discrimination law—a law that protects discrimination on the basis of religion as well as sexual orientation." *Id.* at 14. Further, the Court noted that government "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices. The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Id.* at 17 (citation omitted). As a result, the Court struck down the government action without even subjecting it to strict scrutiny balancing of the government's interest. *See also Lukumi*, 508 U.S. at 533 (unanimously striking down an ordinance where the government targeted religious conduct "on its face" and thus violated the "minimum requirement of neutrality"); *Trinity Lutheran Church*, 137 S. Ct. at 2021 (penalizing "conduct because it is religiously motivated," as well as "discriminat[ing] against 'some or all religious beliefs'").

---

actions would make petty harassment of religious institutions and exercise immune from the protection of the First Amendment." *Brown v. Borough of Mahaffey, Pa.*, 35 F.3d 846, 849-50 (3d Cir. 1994).

Frequently, religious discrimination comes in sheep's clothing, and sham motivations must be carefully revealed as such. "But this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). Here, as in *Masterpiece*, the City has been explicit that its actions are motivated based on disagreement with Catholic Social Services' religious beliefs regarding marriage. The philosophic nature of this religious disagreement is highlighted by the fact that no same-sex couples have been denied the ability to become foster parents because of Catholic Social Services, no same-sex couples have filed complaints against Catholic Social Services regarding its provision of services, and no same-sex couple has even requested these services.

Despite the complete absence of any complaint, on March 15, 2018, the City announced that it was suspending new placements of foster children through Catholic Social Services. That same day, the City Council formally adopted a resolution authorizing "the Committee on Public Health and Human Services to investigate the Department of Human Services' policies on contracting with social services agencies that either discriminate against prospective LGBTQ foster parents or allow non-LGBTQ foster parents to discriminate." The resolution claims that preventing religious agencies from acting in accordance with their beliefs is necessary "to protect [Philadelphia's] people from discrimination that occurs under the guise of religious freedom." Ex. 1, Attach. B at 1. A local news agency also quoted the Mayor saying, "we cannot use taxpayer dollars to fund organizations that discriminate against people because of their sexual orientation or because of their same-sex marriage status. . . . It's just not right."[13] The City also sent a letter explicitly comparing CSS's religious beliefs to racist discrimination. Ex. 1, Attach. F at 1. The City Council resolution and subsequent City communications thus on their face target Catholic Social Services

---

[13] Ex. 1, Attach. U; Tom MacDonald, *Philly halts foster placements with 2 faith-based agencies shutting out LGBT couples*, WHYY, Mar. 16, 2018, https://whyy.org/articles/philly-halts-foster-placements-2-faith-based-agencies-shutting-lgbt-couples/.

based upon its religious exercise.

Comments by the Mayor also confirm this discriminatory targeting of Catholic Social Services. Local media has chronicled Mayor Kenney's public statements criticizing the Archdiocese and Archbishop.[14] For example, the Mayor has previously tweeted that the archdiocese's religious beliefs about marriage are "not Christian." And the City explained that it "initiated [its] investigation [of Catholic Social Services] at the request of the *Mayor*." Ex. 1, Attach. G (emphasis added). This unabashed religious discrimination mirrors the "disparage[ment] of religion" that the Supreme Court found impermissible in *Masterpiece*.

**Non-neutrality and the Allowance of Secular Referrals**. The Supreme Court and the Third Circuit have repeatedly affirmed that Government may not provide exemptions for secular reasons but refuse similar exemptions for religious reasons. *Masterpiece Cakeshop Ltd.*, slip op. at 6. This is based on the Free Exercise Clause's protection of "religious observers against unequal treatment." *Lukumi*, 508 U.S. at 542 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148 (1987)).

For example, in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999), the Third Circuit considered a free-exercise challenge to a police department's grooming policy. The policy exempted beards grown for medical reasons, but not for religious reasons. Writing for the Third Circuit, then-Judge Alito held that the policy was not generally applicable, because the exemption for medical reasons involved "a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome [the government's] general interest in uniformity but that religious motivations are not." *Id.* at 366. And "when the government makes a value judgment in favor of secular motivations, but not

---

[14] *See, e.g.*, Ex. 1, Attach. J, K.

religious motivations, the government's actions must survive heightened scrutiny." *Id.*

Here, the City has made a "value judgment in favor of secular motivations" by permitting referrals of families for a variety of secular reasons, including proximity, expertise in caring for medical needs, expertise in addressing behavioral needs, ability to find foster placements for pregnant youth, expertise working in a "kin care" program, and other specialties or areas of focus. Ex. 1, ¶ 7. But it is refusing to extend any comparable exemption for actions based upon religious motivations. When the government "actually creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection," the decision "is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under *Smith* and *Lukumi*." *Fraternal Order*, 170 F.3d at 365.

