# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHARONELL FULTON, CECELIA PAUL, TONI LYNN SIMMS-BUSCH, and CATHOLIC SOCIAL SERVICES,

*Plaintiffs,*

v.

CITY OF PHILADELPHIA, DEPARTMENT OF HUMAN SERVICES FOR THE CITY OF PHILADELPHIA, and PHILADELPHIA COMMISSION ON HUMAN RELATIONS,

*Defendants.*

Civil Action No. 18-cv-2075

Assigned to the Honorable Judge Tucker

## DECLARATION OF JAMES AMATO

1.      My name is James Amato. I am over the age of 21 years old and capable of making this declaration pursuant to 28 U.S.C. § 1746. I have not been convicted of a felony or been convicted of a crime of dishonesty. I have personal knowledge of all the contents of this declaration.

2.      The City of Philadelphia is facing a crisis because of the acute shortage of qualified families available to care for the thousands of vulnerable children who have been removed from abusive or neglectful homes and placed in foster care. The City relies on private foster agencies to help fill this shortage. In March of this year, the City sent out an "urgent" call that 300 additional families are needed for fostering.

3.     Catholic Social Services exists to help fill this need. For over 100 years, the Archdiocese of Philadelphia has worked to provide loving foster homes for needy children. This continues today through the work of Catholic Social Services (CSS), a non-profit religious corporation under the auspices of the Archdiocese. CSS has contracted with the City on an annual basis for over 50 years. On an average day, Catholic Social Services serves more than 120 children in foster care, and it supervises around 100 different foster homes.

4.     Through its contract with the City, CSS placed these children in loving foster homes—many of whom have worked exclusively with CSS for decades. CSS also provides ongoing support to its foster families. In all this time, the City has never suspended referrals to Catholic Social Services as long as CSS had homes available, nor has it sought to either construe the contract to require CSS to do home studies for same-sex couples or to enforce such a construction against Catholic Social Services. A true and correct copy of this contract is included as Attachment A.

5.     There are 28 state-licensed agencies who partner with the City to provide additional services to foster children. Of those agencies, eight obtained additional competitive contracts with the City to also serve as a Community Umbrella Agency (CUA), an entity that works to try to help at-risk children stay in their homes where such an option would be possible and safe for the child. If that option is not available, the CUA refers the child to be placed in foster care. Of the select agencies in the City who obtained additional competitive contracts to serve foster children and families, the City ranked CSS as the second highest of all agencies.

6. Foster care services involve placing children with foster families who have already undergone extensive interviews and home studies by social workers at the agency. The agency makes a determination whether a particular foster family would be an appropriate family to care for foster children. After these interviews, home studies, and evaluations, an agency may provide a written certification endorsing a specific foster family to care for foster children, including thorough analysis and a written endorsement of any relationships of the foster parents. No same-sex couple has ever requested CSS to provide such a written certification for foster care services.

7. State law does not prohibit foster agencies from declining to perform a home study, nor from referring families to another licensed agency to perform a home study. And in fact, foster care agencies have referred families to other agencies regularly for a number of secular reasons including 1) geographic constraints, such as proximity of an agency to the child's biological home or current school, 2) the expertise of an agency for particular medical needs, 3) the expertise of an agency to address particular behavioral issues, 4) agencies focused on finding foster placements for pregnant youth, and 5) the expertise of an agency focused on homes under the City's "kin care" program. Some agencies also specialize in finding families who want to foster LGBT youth, including an agency located in suburbs near Philadelphia. Other agencies specialize in placing Native American children with families of Native American lineage.

8.      Because of its religious mission, CSS would also refer a family to one of over two dozen nearby agencies if providing a written certification for that family would violate CSS's religious beliefs. In fact, four such agencies are located within two miles of CSS's downtown office. Catholic Social Services has provided foster services consistent with its religious beliefs, without complaint, as long as it has been operating.

9.      On March 15, in response to a newspaper article discussing Catholic Social Services' religious beliefs, the City abruptly cut off foster care referrals to CSS, and has threatened to make it impossible for CSS to continue contracting with the City to provide these services as of June 30, 2018. Only two religious foster care agencies have been subject to contract suspensions by the City, even though a number of other religious groups operate foster care agencies.

10.     Also on March 15, the Philadelphia City Council passed a resolution alleging that some foster service providers prohibit the placement of children with LGBTQ people based on religious principles and calling for an investigation. A true and correct copy of this resolution is included as Attachment B. Catholic Social Services has provided foster services consistent with its religious beliefs, without complaint, as long as it has been operating.

11.     On March 16, the Commission on Human Relations (Commission) sent a letter to Catholic Social Services, to which CSS later responded. A true and correct copy of the Commission's letter is included as Attachment C; a true and correct copy of Catholic Social Services' response is included as Attachment D. On March 27, the

Operations Director at the City's Department of Human Services (DHS), sent an email to other foster agencies in Philadelphia forbidding them from referring any additional foster intakes to Catholic Social Services. A true and correct copy of this email is included as Attachment E.

12.     On May 7, the Commission and the City's Law Department responded to Catholic Social Services' April 18th letter (Attachment D), defending the City's actions and stating that CSS would face subpoenas and further adverse actions under the contract in 10 days. True and correct copies of these letters are included as Attachments F and G, respectively.

13.     If the City persists in these actions, the consequences will be severe. Currently, CSS has about 26 available spots for foster children in need of a home, and this number is projected to increase to about 35 spots by the end of June 2018. Additionally, about a dozen foster homes currently sit completely empty because CSS cannot receive any referrals, and therefore cannot place any children with these loving parents.  The number of foster parents, like Mrs. Paul, who are willing and anxious to care for foster children but are unable to do so at all because of the City's actions, will increase to about 20 by the end of June. This number is expected to accelerate quickly if the City's actions continue, as CSS on average would receive about 9 additional referrals from the City every month prior to the current referral freeze.

14.     If the City makes renewal of the contract impossible on June 30, then many current placements will be in jeopardy. Children who are already at a

vulnerable point in their lives stand to have those lives disrupted again, since their foster parents are certified and supported by CSS and cannot automatically receive foster placements and support from another agency.

15.     The City's current actions are resulting in placements being made that are not in the best interest of children. A court has already had to order the City to place a child with the former foster mother of that child—a mother working with CSS. And right now, an urgent situation is ongoing where the City is refusing to place a special needs child, referred to as Doe Foster Child #1, with his former foster mother named Doe Foster Mother #1, even though no other permanent home for the child is currently available and the child is languishing in temporary respite homes. Included as Attachment H is a true and correct copy of the email a social worker at Catholic Social Services sent seeking to resolve this situation. My understanding is that under normal circumstances, Doe Foster Child #1 would have been placed with his former foster mother almost immediately after he was removed from the other home due to an emergency, and no court order or court determination would have been necessary since she was the only permanent home available. The CUA assigned to Doe Foster Child #1 has expressed the position that it would be in Doe Foster Child #1's best interest to return to Doe Foster Mother #1's care, as she is prepared to adopt Doe Foster Child #1. I am aware that the Child Advocate with the Philadelphia Defender Association assigned to Doe Foster Child #1's case has also expressed her opinion that the child should be returned to Doe Foster Mother #1's care. Yet DHS is still resisting

this outcome.  The reason DHS provided to Doe Foster Child #1's social worker for denying the placement was the City's current dispute with Catholic Social Services.

16.    I am aware of multiple additional children who have been referred elsewhere when CSS families should have been the preferred placement for those children as a result of the City's freeze on referrals to CSS.

17.    If the City continues refusing to refer children to CSS, or if the City fulfills its threat to permanently end CSS's foster care service to Philadelphia children on June 30th, CSS will probably have to close its foster program and immediately lay off the staff involved in this program. Relying on its contract with the City, CSS has hired 15 staff members dedicated exclusively to its foster services program and has budgeted and raised funds designed to supplement the City's funding for foster care. Were CSS forced to close this program, CSS would also lose the network of foster families it has carefully cultivated over the years. Restarting this program later from scratch would be incredibly difficult, and likely impossible.

 Even if a new contract were not signed by June 30th, however, CSS could continue operating under the current contract if referrals resume. It is commonplace for CSS to continue operating under an old contract in agreement with the City until a new contract could be drafted and signed.  True and accurate signature pages from prior contracts showing the date of ratification are included as Attachment I.

18.    Attachment J is a true and correct copy of an article entitled *Chaput edict draws mixed reviews; Kenney calls it 'not Christian'*, visited on June 4, 2018,

and available at http://www.philly.com/philly/news/20160707_Chaput_edict_draws_mixed_reviews__Kenney_calls_it__not_Christian_.html.

19.     Attachment K is a true and correct copy of an article entitled *Jim Kenney's Long War with the Archdiocese*, visited on June 4, 2018, and available at https://www.phillymag.com/citified/2015/07/09/jim-kenney-catholic-archdiocese-charles-chaput/#Ipkpzv0aRJyCyIrL.99.

20.     Attachment L is a true and correct copy of an article entitled *Project Discovery by Crossroads*, last visited on June 4, 2018, and available at http://crossroadsprograms.org/wp-content/uploads/2016/07/Project-Discovery-Brochure.pdf.

21.     Attachment M is a true and correct copy of an article titled *Crossroads Programs Inc: LGBTQ Focused Services*, last visited on June 4, 2018, and available at https://www.mightycause.com/organization/Crossroads-Programs.

22.     Attachment N is a true and correct copy of an article titled *Local Organization Seeks Foster Parents for LGBTQ Youth*, list visited on June 4, 2018, and available at https://www.phillymag.com/g-philly/2014/05/28/local-organization-seeks-foster-parents-lgbtq-youth/.

23.     Attachment O is a true and correct copy of an article titled *N.J. Youth Agency Looks to Match LGBT Adults, Teens*, last visited on June 4, 2018, and available at http://www.epgn.com/news/regional/7396-25314381-nj-youth-agency-looks-to-match-lgbt-adults-teens.

24.     Attachment P is a true and correct copy of a website titled *Mother/Baby Host Home*, last visited on June 4, 2018, and available at https://www.pa-mentor.com/who-we-serve/children-and-families/motherbaby-host-home/.

25.     Attachment Q is a true and correct copy of a website titled *Therapeutic Foster Care*, last visited on June 4, 2018, and available at https://www.pa-mentor.com/who-we-serve/children-and-families/therapeutic-foster-care/.

26.     Attachment R is a true and correct copy of a document titled *Pennsylvania Indian Child Welfare Handbook*, last visited on June 4, 2018, and available at http://www.pacwrc.pitt.edu/ICWA/Indian%20Child%20Welfare%20Handbook.pdf.

27.     Attachment S is a true and correct copy of a website titled *Welcome to Rainbow Adoptions*, last visited on June 4, 2018, and available at http://www.cotraic.org/adopt.html.

28.     Attachment T is a true and correct copy of a document titled *Quarterly Indicators Report*.

29.     Attachment U is a true and correct copy of an article titled *Philly halts foster placements with 2 faith-based agencies shutting out LGBT couples*, last visited on June 4, 2018, and available at https://whyy.org/articles/philly-halts-foster-placements-2-faith-based-agencies-shutting-lgbt-couples/.

30.     Attachment V is a true and correct copy of testimony entitled *Education Interrupted: How We Are Failing Our Children in Residential Placements*, last visited on June 4, 2018, and available at https://www.elc-pa.org/wp-

9

content/uploads/2018/05/ELC-Testimony-Before-City-Council-Re-Residential-Placements-May-17-2018.pdf.

31.     Attachment W is a true and correct copy of an article entitled *Two foster agencies in Philly won't place kids with LGBTQ people*, last visited on June 4, 2018, and available at http://www.philly.com/philly/news/foster-adoption-lgbtq-gay-same-sex-philly-bethany-archdiocese-20180313.html.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 4, 2018.

James Amato

# Attachment A

Contract Number      **16-20030-04**
Original Contract Number **16-20030**
**290 – Placement Services**

**City of Philadelphia**
**Department of Human Services**

# CONFORMED
# STANDARD AMENDMENT AGREEMENT

**THIS STANDARD AMENDMENT AGREEMENT** ("Amendment Agreement") is made as of September 20, 2017 and effective July 1, 2017 (the "Effective Date") by and between the City of Philadelphia ("the City"), by and through its **DEPARTMENT OF HUMAN SERVICES** ("Department"), and **CATHOLIC SOCIAL SERVICES** ("Provider"), a nonprofit corporation, with its principal place of business at **222 NORTH 17TH STREET, PHILADELPHIA, PENNSYLVANIA 19103**.