The Government is also prohibited from selectively enforcing laws or legal instruments in a way that burdens conduct for religious reasons but not secular reasons. In *Masterpiece*, for example, the Supreme Court held that it was impermissible for the government to decline to enforce anti-discrimination laws against three secular bakers who objected to baked goods denigrating homosexuality, while choosing to enforce the same law against a baker who objected to provide a cake celebrating a same-sex wedding. *Masterpiece*, slip op. at 8-9. The Court noted that such a double standard provides "[a]nother indication of hostility" forbidden by the Free Exercise Clause. *Id.* at 14.

Similarly, in *Tenafly Eruv Association, Inc. v. Borough of Tenafly*, the Third Circuit considered a city ordinance that banned the placement of any materials on public utility poles. 309 F.3d 144 (3d Cir. 2002). It was undisputed that this ordinance was neutral and generally applicable on its face. But in practice, the city had not enforced the ordinance absent a complaint. The city had done nothing to prohibit common directional signs, lost animal signs, or holiday decorations. But

reacting to "vehement objections" from local residents, the city prohibited lechis placed by Orthodox Jews. The Third Circuit held that the government's "invocation of the often dormant Ordinance" against religious items triggered strict scrutiny. *Id.* at 153, 168.

Likewise, in this case the City claims that the contract prohibits a foster agency from referring a family "for any other reason." Ex. 1, Attach. A at 2. But (aside from the fact that this is not actually a contract requirement), as discussed above, the City does not enforce any such requirement to prevent referrals for a host of secular reasons—much less enforce it using the draconian measures it used here. As in *Masterpiece* and *Tenafly*, this arbitrary enforcement aimed at disfavored religious belief is subject to strict scrutiny.

### 2. Defendants' scheme of individualized and discretionary exemptions is subject to strict scrutiny.

Both Supreme Court and Third Circuit precedent have made clear that when a law gives the government discretion to grant case-by-case exemptions based on "the reasons for the relevant conduct," strict scrutiny is required. *Lukumi*, 508 U.S. at 537 (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 884 (1990)); *see also Sherbert v. Verner*, 374 U.S. 398 (1963). In *Blackhawk v. Pennsylvania*, government officials enforced a wildlife permitting fee requirement against Blackhawk, a Lakota tribal member who kept wildlife for religious reasons, even though the law permitted exemptions from the fee when an exemption would be "consistent with sound game or wildlife management." 381 F.3d. 202, 204-05, 210 (3d Cir. 2004). Officials refused Blackhawk's request for an exemption based on his religious beliefs, and they threatened to penalize him if he did not give up his wildlife or pay a large permitting fee. *Id.* at 205. Then-Judge Alito wrote on behalf of the Third Circuit and concluded that "the waiver mechanism . . . create[d] a regime of individualized, discretionary exemptions that triggers strict scrutiny." *Id.* at 210.

22

Other Circuits have followed this same approach. In *Ward v. Polite*, the Sixth Circuit struck down a rule that permitted "ad hoc" exemptions from a no-referral policy. 667 F.3d 727, 739-40 (6th Cir. 2012). And in *Axson-Flynn v. Johnson*, the Tenth Circuit ruled against a university policy that allowed "ad hoc" exemptions from the university's curricular requirements. 356 F.3d 1277, 1298-99 (10th Cir. 2004). In each of these cases, the problem was that the law was "sufficiently open-ended" that it allowed the government to grant exemptions based on an "individualized governmental assessment of the reasons for the relevant conduct." *Blackhawk*, 381 F.3d at 207, 209-210 (quoting *Smith*, 494 U.S. at 884).