## BACKGROUND

The City and Provider entered into a certain Contract, Contract Number **16-20030**, dated **November 30, 2015**, which includes the City of Philadelphia Professional Services Contract General Provisions for the Department of Human Services (the "General Provisions"), the Provider Agreement, Cross Agency Response for Effective Services ("CARES") Limited License Agreement (when applicable), and any and all attachments, exhibits and documents thereto (collectively, the "Base Contract"), wherein Provider agreed to render various Services to the City in accordance therewith; and

The City and Provider entered into an amendment to the Base Contract, Contract Number **16-20030-01**, for the period **July 1, 2015** to **June 30, 2016**; and

The City and Provider entered into an amendment to the Base Contract, Contract Number **16-20030-02**, for the period **July 1, 2015** to **June 30, 2016**; and

The City and Provider entered into an amendment to the Base Contract, Contract Number **16-20030-03**, for the period **July 1, 2016** to **June 30, 2017**; and

Hereinafter, the Base Contract and all prior amendments, if any, shall be referred to as the "Base Contract as Amended;" and

It is necessary to INCREASE the amount of compensation payable under the Base Contract as Amended by **Nineteen Million, Four Hundred Thirty Thousand, Nine Hundred Ninety-One Dollars and Twenty-Three Cents ($19,430,991.23)**, in order for Provider to continue to render the Services and provide the Materials specified in the Base Contract as Amended and this Amendment Agreement; and

The City and Provider have agreed to amend certain terms and conditions of the Base Contract as Amended, as set forth herein; and

In consideration of the mutual obligations set forth herein, and each intending to be legally bound, the City and Provider covenant and agree as of the Effective Date as follows:

## ARTICLE I: AMENDMENTS TO THE CONTRACT

With the exception of the following amendments set forth in this Amendment Agreement, and subject to councilmanic appropriation of funds, the terms and conditions of the Provider Agreement "as amended" shall be and remain in full force and effect:

### 1.1 Incorporation of Background.

The Background is incorporated by reference herein.

### 1.2 Definitions.

Capitalized terms not otherwise defined herein shall have the meanings set forth in the Base Contract as Amended.

### 1.3 Term.

The term of the Base Contract as Amended is extended for an Additional Term commencing **JULY 1, 2017** and expiring **JUNE 30, 2018**.

### 1.4 Compensation.

As compensation for the Services and Materials being provided under this Contract, the City covenants and agrees to set the amount of compensation payable to Provider for the current contract term at **Nineteen Million, Four Hundred Thirty Thousand, Nine**

**Hundred Ninety-One Dollars and Twenty-Three Cents ($19,430,991.23)**.  Notwithstanding anything in the Contract to the contrary, in no event shall the amount certified by the Finance Department for Services and Materials under the Contract, including this Amendment Agreement, exceed **Forty-Three Million, One Hundred Seventy-Eight Thousand, Seven Dollars and Twenty-Three Cents ($43,178,007.23)**.

    **1.5**    **Services and Materials.**

        Section 2.1 of the Provider Agreement, is amended in accordance with the attachments listed below, which are attached to this Amendment Agreement and incorporated herein by reference.

    (a)    S.A.A.-1: **Service, Rate, Maximum Days/Units**

    (b)    S.A.A.-2: **Scope of Services**

        Section 2.1 of the Provider Agreement, is amended in accordance with the Exhibits listed below, which are available on the Provider Extranet and incorporated herein by reference.

    (c)    S.A.A.- 3 :**Community Umbrella Agency Practice Guidelines**

    (d)    S.A.A.- 4 :**Day Treatment Standards**

    (e)    S.A.A.- 5 :**Foster Family Care Standards**

    (f)    S.A.A.- 6 :**Group Home Standards**

    (g)    S.A.A.- 7 :**Institutional Care Standards**

    (h)    S.A.A.- 8 :**Re-Integration Standards**

    (i)    S.A.A.- 9 :**Specialized Behavioral Health Standards**

    (j)    S.A.A.- 10 :**Maternity Mother/Baby Standards**

    (k)    S.A.A.- 11 :**Medical Standards**

    (l)    S.A.A.- 12 :**Supervised Independent Living Standards**

    (m)    S.A.A.- 13 :**Streamlined Standards**

    (n)    S.A.A.- 14 :**CARES Limited License Agreement**

    (o)    S.A.A.- 15 :**Balanced and Restorative Justice Standards**

**1.6**     <u>Additional Provisions.</u>

Other provisions, including, without limitation, OEO participation commitments and any exceptions or modifications to the General Provisions of the Contract, are set forth in the following clause(s) and incorporated herein by reference:

(a)     DHS is increasing its administrative efficiency through the use of electronic record keeping and data sharing technology. As these updates occur, the Department will continue to notify providers of these technology requirement changes through written notices. Failure to comply with any DHS technology requirements (including, but not limited to the use of P-Web and P-DRIVE) may result in a financial penalty and/or a finding that an Event of Default has occurred.

**1.7**     <u>Acknowledgment of General Provisions.</u>

Provider specifically acknowledges that Provider has read and understands the terms and conditions contained in the General Provisions and acknowledges that by executing this Amendment Agreement, Provider shall be legally bound by all of the terms of this Contract, including, but not limited to, those set forth in the General Provisions. **The revised General Provisions are attached to this document and are explicitly accepted by the Provider.**

**1.8**     <u>Acknowledgment of Standards.</u>

Provider specifically acknowledges that Provider has read and understands the terms and conditions contained in the applicable above referenced Performance and Service Standards ("Standards") formerly known as Service Description and Contract Requirements, Service Description, Performance Standards, Service Standards, Procedural Manuals and/or Guides which are available on the Provider Extranet at (http://dhs.phila.gov/extranet/extrahome_pub.nsf/Content/ServiceStandards ) which are incorporated to this Amendment Agreement by reference. Provider acknowledges that by executing this Amendment Agreement, Provider shall be legally bound by all of the terms of this Contract, including, but not limited to, those set forth in the Standards currently published on the Provider Extranet and any and all subsequent amendments.

(SIGNATURE PAGE TO FOLLOW)

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound by all of the Contract Documents, have caused the Contract to be executed by their respective duly authorized officers as of the date in the heading of this Standard Amendment Agreement.

APPROVED AS TO FORM

SOZI PEDRO TULANTE, CITY SOLICITOR

**THE CITY OF PHILADELPHIA**

Through: **The Department of Human Services**

Per: _Crystal T. Espanol_
      7777BBC1F7E44C9...

By: _Cynthia Figueroa_
     A0C52E46A19349B...

Name: Crystal T. Espanol

Name: Cynthia Figueroa

Title: Assistant City Solicitor

Title: Commissioner

**CATHOLIC SOCIAL SERVICES**

By: _James Amato_
     6C6D462686844FD...

Name: James Amato

Title: Vice President

By: _Franz Fruehwald_
     D426312A44334D4...

Name: Franz Fruehwald

Chief Financial Officer

Title: Assistant Treasurer

 **City of Philadelphia Contract Routing Slip**

**External Negotiation/Encumbrance & Budget Verification (Conformance Manager)**

1. Review contract as signed by vendor and consult with supervisor.

     X     Click the check box to attach additional documentation, if required.

2. Confirm Encumbrance; supervisor routes in ACIS to Budget Verification.
3. Confirm Budget Verification completed in ACIS.

     X     Send to Law.

**Approve as to Form (Attorney)**

      Click the check box to attach additional documentation, if required.

     X     Route in ACIS to Finance

**Finance Certification**

     X     Attach the Endorsement Sheet then route in ACIS to Finance Review. 

**Finance Review**

     X     Review then route in ACIS to Department Signs Contract.

**Departmental Review (Conformance Manager)**

     X     Route in ACIS to Conformance.

**Conformance Review (Conformance Clerk)**

     x     Conform Contract.

DocuSign Envelope ID: 421E34E1-1109-43FD-9478-27B82FBF845C

# Exhibit SAA - 1
# Fiscal Year 2018

## 6606 - Catholic Social Services

| Services | Rate | Service Code | Contract Units | Total |
|---|---|---|---|---|
| ***DEPENDENT SERVICES*** | | | | |
| **Bouvier, McCarthy, Fairless, Morrell, Drexel and McGlade - CUA/Placement** | | | | |
| GH-Intensive (Non-RTF) | $212.16 | K1LG | AS NEEDED | $0.00 |
| GH-Intensive (Non-RTF) (Child Specific) | $256.55 | K1LG | AS NEEDED | $0.00 |
| GH-RTF (C/P) | $3.00 | K13M | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X1XX | AS NEEDED | $0.00 |
| | Bouvier, McCarthy, Fairless, Morrell, Drexel and McGlade - CUA/Placement TOTAL: $0.00 | | | |
| **CUA - 1/1/18 to 6/30/18** | | | | |
| FFC-College Rate | $32.13 | J1GW | AS NEEDED | $0.00 |
| FFC-Emergency Shelter | $45.06 | E1GG | AS NEEDED | $0.00 |
| FFC-Emergency Shelter 13+ | $55.06 | E1GG | AS NEEDED | $0.00 |
| FFC-General | $45.06 | J1GG | AS NEEDED | $0.00 |
| FFC-General 13+ | $55.06 | J1GG | AS NEEDED | $0.00 |
| FFC-M/B-Baby | $0.00 | J1WC | AS NEEDED | $0.00 |
| FFC-M/B-Mother | $57.06 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (2B) | $65.56 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (2B) 13+ | $75.56 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (3B) | $74.06 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (3B) 13+ | $84.06 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother 13+ | $67.06 | J1WP | AS NEEDED | $0.00 |
| FFC-Maternity | $45.06 | J1JG | AS NEEDED | $0.00 |
| FFC-Maternity 13+ | $55.06 | J1JG | AS NEEDED | $0.00 |
| FFC-Medical | $45.06 | J1MR | AS NEEDED | $0.00 |
| FFC-Medical 13+ | $55.06 | J1MR | AS NEEDED | $0.00 |
| FFC-Respite | $0.00 | J14G | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X1XX | AS NEEDED | $0.00 |
| KIN-College Rate | $32.13 | Z1GW | AS NEEDED | $0.00 |
| KIN-Emergency | $45.06 | Z1DG | AS NEEDED | $0.00 |
| KIN-Emergency 13+ | $55.06 | Z1DG | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Baby | $0.00 | Z1DC | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother | $57.06 | Z1DP | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother (2B) | $65.56 | Z1DP | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother (2B) 13+ | $75.56 | Z1DP | AS NEEDED | $0.00 |

DocuSign Envelope ID: 421E345J-1189-43E9-9470-27B9159F845C

# Exhibit SAA - 1
# Fiscal Year 2018

## 6606 - Catholic Social Services

| Services | Rate | Service Code | Contract Units | Total |
|---|---|---|---|---|
| KIN-Emergency-M/B-Mother (3B) | $74.06 | Z1DP | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother (3B) 13+ | $84.06 | Z1DP | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother 13+ | $67.06 | Z1DP | AS NEEDED | $0.00 |
| KIN-General | $45.06 | Z1GG | AS NEEDED | $0.00 |
| KIN-General 13+ | $55.06 | Z1GG | AS NEEDED | $0.00 |
| KIN-M/B-Baby | $0.00 | Z1WC | AS NEEDED | $0.00 |
| KIN-M/B-Mother | $57.06 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (2B) | $65.56 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (2B) 13+ | $75.56 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (3B) | $74.06 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (3B) 13+ | $84.06 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother 13+ | $67.06 | Z1WP | AS NEEDED | $0.00 |
| KIN-Maternity | $45.06 | Z1JG | AS NEEDED | $0.00 |
| KIN-Maternity 13+ | $55.06 | Z1JG | AS NEEDED | $0.00 |
| KIN-Medical | $45.06 | Z1MR | AS NEEDED | $0.00 |
| KIN-Medical 13+ | $55.06 | Z1MR | AS NEEDED | $0.00 |