The same is true in this case. By the City's own admission, the very contract provisions on which the City relies would allow the City to grant Catholic Social Services an exemption from any requirements regarding a denial of service in the City's "sole discretion." Ex. 1, Attach. F at 2.[15] However, the City stated that it "has no intention of granting an exception" to Catholic Social Services based on its religious beliefs. *Id.* This is true even though the City permits exceptions for proximity, expertise in medical needs, expertise in behavioral needs, specialization in kin care, and other specialties or unique agency focuses. Ex. 1, ¶ 7. State law also permits discretionary exemptions from foster care licensing requirements, so long as the exception "[d]oes not jeopardize receipt of Federal monies." 55 Pa. Code § 3700.5. Where such schemes exist, strict scrutiny is warranted "because such a regime creates the opportunity for a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously

---

[15] The full contract provision is as follows: "Provider shall not reject a child or family for Services based upon the location or condition of the family's residence, their environmental or social condition, *or for any other reason* if the profiles of such child or family are consistent with Provider's Scope of Services or DHS's applicable standards as listed in the Provider Agreement, unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." Ex. 1, Attach. A at 55.

motivated conduct." *Blackhawk*, 381 F.3d at 209 (citing *Lukumi*, 508 U.S. at 537; *Smith*, 494 U.S. at 884; *Fraternal Order*, 170 F.3d at 364–65). Just as in *Blackhawk*, the City's scheme allowing completely discretionary individualized exemptions and refusal to provide a religious exemption must be subjected to strict scrutiny.

### 3. Defendants are engaging in denominational preference and targeting.

The City is also engaging in religious preferences and targeting in violation of both Religion Clauses. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The Free Exercise Clause likewise requires strict scrutiny "if the object of a law is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. Here, the City's actions demonstrate a preference for some religious groups over Catholic Social Services, as well as an intent to restrict Catholic Social Services' practices because of their religious motivation. City Council Resolution 180252 states that "[a]t least two of these providers have policies that prohibit the placement of children with LGBTQ people based on religious principles," a clear reference to Catholic Social Services and what the City believes its religious beliefs and practices to be. Ex. 1, Attach. B. Only two religious foster care agencies have been subject to a suspension of referrals by the City, even though a number of other religious groups operate foster care agencies. *Id*. ¶ 9. These facts demonstrate a preference for some religious groups and beliefs over others, as well as an intent to target Catholic Social Services' religious practices.

The City's mayor has also publicly criticized the Archdiocese and the Archbishop, including in a number of Twitter tirades. *See supra* n.13. The Supreme Court is currently considering whether a politician's pre-election statements regarding a particular religious group are evidence of an Establishment Clause violation if the politician later takes official action which disproportionately impacts that group. The City has taken the position that such statements are evidence of

unconstitutionality. *See* Brief of *Amici Curiae* Philadelphia, et al., *Trump, et al. v. State of Hawaii, et al.,* No. 17-965, at 17-20. The City's actions demonstrate an intent to target Catholic Social Services based upon disagreement with its religious beliefs, in violation of the Religion Clauses.

The City did not stop there. By stopping referrals to Catholic Social Services—even referrals to existing foster families—the City is penalizing Doe Foster Mother #1, Ms. Fulton, Mrs. Paul, and Ms. Simms-Busch for their religious affiliation with CSS and publicly denigrating beliefs that they share. It is refusing to place children with them solely because of their affiliation with a religious agency, sending the message that they are outsiders in the community. It is creating additional obstacles for Doe Foster Mother #1 to be reunited with her former foster son that would not exist but for the City's disapproval of CSS's religious beliefs. And it is doing so without justification—referrals to *existing* foster parents are not implicated by the City's interests in ensuring participation by LGBT couples who wish to complete homes studies. Therefore, its actions penalizing the foster parents are overinclusive in violation of *Lukumi*: "they proscribe more religious conduct than is necessary to achieve their stated ends." 508 U.S. at 538. In such cases, "a law which visits 'gratuitous restrictions' on religious conduct . . . seeks not to effectuate the stated governmental interests, but to suppress the conduct because of its religious motivation." *Id.* For all these reasons, the City's actions must face strict scrutiny.

### 4. Defendants' actions cannot pass strict scrutiny.

For the same reasons discussed above, Defendants' actions cannot pass strict scrutiny.