CUA - 1/1/18 to 6/30/18 TOTAL: $0.00

### CUA - 7/1/17 to 12/31/17

| Services | Rate | Service Code | Contract Units | Total |
|---|---|---|---|---|
| FFC-College Rate | $28.50 | J1GW | AS NEEDED | $0.00 |
| FFC-Emergency Shelter | $41.43 | E1GG | AS NEEDED | $0.00 |
| FFC-Emergency Shelter 13+ | $51.43 | E1GG | AS NEEDED | $0.00 |
| FFC-General | $41.43 | J1GG | AS NEEDED | $0.00 |
| FFC-General 13+ | $51.43 | J1GG | AS NEEDED | $0.00 |
| FFC-M/B-Baby | $0.00 | J1WC | AS NEEDED | $0.00 |
| FFC-M/B-Mother | $53.43 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (2B) | $61.93 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (2B) 13+ | $71.93 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (3B) | $70.43 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (3B) 13+ | $80.43 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother 13+ | $63.43 | J1WP | AS NEEDED | $0.00 |
| FFC-Maternity | $41.43 | J1JG | AS NEEDED | $0.00 |
| FFC-Maternity 13+ | $51.43 | J1JG | AS NEEDED | $0.00 |
| FFC-Medical | $41.43 | J1MR | AS NEEDED | $0.00 |
| FFC-Medical 13+ | $51.43 | J1MR | AS NEEDED | $0.00 |
| FFC-Respite | $0.00 | J14G | AS NEEDED | $0.00 |

# Exhibit SAA - 1
# Fiscal Year 2018

## 6606 - Catholic Social Services

| Services | Rate | Service Code | Contract Units | Total |
|---|---|---|---|---|
| Initial Clothing Allowance | Up to $250/child | X1XX | AS NEEDED | $0.00 |
| KIN-College Rate | $28.50 | Z1GW | AS NEEDED | $0.00 |
| KIN-Emergency | $41.43 | Z1DG | AS NEEDED | $0.00 |
| KIN-Emergency 13+ | $51.43 | Z1DG | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Baby | $0.00 | Z1DC | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother | $53.43 | Z1DP | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother (2B) | $61.93 | Z1DP | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother (2B) 13+ | $71.93 | Z1DP | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother (3B) | $70.43 | Z1DP | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother (3B) 13+ | $80.43 | Z1DP | AS NEEDED | $0.00 |
| KIN-Emergency-M/B-Mother 13+ | $63.43 | Z1DP | AS NEEDED | $0.00 |
| KIN-General | $41.43 | Z1GG | AS NEEDED | $0.00 |
| KIN-General 13+ | $51.43 | Z1GG | AS NEEDED | $0.00 |
| KIN-M/B-Baby | $0.00 | Z1WC | AS NEEDED | $0.00 |
| KIN-M/B-Mother | $53.43 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (2B) | $61.93 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (2B) 13+ | $71.93 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (3B) | $70.43 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (3B) 13+ | $80.43 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother 13+ | $63.43 | Z1WP | AS NEEDED | $0.00 |
| KIN-Maternity | $41.43 | Z1JG | AS NEEDED | $0.00 |
| KIN-Maternity 13+ | $51.43 | Z1JG | AS NEEDED | $0.00 |
| KIN-Medical | $41.43 | Z1MR | AS NEEDED | $0.00 |
| KIN-Medical 13+ | $51.43 | Z1MR | AS NEEDED | $0.00 |
| | | | CUA - 7/1/17 to 12/31/17 TOTAL: $0.00 | |

### Placement - 1/1/18 to 6/30/18

| | | | | |
|---|---|---|---|---|
| FFC-College Rate | $32.13 | J1GW | AS NEEDED | $0.00 |
| FFC-Emergency Shelter | $58.12 | E11G | AS NEEDED | $0.00 |
| FFC-Emergency Shelter 13+ | $68.12 | E11G | AS NEEDED | $0.00 |
| FFC-Level II | $58.12 | J12G | AS NEEDED | $0.00 |
| FFC-Level II 13+ | $68.12 | J12G | AS NEEDED | $0.00 |
| FFC-M/B-Baby | $0.00 | J1WC | AS NEEDED | $0.00 |
| FFC-M/B-Mother | $71.64 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (2B) | $98.64 | J1WP | AS NEEDED | $0.00 |

# Exhibit SAA - 1
## Fiscal Year 2018

## 6606 - Catholic Social Services

| Services | Rate | Service Code | Contract Units | Total |
|---|---|---|---|---|
| FFC-M/B-Mother (2B) 13+ | $108.64 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (3B) | $125.64 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (3B) 13+ | $135.64 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother 13+ | $81.64 | J1WP | AS NEEDED | $0.00 |
| FFC-Maternity | $46.12 | J1JG | AS NEEDED | $0.00 |
| FFC-Maternity 13+ | $56.12 | J1JG | AS NEEDED | $0.00 |
| FFC-Medical | $46.12 | J1MR | AS NEEDED | $0.00 |
| FFC-Medical 13+ | $56.12 | J1MR | AS NEEDED | $0.00 |
| FFC-Respite | $0.00 | J14G | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X1XX | AS NEEDED | $0.00 |
| KIN-College Rate | $32.13 | Z1GW | AS NEEDED | $0.00 |
| KIN-Level II | $58.12 | Z12G | AS NEEDED | $0.00 |
| KIN-Level II 13+ | $68.12 | Z12G | AS NEEDED | $0.00 |
| KIN-M/B-Baby | $0.00 | Z1WC | AS NEEDED | $0.00 |
| KIN-M/B-Mother | $71.64 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (2B) | $98.64 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (2B) 13+ | $108.64 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (3B) | $125.64 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (3B) 13+ | $135.64 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother 13+ | $81.64 | Z1WP | AS NEEDED | $0.00 |
| KIN-Maternity | $46.12 | Z1JG | AS NEEDED | $0.00 |
| KIN-Maternity 13+ | $56.12 | Z1JG | AS NEEDED | $0.00 |
| KIN-Medical | $46.12 | Z1MR | AS NEEDED | $0.00 |
| KIN-Medical 13+ | $56.12 | Z1MR | AS NEEDED | $0.00 |
| SBH-Transition FFC | Up to $87.77 | J1UG | AS NEEDED | $0.00 |
| SBH-Transition FFC 13+ | Up to $97.77 | J1UG | AS NEEDED | $0.00 |
| SBH-Transition KIN | Up to $87.77 | Z1UG | AS NEEDED | $0.00 |
| SBH-Transition KIN 13+ | Up to $97.77 | Z1UG | AS NEEDED | $0.00 |

Placement - 1/1/18 to 6/30/18 TOTAL: $0.00

### Placement - 7/1/17 to 12/31/17

| Services | Rate | Service Code | Contract Units | Total |
|---|---|---|---|---|
| FFC-College Rate | $28.50 | J1GW | AS NEEDED | $0.00 |
| FFC-Emergency Shelter | $54.59 | E11G | AS NEEDED | $0.00 |
| FFC-Emergency Shelter 13+ | $64.49 | E11G | AS NEEDED | $0.00 |
| FFC-Level II | $54.49 | J12G | AS NEEDED | $0.00 |
| FFC-Level II 13+ | $64.49 | J12G | AS NEEDED | $0.00 |
| FFC-M/B-Baby | $0.00 | J1WC | AS NEEDED | $0.00 |
| FFC-M/B-Mother | $68.01 | J1WP | AS NEEDED | $0.00 |

DocuSign Envelope ID: 421E54E1-1T09-43FD-9478-27B82F8F845C

# Exhibit SAA - 1
# Fiscal Year 2018

## 6606 - Catholic Social Services

| Services | Rate | Service Code | Contract Units | Total |
|---|---|---|---|---|
| FFC-M/B-Mother (2B) | $95.01 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (2B) 13+ | $105.01 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (3B) | $122.01 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother (3B) 13+ | $132.01 | J1WP | AS NEEDED | $0.00 |
| FFC-M/B-Mother 13+ | $78.01 | J1WP | AS NEEDED | $0.00 |
| FFC-Maternity | $42.49 | J1JG | AS NEEDED | $0.00 |
| FFC-Maternity 13+ | $52.49 | J1JG | AS NEEDED | $0.00 |
| FFC-Medical | $42.49 | J1MR | AS NEEDED | $0.00 |
| FFC-Medical 13+ | $52.49 | J1MR | AS NEEDED | $0.00 |
| FFC-Respite | $0.00 | J14G | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X1XX | AS NEEDED | $0.00 |
| KIN-College Rate | $28.50 | Z1GW | AS NEEDED | $0.00 |
| KIN-Level II | $54.49 | Z12G | AS NEEDED | $0.00 |
| KIN-Level II 13+ | $64.49 | Z12G | AS NEEDED | $0.00 |
| KIN-M/B-Baby | $0.00 | Z1WC | AS NEEDED | $0.00 |
| KIN-M/B-Mother | $68.01 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (2B) | $95.01 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (2B) 13+ | $105.01 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (3B) | $122.01 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother (3B) 13+ | $132.01 | Z1WP | AS NEEDED | $0.00 |
| KIN-M/B-Mother 13+ | $78.01 | Z1WP | AS NEEDED | $0.00 |
| KIN-Maternity | $42.49 | Z1JG | AS NEEDED | $0.00 |
| KIN-Maternity 13+ | $52.49 | Z1JG | AS NEEDED | $0.00 |
| KIN-Medical | $42.49 | Z1MR | AS NEEDED | $0.00 |
| KIN-Medical 13+ | $52.49 | Z1MR | AS NEEDED | $0.00 |
| SBH-Transition FFC | Up to $84.14 | J1UG | AS NEEDED | $0.00 |
| SBH-Transition FFC 13+ | Up to $94.14 | J1UG | AS NEEDED | $0.00 |
| SBH-Transition KIN | Up to $84.14 | Z1UG | AS NEEDED | $0.00 |
| SBH-Transition KIN 13+ | Up to $94.14 | Z1UG | AS NEEDED | $0.00 |

Placement - 7/1/17 to 12/31/17 TOTAL: $0.00

### St Francis/St Joseph for Boys – CUA/Placement

| | | | | |
|---|---|---|---|---|
| GH-Intensive (Non-RTF) | $212.16 | K1LG | AS NEEDED | $0.00 |
| GH-Intensive (Non-RTF) | $256.55 | K1LG | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X1XX | AS NEEDED | $0.00 |
| SIL (Requires Authorization) | $114.52 | M1GG | AS NEEDED | $0.00 |
| SIL-College Rate | $24.75 | M1GW | AS NEEDED | $0.00 |

St Francis/St Joseph for Boys - CUA/Placement TOTAL: $0.00

# Exhibit SAA - 1
# Fiscal Year 2018

## 6606 - Catholic Social Services

| Services | Rate | Service Code | Contract Units | Total |
|----------|------|--------------|----------------|-------|
| **St Gabriel's (Requires Authorization) - CUA/Placement** | | | | |
| Initial Clothing Allowance | Up to $250/child | X1XX | AS NEEDED | $0.00 |
| INST-Intensive (Non-RTF) | $197.35 | L1LG | AS NEEDED | $0.00 |
| INST-Intensive (Non-RTF) | $239.94 | L1LG | AS NEEDED | $0.00 |
| INST-RTF D&A (R/B,C/P) | $84.61 | L1AR | AS NEEDED | $0.00 |
| INST-RTF Mitchell (R/B,C/P) | $84.61 | L13R | AS NEEDED | $0.00 |
| INST-RTF Module I (R/B,C/P) | $84.61 | L13R | AS NEEDED | $0.00 |

St Gabriel's (Requires Authorization) - CUA/Placement TOTAL: $0.00

| Services | Rate | Service Code | Contract Units | Total |
|----------|------|--------------|----------------|-------|
| **St Vincent's: Guardian Angel/St.Vincent's Maternity Home - CUA/Placement** | | | | |
| GH-Intensive (Non-RTF) | $212.16 | K1LG | AS NEEDED | $0.00 |
| GH-M/B-Baby | $0.00 | K1WC | AS NEEDED | $0.00 |
| GH-M/B-Mother | $229.16 | K1WP | AS NEEDED | $0.00 |
| GH-M/B-Mother (2B) | $246.16 | K1WP | AS NEEDED | $0.00 |
| GH-M/B-Mother (3B) | $263.16 | K1WP | AS NEEDED | $0.00 |
| GH-Maternity | $212.16 | K1JG | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X1XX | AS NEEDED | $0.00 |