## C. Plaintiffs are likely to prevail on their Free Speech claims.

### 1. Defendants are retaliating against Plaintiffs based on their speech.

The City's stoppage of foster care referrals and its threat to exclude CSS from foster care work is retaliation for Catholic Social Services' protected speech and religious exercise, and thus violates the First Amendment. "To prevail on a retaliation claim, a plaintiff must prove "(1) that

he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010) (upholding preliminary injunction). As a contractor, Catholic Social Services is treated as "akin to a government employee" addressing matters of "public concern." *Luongo v. Pennsylvania State Police*, 156 F. Supp. 3d 599, 610 (E.D. Pa. 2016) (citing *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 673 (1996) (additional citation omitted)).

Catholic Social Services easily meets this test. First, its protected speech and religious exercise were obviously about a matter of public concern: foster care. "Speech implicates a matter of public concern if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community." *Miller v. Clinton Cty.*, 544 F.3d 542, 548 (3d Cir. 2008); *see also Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d 536, 559 (W.D. Pa. 2003). Indeed, that is presumably why the *Philadelphia Inquirer* article appeared in the first place.

Second, the City responded with retaliation, obviously designed to deter Catholic Social Services from its continued speech and religious exercise. *Miller*, 598 F.3d at 152 (retaliation is government action "sufficient to deter a person of ordinary firmness from exercising his constitutional rights") (citation omitted). The City called for a formal investigation of Catholic Social Services, threatened subpoenas for the agency, and for the first time in memory, stopped all foster care referrals to Catholic Social Services. *See supra.* And finally, the City threatened to put Catholic Social Services to the untenable choice of engaging in the government's preferred form of speech or forgoing religious exercise. The City also explicitly communicated to social workers that it was refusing to place a special needs child with his former foster mother working with Catholic Social Services because "CSS is going through a case right now and DHS is not approving

him to come back here." Doe Foster Mother #1 Decl. at ¶ 13. The City's actions would be sufficient to deter an ordinary person from exercising her rights—deterrence was the point.

Third, the City admits that its adverse actions were motivated by Catholic Social Services' protected activity. For example, the Commission's March 16th letter specifically referenced the earlier *Philadelphia Inquirer* article (highlighting Catholic Social Services' religious beliefs) as the impetus for the agency's actions ("Based on the information provided in the [March 13, 2018 *Philadelphia Inquirer*] article, it appears that CSS may be in violation of Article XIV, Section 14.1.").[16] And the City was explicit in its letter that both Catholic Social Services' speech and its refusal to speak were the reason for the suspension of referrals and threat to make future foster care work by Catholic Social Services impossible: it stated that the cessation of referrals was warranted because "you have clearly reaffirmed that CSS intends" to provide foster care consistent with its religious beliefs. Ex. 1, Attach. F at 2.

Catholic Social Services' protected activity is thus the reason that the City suspended further foster care referrals to CSS without cause and in violation of its own contract,[17] coerced fellow foster agencies to stop referring children to Catholic Social Services,[18] threatened not to renew Catholic Social Services' contract,[19] passed a City Council resolution aimed at investigating faith-based agencies like Catholic Social Services purely because of their religious beliefs about marriage,[20] and threatened to subpoena Catholic Social Services even though no complaint had been filed against it.[21] Even when presented with a child with special needs who should be placed

---

[16] Ex. 1, Attach. C at 2.
[17] Ex. 1, Attach. A.
[18] Ex. 1, Attach. E.
[19] Ex. 1, Attach. F.
[20] Ex. 1, Attach. B.
[21] Ex. 1, Attach. G.

27

with a loving adoptive parent, the City has explicitly refused to make the placement because Catholic Social Services has asserted its rights. Doe Foster Mother #1 Decl. ¶13.

In sum, the City has taken adverse action against Catholic Social Services because of its speech, religious exercise, and defense of its federal and state civil rights on a matter of public concern. That retaliation has severe, ongoing consequences for real human beings. And it is forbidden by the First Amendment.

### 2.   Defendants are conditioning government contracts on compelled speech that falls outside the services it compensates Catholic Social Services for providing.

Government cannot compel speech that falls outside the message it pays the organization to convey. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541-43 (2001). In *Velazquez*, grants of federal money were made available to subsidize legal representation of indigent clients. Funding restrictions prevented use of the funds to challenge the validity of welfare laws. The Supreme Court found the limitations unconstitutional because the "program was designed to facilitate private speech, not to promote a governmental message" to third parties. *Id.*, at 542. Therefore, it could not restrict the private speech of attorneys to and for their clients.