St Vincent's: Guardian Angel/St.Vincent's Maternity Home - CUA/Placement TOTAL: $0.00

| Services | Rate | Service Code | Contract Units | Total |
|----------|------|--------------|----------------|-------|
| **St. Vincent's Group Homes: Guardian Angel/St. Joachim/St. Joseph for Girls, M. Carol - CUA/Placement** | | | | |
| GH-Intensive (Non-RTF) | $212.16 | K1LG | AS NEEDED | $0.00 |
| GH-Shelter (Requires Authorization) | $180.44 | B12G | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X1XX | AS NEEDED | $0.00 |

St. Vincent's Group Homes: Guardian Angel/St. Joachim/St. Joseph for Girls, M. Carol - CUA/Placement TOTAL: $0.00

**DEPENDENT TOTAL: $9,021,176.23**

## *DELINQUENT SERVICES*

### Bouvier, McCarthy, Fairless, Morrell, Drexel and McGlade

| Services | Rate | Service Code | Contract Units | Total |
|----------|------|--------------|----------------|-------|
| GH-RTF (C/P) | $3.00 | K23M | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X2XX | AS NEEDED | $0.00 |

Bouvier, McCarthy, Fairless, Morrell, Drexel and McGlade TOTAL: $0.00

DocuSign Envelope ID: 42YL34ET-1Y09-43FD-9478-27BB2F8F845C

# Exhibit SAA - 1
## Fiscal Year 2018

## 6606 - Catholic Social Services

| Services | Rate | Service Code | Contract Units | Total |
|---|---|---|---|---|
| **Del Voc** | | | | |
| Day Treatment (5 Day) | $107.46 | G2GF | AS NEEDED | $0.00 |
| | | | **Del Voc TOTAL: $0.00** | |
| | | | | |
| **St Francis/St. Joseph for Boys** | | | | |
| Initial Clothing Allowance | Up to $250/child | X2XX | AS NEEDED | $0.00 |
| SIL | $114.52 | M2GG | AS NEEDED | $0.00 |
| | | | **St Francis/St. Joseph for Boys TOTAL: $0.00** | |
| | | | | |
| **St Gabriel's** | | | | |
| Counseling | $25/.5 Hr | X2XX | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X2XX | AS NEEDED | $0.00 |
| INST-Intensive (Non-RTF) | $197.35 | L2LG | AS NEEDED | $0.00 |
| INST-Intensive (Non-RTF) Mitchell | $239.94 | L2LG | AS NEEDED | $0.00 |
| INST-RTF D&A (R/B,C/P) | $84.61 | L2AR | AS NEEDED | $0.00 |
| INST-RTF Mitchell (R/B,C/P) | $84.61 | L23R | AS NEEDED | $0.00 |
| INST-RTF Module I (R/B,C/P) | $84.61 | L23R | AS NEEDED | $0.00 |
| | | | **St Gabriel's TOTAL: $0.00** | |
| | | | | |
| **St Gabriel's - Reintegration Services** | | | | |
| Aftercare I | $25.58 | C2NG | AS NEEDED | $0.00 |
| | | | **St Gabriel's - Reintegration Services TOTAL: $0.00** | |
| | | | | |
| **St Vincent's: Guardian Angel/St.Vincent's Maternity Home** | | | | |
| GH-Intensive (Non-RTF) | $212.16 | K2LG | AS NEEDED | $0.00 |
| GH-M/B-Baby | $0.00 | K2WC | AS NEEDED | $0.00 |
| GH-M/B-Mother | $229.16 | K2WP | AS NEEDED | $0.00 |
| GH-M/B-Mother (2B) | $246.16 | K2WP | AS NEEDED | $0.00 |
| GH-M/B-Mother (3B) | $263.16 | K2WP | AS NEEDED | $0.00 |
| GH-Maternity | $212.16 | K2JG | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X2XX | AS NEEDED | $0.00 |
| | | | **St Vincent's: Guardian Angel/St.Vincent's Maternity Home TOTAL: $0.00** | |
| | | | | |
| **St. Vincent's Group Homes: Guardian Angel/St. Joachim/St. Joseph for Girls, M. Carol** | | | | |
| GH-Intensive (Non-RTF) | $212.16 | K2LG | AS NEEDED | $0.00 |
| Initial Clothing Allowance | Up to $250/child | X2XX | AS NEEDED | $0.00 |
| | | | **St. Vincent's Group Homes: Guardian Angel/St. Joachim/St. Joseph for Girls, M. Carol TOTAL: $0.00** | |

**DELINQUENT TOTAL: $10,409,815.00**

**CONTRACT MAXIMUM LIMIT: $19,430,991.23**

# CITY OF PHILADELPHIA
# DEPARTMENT OF
# HUMAN SERVICES

"We believe that a community-neighborhood approach with clearly defined roles between county and provider staff will positively impact safety, permanency, and well-being."

What are we working together to achieve?

- More children and youth maintained safely in their own homes and communities.
- More children and youth achieving timely reunification or other permanence.
- A reduction in the use of congregate care.
- Improved child, youth, and family functioning.

# S.A.A.-2

## Scope of Service:

## For General, Kinship, and Teen Parent/Baby Resource Home Care Providers

## July 2017

**Statement of Purpose:**
This Scope of Service is made and entered into between Catholic Social Services (the Provider) and the Philadelphia Department of Human Services (DHS), and sets forth the services for general, kinship, and teen parent/baby resource home care.

Throughout this document, the term "Resource Parent" refers to both kinship parents and non-relative foster parents.

**When a child or youth is placed through a Community Umbrella Agency, CUA, the Provider offers ongoing support and coaching to Resource Parents through Provider Staff[1] . The Provider is required to work collaboratively with the CUA.  Contracts between DHS and all CUAs set forth services for resource home care with case management responsibilities remaining with the CUA.  When the child or youth is receiving case management services directly from DHS, the Provider must also deliver case management services to the Resource Parent, parent or other reunification resource, and the child or youth and collaborate with the assigned DHS Social Worker (DHS cases).**

**Department Overview:**
The mission of the Department of Human Services (DHS) is to provide and promote safety, permanency, and well being for children and youth at risk of abuse, neglect and delinquency. DHS is organized in the following Divisions: Administration and Management, Child Welfare Operations Division, Community Based Prevention Services, Finance, Juvenile Justice Services, and Performance Management and Technology. DHS continues to implement the Improving Outcomes for Children (IOC) model.  The vision for IOC is to:
o   Maintain children and youth safely in their own homes and community.
o   Timely reunification or other permanency.
o   Reduce use of congregate care.
o   Improve children, youth, and family functioning.

As it relates to Resource Home care, the IOC framework provides a single Case Manager to work with assigned families. The case management service is provided by Community Umbrella Agencies who are embedded in the communities they serve.

For children and youth for whom the Provider continues to provide case management services, the case management staff interact on a regular basis with schools, medical, dental, and behavioral health providers; various community resources; and all service providers indicated on an Individual Service Plan (ISP) or Family Service Plan (FSP). For youth funded and placed by a CUA, the Provider interacts with external resources as needed, collaborates and communicates with the CUA, and continues to support the resource caregivers.

**Provider Organizational Overview:**

**Mission Statement:**  Catholic Social Services of the Archdiocese of Philadelphia continues the work of Jesus by affirming, assisting and advocating for individuals, families, and communities.

**Vision and Values Statement:** Catholic Social Services Vision:

---

[1] Provider Staff is responsible for recruiting and certifying foster and kinship homes.

Catholic Social Services exists to transform lives and bring about a just and compassionate society where every individual is valued, families are healthy and strong, and communities are united in their commitment to the good of all. We envision a world touched by God's mercy: where poverty and need are alleviated, and all people share justly in the blessings of creation.

Catholic Social Services Values:

Compassion: genuine care and heartfelt concern for those we serve
Dignity: respect for each person created in God's image, regardless of color, capacity, or age
Charity: generosity toward all people in response to God's goodness to us
Justice: defense of and advocacy for the rights of the poor, vulnerable, and disadvantaged
Excellence: professional competence and responsible stewardship of time and resources

## Problems and Issues to be Addressed:

Ideally, children and youth should be with their own families. When this is not possible, resource homes ensure that children and youth can be maintained safely in their own community. All resource home procedures and resources must be directed to supporting reunification or other permanency options, and the overall positive functioning of children, youth, and their families. Resource Parents must function as mentors to legal families to support these goals. An increased focus on recruiting resource caregivers who can manage adolescents is required in order to reduce the use of congregate care. There must also be a continued focus on the need for resource homes for children who are 0-6 years of age. The specific issue to be addressed by the Provider is to recruit, screen, train, and provide certified resource care homes for dependent children or youth, some of whom will need support to address behavioral health, medical, and educational needs. Homes for teens including pregnant teens and teen parents (teen parent/baby placements) are a priority in order to reduce the use of congregate care.

## Program Objectives:

The program objectives are to provide trauma informed and culturally competent placement resources via trained resource caregivers. Resource caregivers also serve as a mentor and support to the legal family. Anticipated outcomes for resource home care services are:

o   To provide children with protection, care, and a nurturing environment with certified Resource Parents which can include extended family members while a permanent plan can be established within a set time frame.
o   To focus on identifying strengths, developing protective capacities and building resiliency and adaptive coping skills.
o   To facilitate participation in service delivery and/or treatment provided by external resources so that healthy partnerships can be created and goals on the service plans can be archived.
o   To provide opportunities to strengthen and develop youth assets.
o   To promote social competency skills.
o   To ensure that youth is available for assigned court related appearances.
o   To collaborate with the CUA case manager, DHS and/or other team members in planning the transition into the next level of care which will ideally be family reunification.
o   To access medical, dental and behavioral health services as needed.
o   To provide support, including access to resources, to achieve academic and vocational goals.

## Program Overview:

**Resource Home (Foster Care and Kinship Care):** The primary goal of Resource Home Care is to support the safety, stability, permanency, and well-being needs of the child or youth and legal family. Resource

Parents provide general care and supervision for children and youth placed in their home. For CUA cases, the Provider focus is on supporting the Resource Parent while case management is provided by the CUA. For cases in which DHS also provides case management, the Provider delivers case management services and ongoing support to the parents and reunification resource. Whether providing services for a DHS case or a CUA case, the safety, stability, permanency, and well-being needs of the child or youth and legal family support includes developing a mentoring relationship with the legal family specifically in ways that foster positive family relationships and reunification. Resource caregivers are screened, trained, and certified by the Provider. In kinship care, the caregiver may also be an extended family member, friend, previous Resource Parent, or other professional who in the past has established a relationship with the child.

**General level resource care, including kinship:** Children and youth identified for this service category mostly demonstrate a moderate degree of behavioral, social, emotional, intellectual, and educational needs or issues. Service needs are compounded by normal placement adjustment issues. Routine care and supervision of the children and youth is manageable with some ongoing training and support from the Provider. Siblings are placed together whenever possible.

In addition:
o   Youth may require access to special education, or developmental or vocational services. This will be specified in either the FSP or the SCP depending on who is primarily responsible for case management functions (DHS or CUA).
o   The child's or youth's biological family requires support and to maintain their emotional bond with their children and to address identified safety issues and permanency goals.
o   Children and youth may require therapy or other therapeutic services provided by external resources as specified in either the FSP or the SCP, depending on who is primarily responsible for case management functions (either DHS or CUA).
o   Children and youth require routine health care or may have minor health or medical needs for which follow up care is to be provided.
o   The Provider agency staff or Resource Parents, or both participate in teaming meetings and development of SCP (CUA cases).