Similarly, in *Agency for International Development*, the Court was faced with a government program to combat HIV/AIDS which permitted funding only to organizations which "explicitly agree with the Government's policy to oppose prostitution and sex trafficking." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). The court struck down the requirement, holding that "[b]y demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects 'protected conduct outside the scope of the federally funded program.'" *Id.* at 218 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). Because the requirement was not limited to the activities funded, but compelled recipients "to pledge allegiance to the Government's policy," it could not

stand. *Id.* at 220.

In *Cradle of Liberty Council, Inc. v. City of Philadelphia*, this Court rejected the City's argument "that it is not required to subsidize private speech and that it may condition participation in its programs on compliance with its nondiscrimination policies." 851 F. Supp. 2d 936, 948 (E.D. Pa. 2012). There, the City sought to terminate a rent-free lease with the Boy Scouts due to the Scouts' position on same-sex relationships. The Scouts prevailed because "when a condition for receipt of a government benefit compromises a First Amendment right, it must be reasonable and viewpoint neutral," and the jury reasonably determined that the City's conditions on the Scouts' speech and association were not. *Id.*

Here, the City seeks to compel unpaid-for speech from Catholic Social Services in at least two ways. First, as a pre-condition to partnering with the City, Catholic Social Services would have to adopt a policy to promising in advance to provide certifications and endorsements of same-sex couples, even though no same-sex couple has ever requested this service. This is precisely the sort of "pledge allegiance to the Government's policy" that the First Amendment prohibits. *Agency for Int'l Dev.*, 570 U.S. at 220. Second, to add insult to injury, the service such a policy would require is that Catholic Social Services provide the City with written certifications and endorsements that themselves conflict with CSS's religious beliefs. Notably, the City does not provide any compensation to Catholic Social Services when it performs this function. Under the contract, Catholic Social Services is compensated only on a *per diem* basis for children who are placed in foster care—it receives no payment for conducting a home study.

Catholic Social Services has no desire to stand in the way of same-sex couples who come to it seeking foster care certifications. Rather, if CSS were ever unable to perform an in-depth home assessment and make a report and written certification to the State for any reason, including

consistency with the religious beliefs and mission of Catholic Social Services, it would refer the potential foster parent(s) to one of the 26 nearby agencies who might better serve their needs. Ex. 2, ¶ 9. Furthermore, it is difficult to believe that couples actually want to have their evaluations performed by an organization with religious objections, which is presumably why no couple has ever complained about Catholic Social Services in the provision of home studies, and no same-sex couple has even asked CSS to provide a home study for them.

The City's actions would prohibit Catholic Social Services from stepping aside and instead force them to speak and "to adopt [the] particular belief," in a written certification to the State, inconsistent with their religious beliefs about marriage, and outside of the services the City actually pays for. *Agency for Int'l Dev*, 570 U.S. at 218. This would clearly contravene "the individual's right to speak his own mind" and instead allow "public authorities to compel him to utter what is not in his mind." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). Laws "that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those "that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). For the same reasons the City cannot satisfy strict scrutiny under Plaintiffs' RFPA and free exercise claims, it cannot withstand strict scrutiny required under the compelled speech doctrine. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429-30 (2006) (whether strict scrutiny is triggered by the Free Speech Clause or RFRA, "the consequences are the same"). Therefore, Catholic Social Services is likely to prevail on its compelled speech claim.

## II.  Plaintiffs will be irreparably harmed absent an injunction.

The City's decision to discriminate against CSS constitutes a paradigmatic irreparable harm, as it is well settled that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord*

*McTernan v. City of York*, 577 F.3d 521, 528 (3d Cir. 2009) ("The District Court acknowledged that loss of First Amendment freedom for any period of time can be considered irreparable harm[.]").

The City's actions are also currently causing irreparable harm to needy children and foster parents across Philadelphia. By allowing homes to sit empty, the City is depriving children of loving homes and preventing foster parents from living out their religious commitment to serve those most in need. Instead, due to the City's actions, children such as Doe Foster Child #1 are caught in limbo with unsuitable respite homes, other children may end up languishing in "institutional placements [that] harm them academically, emotionally, and sometimes physically,"[22] and still other children will have their placements disrupted if the City fulfills its threatened actions. Even a temporary disruption such as the one experienced by Doe Foster Child #1 has had, and will continue to have, a lasting impact on these children that cannot simply be remedied by a monetary judgement or final order once this controversy is resolved.