**Teen Parent/Baby Foster or Kinship Placement Services:** Teenage parents and their child who are identified for this service category demonstrate difficulty in behavioral, social, emotional, or intellectual development. The adolescent is not prepared to assume their current parental role. The child's legal family is typically not equipped to adequately address the adolescent needs.
This service includes:
o   General care of healthy infants or toddlers requiring routine care. The adolescent is physically healthy and requires routine care.
o   Neither the teen nor the child requires specially trained Resource Parents.
o   Parents or reunification resource, if different, requires support and to maintain their emotional bond with the teen and the teen's child and to address identified safety issues and permanency goals.

## Services:

### Referrals:
The DHS Central Referral Unit and the DHS On-going Worker, the DHS Investigating Worker (if a newly accepted case), or CUA Case Manager (CUA CM) must share with the Provider pertinent information as required by the five county standards which include: medical consent form, Medical and Immunization Records, Universal referral, service plan, placement history, court disposition, Court Orders, educational records, birth certificate, and the name of the child's or youth's attorney.

**Case Management:**
Case management will be provided either by the Provider (for DHS placements) or one of the CUA's (for CUA placements). The CUA Case Manager will visit the resource home at least once per month. For DHS placements, the Provider Case Manager will visit the home as required pursuant to DHS performance standards.

For CUA placements, the Provider offers support to the resource caregivers via a Provider Staff as defined earlier in this document. They may visit the resource caregiver as often as needed but at a minimum, once per quarter. They provide other supportive services to resource caregivers and act as a possible liaison to CUAs as needed.

For DHS placements, there is a Provider Case Manager assigned to the case.

Examples of relevant topics to be discussed with the DHS Worker or CUA Case Manager include:
o   Child's or youth's adjustment to the home.
o   Behavior management strategies.
o   Child's or youth's educational, medical, and behavioral health progress.
o   Resource Parent's ability to meet needs and assistance needed.
o   Relationship with parents and reunification resource, and quality of visits (if applicable).

Examples of relevant topics to be discussed with Case Manager (CUA or DHS) include:
o   Placement stability.
o   Relationship issues with the other children in the resource home.
o   Child's educational, medical, and behavioral health needs and proposed interventions.
o   Behavior management strategies utilized by the Resource Parents.
o   Relationship between Resource Parent and parents and reunification resource, if different and issues related to the resource caregiver as a mentor.
o   Clarification of the role of the CUA Case Manager.
o   Youth's interaction in the community and use of community resources.
o   Progress or lack of progression toward attainment of service plan goals.
o   Permanency planning.
o   Results of Like Skills Assessment and related planning to help youth develop life skills.
o   Provision of routine medical and dental care.
o   Supplemental services or needs.

All resource caregivers and the Provider must ensure that:
o   Three nourishing meals and additional snacks daily are provided and any special dietary needs or religious food restrictions are accommodated. Food is never to be withheld as a means of discipline.
o   Provide children and youth with new, age appropriate, and seasonal clothing. All clothing should be purchased new with the child or youth, when appropriate, having choice in the selection. Consignment shops may be used as long as all household members utilize this option. Foster children and youth are to be treated no differently. All clothing purchased is the property of the child or youth. Purchase of necessary clothing is never to be withheld as a means of discipline by Resource Parents.

All resource homes must and the Provider must ensure that:
o   The home is free of infestation, structural damage that poses an immediate threat to safety, lead (unless being treated), non-functioning utilities, fire or other health or safety hazards.
o   There must be a working land line phone within the residence.
o   The home meets all of the requirements of an approved adoptive placement. At the same time, Resource Parents must be willing to work with and mentor the reunification resource to ensure

that children and youth can reunify in a timely way. If reunification is not feasible, Resource Parents must be willing to consider being a permanency resource for children and youth placed in their care.

More specifically resource homes must meet the following criteria:
o    All doors leading outside of the house are able to be locked or otherwise secured.
o    There are cribs for infants and beds for each child and youth.
o    There are working smoke detectors, fire extinguishers, and carbon monoxide detectors. Chemicals and drugs are stored properly away from children and youth.
o    Firearms are locked and ammunition is stored separately in a locked container.
o    Safe infant and toddler care, as applicable to the age of the children placed in the home including:
     •    Safe bathing and the use of bath water thermometers.
     •    Safe sleeping.
     •    Car seats appropriate to the age and weight of the children if the resource family owns or will transport children in a vehicle.
     •    Child proofing of the home and environment including stair gates, radiator covers, fireplace guards and other necessary safety devices including outlet covers.

The home must have and the Provider must ensure that there are the following resources:
o    Mobile Crisis number and contacting procedures.
o    Suicide Prevention Hotline number.
o    Poison Control number.
o    Smoke detectors and fire extinguishers.
o    Police Department number and contacting procedures.
o    Drug and Alcohol Intervention numbers and contacting procedures.
o    No smoking signs.

The Provider must complete an inspection of the above for all Resource Parents on a quarterly basis.

The Provider is responsible for offering training and related support to Resource Parents that includes the impact that trauma has on youth behaviors and functioning, ways to motivate positive behaviors of children and youth, and strategies on ways to manage child and youth behaviors and encourage positive behaviors in a manner that is not vindictive, abusive, or degrading. For children and youth placed by CUA's, this support is provided to resource caregivers by Provider Staff. The Provider recognizes that the interaction between a caring Resource Parent and the child or youth is an opportunity to help them recognize their inherent assets and strengths, and develop acceptable behaviors. Such support assists children and youth in developing skills that promote their successful integration into the community.

Provider and Resource Parents are prohibited by both PA Regulation and DHS policy from using corporal punishment, threats or derogatory remarks, the depriving of meals, and the depriving of visits with parents or others, verbal abuse or any punitive, unusual, or unnecessary consequences for behaviors.

In deciding on an effective means of intervening during conflict, Resource Parents assess and ensure the following:
o    The child's or youth's ability to problem solve and social or emotional maturity.
o    There is open communication with the child or youth to understand reactions and feelings.
o    Set clear limits and guidelines for positive behavior and ensure they have been communicated effectively.
o    That expectations for improved behaviors are defined or explained so that youth can develop new skills and receive incentives for pro social or positive behaviors.

If the Provider Staff (CUA cases) or Provider Case Manager (DHS cases) suspect that the disciplinary actions occurring in the foster home violate the Pennsylvania Child Protective Services Law, it is the mandated obligation of the Provider Staff to immediately report this incident to the Pennsylvania Child Abuse Hotline and to DHS. In some cases, the police and the District Attorney's Office may also be involved in investigating any alleged criminal actions. The State investigates these reports and determines if the incident is indicated or unfounded. State Foster Family Care Regulations mandate that the agency remove children and youth in situations where their safety is in question. Children and youth may require removal from the resource home while an investigation is taking place unless an acceptable plan of supervision can be put in place to ensure safety. This decision is made in conjunction with the Southeast Regional Office investigating the report, the CUA CM, if a CUA case and either the DHS Worker or the DHS Investigator assigned.

If the decision is made to allow the child or youth to remain in the home during or following an investigation, a written plan of supervision must be developed by the appropriate case management team. If the Resource Parent is placed on probation for this or any other reasons, no additional placements will be made in the Resource Parent's home during a probationary period or whenever the investigation is complete.

All placement moves must be legally approved by the Court or by agreement of all parties except in the case of emergencies. It is the case management's team responsibility to obtain Court authorization to move children or youth through the City of Philadelphia Law Department.

**Visitation:**
The frequency and duration of visits both with reunification resources, concurrent plan resources, and siblings must be as liberal as possible from the time of placement. Whenever possible, visitation should be weekly but parental and sibling visitation cannot be less than twice monthly unless otherwise prohibited or specified by Court. The visitation plan must be discussed and agreed upon. It must be accommodating to the schedules of the reunification resource, children, and youth and include weekends or evenings or both where needed.

For DHS placements, Provider Case Managers are responsible for visitation. For CUA placements, CUA's are responsible for visitation based on the SCP. Either Provider or CUA must ensure that children and youth have adequate resources and items provided by the Resource Parent to have successful visits. This may include a provision of transportation for the visitation, food, diapers, etc... to meet the child's needs.

Whenever children or youth are placed or re-placed, a visit must occur between the child or youth and the parent from whom they are removed as soon as possible and no later than two business days.

An introductory meeting between the Resource Parent or the Provider Staff and the parents must also occur within five business days of the placement or replacement. Resource Parents should communicate with the parents or other reunification resources regularly and at least monthly about the children or youth outside of regularly scheduled visits. Siblings are to be placed together whenever possible. When siblings are not able to be placed together, visits are to occur between the siblings bi-weekly, at a minimum, unless otherwise directed by Court Order.

Whenever possible visits must be:
o   In the home of the reunification resource unless there is a Court Order, clear documentation in the visitation plan, service plan or in a Structured Progress Note as to why this cannot occur. If other than the home of the reunification resource, visits must be in a family-like and family friendly visitation space that allows for normal parent-child interaction, ideally in the home of a relative or Resource Parent. If such home is not available, visits should occur at a community

location familiar to the child, youth, or parent (such as a recreation center, playground, or church). The option of last resort is a family-friendly area of the Provider's as the case manager or subcontractor for a CUA. In order to move from the best option in the hierarchy to a lower option, the higher option must be ruled out and the reasons for ruling it out must be clearly documented. When visits are not in the home, a progression plan for visits in the home must be considered at the service plan meetings and court hearings.

o   Supervised only if necessary, based on clear threats to the safety of children and youth or Court Order. Persons supervising visits must ensure safety, remain in line of sight and earshot, and provide unobtrusive constructive feedback and coaching on parenting.

o   Accommodating to the schedules of the reunification resource, children, and youth.

**Transportation:** Will be coordinated between all parties. Visits between parents and children and youth are critical to support and enhance the process of reaching the goals of reunification.

**Teaming:** For DHS cases, the Provider's Case Manager participates in DHS Family Service Plan (FSP) meetings and develops the Individual Service Plan (ISP). For CUA cases, Resource Parents or an agency representative, such as Provider Staff as defined earlier, or both will participate in teaming as needed. Information critical for decision making and planning will be shared with the CUA Case Manager prior to all teaming meetings.

**Court:**
For CUA, Provider Staff may be called upon to testify to safety or any other matters as providers currently are called upon. The Law Department will notify the CUA CM, and, if necessary, subpoena the provider. For DHS cases, the Provider Case Manager appears in court and provides safety testimony as well as family progress information to the Court.

**Placement Disruption:**
Providers and Resource Parents must give 30 days notice to DHS CRU regarding the need to remove a child or youth.

Whenever there appears or it is reported by either the child or youth or the Resource Parent that the placement is in danger of disruption or the Resource Parent gives 30 days notice, the Provider must notify CRU immediately. An email must be sent to DHS_CRU@phila.gov with the subject line to read: "30 Day Notice."

If a CUA case, the CUA CM is to be notified and a Placement Stability Conference must be requested. The Provider and Resource Parent must be invited and must participate in this conference. The focus of the conference is to determine whether there are additional supports that could be put into place to avoid the disruption.

If it is a DHS case, the Provider and DHS Worker and Supervisors must conference the case together to determine whether there are additional supports that could be put into place to avoid the disruption.

**Reporting:**
**High Profile Cases:**
In an effort to keep abreast of high profile cases, Child Welfare Operations Leadership is requiring that all Directors of all agencies report to the appropriate Operations Director (DHS Front End, DHS Permanency and Well-being Services, or DHS CUA) via telephone and email any high profile case that come to their attention. These high profile cases must be conferenced with the assigned chain of command, including the CUA Director, and then the Director determines if a CWO Management team meeting is needed. This is a collaborative effort between CWO Management and Support Centers to extend support and guidance to DHS Social Work Services and CUA staff in their decision-making.

Criteria:

o   Death of a child or youth involved with DHS or in a DHS involved household.

o   Any missing child 12 years of age or under and active with DHS (committed to DHS or receiving in-home services).

o   Any child or youth sexually abused while in care.

o   Media report involving DHS cases or families.

o   Any child or youth committed to DHS and hospitalized subsequent to injury (whether accidentally or intentionally injured).

o   The arrest of a kin, Resource Parent, or any household member of a resource home, including any child or youth committed to the Department.

o   Notification from any placement agency that a child or youth has been moved due to a report of abuse or neglect and the kin, Resource Parent, or household member is the alleged perpetrator.

o   Any other type of incident as may be subsequently designated by the Department as High Profile.