In addition, without this Court's intervention, the City has threatened to exclude Catholic Social Services from providing foster care on June 30th, and currently it has no plan in place to keep foster children placed with Catholic Social Services in their current homes. Not only will this place many foster children—such as the children of Ms. Fulton who have challenging medical conditions—in institutional limbo and devastate their loving foster parents, it will likely also require Catholic Social Services to permanently close its foster care referral and support service, leaving close to a dozen CSS employees looking for new jobs. These harms too will be immediate

---

[22] Ex. 1, Attachment V; Testimony of Maura McInerney, Esq. before the City of Philadelphia Committee on Children & Youth, *Education Interrupted: How We Are Failing Our Children in Residential Placements* (May 17, 2018), https://www.elc-pa.org/wp-content/uploads/2018/05/ELC-Testimony-Before-City-Council-Re-Residential-Placements-May-17-2018.pdf.

and irreparable. What is more, once Catholic Social Services shuts down and lays off its employees, it will lose its connections to foster families, its institutional knowledge and experience, and its ability to place foster children in loving homes.

The immediate and severe nature of these harms—and, in particular, the very real impact the City's policy is already having on Doe Foster Child #1 and untold other foster children—easily satisfies the TRO standard. *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994) (granting a TRO requires "a clear showing of immediate irreparable injury").

## III. An injunction is in the public interest.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012); *see also Ramsey v. City of Pittsburgh*, 764 F. Supp. 2d 728, 735 (W.D. Pa. 2011) ("[C]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."). And as established by Pennsylvania law, there is a significant interest in ensuring that children receive foster care placements that are in their best interests. *See, e.g.*, 11 Pa. Stat. Ann. § 2633(4). Here, the public interest is best served by ensuring that empty foster homes are filled and that needy children are placed with loving foster parents. This, by definition, serves the public interest while also protecting CSS's constitutional rights.

## IV. The balance of the equities favors Plaintiffs.

In considering whether equitable factors favor granting a preliminary injunction, this Court looks to "the potential injury to the plaintiffs without this injunction versus the potential injury to the defendant with it in place." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017). Here, the balance of these equities overwhelmingly favors Catholic Social Services. As explained above, Catholic Social Services—along with potentially dozens of foster parents and an untold

number of children—will be harmed if this Court does not act to prevent the City from cutting off referrals under the current contract. This harm is serious, immediate, and irreparable.

The City, on the other hand, cannot point to anything but a theoretical harm. First, not a single a complaint has been filed against Catholic Social Services by a same-sex couple seeking to foster a child. As discussed above, no same-sex couple has ever even requested this from Catholic Social Services. Second, even if a couple had been referred by Catholic Social Services to one of twenty-six different agencies, that couple will no more be blocked from fostering children than any other family referred to other agencies for a host of secular reasons. Moreover, the City's actions extend far beyond the narrow issue of home studies and penalize current foster parents like Doe Foster Mother #1, Ms. Fulton, Mrs. Paul, and Ms. Simms-Busch, merely for choosing to affiliate with an agency who shares their religious beliefs.

In sum, the City's purely hypothetical harm cannot compare to the immediate and irreparable harm suffered by Catholic Social Services, the foster families it serves, and at-risk children in Philadelphia. There is no doubt that the equities favor immediate action in the form of a TRO and a preliminary injunction hearing.

## CONCLUSION

For all these reasons, the Plaintiffs' motion for a temporary restraining order and preliminary injunction should be GRANTED.


Dated: June 5, 2018                                      Respectfully submitted,


                                                         /s/ Nicholas M. Centrella
                                                         Nicholas M. Centrella
                                                         Conrad O'Brien PC
                                                         1500 Market Street, Suite 3900
                                                         Philadelphia, PA 19102-2100
                                                         Telephone: (215) 864-8098

Facsimile: (215) 864-0798
ncentrella@conradobrien.com

Mark Rienzi*
Lori Windham*
Stephanie Barclay*
Nicholas Reaves*
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

*Counsel for Plaintiffs*
*Admission pro hac vice pending*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of June, 2018, the foregoing document was filed pursuant

to the Court's electronic filing procedures using the Court's CM/ECF system.

/s/ Nicholas M. Centrella
Nicholas M. Centrella