Notification Procedure:

o   The Provider must immediately notify the CUA Chain of Command until an in-person contact is made or through the CUA after hours mechanism.

o   The CUA staff who is informed must notify the chain of command (up to Director level).

o   Directors must immediately notify via telephone the Operations Director who has responsibility for their service and subsequently send an email notification within 24 hours to
    * Operations Director for Front End Services;
    * Operations Director for Permanency and Well-being Services;
    * Operations Director for Improving Outcomes for Children; and
    * Chief of Staff for the Deputy Commissioner.

o   The CWO Deputy Commissioner will be contacted as needed. The CWO Deputy Commissioner notifies the Commissioner and other Executive Staff members as appropriate and always if the media is involved.
    * After hours notifications must be given to the Hotline Staff and Hotline Staff must immediately alert the Operations Director.

The above does not relieve any agency required to report incidents through HCSIS.

**Information Sharing:**
Routine information that emerges during or between visits such as a change in school functioning, relevant communication with a family member, emerging wellness concerns, or new legal family information that potentially changes goals or objectives identified in the FSP or SCP, whichever is applicable, must be reported to the DHS Worker or Supervisor (DHS case), or the CUA Case Manager or Supervisor (CUA case), during the same business week that the information becomes known.

**Media Inquiries:**
In the event that the Provider receives a media inquiry, the Provider must notify the CUA Director and DHS Communications Director. Staff are not permitted to comment or even acknowledge a case, but should direct such inquiries to the Department's Communications Director.

**Megan's Law Requirements:**
When a sexually violent predator from the National Megan's Law database lives or moves within 1000 feet of any of a Provider's resource home, the Provider receives an electronic notification from the Department. Upon receipt of this notification, the Provider must do the following:

- o    Make a telephone call (within 24 hours of the electronic notification) to the resource home notifying the Resource Parent that a sexually violent predator lives within 1000 feet of the home.
- o    Visit the resource home within 48 hours and:
  - ▪ Review the Megan's Law Safety Plan with the Resource Parent and any youth 14 and older.
  - ▪ Have all parties sign the Megan's Law Notification and Safety Plan.
  - ▪ Provide a picture of the predator.
- o    Mail a copy of the signed Megan's Law Notification/Safety Plan or Receipt of Megan's Law Notification and Safety Plan to the DHS Ombudsman in care of the DHS Commissioner's Office:
      1515 Arch Street, 8th Floor
      Philadelphia, PA 19102
- o    Email the signed Megan's Law Notification and Safety Plan to the CUA Director of Quality Assurance for any child or youth residing in the facility.

**Foster Parent Registry**
Providers promptly provide information to the PA Foster Parent Registry regarding Resource Parent Caregiver status and changes in status between annual certification and re-certification time frames.

Providers must ensure current and updated copies of each Resource Caregivers Certificate of Compliance are provided to the Department and the CUA. Providers must upload Resource Home certification information and documentation to the Provider Licensure module of DHSConnect whenever Resource Caregivers are certified and whenever their certification status changes.

**Mentoring**:
The Resource Parent must play a role in facilitating reunification as described in the service plans. Primarily this will be based on the Resource Parents' capabilities to serve as a mentor to the legal family and assist legal family in strengthening parental capabilities, assisting with planned activities, modeling and fostering positive parent-child interaction.

*See also*, the DHS Performance Standards, DHS policy, and as appropriate, the IOC Practice and Fiscal Guidelines for relevant policy.

**Hours and location of work:**
The Provider must have 24 hours a day, 7 days a week accessibility. For CUA cases, resource homes are located ideally in the CUA region.

**Emergency contact procedures are as follows:**
Departmental supervisory staff will provide emergency coverage on a rotational basis to ensure access to agency assistance and services outside of regular business hours for referrals from the Philadelphia Department of Human Services and Community Umbrella Agencies for the placement of children in appropriate foster homes and to respond to emergencies involving the children and families served by the program. The on call supervisor can be reached at 215-808-8656.

**The administrative office for the Provider is located at:**
Catholic Human Services
222 N. 17th Street
3rd floor
Philadelphia, PA 19103

Referrals are typically accepted during normal work hours although emergency placements are considered on a case by case basis.

**Staffing Structure:**
Attach Agency Organizational Chart and Program Organizational Chart.

**Technology requirements:**
Internet access to utilize DHSConnect.

**Funding restrictions:**
(Insert N/A or describe restrictions)

**The program is overseen by:**
**Robert Montoro, MSW, Administrator**

## Cover Page

| | |
|---|---|
| User: | UNKNOWN |
| Document: | UNKNOWN |
| Server: | C6O-C70-7B51 |
| Time: | 08/03/2017 07:58:16 |
| Pages requested: | 11 |
| Sheet Size: | 8.5x11" LEF |
| Selected Page Range: | All |
| Number of Copies: | 1 |
| Number of Printed Sheets: | 11 |
| Status: | OK |

Notes 1:

Notes 2:

Instructions:

DocuSign Envelope ID: 421E34E1-1109-43FD-9478-27B82F8F845C

# CATHOLIC SOCIAL SERVICES

## ARCHDIOCESE OF PHILADELPHIA

### Organizational Structure

July 2017





# THE CITY OF PHILADELPHIA

# PROFESSIONAL SERVICES CONTRACT

# GENERAL PROVISIONS

# FOR

# DEPARTMENT OF HUMAN SERVICES CONTRACTS

Revision Date: June 2017

The City of Philadelphia
Professional Services Contract
Department of Human Services
General Provisions

## TABLE OF CONTENTS

| | | |
|---|---|---|
| TABLE OF CONTENTS | | ii |
| ARTICLE I: DEFINITIONS | | 9 |
| 1.1 | ADA. | 9 |
| 1.2 | Additional Services and Materials. | 9 |
| 1.3 | Additional Term, Additional Terms | 9 |
| 1.4 | Agency | 9 |
| 1.5 | Aggregate Actual Cost | 9 |
| 1.6 | Appropriated Fiscal Year | 9 |
| 1.7 | Amendment | 9 |
| 1.8 | Applicable Law | 9 |
| 1.9 | Applicant. | 9 |
| 1.10 | CBES. | 9 |
| 1.11 | Certification of Restrictions on Lobbying | 10 |
| 1.12 | City. | 10 |
| 1.13 | City Agency. | 10 |
| 1.14 | City Council | 10 |
| 1.15 | City-Related Agency. | 10 |
| 1.16 | Code. | 10 |
| 1.17 | Commissioner | 10 |
| 1.18 | Commonwealth | 10 |
| 1.19 | Community Behavioral Health | 10 |
| 1.20 | Consultant. | 10 |
| 1.21 | Contract. | 11 |
| 1.22 | Contract Cost Principles | 11 |
| 1.23 | Contract Documents. | 11 |
| 1.24 | Contributions. | 11 |
| 1.25 | Community Umbrella Agency. | 11 |
| 1.26 | CRU | 11 |
| 1.27 | CWO. | 11 |
| 1.28 | CYD Policy Manual | 11 |
| 1.29 | Department. | 11 |
| 1.30 | Departmental and Administrative Policy Directives | 11 |
| 1.31 | Discharge Plan | 11 |
| 1.32 | Discharge Summary | 12 |
| 1.33 | EPSDT | 12 |
| 1.34 | Event of Default | 12 |
| 1.35 | Event of Insolvency | 12 |
| 1.36 | Exhaustion of Capacity | 12 |
| 1.37 | Family Court | 12 |

DocuSign Envelope ID: 42TE34ET-TT09-43FD-9B7B-27B82EBF845C

| 1.38 | Financial Assistance | 12 |
| 1.39 | Fiscal Year | 12 |
| 1.40 | Form Authorizations | 13 |
| 1.41 | FSP | 13 |
| 1.42 | Functional Expenditure Report | 13 |
| 1.43 | General Provisions | 13 |
| 1.44 | HealthChoices | 13 |
| 1.45 | Improving Outcomes for Children | 13 |
| 1.46 | Independent Audit Report | 13 |
| 1.47 | Initial Term | 13 |
| 1.48 | Intent to Adopt | 13 |
| 1.49 | Interpretation; Number, Gender | 13 |
| 1.50 | ISP | 14 |
| 1.51 | JPO | 14 |
| 1.52 | Materials | 14 |
| 1.53 | Medical Assistance | 14 |
| 1.54 | Mental Health Procedures Act | 14 |
| 1.55 | Modification Notice | 14 |
| 1.56 | Non-Competitively Bid Contract | 14 |
| 1.57 | Out-of-Home Placement | 14 |
| 1.58 | PA DHS | 14 |
| 1.59 | Party; Parties | 15 |
| 1.60 | PBC | 15 |
| 1.61 | Person | 15 |
| 1.62 | Placement Amendment | 15 |
| 1.63 | Policy Transmittals and Guides | 15 |
| 1.64 | Professional Services Contract | 15 |
| 1.65 | Provider | 15 |
| 1.66 | Provider Agreement | 15 |
| 1.67 | Provisional | 15 |
| 1.68 | Referring Agency | 15 |
| 1.69 | Responsible Official | 15 |
| 1.70 | Santiago Consent Decree | 15 |
| 1.71 | Scope of Services | 15 |
| 1.72 | Services | 16 |
| 1.73 | Single Case Plan | 16 |
| 1.74 | Subcontract | 16 |
| 1.75 | Subcontractor | 16 |
| 1.76 | Subrecipient Audit Guide | 16 |
| 1.77 | Suspension Notice | 16 |
| 1.78 | Suspension Period | 16 |
| 1.79 | SWAN | 16 |
| 1.80 | Term | 16 |
| 1.81 | Termination Notice | 16 |
| 1.82 | Transition | 16 |
| 1.83 | Transition Notice | 16 |
| 1.84 | Total Actual Cost | 17 |

| | | |
|---|---|---|
| 1.85 | Vacancy | 17 |
| ARTICLE II: TERM | | 17 |
| 2.1 | Initial Term. | 17 |
| 2.2 | Additional Terms. | 17 |
| ARTICLE III: PROVIDER'S DUTIES AND COVENANTS | | 17 |
| 3.1 | Performance Requirements | 17 |
| 3.2 | Compliance with Applicable Law | 17 |
| (a) | Title IV(e) of the Social Security Act ("Title IV(e)") and Adoption and Safe Families Act ("ASFA") Compliance. | 18 |
| (b) | Compliance with Title VI of the Civil Rights Act of 1964 | 18 |
| (c) | Compliance with the Prison Rape Elimination Act of 2003 | 19 |
| (d) | Fostering Connections To Success and Increasing Adoption Act of 2008 | 19 |
| (e) | Activities and Experiences for Children in Out-of-Home Placements Act of 2015. | 19 |
| 3.3 | Additional Services and Materials; Change in Scope of Services. | 20 |
| 3.4 | Responsibility | 20 |
| 3.5 | Subcontracts | 22 |
| 3.6 | Conflict of Interest; Related Party Transactions | 25 |
| 3.7 | Relationship with the City or Family Court | 25 |
| 3.8 | Time Frame for Submissions | 25 |
| 3.9 | Prompt Payment by Provider | 26 |
| 3.10 | Sales and Use Tax | 26 |
| 3.11 | Adherence to Departmental Policy | 26 |
| 3.12 | Adoption License | 26 |
| 3.13 | Routine Transportation Costs | 27 |
| 3.14 | Family Visit Food Costs | 27 |
| 3.15 | Payments for Placement Services | 27 |
| 3.16 | EPSDT; Managed Care | 27 |
| 3.17 | Service Requirements | 28 |
| 3.18 | Web-Based Central Referral Unit (CRU) System Participation | 28 |
| 3.19 | Dependent Placement Referrals. | 28 |
| 3.20 | Referral Disputes | 28 |
| 3.21 | Rejection of Referral | 28 |
| 3.22 | Notice of Referral Acceptance or Rejection | 29 |
| 3.24 | Vacation, Holiday Placement. | 29 |
| 3.25 | Adequate Clothing | 29 |
| 3.26 | Return of Medical Assistance Card | 29 |
| 3.27 | Service Reports | 29 |
| (a) | Progress Reports. | 29 |
| (b) | Placement Objectives; Adjustment Reports. | 30 |
| (c) | Notice of Child's Location. | 30 |
| (d) | Copies of ISPs, Other Reports. | 31 |
| (e) | In Home Services and Foster Care Outcomes Requirements. | 31 |
| (f) | Compliance with Temporary Assistance for Needy Families ("TANF") Reporting Requirements. | 31 |
| (g) | Unusual Incident, Safety Alert and HCSIS Reports | 32 |
| (h) | Documentation of arrests of children/youth. | 32 |
| (i) | Documentation of restraints of children/youth. | 32 |

| | | | |
|---|---|---|---|
| 3.28 | | Transitional and Discharge Planning. | 32 |
| | (a) | Upon Agreement of the Parties | 33 |
| | (b) | Upon Request of Provider | 33 |
| | (c) | Delinquent Children | 33 |
| | (d) | Documentation of discharges of children/youth. | 34 |
| 3.29 | | Absence of Child | 34 |
| 3.30 | | Provider's Publications | 35 |
| 3.31 | | Certifications | 35 |
| 3.32 | | Child Death Review | 39 |
| 3.33 | | Foster Parent Agreements. | 39 |
| 3.34 | | Group Home Provision. | 40 |
| 3.35 | | Adoption and Permanent Legal Custodianship | 40 |
| ARTICLE IV: PROVIDER'S REPRESENTATIONS AND COVENANTS | | | 40 |
| 4.1 | | Provider's Representations and Covenants | 40 |
| | (a) | Good Standing | 40 |
| | (b) | Authority to Act | 40 |
| | (c) | Legal Obligation | 41 |
| | (d) | No Litigation Preventing Performance | 41 |
| | (e) | Requisite Licensure and Qualifications | 41 |
| | (f) | No Adverse Interests | 42 |
| | (g) | No Indebtedness to the City | 42 |
| | (h) | Commercial Activity License | 43 |
| | (i) | Subcontractor Licensure; No Indebtedness to the City | 43 |
| | (j) | Non-Suspension; Debarment | 43 |
| | (k) | Prohibiting Religious Activities | 43 |
| | (l) | Non-Lobbying Certification | 44 |
| 4.2 | | Notice of Change | 44 |
| ARTICLE V: SERVICE REQUIREMENTS | | | 45 |
| 5.1 | | Scope of Services | 45 |
| 5.2 | | Placement and Referral Process | 45 |
| | (a) | Eligibility for Services | 45 |
| | (b) | Referral Process | 45 |
| | (c) | Residential Treatment Facility Placement | 46 |
| | (d) | Emergency Shelter Placement | 46 |
| | (e) | Availability of Placement Providers | 46 |
| | (f) | Information Sharing Following Acceptance for Placement | 46 |
| | (g) | Information Sharing in Emergency Out-of-Home Placement Cases | 46 |
| | (h) | Collaborative Planning | 47 |
| | (i) | Clothing | 47 |
| | (j) | Life skills training for children in placement | 47 |
| 5.3 | | Medical and Dental Costs | 48 |
| | (a) | Responsibility for Payment | 48 |
| | (b) | Medical Assistance | 48 |
| | (c) | Limits of the City's Responsibility | 48 |
| | (d) | Elective Services | 49 |
| 5.4 | | Change in Laws | 49 |
| 5.5 | | Right of Review and Rejection | 49 |

ARTICLE VI: COMPENSATION ........................................................................................ 49
6.1     Requisite Documents ........................................................................................ 49
6.2     Certification of Available Funds ....................................................................... 49
6.3     Unavailability of Funds ..................................................................................... 49
6.4     Crossing Fiscal Years ....................................................................................... 50
6.5     Allowability of Cost Items ............................................................................... 50
6.6     Advances .......................................................................................................... 50
6.7     Income From Contract Funds ........................................................................... 51
6.8     Monitoring of Fund Utilization ........................................................................ 51
6.9     Maximum Daily Rate, Days of Care or Units of Service (or combination thereof) ........ 51
6.10    Total Actual Cost .............................................................................................. 51
6.11    Excess Compensation ....................................................................................... 52
6.12    Unpaid Amounts ............................................................................................... 52
6.13    Invoices ............................................................................................................ 52
6.14    Golden Parachute Agreements .......................................................................... 53
6.15    Indirect Rate Requests ...................................................................................... 53
6.16    Timely Payment From Pennsylvania State Funds ............................................ 53
ARTICLE VII: AUDITS; INSPECTION RIGHTS; RECORDS ........................................ 53
7.1     City Audit ......................................................................................................... 53
7.2     Inspection ......................................................................................................... 54
7.3     Availability of Records ..................................................................................... 54
7.4     Retention of Records ........................................................................................ 54
7.5     Independent Audit ............................................................................................ 54
7.6     Compliance Audit Reports ............................................................................... 57
7.7     Program Records; Reporting Costs ................................................................... 57
   (a)      Reports Concerning Provider's Costs .......................................................... 57
   (b)      Purchase Category ........................................................................................ 58
   (c)      Unallowable Costs; Third Party Funds ........................................................ 58
7.8     Audits Pursuant to Section 6-400 of the Home Rule Charter ........................... 59
ARTICLE VIII: ASSIGNMENT ........................................................................................ 59
8.1     Assignment By Provider ................................................................................... 59
8.2     Applicability in Case of Bankruptcy or Insolvency ......................................... 59
8.3     Personal Services ............................................................................................. 60
ARTICLE IX: INDEPENDENT CONTRACTOR; INDEMNIFICATION;   LITIGATION
        COOPERATION ............................................................................................... 60
9.1     Independent Contractor .................................................................................... 60
9.2     Indemnification ................................................................................................ 60
9.3     Litigation Cooperation ..................................................................................... 60
9.4     Notice of Claims .............................................................................................. 60
ARTICLE X: INSURANCE ................................................................................................ 61
10.1    Insurance .......................................................................................................... 61
   (a)      Workers' Compensation and Employers' Liability ....................................... 61
   (b)      General Liability Insurance ........................................................................... 61
   (c)      Automobile Liability Insurance .................................................................... 62
   (d)      Professional Liability Insurance ................................................................... 62
10.2    Self-Insurance .................................................................................................. 62
10.3    Evidence of Insurance Coverage ...................................................................... 63

| 10.4 | Fidelity Bond | 64 |
|------|---------------|-----|
| | ARTICLE XI: OWNERSHIP OF MATERIALS; PROPRIETARY INFORMATION; CONFIDENTIALITY | 64 |
| 11.1 | City Data | 64 |
| 11.2 | Ownership of Materials | 64 |
| 11.3 | Non-Disclosure and Destruction of Data | 66 |
| | ARTICLE XII: EVENTS OF DEFAULT | 66 |
| 12.1 | Events of Default | 66 |
| 12.2 | Notice and Cure | 67. |
| | ARTICLE XIII: REMEDIES | 67 |
| 13.1 | The City's Remedies | 67 |
| 13.2 | Concurrent Pursuit of Remedies; No Waiver | 69 |
| | ARTICLE XIV: TRANSITION, TERMINATION AND SUSPENSION | 69 |
| 14.1 | Transition | 69 |
| 14.2 | Termination or Suspension | 69 |
| 14.3 | Provider Responsibilities Upon Transition, Termination or Suspension | 69 |
| 14.4 | Payment of Provider upon Transition, Termination or Suspension | 70 |
| 14.5 | Special Suspension Rules | 71 |
| | ARTICLE XV: ADDITONAL REPRESENTATIONS AND COVENANTS OF PROVIDER RELATING TO CERTAIN APPLICABLE LAWS | 71 |
| 15.1 | Non-Discrimination; Fair Practices | 71 |
| 15.2 | Chapter 17-400 of the Philadelphia Code: Exclusionary Private Organizations | 72 |
| 15.3 | Executive Order 03-12: Minority, Woman and Disabled Business Enterprise Participation | 72 |
| 15.4 | Federal Laws | 75 |
| 15.5 | Americans With Disabilities Act | 75 |
| 15.6 | Northern Ireland | 76 |
| 15.7 | Limited English Proficiency | 76 |
| 15.8 | Business, Corporate and Slavery Era Insurance Disclosure | 77 |
| 15.9 | Protected Health Information | 77 |
| 15.10 | Chapter 17-1300 of The Philadelphia Code: Philadelphia 21st Century Minimum Wage and Benefits Standard | 78 |
| 15.11 | Chapter 17-1400 of the Philadelphia Code: Contributions and Other Mandatory Disclosures | 81 |
| 15.12 | Executive Order 10-16: Gifts | 84 |
| 15.13 | Chapter 17-1900 of the Philadelphia Code: Equal Benefits Ordinance | 85 |
| | ARTICLE XVI: MISCELLANEOUS | 86 |
| 16.1 | Governing Law | 86 |
| 16.2 | Amendments; Waiver | 86 |
| 16.3 | Integration | 86 |
| 16.4 | No Joint Venture | 86 |
| 16.5 | No Third Party Beneficiaries | 86 |
| 16.6 | Counterparts | 87 |
| 16.7 | Severability and Partial Invalidity | 87 |
| 16.8 | Survival | 87 |
| 16.9 | Determination of Disputes | 87 |
| 16.10 | Interpretation; Order of Precedence | 87 |

| | | |
|---|---|---|
| 16.11 | Headings | 87 |
| 16.12 | Statutory and other Citations | 88 |
| 16.13 | Days | 88 |
| 16.14 | Forum Selection Clause; Consent to Jurisdiction | 88 |
| 16.15 | Waiver of Jury Trial | 88 |
| 16.16 | Notices | 88 |
| 16.17 | E-signatures | 89 |
| (a) | Technology Changes | 89 |
| (b) | Electronic Submissions | 89 |
| (c) | Breach | 89 |

The City of Philadelphia
Professional Services Contract
Department of Human Services
General Provisions

# GENERAL PROVISIONS

## ARTICLE I:  DEFINITIONS

1.1     **ADA.** "ADA" shall have the meaning set forth in Section 15.5 (Americans with Disabilities Act) below.

1.2     **Additional Services and Materials.** "Additional Services and Materials" shall have the meaning set forth in Section 3.3 (Additional Services and Materials; Change in Scope of Services) below.

1.3     **Additional Term, Additional Terms.** "Additional Term" and "Additional Terms" shall have the meanings set forth in Section 2.2 (Additional Terms) below.

1.4     **Agency.** "Agency" shall have the meaning set forth in Section 7.8 (Audits Pursuant to Section 6-400 of the Home Rule Charter) below.

1.5     **Aggregate Actual Cost.** "Aggregate Actual Cost" means the sum of all Total Actual Costs incurred by Provider in provision of the Services.

1.6     **Appropriated Fiscal Year.** "Appropriated Fiscal Year" shall have the meaning set forth in Section 6.4 (Crossing Fiscal Years) below.

1.7     **Amendment.** "Amendment" means (a) a written modification or change to any Contract Document signed by both Parties, and (b) a Modification Notice (see Section 6.9 Maximum Daily Rate, Days of Care or Units of Service (or combination thereof) below).

1.8     **Applicable Law.** "Applicable Law" means all applicable present and future federal, state or local laws, ordinances, executive orders, rules, regulations and all court orders, injunctions, decrees and other official interpretations thereof of any federal, state or local court, administrative agency or governmental body, including the City, the Commonwealth and the United States of America. Applicable Law includes, without limitation, the Philadelphia Home Rule Charter, the Philadelphia Code, the Pennsylvania Code, and the specific laws set forth in Article XV (Additional Covenants of Provider Relating to Certain Applicable Laws) below, each as amended from time to time.

1.9     **Applicant.** "Applicant" has the meaning as set forth in Subsection 17-1401(1) of The Philadelphia Code, as it may be amended from time to time. As of June 2012, that definition was "[a] Person who has filed an application to be awarded a Non-Competitively Bid Contract."

1.10    **CBES.** "CBES" means Community Based Emergency Shelter, an emergency placement facility for delinquent or alleged delinquent youth.

1.11   **Certification of Restrictions on Lobbying.** "Certification of Restrictions on Lobbying," if required in the Provider Agreement, means a certificate in the form attached to the Provider Agreement.

1.12   **City.** The "City" means The City of Philadelphia, a corporation and body politic existing under the laws of the Commonwealth of Pennsylvania, and includes its various executive and administrative departments, agencies, boards and commissions, including the Department, and its legislature, City Council (defined below). The City is a City of the First Class under the laws of the Commonwealth of Pennsylvania.

1.13   **City Agency.** "City Agency" has the meaning as set forth in Subsection 17-1401(5) of The Philadelphia Code, as it may be amended from time to time. As of June 2012, that definition was "[a]ny office, department, board, commission or other agency of the City of Philadelphia."

1.14   **City Council.** "City Council" means the Council of The City of Philadelphia, as described in Article II of the Philadelphia Home Rule Charter, as it may be amended from time to time. City Council is the legislature of the City.

1.15   **City-Related Agency.** "City-Related Agency" has the meaning set forth in Subsection 17-1401(9) of The Philadelphia Code, as it may be amended from time to time. As of June 2012, that definition was "[a]ll authorities and quasi-public corporations which either: receive appropriations from the City, have entered into continuing contractual or cooperative relationships with the City, or operate under legal authority granted to them by City ordinance."

1.16   **Code.** The "Code" unless otherwise specified shall mean the Philadelphia Code, as it may be amended from time to time.

1.17   **Commissioner.** "Commissioner" means the Commissioner of the Department of Human Services of the City.

1.18   **Commonwealth.** "Commonwealth" means the Commonwealth of Pennsylvania.

1.19   **Community Behavioral Health.** "Community Behavioral Health" or "CBH" means Community Behaviorial Health, a Pennsylvania nonprofit corporation incorporated for the purpose of helping to ensure that Philadelphians with mental health and substance abuse needs receive the most appropriate and effective treatment in the least restrictive and most cost effective setting.

1.20   **Consultant.** "Consultant" has the meaning as set forth in Subsection 17-1401(6) of The Philadelphia Code, as it may be amended from time to time. As of June 2012, that definition was "[a]ny Person used by Provider to assist in obtaining a Non-Competitively Bid Contract through direct or indirect communication by such Person with any City Agency or any City officer or employee, if the communication is undertaken by such Person in exchange for, or with the understanding of receiving, payment from Provider or any other Person; provided, however, that "Consultant" shall not include a full-time employee of Provider."

1.21   **Contract.** The "Contract" means the agreement of the Parties evidenced by the Contract Documents. References to this "Contract" shall mean this Contract as the same may be in effect at the time such reference becomes operative.

1.22   **Contract Cost Principles.** The "Contract Cost Principles" means the "City of Philadelphia Contract Cost Principles and Guidelines," as it may be amended from time to time, which specifies the Department's guidelines for the qualitative and quantitative evaluation of contract services and materials, the determination of allowable costs, and the standards to determine the allowability of individual cost items. (Copies are available from the Department upon request.)

1.23   **Contract Documents.** The "Contract Documents" means these General Provisions, the Provider Agreement, the Limited License Agreement for the Cross Agency Response for Effective Services (CARES) (where applicable) and any and all other documents or exhibits incorporated by reference in either the General Provisions or the Provider Agreement, and any and all Amendments to any of these documents.

1.24   **Contributions.** "Contributions" shall have the meaning set forth in the Pennsylvania Election Code, 25 P.S. Section 3241.

1.25   **Community Umbrella Agency.** "Community Umbrella Agency" or "CUA" means an agency located in a defined geographic area that provides a continuum of services to children and youth at risk of abuse, neglect, or delinquency, as further described in the Scope of Services.

1.26   **CRU.** "CRU" means Central Referral Unit.

1.27   **CWO.** "CWO" means Child Welfare Operations of the Department. CWO was formerly known as the Children and Youth Division ("CYD").

1.28   **CYD Policy Manual.** "CYD Policy Manual" (formerly the Operations Manual ) means the document and its revisions which contains all the policies of the Department's Child Welfare Operations.

1.29   **Department.** The "Department" or "DHS" means the Department of Human Services of the City.

1.30   **Departmental and Administrative Policy Directives.** "Departmental and Administrative Policy Directives" means those policy or procedural directives regarding programs and operations of the various divisions of the Department that are issued to Providers by the Commissioner or the Commissioner's designee which may include, but is not limited to, Deputy Commisioners, Policy and Planning, and Provider Relations and Evaluations of Programs (PREP). .

1.31   **Discharge Plan.** "Discharge Plan" means the document submitted by Provider to the Department upon discharge of a child from Provider's agency. The Discharge Plan outlines the Services Provider has provided to the child and the child's family, the effectiveness of those Services, and any additional services recommended by Provider.

1.32 **Discharge Summary.** "Discharge Summary" means a description of the Services provided to a child and the child's family by Provider, and a statement of the reasons for the child's discharge.

1.33 **EPSDT.** "EPSDT" means Early and Periodic Screening, Diagnosis and Treatment, a Pennsylvania Medical Assistance program initiative providing medical services to children aged 0-21 years.

1.34 **Event of Default.** "Event of Default" means those events defined and identified in Section 12.1 (Events of Default) of these General Provisions.

1.35 **Event of Insolvency.** "Event of Insolvency" means (a) the filing of a voluntary petition by Provider under the Federal Bankruptcy Code or any similar state or federal law; or (b) the filing of an involuntary petition against Provider under the Federal Bankruptcy Code or any similar state or federal law which remains undismissed for a period of forty-five (45) days; or (c) Provider's making of an assignment for the benefit of creditors; or (d) the appointment of a receiver for Provider or for the property or assets of Provider, if such appointment is not vacated within forty-five (45) days thereafter; or (e) any other proceeding under any bankruptcy or insolvency law or liquidation law, voluntary or otherwise; or (f) Provider's inability to pay its obligations as they mature; or (g) Provider's insolvency as otherwise defined under any Applicable Law.

1.36 **Exhaustion of Capacity.** "Exhaustion of capacity" means the utilization of all of the Service capacity (whether beds in the case of out-of-home placement, or units or slots of Service in the case of non-placement), of Provider.

1.37 **Family Court.** "Family Court" means that judicial division of the Court of Common Pleas for Philadelphia County with original jurisdiction over all matters pertaining to dependent and delinquent children.

1.38 **Financial Assistance.** "Financial Assistance" has the meaning set forth in Section 17-1401(16) of The Philadelphia Code, as it may be amended from time to time. As of June 2012, that definition was "[a]ny grant, loan, tax incentive, bond financing subsidy for land purchase or otherwise, or other form of assistance that is realized by or provided to a Person in the amount of fifty thousand dollars ($50,000) or more through the authority or approval of the City, including, but not limited to, Tax Increment Financing (TIF) aid, industrial development bonds, use of the power of eminent domain, Community Development Block Grant (CDBG) aid or loans, airport revenue bonds, and Enterprise Zone or similar economic development zone designations (such as Keystone Opportunity Zones, Keystone Opportunity Expansion Zones, Keystone Opportunity Improvement Zones, and Economic Development District Zones), but not including any assistance to which a Person is entitled under a law enacted before the Person applied for or requested such assistance."

1.39 **Fiscal Year.** "Fiscal Year" means the fiscal year of the City, which commences on July 1 of each calendar year and expires on June 30 of the next succeeding calendar year.

1.40   **Form Authorizations.**  "Form Authorizations" means the "CRU Fax Cover Transmittal Sheet for Referral and Service Authorization" and "DHS After-Hours Fax Cover Transmittal Sheet for Referral and Service Authorization."  The authorization forms will provide the Provider with the required documentation of proof or authorization to provide services to a child prior to accepting the child for service.  Once the Fax Sheet has been received, Provider cannot make further requests for this form or for a Form 85-29 printout.

1.41   **FSP.**  "FSP" means Family Service Plan, the document prepared by the Department which outlines those Services required for the family of the child or children committed to, or under the supervision of, the Department.

1.42   **Functional Expenditure Report.**  "Functional Expenditure Report" means a report required by Subrecipient Audit Guide.

1.43   **General Provisions.**  "General Provisions"  means these "The City of Philadelphia Professional Services Contract General Provisions for Department of Human Service Contracts," which contains the standard provisions required by the City in its professional services contracts for the Department of Human Services, and any exhibits identified in these General Provisions.

1.44   **HealthChoices.**  "HealthChoices" means the program operating under a waiver from the Centers for Medicare and Medicaid Services (formerly Health Care Financing Administration) pursuant to Section 1915(b) of the Social Security Act, 42 U.S.C. 1396(n), to provide mandatory managed health care to Medical Assistance recipients in Bucks, Chester, Delaware, Montgomery and Philadelphia Counties.

1.45   **Improving Outcomes for Children**.  "Improving Outcomes for Children" or "IOC" means the City's multi-year reform plan to create a single case management system with distinct and well-defined roles for both DHS and Provider agencies.

1.46   **Independent Audit Report.**  "Independent Audit Report" means a report prepared by a Certified Public Accountant who, pursuant to AICPA Professional Standards, is not (a) a member of the board of Provider, (b) an officer or employee of Provider, or (c) a partner, director, officer or employee of a partnership, corporation or association who is a member of the board of Provider, or a director, officer or employee of Provider.

1.47   **Initial Term**.  "Initial Term" shall have the meaning set forth in Section 2.1 (Initial Term) below.

1.48   **Intent to Adopt**.  "Intent to Adopt" means that report which is required by the Adoption Act (23 Pa. C.S. § 2531), to be filed with the Court of Common Pleas by the person or persons intending to adopt a child, confirming said person or persons' intent to adopt.

1.49   **Interpretation; Number, Gender.**  The words "herein" "hereof" and "hereunder" and other words of similar import refer to this Contract as a whole, including the all of the Contract Documents, and not to any particular article, section, subsection or clause contained in the Contract Documents. Whenever the

context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include the masculine, feminine and neutral genders.

1.50 **ISP.** "ISP" means the Individual Service Plan, that document prepared by Provider in accordance with the FSP, which identifies the specific Services Provider will render to the child and the child's family.

1.51 **JPO.** "JPO" means the Juvenile Probation Officer.

1.52 **Materials.** "Materials" means any and all reports, records, documents, documentation, information, supplies, plans, original drawings, specifications, computations, sketches, renderings, arrangements, videos, pamphlets, advertisements, statistics, and other data, computer tapes, computer software, and other tangible work product or materials prepared or developed by Provider in connection with the Services, or for Provider by a Subcontractor in connection with the Services, and supplied to the City by Provider or its Subcontractor pursuant to this Contract.

1.53 **Medical Assistance.** "Medical Assistance" or "MA" means that program authorized under Article IV(f) of the Public Welfare Code, which is administered in accordance with Title XIX of the Social Security Act (42 U.S.C. §1396), and the regulations from time to time promulgated thereunder, to provide for specific medically necessary medical services and items furnished to eligible recipients by approved providers enrolled in the program.

1.54 **Mental Health Procedures Act.** "Mental Health Procedures Act" means the law, codified at 50 P.S. §§7101-7503, as it may be amended from time to time, which governs the procedures for voluntary and involuntary mental health treatment in the Commonwealth of Pennsylvania.

1.55 **Modification Notice.** "Modification Notice" means written notice from the City to Provider that informs Provider of the City's intent to modify the maximum daily rate, number of days of care or units of Services under this Contract. The Modification Notice operates as an amendment to this Contract.

1.56 **Non-Competitively Bid Contract.** "Non-Competitively Bid Contract" has the meaning set forth in Section 17-1401(12) of The Philadelphia Code, as it may be amended from time to time. As of June 2012, that definition was "[a] contract for the purchase of goods or services to which the City or a City Agency is a party that is not subject to the lowest responsible bidder requirements of Section 8-200 of the Charter, including, but not limited to, a Professional Services Contract, and any renewal of such a contract (other than a renewal term pursuant to an option to renew contained in an executed contract)."

1.57 **Out-of-Home Placement.** "Out-of-Home Placement" means those Services that involve placement of a child outside of the child's home, including, without limitation, placement in a foster care home, a group home, a residential treatment facility, or any similar placement setting.

1.58 **PA DHS.** "PA DHS" means the Commonwealth Department of Human Services.