> @MikeFOX29 @Pontifex Pope Francis is a social media guy. The Muckety Mucks are going to Rome but Papa listens to the real people!
>
> 3:43 PM - Mar 8, 2014
>
>    1     See Jim Kenney's other Tweets

Follow @pkerkstra and @CitifiedPHL on Twitter.

## Read More About:

Archdiocese of Philadelphia      Charles Chaput      Jim Kenney

---

# You Might Also Like



**The Coolest Ice Cream Shops in Philadelphia**





# Around The Web

### It's Like Amazon, but Everything Sells in 90 Seconds
**Tophatter**

### Washington, District Of Columbia: This Tiny, Unknown Company Is Disrupting A $200 Billion Industry
**EverQuote Insurance Quotes**

### Play this for 1 minute and see why everyone is addicted
**Throne: Free Online Game**

### 25 Seriously Addicting Shows Streaming On Netflix
**Livingly**

### This new snoring fix has CPAP makers on high alert. Here's how it works
**My Snoring Solution**

### District Of Columbia: Born Before 1985? Gov't Program May Pay Off Your Mortgage (Only if You Claim it)
**HARP Refi Quote**

### Glasses-Wearers Are Going Crazy Over This Website
**GlassesUSA.com**

### Discover Cars for Sale in District Of Columbia
**Edmunds**

Sponsored Links by Taboola

# TRENDING

**1** **Starbucks Anti-Bias Training "Missed the Mark Completely," Say Two Philly Baristas**

**2** **This Quaker Sex Ed Teacher Says Your Kids Need to Be Porn-Literate**

**4**    **A Bucks County Farm Is Hosting Philly's Top Chefs This Summer**

**5**    **Body of Woman Lost in Flash Flood Pulled From Pennypack Creek**

# Sign up to get the best of Philly, every day.

SUBMIT

SEE ALL

| About | Contact | Subscribe |
| --- | --- | --- |
| Advertise | Customer Service | Careers |
| Privacy Policy | | |

# Philadelphia

2018 © Metro Corp. All Rights Reserved.

# Attachment L



## Project Discovery by Crossroads

Was created in 2005 to provide LGBTQ (lesbian, gay, bisexual , transgender or questioning) youth ages 12-21, with a community based home environment of support and sensitivity. Social, emotional and/or behavioral difficulties, along with individual LGBTQ issues are addressed by Treatment Parents who have an understanding of the extra pressures of adolescents when sexual identity and preference are added into the already challenging mix today's young people face.

## The Confidence to Grow Up & Grow Strong

Project Discovery by Crossroads provides extra training to these therapeutic foster homes to help support LGBTQ young people so they can develop a healthy and positive self- evaluation, awareness and image. The future can be a bright one with many wonderful possibilities…if we take care to provide ' the right place and the right space' in which our LGBTQ youth can live and grow. *Project Discovery by Crossroads is a Medicaid funded program with an average length of stay of 12-18 months.*



### Home isn't always a safe place for LGBTQ young people.

The teenage years are not easy ones.  Young people struggle with school, parental issues and emotional ups and downs as they transition into adulthood.

But when you are an LGBTQ teen, you can face far more serious dangers…simply because of who you are.

To avoid a home environment that does not embrace or support questions about sexual identity, many young LGBTQ youth run away from home, making them easy targets for human trafficking or the dangers of street life.

## Project Discovery by Crossroads Can Make a **Difference**

# Would you consider becoming an LGBTQ Foster Parent?

It's the hardest job you'll ever love…and the most important one. Your support today could make the difference in all the tomorrows these young people will face. Don't let them do it alone!

## Get in Touch – We could use your help!

Crossroads will provide our Project Discovery therapeutic foster homes with:

- Specialized training
- Counseling
- Financial assistance
- Clinical Support
- Staff Support
- Some services brought right to your home

## For more information about Project Discovery by Crossroads:

**Kerri Durkin**
*Program Director*
kerri@crossroadsprograms.org
609.880.0210 x106

**Stephanie Green**
*Treatment Home Coordinator*
Stephanie@crossroadsprograms.org
609.880.0210 x120



610 Beverly Rancocas Road
Willingboro, NJ 08046
P: 609.880.0210
F: 609.880.0230

**www.crossroadsprograms.org**

# Project Discovery by Crossroads



**Life is a journey toward self-discovery… let Crossroads be part of that journey.**

Project Discovery by Crossroads is designed to provide safety and support for LGBTQ youth.

# Attachment M

Razoo is now Mightycause! Same great fundraising tools, mighty new name.    READ MORE



# CROSSROADS PROGRAMS INC
### A NONPROFIT ORGANIZATION ✓

**19 DONORS**    FUNDRAISE (/FUNDRAISE/START?ORG_URN=CROSSROADS-PROGRAMS&ORG_NAM

**ABOUT (/ORGANIZATION/CROSSROADS-PROGRAMS)**

**LGBTQ Focused Services**

In 2007, Crossroads opened Project Discovery, specialized Foster Homes for self-identified lesbian, gay, bisexual, transgender, and/or questioning (LGBTQ) youth. A program providing them with the support and sensitivity necessary to address thier unique needs. While Project Discovery was growing, there were requests from the other providers and the community for something to bring LGBTQ youth together for support, socialization and to know they are not alone. With the help of concerned youth and adults from the community, this group has finally come to fruition.

"Kaleidoscope" — Teens embracing, experiencing, and transforming the spectrum"

Meeting monthly at The Spot at the Voorhees Town Center, this youth run group hopes to offer support, advocacy and information to their peers. To our knowledge, we are the only such group in South Jersey.

We are a grassroots, start up group with no grants or funding behind us. **We will survive on the generosity of those who have taken this journey or watched someone take it and know what a difference acceptance and support can make.**

We need support for rent, background checks on the adult volunteers, snacks, supplies and to off set the cost of some of the events the youth hope to attend.

Our youth have so many exciting ideas about speakers and events (including a prom) that we want to tap into that energy as quickly as possible and reduce as many barriers as possible.

# Attachment N

MAGAZINE • NEWSLETTERS

   

# Local Organization Seeks Foster Parents for LGBTQ Youth

*by* **BRYAN BUTTLER** • *5/28/2014, 9:00 a.m.*





The number of LGBTQ youth who are homeless or seeking shelter is staggering: according to recent studies by UCLA, nearly 40% of homeless youth identify as LGBTQ. A local South Jersey

organization is trying to address the specific needs of foster homes for gay youth, and is seeking a few good people to help in their efforts.

Next month, Crossroads Programs will be hosting an information session in Collingswood, New Jersey (a simple PATCO ride over the Ben Franklin Bridge) at the Collingswood Community Center for those interested in learning information about how to provide support and homes for LGBTQ youth.

"When Crossroads Programs looked for a place to host an information session for potential foster parents for LGBT youth, they first thought of Collingswood," said Lydia Cipriani, Director of Development and Communications for Crossroads, who called Collingswood "a progressive town with a significant gay community."

The organization wants to emphasize the distinct needs of LGBTQ youth, especially in a foster care situation. Program Director Kerri Durkin reinforced this point: "Lesbian, Gay, Transgender, Bisexual and Questioning teens are a particularly vulnerable group and they need adult support while going through a difficult period in their lives. Problems tend to loom large when you're a susceptible teen. It's important to have emotionally supportive adults in your life to let you know that you're cared for and supported."

The Collingswood Community Center information session takes place on Thursday, June 26 from 6-8PM; it's located at 30 West Collings Avenue. For more information, visit Crossroads Program's website, or contact 800-601-4900.

## Read More About:

Collingswood    LGBTQ Youth

# You Might Also Like



LGBTQ&A: Mikhel Harrison



LGBTQ&A: Sam Mink



LGBTQ&A: Sam Marks

# Around The Web



**Quicken Loans...**

Quicken Loans

NMLS#3030



**Unsecured Business...**

SnapCap Business Lending



**It's Like Amazon, b...**

Tophatter



**Why Home Chef Beats**

Home Chef

Sponsored Links by Taboola 

## TRENDING

**1**  Starbucks Anti-Bias Training "Missed the
Mark Completely," Say Two Philly Baristas

**2**  This Quaker Sex Ed Teacher Says Your Kids
Need to Be Porn-Literate

**3**  Philly Apparently Hates Poutine

**4**  A Bucks County Farm Is Hosting Philly's Top
Chefs This Summer

**5**  Body of Woman Lost in Flash Flood Pulled
From Pennypack Creek

## Sign up to get the best of Philly, every day.

SEE ALL

## READ MORE ABOUT



50 Best Shops in Philadelphia



Best of Philly Shopping

## Vote Now for the Best Philly Athlete Ever

We asked five influential Philadelphians to nominate their favorite Philly athlete to win a Best of Philly award. Now's your chance to weigh in! Vote now and enter to win tickets to the Best of Philly Soirée this August.



About     Contact     Subscribe     Advertise     Customer Service     Careers     Privacy Policy

2018 © Metro Corp. All Rights Reserved.

# Attachment O





REGIONAL —

# N.J. youth agency looks to match LGBT adults, teens

PGN Staff    June 19, 2014

Crossroads Programs was founded in 1978 to support and empower young people who have been abandoned, abused, homeless or at-risk and now the New Jersey-based organization hopes to inspire the LGBT community to help.

Crossroads Programs implemented Discovery Project in 2006 to help find foster homes for LGBT youth and is redoubling its efforts with an information session geared toward LGBT-headed households later this month.

Crossroads director of development and communications Lydia Cipriani said that Discovery Project grew from the high volume of youth the organization encounter who were marginalized because of their LGBT identity.

"A high percentage of LGBT kids were running away or homeless because they were rejected for their sexual orientation or gender identity," she said.

And, when the youth entered the foster-care system, they were often met by families who were not accepting of their LGBT identity, said Crossroads CEO Michael Snyder.

"There were a number of LGBT youth who were not feeling safe in traditional foster care," Snyder said. "So we made it our mission to create a safe space and support youth in their development by recruiting families who would provide a loving, supportive home. These kids need to know that they are loved and cared for and if they have that supportive

environment, that is just one less thing they have to deal with."

Discovery Project normally serves up to 10 youth per year, who usually are 15 or 16, but who range from 12-21.

To become a treatment foster parent, individuals must go through an interview, home check, trainings and licensing and be inspected by the state. Crossroads also offers additional training on LGBT issues.

The agency conducts reference checks on the prospective foster parents and also looks to ensure the family can financial support a child. While the family is reimbursed up to $75 a day for their participating, Snyer noted fostering is not a salaried job.

Program director Kerri Durkin said the youth who go through the Discovery Program are normal teenagers.

"They are just like any other kid in the program except they are dealing with something additional. They have the same problems and emotional issues," she said, noting it can be difficult to find people who understand the added pressures LGBT youth are facing. "It is an ongoing challenge with treatment and foster case in general with this population.

LGBT adults, Cipriani noted, are a natural match for the program, as they've likely faced some of the same issues the youth are dealing with.

"We want to find people who understand them and who will provide the tolerance and sympathy they need," she said. "Historically, the LGBT community has come together for causes that are important to them and provide a lot of support."

Crossroads will host an information session from 6-8 p.m. June 26 at the Collingswood Community Center, 28 W. Collins Ave., in Collingswood.

For more information, visit www.crossroadsprograms.org.



## OPINION

Editorials

Mark My Words

Street Talk

Letters

Op-Ed

Creep of the Week

## ARTS & CULTURE

Portraits

Features

Out & About

Arts

Music

Television

Food

Books

Scene in Philly

## COLUMNS

Out Law

On Being Well

Before the Bells

Mombian

Outward Bound

Get Out and Play

Paw Prints

Work it Out

Thinking Queerly

Gettin' On

Out Money

Queer Faith

Body U

## INFO

About PGN

Contact Us

Advertising

Where to Find Us

Job Opportunities

Print Edition

Sitemap

## NEWSLETTER SIGNUP

Subscribe to our email newsletter for weekly updates from The Philadelphia Gay News - delivered to your inbox every Thursday.

Copyright © 2014 The Philadelphia Gay News. All Rights Reserved.

Case 2:18-cv-02075-PBT   Document 13-8   Filed 06/07/18   Page 21 of 74

Designed by Soapbox Solutions.

# Attachment P



# Mother/Baby Host Home

Children & Families

   Therapeutic Foster Care

   CRR Host Home

   Mother/Baby Host Home

   Behavioral Health Rehabilitation Services

   Case Management & Resource Coordination Services

   Relief Support

   Emergency After Hours Placement Response Service

   Family-Based Services

Adults with Disabilities

It takes a village to raise a child, and at Pennsylvania MENTOR, we help build a community of support for the young mothers we serve. In this program, young mothers living in the homes of our foster parents, who we call Mentors, receive intensive case management services to help them be the best moms they can be. The teenage girls are in foster care when they are pregnant or have already given birth. The baby lives with their mother in the Mentor's home. As long as it remains in the best interest of the child, the mother maintains full custody. Through our Mother Baby Host Home program, we help these young mothers learn how to support and care for their child.



## Personalized Support

Our dedicated program service coordinators visit the young mothers in their Mentors' homes. We make sure the young mothers are working with the support system we help them develop, a support system that includes:

- Parenting classes
- Independent living classes
- Day care
- Support groups
- Access to health care, WIC, and transportation

Our experienced team is available to the young mothers 24/7, offering constant guidance and support. Our goal is to make sure these young women have everything they need to be the best moms possible.

This program is available in Philadelphia, Bucks, Montgomery, Delaware, and Chester Counties. Please call 215-925-3461 *5025 for more information.

**If you would like to help a young mother and her baby have the best start possible, go to www.makeadifferenceathome.com to learn more about becoming a Mentor!**

Contact Us | Privacy Policy | Legal Statement | Bobby Approved



# Attachment Q

# Pennsylvania MENTOR

Search

# Therapeutic Foster Care

**Children & Families**

   Therapeutic Foster Care

   CRR Host Home

   Mother/Baby Host Home

   Behavioral Health Rehabilitation Services

   Case Management & Resource Coordination Services

   Relief Support

   Emergency After Hours Placement Response Service

   Family-Based Services

**Adults with Disabilities**

The children we serve in our Therapeutic Foster Care program may have intellectual and developmental disabilities or emotional and behavioral challenges, and we provide them with nurturing homes where they can thrive.

## A Personal Approach

Every child is different, and our team of clinical coordinators, behavioral specialists, and therapists work with the child and their Mentor to develop an Individual Service Plan.  The plan outlines goals and personalized supports which include:

- 24-hour home-based monitoring
- Therapeutic intervention
- Nurturing support
- Guidance
- Access to routine family and community-based activities
- Life skills development
- Medication management oversight

### It's All about Relationships

Our Therapeutic Foster Care program is supported by foster parents, who we call Mentors.  We call them Mentors because they are more than care providers to the children we serve – they are teachers, advocates, and friends.  Mentors open their homes and their hearts to the children we support.  We carefully screen our Mentors and provide them with specialized skill development opportunities to ensure they are able to support the children in our program.  We are with our Mentors every step of the way, providing them with 24/7 on-call support and guidance.

**If you are interested in learning more about how you can change a child's life, go to Be a Mentor!**

**Western PA Area**

412-731-7422

**Central PA Area**

717-657-2073

**Pittston/Pocono Area**

570-654-0953

**Lehigh/Wescosville/Reading**

610-706-0442

**Philadelphia/Montgomery/Delaware/Bucks  & Chester Counties**

215-925-3461

## Open Your Heart and Your Home



At Pennsylvania MENTOR, we believe every child deserves to live in a safe, nurturing home where they can feel valued and loved.  Our Therapeutic Foster Care and CRR Host Home programs are designed to give them exactly that.

**Watch Video**

Contact Us | Privacy Policy | Legal Statement | Bobby Approved   

# Attachment R



# Pennsylvania Indian Child Welfare Handbook

*Developed By*

The Pennsylvania Child Welfare Training Program
University of Pittsburgh, School of Social Work

# Pennsylvania Indian Child Welfare Handbook

The Pennsylvania Child Welfare Training Program is a collaborative effort of the Pennsylvania Department of Public Welfare, University of Pittsburgh, School of Social Work, and the Pennsylvania Children and Youth Administrators established to train direct service workers, supervisors, and administrators in providing social services to abused and neglected children and their families. The Training Program is centrally managed and regionally administered by the University.

  

Copyright © 2006, The University of Pittsburgh

This material is copyrighted by The University of Pittsburgh. It may be used freely for training and other educational purposes by public child welfare agencies and other not-for-profit child welfare agencies that properly attribute all material use to The University of Pittsburgh. No sale, use for training for fees, or any other commercial use of this material in whole or in part is permitted without the express written permission of The Pennsylvania Child Welfare Training Program of the School of Social Work at The University of Pittsburgh. Please contact the Karen D. Ostrander at (717) 795-9048 for further information or permissions.

The Pennsylvania Child Welfare Training Program
University of Pittsburgh, School of Social Work
403 East Winding Hill Road
Mechanicsburg, PA 17055
www.pacwcbt.pitt.edu
Phone (717) 795-9048       Fax (717) 795-8013

# Table of Contents

I.   Introduction................................................................................................. 3

II.  Historical Overview ..................................................................................... 5

III. Congressional Findings............................................................................... 7

IV.  Cultural Considerations .............................................................................. 8

V.   ICWA Basics .............................................................................................. 11

VI.  ICWA Terms And Definitions.................................................................... 12

VII. What Does ICWA Mean for Me? .............................................................. 14

VIII. ICWA Process ........................................................................................... 18

IX.  Footnotes and Bibliography ...................................................................... 19

X.   Appendices ............................................................................................... 20
     A. Indian Child Welfare Act
     B. Resource Directory of U.S. Tribes as Published in Federal Registry
     C. Hearing Checklists
     D. Additional Resources

**Section I**
**Introduction**

**About the Handbook**

This handbook has been developed as a way of disseminating information regarding the Indian Child Welfare Act (ICWA) and what it requires of county children and youth agencies and private providers throughout the Commonwealth. It is intended to be used as a quick-reference guide for staff in working with American Indian children and families, and is not a substitute for comprehensive training. Indian Child Welfare is part of Child Welfare and each State has the responsibility to implement best practice within the requirements of law.

The handbook provides historical context for the passage of ICWA, details the major requirements of the Act, includes cultural considerations for agency staff when practicing Indian Child Welfare work, hearing checklists and Tribal contact information.

**What is the Indian Child Welfare Act?**

The Indian Child Welfare Act, which went into effect in 1978, establishes minimum standards for the handling of child custody cases involving Indian children. Child custody cases for the purposes of ICWA are:

> ➢ *Foster care placement;*
> ➢ *Termination of parental rights;*
> ➢ *Pre adoptive placemen or;*
> ➢ *Adoptive placement.*

ICWA recognizes the government-to-government relationship that exists between the United States and tribes. ICWA does not govern the actions or practices of tribes. Instead, it honors the authority of tribes to intervene in child welfare matters and provides that Tribal Courts have authority to adjudicate child custody cases involving children of the tribe. Most tribes in the United States now have their own child welfare services.

**Why is it important in Pennsylvania?**

At one time numerous tribes resided in what we now call Pennsylvania. The Susquehanock, the Erie, the Delaware, the Honniasont and the Shawnee are a few of the tribes that lived within the Commonwealth's borders. Although currently, there are no federally recognized tribes residing in Pennsylvania, many Indians are residents of Pennsylvania. Approximately 50,000 Indian people (American Indian alone or in combination with another race) reside in Pennsylvania[i]. According to the 2000 U.S.

Census, just over 15,000 children under the age 18 are Indian or are Indian in combination with another race[ii]. Some families have been in the area for many generations; other families are from elsewhere in the country. Many are enrolled or eligible for enrollment in tribes. ICWA applies whenever a child who is enrolled or eligible for enrollment in a tribe is involved in a child custody proceeding.

**Federal Recognition**

Federally recognized tribes have dependent sovereign nation status. This means that they have the authority to govern themselves. Some tribes choose leaders using traditional ways and other tribes have adopted a constitutional way of electing leaders.[iii] In addition, federally recognized tribes are eligible for federal benefits including health care and housing. There are over 550 federally recognized tribes and Native Alaskan villages in the United States. Some 200 more tribes are petitioning for recognition.[iv] Some tribes have lost federal recognition. The Menominee Tribe lost federal recognition in the 1960's through a federal termination program. The program was unsuccessful and the Menominee regained their federal recognition in the 1970's.

**Section II**
**Historical Overview**

To understand ICWA, one must understand the historical context in which ICWA was crafted. This historical overview is brief and is not intended to represent a complete history. Its purpose is to assist the reader in understanding major events that precipitated the necessity of ICWA. ICWA was passed in response to information that revealed that Indian children were being removed from their homes and placed in foster care at much higher rates than non-Indian children. Many children were removed from their homes because of a lack of understanding of Indian culture and child rearing practices. In addition, an overwhelming majority of Indian children were being placed with non-Indian caregivers who not only did not understand the culture from which the Indian children came they were unable to maintain the cultural connections.

When the settlers came to America, Indian tribes lived all over the United States in every State. Tribes were pushed from their homes and migrated further west. Conflict occurred as the settlers pushed their way further into the country and from misunderstandings of culture. For example, when the settlers offered Indian tribes trinkets for land, the Indians never realized that they were selling the land. In Indian culture, the creator made the land for all men and animals to use. Land was not bought or sold. Once the settlers began to develop governments, policies regarding Indians were established. Federal policy has flipped from annihilation of Indian tribes and culture to assimilation and somewhere in between.

In 1887, Congress enacted the Dawes Act. The Dawes Act was supposed to protect Indian land. It allowed Indian male heads of family to register to claim 160 acres of reservation land. Smaller allotments were given to single men and orphaned men. In order to register, an Indian had to use a more socially accepted name. His tribal name could not be used. Some of the workers registering Indians under the Dawes Act used the names of their friends and family when registering Indians thereby making it possible to steal the land from the Indians. To determine who was Indian and eligible for the land, the blood quantum theory was used. Those who could document that they were one half or more Indian were registered on the rolls and given land. Some of the land given to Indians was desert land. Once the reservation land had been divided among the "blooded' Indians, the rest of the reservation land was sold to non-Indians. What was supposed to assimilate and "civilize" the Indians by providing them with property ownership and giving them an acceptable way of living as farmers, further robbed the Indians of their culture and way of life.

The creation of boarding schools was an attempt to mainstream Indians into society. What it did was forcibly remove children from their families and place them far from their homes. They were not allowed to speak their language nor to have or to practice anything that resembled their Indian culture, including their name. This was another attempt to civilize the Indians by "killing the Indian and saving the man". Richard Henry Pratt ran the first boarding school in an abandoned military barracks in Carlisle. Indian parents who resisted sending their children to boarding schools were denied rations; others had their children removed by force. In 1928, a report commissioned by the Indian Commission brought to the forefront criticism of boarding schools and of government policy regarding Indians. This same report also led to repeal of the Dawes Act. By the 1930's boarding schools were being closed. But even as the pendulum eventually shifted from assimilation to providing services to assist families, the Indian tribes were not consulted. Someone else who was not Indian determined what was needed and what was best.

At the time of enactment of the Indian Child Welfare Act, Congress laid out a clear statement of fact:

❑ "That there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe,

❑ That an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by non-tribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions, and

❑ That the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."

**Section III**
**Congressional Findings**


## Congressional Declaration of United States Policy

When enacted in 1978, the Indian Child Welfare Act was given by Congress the following purpose:


*"Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."*

**Section IV**
**Cultural Considerations**

Given that there are over 550 Indian tribes and Alaskan villages, each with unique cultural considerations, this section will give a brief overview of factors that are intrinsic to most Indian tribal cultures. Although the non-Indian worker should bear these considerations in mind when working with an Indian family, the worker should also educate himself when working with a family of a particular tribe. Some families may be very traditional and other families may be less traditional. Each family and each individual within that family should be assessed based in context of their own history, tribal affiliation, connectedness to that tribe and amount of assimilation into the dominant society.

The non-Indian worker should tune into his own personal biases. Most non-Indians have very little exposure to Indians and Indian cultures except for what is portrayed in television, movies, and books of the dominant culture. The non-Indian worker may have pre-determined concepts of what is Indian based on these sometimes inadequate portrayals. Often Indians are depicted in a either a romantic, melodramatic portrayal or an unsophisticated, violent portrayal. In addition to addressing his own personal biases, the worker may also have to tune into biases that the Indian family may have toward the non-Indian worker.

Provided the acrimonious nature of the historic relationship between Indian and non-Indian peoples overall as well as that between the federal government and tribal nations, it is not unusual to find Indian families who are still distrustful of non-Indians and of government agencies. In addition to not making assumptions based on faulty portrayals perpetuated by the dominant society, the worker should also not presume some knowledge enables him to make educated assumptions. The strengths and needs of the Indian family should be understood within the context of tribal culture and not assessed as a result of the context of tribal culture. Admitting a lack of understanding and asking questions could go a long way in engaging a reluctant and suspicious family. A worker might ask if the family has concerns because of the differences in background and culture. By making the cultural difference a topic in the preliminary engagement process, a family may be more willing to discuss feelings of mistrust and suspicion. Addressing the differences in culture early on may lay better foundation for the worker to effectively contract with the family later.

In addition to admitting lack of knowledge and differences in culture, it is important that the non-Indian worker identify and acknowledge feelings of anger, rage, and resentment resulting from the anguish inflicted by attempts to annihilate Indian culture at any cost. It

is difficult for a non-Indian to comprehend the magnitude of what has happened to Indian people. Almost every Indian family has been negatively affected. Tribal lands have been lost, communities destroyed, customs and languages lost and children forever removed from families. The worker should do this without seeming defensive. It does not matter that the worker was not the one to do these things. It is enough that is was done.

The way a family perceives their culture is illustrated in their everyday life. Because Pennsylvania has no federally recognized tribes, workers will not be meeting families on tribal reservations. The family's cultural identity and their extent of assimilation will still be visible in their family customs, their language, their spiritual beliefs, and their relationship to extended family. As in working with any family, a worker cannot assess a family's behavior and actions based on the worker's own culture and experience. For example, a worker may fail to recognize not maintaining eye contact as a sign of politeness if he only evaluates that behavior based on his own culture and experience. It is always important regardless of the culture of the family or the culture of the worker to assess the family based on their cultural norms which may be slightly varied from family to family even within the same tribe.

Most Indian culture recognizes the importance of the extended family. Tribes live as a community in a way that emphasizes sharing and expounds on the greater good of the whole rather than the good of the individual. For example, child-rearing responsibilities may be shared by extended family members in addition to the parents. There may be times as well when extended family members provide the bulk of the child rearing. Children are viewed in typical tribal culture as gifts from the creator. If they are not properly cared for, the creator may choose to take them back. When coupled with Indian philosophy that all things are connected and when the world is unbalanced harmony is disrupted, it makes sense that responsibilities and the basics of life are shared. It would not be unusual for an Indian family to house, feed and clothe extended family members even if they barely have enough for themselves.

For many Indian families, the extended family is the primary support resource. If an Indian family has a connection to their extended family, it would be important to include them in the casework process. Resistance can be reduced when a family sees value and appropriateness in the intervention. The family may value the inclusion of elders or traditional healers. The worker must be sure to recognize and respect that each extended family group has it own rules and ideals. Even if the extended family is not part of the permanency goal for a child, they should be included in the planning making process. For every child regardless of culture it is important to maintain connections to culture and community. Although the tradition of extended family can be a great

resource, the worker must be careful of causing family division in addition to already existing family divisions. As within any family, the worker must recognize and show consideration for the roles of various members as decision makers or advice givers. Many decisions are made with consultation and approval of extended family members.

❖ As true in developing any relationship, the worker must employ active listening, communicating concern and acceptance verbally, and non-verbally.

❖ The worker's sincerity may be tested. The worker could be assessed verbally and non-verbally using silence and even humor. The worker should not be surprised if the family asks personal questions of the worker.

❖ The use of humor is an important part of Indian culture. If the family jokes with the worker it may be an indication of rapport.

❖ Pauses and silences during conversation are important. Many Indian people are taught to think carefully through something before responding. Don't rush a response.

❖ Another way to build rapport is the use of casual conversation. By taking time to engage in some non-work related conversation the worker establishes who he is as a person.

❖ A gentle handshake could be offered as a sign of respect.

❖ Extended family members may be present and communicate through a designated person. Don't urge everyone to actively participate.

❖ Time kept by the clock may be more important to you than the family.

❖ The worker may be offered a beverage and/or food. If refused the family may be very insulted.

This brief overview of cultural considerations is by no way all-inclusive but rather designed to help the worker to begin to appreciate Indian culture and to spark interest in adding to the worker's knowledge base. All tribes, all extended families and all immediate families are unique.

## Section V
## ICWA BASICS

### When Does ICWA Apply?
***ICWA applies when an Indian child is involved in a child custody proceeding.***

**Indian Child**
Person who is:
- Unmarried and;
- Under age 18

And either:
- A member of an Indian tribe or;
- Is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe

**Child Custody Proceeding**
*Foster care placement* – any action removing an Indian child from his parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand but where parental rights have not been terminated.

*Termination of parental rights* – any action resulting in the termination of the parent-child relationship.

*Pre adoptive placement* – the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement.

*Adoptive placement* – the permanent placement of an Indian child for adoption including any action resulting in the final decree of adoption.

### When Does ICWA Not Apply

- A temporary placement arrangement in which the parent or Indian custodian can have the child returned at any time, such as a Voluntary Placement Agreement.
- Custody awarded to a parent as part of a divorce proceeding.
- Most delinquency proceedings.

**Section VI**
**ICWA Terms and Definitions**

**Child custody proceeding** --

*foster care placement* – any action removing an Indian child from his parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;
*termination of parental rights* – any action resulting in the termination of the parent-child relationship;
*pre adoptive placement* – the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and
*adoptive placement* – the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption. Such term or terms shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce proceeding, of custody to one of the parents.

**Extended family member** – defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.

**Indian** – any person who is a member of an Indian tribe, or who is an Alaska Native and a member of a Regional Corporation as defined in 1606 of title 43.

**Indian child** – any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.

**Indian child's tribe** – (a) the Indian tribe in which an Indian child is a member or eligible for membership or (b), in the case of an Indian child who is a member of or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has the more significant contacts.

**Indian custodian** – any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child.

**Indian organization** – any group, association, partnership, corporation, or other legal entity owned or controlled by Indians, or a majority of whose members are Indians.

**Indian tribe** – any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians, including any Alaska Native village as defined in section 1602(c) of title 43.

**Parent** – any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under tribal law or custom. It does not include the unwed father where paternity has not been acknowledged or established.

**Reservation** – Indian country as defined in section 1151 of title 18 and any lands not covered under such section, title to which is either held by the United States in trust for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to a restriction by the United States against alienation.

**Secretary** – the Secretary of the Interior.

**Tribal court** – a court with jurisdiction over child custody proceedings and which is either a Court of Indian Offenses, a court established and operated under the code or custom of an Indian tribe, or any other administrative body of a tribe, which is vested with authority over child custody proceedings.

**Section VII**
**What Does ICWA Mean for Me?**

<u>Involuntary child custody proceedings</u>

It is the responsibility of the county children and youth **agency** as the petitioning agency to **notify** the **tribe** when a child custody proceeding (see definitions page 10) involves an Indian child or a child who may be an Indian child.

If the child is not currently a member of the tribe, the county children and youth agency must contact the tribe for determination of the child's membership. Each tribe solely determines membership (for Tribal contact list, see Appendix B).

<u>Jurisdiction</u>

The child's **tribe** has the **right to intervene** at any point in child custody proceedings.

**Tribes** have **jurisdiction** over child custody proceedings of children residing on **reservation**; this may be concurrent with the state (P.L. 280 states tribes may have exclusive jurisdiction). When a Tribal Court has custody of an Indian child, the Indian tribe retains exclusive jurisdiction regardless of where the child lives.

**Tribes** may petition for **transfer** of the child custody proceeding. The juvenile court may have temporary jurisdiction over an Indian child who is temporarily or permanently living off of the reservation. Jurisdiction must be transferred from juvenile court to tribal court upon the petition of the tribe, parent or Indian custodian unless there is good cause to the contrary.

There is no definition for good cause to the contrary. The court will determine if good cause to the contrary exists.

The county children and youth agency must send **notice** by **registered mail**, to the parent, Indian custodian and tribe of pending child custody proceedings in juvenile court (for Tribal contact list, see Appendix B).

**Notice** must **include** the following:
- o Child's name;
- o Child's tribal affiliation, if known;
- o Copy of document or petition which initiates the action;

- o County Agency contact information (petitioner) including contact information for county agency attorney;
- o A statement informing the parents, Indian Custodian and tribe of their right to intervene;
- o A statement that if the parents, Indian Custodian or tribe are unable to afford counsel one will be appointed for them;
- o A statement that the parents, Indian custodian or tribe can have up to twenty days to prepare for the proceedings;
- o The Court's location, mailing address and telephone number;
- o A statement informing the parents; Indian custodian or tribe of the right to request a transfer to tribal Court;
- o The potential legal consequences on the rights of the parties if the child is adjudicated dependent; and
- o A statement that child custody proceedings should be kept confidential.

If the **identity** or location of the parent or Indian custodian and the tribe is **unknown**, the notice shall be given to the **Secretary of the Interior**, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe.

**No** foster care placement or termination of parental rights **proceeding** shall be held until at **least ten days after receipt of notice** by the parent or Indian custodian and the tribe or the Secretary provided that the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

**All parties** have the right to examine all reports or documents related to the case.

The court must be satisfied that **active efforts** have been made to provide remedial and rehabilitative services to prevent family breakup and that these efforts have failed.

**A court order for placement** must be determined by **clear and convincing evidence** including qualified expert witness testimony that continued custody of a child by the parent is likely to result in serious emotional or physical damage to the child.

A **qualified expert witness** is meant to be someone with expertise beyond a social worker and includes:
- ◊ tribal members recognized by the tribe as knowledgeable in family organization and child rearing,
- ◊ lay experts with substantial experience in Indian child and family services, or
- ◊ professional persons with considerable experience in their respective field.

**Foster care placement preferences** must follow a prescribed order, absent good cause to the contrary:
(1) a member of the child's extended family,
(2) a foster home that is approved or licensed by the child's tribe,
(3) an Indian foster home of another tribe that is licensed by the appropriate agency; or
(4) an institutional placement for children that is approved by the child's tribe and is suitable to meet the child's needs.

**Termination of parental rights** may not be ordered without showing **beyond a reasonable doubt** that the continued custody of a child by the parent is likely to result in serious emotional or physical damage to the child. Evidence must include testimony of a qualified expert witness.

**Adoptive placement** requires **preference** be given, absent good cause to the contrary, to placement with:
(1) a member of the child's extended family;
(2) other members of the child's tribe;
(3) members of other tribes; or
(4) a non-American Indian family.

**Adoption** can be **overturned** within 2 years if fraud or duress is proven.

An **Indian adoptee** who is at least 18 years of age may, through the court, request his/her **adoption records** to identify possible tribal affiliation and any rights he/she may be entitled to as an Indian person.


**Voluntary child custody proceedings**

**Voluntary placement agreements** may be withdrawn at any time and the child must be returned to the parent.

**Voluntary consent to termination of parental rights** must be done in writing and recorded in the presence of a judge; certification is required that the parents fully understood their consent.

Any **consent for adoption** given prior to, or within 10 days after birth is not valid (Note: Adoption Act (23 Pa C.S. Chapter 27) at §2711 (relating to consents necessary to adoption) requires that any consent given within 72 hours is not valid.)

**Consent** to termination of parental rights or to adoption may be withdrawn at any time for any reason prior to entry of final decree. (Note: Adoption Act (23 Pa C.S. Chapter 27) § 2711 (relating to contents of consent) requires that the consent can only be revoked by the parent within 30 days of its execution.)

## Section VIII
## ICWA Process



Make **active efforts** to prevent placement and follow ICWA preferences for placement.

**Foster care placement:**

(1) a member of the child's extended family,

(2) a foster home that is approved or licensed by the child's tribe,

(3) an Indian foster home of another tribe that is licensed by the appropriate agency; or

(4) an institutional placement for children that is approved by the child's tribe and is suitable to meet the child's needs.

**Adoptive placement:**

(1) a member of the child's extended family;

(2) other members of the child's tribe;

(3) members of other tribes; or

(4) a non-American Indian family.

## Section IX
## Footnotes and Bibliography

**Footnotes**

> *Kids Count Pocket Guide, American Indian Children: State –Level Measures of Child Well-Being From the 2000 Census,* Annie E. Casey Foundation (2003)

> *Kids Count Pocket Guide, American Indian Children: State –Level Measures of Child Well-Being From the 2000 Census,* Annie E. Casey Foundation (2003)

> *Native American Resource Directory for Juvenile an Family Court Judges National Council of Juvenile and Family Court Judges,* Reno, Nevada (2003)

> *Native American Resource Directory for Juvenile an Family Court Judges National Council of Juvenile and Family Court Judges,* Reno, Nevada (2003)

**Bibliography**

Jones, BJ, *The Indian Child Welfare Handbook: A Legal Guide to the Custody and Adoption of Native American Children* , American Bar Association, Section of Family Law (1995)

Shulman, Lawrence, *The Skills of Helping Individuals , Families, Groups and Communities,* FE Peacock Publishers, Inc., (1999)

*Native American Resource Directory for Juvenile an Family Court Judges National Council of Juvenile and Family Court Judges,* Reno, Nevada (2003)

*Kids Count Pocket Guide, American Indian Children:State –Level Measures of Child Well-Being From the 2000 Census,* Annie E. Casey Foundation (2003)

**Section X**
**Appendices**


A.    **Indian Child Welfare Act**


B.    **Resource Directory of U.S. Tribes as Published in Federal Registry**


C.    **Hearing Checklists**


D.    **Additional Resources**

# Attachment S

# WELCOME TO RAINBOW ADOPTIONS

Rainbow staff are happy that you are considering adoption and would love an opportunity to work with you in achieving this goal. We service families interested in domestic, private, or international adoptions. However, we specialize in the placement of children with special needs. Supportive and financial services are provided for many of these placements.

Most of our available children are classified as having special needs and follow under one or more of the following categories:

- children 0-18 years old who have been abused, neglected or abandoned.
- children that have physical, intellectual and/or behavioral problems.
- children who are members of sibling groups (allowing the children to stay together).
- children of minority races, especially Asian, Hispanic, Black and bi-racial, and Native American (the greatest need is for minority families for this group of children.)

## CRITERIA FOR APPLICATION

Rainbow serves three groups of people:

- Native American Families
- Families residing in Western PA of any race, sex, religion or income level, and
- Birth mothers who are considering the plan of adoption for their infant or child.

It is Rainbow's goal to work with families and not against them.

## TYPES OF SERVICES

Rainbow provides adoption related services to families and children. Our staff completes the home-study, searches, and post-placement services. We can arrange for parenting training, support groups, and often financial, medical and social services for the child.
Rainbow offers counseling services to birth mothers. We allow and encourage active participation from the birth mothers in choosing an adoptive family for her infant.

## THE ADOPTION PROCESS

The first step in the adoption process is the completion of a homestudy. During the homestudy, a social worker with special training in adoption will conduct family preparation sessions. The family preparation sessions will give the social worker a clear understanding of the prospective adoptive family's reasons for adoption and their expectations about parenting.

These sessions will include the following topics:

· the types of children awaiting adoptive homes
· parenting the adopted child
· behaviors and handicaps
· bonding and attachment
· separation, loss and grief
· the adoption triad

· parenting the sexually/physically abused child

Personal references and physicians will be contacted and a criminal and child abuse background check must be complete. Once all paper work is received, there will be a visit to the family's home.

**TYPICAL WAITING PERIOD**
When you have successfully completed the homestudy, you will be eligible for the placement of a child in your home for the purpose of adoption. Given the factors of the adoptive family's preference and the availability of children, we canot tell you how long it will take for you to receive a chile. In most circumstance, however, families adopting special needs children usually have a brief wait.

**POST-PLACEMENT SERVICES**
After a child is placed with you, the agency will schedule a minimum of three (3) post-placement visits to assist and evaluate your transition to adoptive parenting. These visits occur over a six-month period, and at their positive conclusion, this agency will give its consent to legal finalization of the adoption of your child. Adoptive parents retain independent counsel to complete this process.

Thank you for your interest in Rainbow Adoptions. Please let us know if we can provide any additional information by contacting our agency at (412)782-4457. One of our goals is to reduce the number of children who wait for permanent homes. We hope that you choose to work with Rainbow Adoption Services to build your family.

120 Charles Street
Pittsburgh, PA 15238
Telephone: (412) 782-4457
FAX: (412) 767-7808
E-mail: mgold@cotraic.org

HOME | HEADSTART | EARLY | ELDERS | CULTURAL | WIA PROGRAM
Updated August 1, 2011

# Attachment T



CITY OF PHILADELPHIA
**DEPARTMENT OF**
**HUMAN SERVICES**

# Quarterly Indicators Report

May 11, 2018



CITY OF PHILADELPHIA
**DEPARTMENT OF
HUMAN SERVICES**

# Executive Summary

The Quarterly Indicators Report highlights trends in essential Philadelphia Department of Human Services (DHS) and Community Umbrella Agency (CUA) functions, key outcomes, and progress toward the four primary goals of Improving Outcomes for Children (IOC):

 More children and youth maintained safely in their own homes and communities

 A reduction in the use of congregate care

 More children and youth achieving timely reunification or other permanence

 Improved child, youth, and family functioning

Data from the second quarter (October 1 – December 31) of Fiscal Year 2018 (FY18) reveal that the system continues to deal with a higher volume of Hotline and Investigation activity:

- There was a 12% increase in Hotline activity from FY17Q1-Q2 to FY18 Q1-Q2. FY18's projected total is expected to surpass FY17's total by 3,868 contact events.

There are many ways in which DHS and the CUAs are making strides towards IOC goals:

 **More cases closed than accepted for service.** The total number of families receiving services continues to decline, and in the second quarter of FY18, more cases were closed than accepted for service.

 **Emphasis on kinship care.** Nearly half of all youth in placement (47%) are in kinship care.

 **Many youth live close to home.** Over half (51%) of the youth in foster and kinship care live within 5 miles of their home, and three quarters (76%) live within 10 miles.

 **Increases in permanency totals.** The total number of youth achieving permanency has increased every year since FY15, and the reunification rate for FY18 Q1-Q2 was 6 percentage points higher than the rate in FY13 Q1-Q2.

 **Decrease in congregate care.** The percentage of youth in congregate care (11.3%) has declined by 7.7 percentage points in 4 fiscal years, and falls below the national average (13%).

 **Continued decrease in repeat maltreatment.** Despite an increase in total CPS reports, the overall percentage of indicated reports with re-abuse in FY17 has remained comparable to previous Q1-Q2 rates.

The report also reveals areas in which DHS and CUAs can continue to improve:

- **Declines in caseloads, but slightly higher than DHS' goal.** CUA case management workers carry an average of 11.2 cases. While this represents a decrease in caseload ratio from previous years, DHS is committed to funding CUAs for a 1:10 ratio.

- **Fewer cases closed.** In the first two quarters of FY18, DHS and CUA staff closed 154 fewer cases than they did in FY17 Q1-Q2, a decrease of 9%.

-  **Decreases in permanency timeliness.** While the one-year reunification rate for the first two quarter of the fiscal year has increased slightly, the two-year adoption rate for the first two quarters of FY18 was below 10% (compared to 40% in FY13) and the two-year PLC rate was below 20% (compared to 57% in FY13).

The report provides additional details for each of these areas and is organized by Department and CUA functions—Hotline, Investigation, and Service Delivery. Data associated with key outcomes—Permanency and Re-entry—are included in Section IV of the report. The methodology for the report is included in the appendix.



CITY OF PHILADELPHIA
**DEPARTMENT OF**
**HUMAN SERVICES**

# Contents

I.       Hotline........................................................................................................................1

II.      Investigations...........................................................................................................3

   Accept for Service Rate for Investigations .....................................................................4

   Repeat Maltreatment.....................................................................................................4

       Federal Measure .......................................................................................................4

       Pennsylvania State Measures....................................................................................5

III.     Services .....................................................................................................................6

   Volume ...........................................................................................................................6

   Service Type ...................................................................................................................8

   Distance from Home .....................................................................................................11

   Caseloads .....................................................................................................................12

   Monthly Visitation ........................................................................................................13

IV.      Permanency .............................................................................................................15

   Appendix.......................................................................................................................19



CITY OF PHILADELPHIA
**DEPARTMENT OF
HUMAN SERVICES**

## I.  Hotline

The following section includes information related to Hotline, including volume (Figure 1) and screen out rate (Figures 2 and 3).

Figure 1. Hotline Report Activity



Data run 2/14/18    ■ Total Through FY Q2   ▨ Annual Total   ▥ Projected Annual Total

- The combined Hotline activity of Q1 and Q2 has increased every year since FY14.
- Hotline handled an additional 1,814 contacts (12% increase) in FY18 Q1-Q2 compared to FY17 Q1-Q2.
- The projected number of total hotline contacts for FY18 is expected to surpass FY17 totals by approximately 3,868 (11% increase).

Figure 2 below shows how many contact events were not accepted for investigation ("screened out") because they do not meet CPS or GPS criteria.[1] In September 2017, a secondary screen out process began in the Hotline. With this new process, Hotline workers complete field screenings of GPS reports that are given the response priority time of 3 to 7 days.

Figure 2. Total CPS/GPS Screen Outs



Data run 2/14/18                                         *Projected FY18

- Compared to FY17, an additional 39% (4,864) of contact events are expected to be screened out in FY18.[2]
- The projected FY18 screen out total is expected to be more than 4 times the total for FY14.

---

[1] Hotline Administrators review monthly samples to ensure the screen outs are appropriate.
[2] This is an increase of 2,775 from our FY18 projections after Q1. The change is due to an increase in screen outs from Q1 to Q2.

1                                             ✓= Key Success  ❗= Ongoing Challenge



CITY OF PHILADELPHIA
**DEPARTMENT OF**
**HUMAN SERVICES**

DHS created the Secondary Screen-out unit in late Summer 2017 to review GPS reports with a 3-7 day priority that were not immediately accepted for investigation. The unit may confirm the decision to screen out a case after an initial review (with or without a referral to prevention services) or the unit may deploy a hotline worker for screening. Deployed hotline workers may choose to send a case to intake for investigation or screen it out (labeled as screen out after deployment in Figure 3). Figure 3 below details the four outcomes for cases that were sent to the Secondary Screen-out unit: sent on to intake, screened out after deployment of hotline worker, screened out after the initial review, or sent to prevention.

Figure 3. Outcomes for Secondary Screen-out Cases 8/31/2017- 3/2/2018



- About half (48%) of secondary screen-out cases were sent to intake with 963 going to general intake and 243 going to the specialty unit.
- About a quarter (23%) of secondary screen-out cases were screened out after deployment and 15% were screened out after the initial review.
- 14% of secondary screen-outs were sent to prevention.

✓ = Key Success   ① = Ongoing Challenge



CITY OF PHILADELPHIA
**DEPARTMENT OF HUMAN SERVICES**

Figure 4 shows the action taken for each Hotline contact event.

Figure 4. Hotline Action



Data run 2/14/18

* Other reports include referrals for law enforcement only, other jurisdictions, information only, and follow-up on a prior report

- Since FY14, screen outs and accepted investigations have continued to increase.
- ✓ Over time, a higher percentage of contacts are being screened out instead of being accepted for investigation.
  - o Close to one half (45.3%) of contacts in FY18 are projected to be screened out.
- The number of reports accepted for investigation in FY18 is projected to decrease by 1,638 (8% decrease), despite a projected increase in contact events.

## II.   Investigations

The Investigations Section provides additional detail about the volume of investigations (Figure 5), accept for service rate (Figure 6), and rate of repeat maltreatment (Tables 1 and 2).

Figure 5. Total Investigations



Data run 2/14/18

- There were 819 fewer hotline reports accepted for investigation in FY18 Q1-Q2 compared to FY17 Q1-Q2, an 8% decrease.
- There will be an estimated 1,600 fewer investigations in FY18 than in FY17.

✓= Key Success   ①= Ongoing Challenge



CITY OF PHILADELPHIA
# DEPARTMENT OF HUMAN SERVICES

## Accept for Service Rate for Investigations

Figure 6. Investigations Accepted for Service (AFS)



Data run 2/27/18        ········ % Cases Already Open      ─●─ % Cases AFS within 60 days

- The number of cases accepted for service within 60 days of the report date has remained fairly consistent from FY16 through the first half of FY18.
- The percent of investigated cases that were already open for service has remained fairly steady, fluctuating by three percentage points over the last five fiscal years (13-16%).

## Repeat Maltreatment

The federal government and the state of Pennsylvania differ in how they measure repeat maltreatment. Both measures are provided in this section.

### Federal Measure

The federal measure for repeat maltreatment looks at the number of indicated CPS victims within a specific 12-month period and examines how many had another indicated report within the following year. Table 1 shows the rates of repeat maltreatment for FY14-17 using the federal measurement standard.

4                                                            ✓= Key Success  ⓘ = Ongoing Challenge

 CITY OF PHILADELPHIA
**DEPARTMENT OF HUMAN SERVICES**

Table 1. FY15-17 Repeat Maltreatment—Federal Measure

| Fiscal Year | Indicated CPS Victims | Victims with a Subsequent CPS Indication within 12 Months | Federal Repeat Maltreatment Indicator |
|---|---|---|---|
| FY14 | 598 | 14 | 2.3% |
| FY15 | 768 | 30 | 3.9% |
| FY16 | 876 | 33 | 3.8% |
| FY17 Q1-Q2 | 399 | 15 | 3.8% |

- 33 of the 876 CPS victims in FY16 (3.8%) had a subsequent CPS indication within 12 months—the highest total number of victims in the past 3 fiscal years.
  - While FY15 and FY16 had similar rates, there were twice as many victims during these years than in FY14.
- The first two quarters of FY17 had a rate comparable to FY15 and FY16.

*Pennsylvania State Measures*

The Pennsylvania State measures for repeat maltreatment look at the number of CPS reports received during a specific time-period and identify those children who had a *previous* indication of abuse. The rate of repeat maltreatment for the State, as per the 2016 PA DHS report, was 5.7%. Table 2 shows the rates of repeat maltreatment for FY15-18 using the Pennsylvania state measure.

Table 2. Repeat Maltreatment—Pennsylvania State Measures

| | FY15 | FY16 | FY17 | FY18 Q1-Q2 |
|---|---|---|---|---|
| Total Reports (CPS) | 4,926 | 5,232 | 5,786 | 2,738 |
| # of Reports with Suspected Re-abuse[1] | 297 | 282 | 347 | 194 |
| % of Reports with Suspected Re-abuse | 6.0% | 5.4% | 6.0% | 7.1% |
| # of Reports Indicated  (CPS)[2] | 663 | 777 | 953 | 507 |
| % of Reports Indicated | 13.5% | 14.9% | 16.5% | 18.5% |
| # of Indicated Reports with Re-abuse[3] | 64 | 70 | 78 | 44 |
| % of Indicated Reports with Re-abuse | 9.7% | 9.0% | 8.2% | 8.7% |

[1]Total reports where a child is identified as a victim on a previous report at any time
[2]Number of CPS reports that were Indicated (allegations determined to be valid)          Data run 3/13/18
[3]Number of Indicated CPS reports where the identified child was a victim on a previous report

- The overall percentage of reports with indicated re-abuse (last row of Table 2) has declined over three fiscal years, but the first two quarters of FY18 had a slightly higher rate.
- As shown in row 1, there has been an 860 CPS report increase (17%) from FY15 to FY17.
  - The first two quarters of FY18 suggest this trend may continue; the number of CPS reports for FY18Q1-Q2 is higher than the first two quarters of FY16 and FY17—2,360 and 2,542, respectively (not displayed in the table above).
- In FY17, nearly 300 additional reports were indicated compared to FY15—a 44% increase.

✓= Key Success ⊖= Ongoing Challenge

["


CITY OF PHILADELPHIA
**DEPARTMENT OF HUMAN SERVICES**

Figure 8. Total Cases Closed and Accepted for Service



Data run 2/27/18      ‥‥‥‥ Total Case Closures      ●── Total Cases Accepted for Service

(!) 154 fewer cases were closed in FY18 Q1-Q2 compared to FY17 Q1-Q2, a decrease of 9%.

- The total cases accepted for service has fluctuated over the past 3 fiscal years; however, the FY18 Q1-Q2 total remained 2% (42 cases) below the FY16 Q1-Q2 total.

Figure 9. Total Open Cases[3] as of December 31st of Each Year



Data run 5/1/18

- After a 9% decrease in open cases from December 31, 2015 to December 31, 2016, there was a slight increase through December 31, 2017 for a net change of -6% from 2015 to 2017.

---

[3] Cases in the Adoption, PLC, and JJS queues were excluded.

(✓)= Key Success (!)= Ongoing Challenge



CITY OF PHILADELPHIA
**DEPARTMENT OF HUMAN SERVICES**

## Service Type

Two of the four main goals of IOC are to maintain children safely in their own communities and to reduce the utilization of congregate care. The tables and figures in this section provide information about what services youth are receiving. First, a point-in-time analysis highlights in-home (Tables 3 and 4) and placement (Table 5 and Figures 10 and 11) totals. This is followed by an analysis of aggregate placements by year (Figures 12 and 13).

Table 3. Total Cases and Children Receiving In-Home Services

|  | December 31, 2016 | | December 31, 2017 | | Percent Change | |
|---|---|---|---|---|---|---|
|  | Cases | Children | Cases | Children | Cases | Children |
| DHS | 23 | 53 | 25 | 57 | 8.7% | 7.5% |
| CUA | 1,741 | 3,720 | 1,914 | 4,233 | 10% | 13.8% |
| Total | 1,764 | 3,773 | 1,939 | 4,290 | 9.9% | 13.7% |

Data run 2/14/18
- Overall, there were 517 more youth and 175 more cases receiving in-home services at the end of December 2017 than in 2016 (13.7% increase in children, 9.9% increase in cases).

Table 4. Total Cases and Children Receiving In-Home Services by Type

|  | December 31, 2016 | | December 31, 2017 | | Percent Change | |
|---|---|---|---|---|---|---|
|  | Cases | Children | Cases | Children | Cases | Children |
| In-Home Non-Safety | 1,036 | 2,110 | 1,153 | 2,456 | 11.3% | 16.4% |
| In-Home Safety | 728 | 1,663 | 757 | 1,713 | 4% | 3% |
| Pending Type | ------- | ------- | 91 | 121 | N/A | N/A |
| Total | 1,764 | 3,773 | 2,001 | 4,290 | 13.4% | 13.7% |

Data run 2/14/18
- There were 346 more children receiving in-home non-safety services at the end of December 2017 than in 2016 (16.4% increase). There were also 117 more cases in December 2017, representing a 11.3% increase in cases from December 2016.
- There were 50 more children and 29 more cases receiving in-home safety services at the end of December 2017 than in 2016 (3% and 4% increases, respectively).

Table 5. Total Cases and Children Receiving Placement Services

|  | December 31, 2016 | | December 31, 2017 | | Percent Change | |
|---|---|---|---|---|---|---|
|  | Cases | Children | Cases | Children | Cases | Children |
| DHS | 615 | 907 | 275 | 477 | -55.3% | -47.0% |
| CUA | 3,036 | 5,170 | 3,292 | 5,542 | 8.4% | 7.2% |
| Total | 3,651 | 6,077 | 3,567 | 6,019 | -2.3% | -1.0% |

Data run 2/14/18
- There were 58 fewer youth receiving placement services at the end of December 2017 than in 2016 (1% decrease).
- There were 84 fewer placement cases at the end of December 2017 than in 2016 (2.3% decrease).

= Key Success = Ongoing Challenge

CITY OF PHILADELPHIA
**DEPARTMENT OF
HUMAN SERVICES**

Figure 10. Children in Placement on December 31, 2017 by Placement Type[4]



Data run 2/2/18

- On December 31, 2017 a large majority (86%) of the 6,019 youth in placement were in family foster care.
- Roughly 1 in 9 (11.3%) youth in placement were in congregate care.

Figure 11. Children in Family Foster Care and Congregate Care on December 31, 2017



- Of the 5,147 youth in family foster care on December 31, 2017, over half (54%) were in kinship care and 45% were in foster care.
- Of the 712 youth in congregate care, half (50%) were in a group home, and less than one third (29%) were in an institution. 16% of youth in congregate care were in a CBH-funded Residential Treatment Facility (RTF), and 1 in 20 (5%) youth were in an emergency shelter.

---

[4] Percentages may not add up to 100% due to rounding.

⊘ = Key Success  ① = Ongoing Challenge



CITY OF PHILADELPHIA
**DEPARTMENT OF HUMAN SERVICES**

Distance from Home

DHS strives to keep children in or close to their communities. Table 6 shows the distance distribution for youth in CUA foster and kinship care using a point in time analysis.

Table 6. Distance from Home for Children Placed in a CUA Foster & Kinship Care as of December 31, 2017

| CUA | 0-2 miles | | 2-5 miles | | 5-10 miles | | 10+ miles | | Unable to Determine Distance* | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | |
| 01 - NET | 125 | 27% | 134 | 29% | 110 | 24% | 69 | 15% | 18 | 4% | 456 |
| 02 - APM | 153 | 27% | 120 | 21% | 177 | 31% | 101 | 18% | 16 | 3% | 567 |
| 03 - TPFC | 139 | 24% | 153 | 26% | 135 | 23% | 145 | 25% | 10 | 2% | 582 |
| 04 - CCS | 88 | 25% | 91 | 26% | 77 | 22% | 86 | 24% | 10 | 3% | 352 |
| 05 - TPFC[6] | 182 | 26% | 237 | 33% | 159 | 22% | 118 | 17% | 13 | 2% | 709 |
| 06 - TABOR | 76 | 25% | 73 | 24% | 77 | 25% | 63 | 21% | 14 | 5% | 303 |
| 07 - NET | 95 | 23% | 83 | 20% | 160 | 38% | 69 | 16% | 16 | 4% | 423 |
| 08 - BETH | 78 | 22% | 70 | 20% | 89 | 25% | 105 | 29% | 17 | 5% | 359 |
| 09 - TPFC | 120 | 25% | 109 | 23% | 114 | 24% | 121 | 25% | 15 | 3% | 479 |
| 10 – TPFC[3] | 120 | 25% | 131 | 28% | 107 | 23% | 88 | 19% | 28 | 6% | 474 |
| Totals | 1,176 | 25% | 1,201 | 26% | 1,205 | 26% | 965 | 21% | 157 | 3% | 4,704 |

Data run 2/19/18

*Invalid home addresses include those outside of Philadelphia or incomplete addresses that could not be geocoded. Distances were calculated using ArcMap10.5 GIS software.

 A majority (51%) of children residing in family foster care lived within 5 miles of their home of origin and (76%) within 10 miles of their home of origin.

[6] Prior to 1/1/18, Turning Points for Children 5 and 10 were managed by Wordsworth.

= Key Success ⓘ = Ongoing Challenge



CITY OF PHILADELPHIA
**DEPARTMENT OF
HUMAN SERVICES**

## Caseloads

DHS is committed to reducing case management workers' caseloads to 1:10. Table 7 shows the distribution of cases across workers by CUA, and Table 8 looks at caseloads for DHS' Ongoing Services Region (OSR).

Table 7. CUA Case Management Workers' Caseload Distribution on December 31, 2017[7]

| CUA | Total Workers | Total Cases | Median Caseload | Average Caseload |
|---|---|---|---|---|
| 01 – NET | 45 | 511 | 11 | 11.4 |
| 02 – APM | 45 | 510 | 12 | 11.3 |
| 03 – TPFC | 53 | 576 | 12 | 10.9 |
| 04 – CCS | 39 | 419 | 12 | 10.7 |
| 05 – TPFC[8] | 81 | 884 | 12 | 10.9 |
| 06 – TABOR | 30 | 395 | 14 | 13.2 |
| 07 – NET | 47 | 484 | 10 | 10.3 |
| 08 – BETH | 35 | 424 | 14 | 12.1 |
| 09 – TP4C | 53 | 534 | 11 | 10.1 |
| 10 – TPFC[5] | 50 | 562 | 12 | 11.2 |
| Overall | 478 | 5,299 | 12 | 11.2 |

Data run 2/27/18

- As reported in Q1, there continues to be little variation among CUA case management workers' median and average caseloads.
- NET-07 had the lowest median caseload (10), while Bethanna-08 had the highest median caseload (14).
- Turning Points-09 had the lowest average caseload (10.1), while Tabor-06 had the highest average caseload (13.2).

Table 8. DHS OSR Case Management Workers' Caseload Distribution on December 31, 2017[9]

| CWO | Total Workers | Total Cases | Median Caseload | Average Caseload |
|---|---|---|---|---|
| DHS | 23 | 211 | 9 | 9.2 |

Data run on 5/9/18

- DHS's Ongoing Services Region has an average caseload size of 9.2 and a median caseload of 9.

---

[7] Table 7 excludes 192 cases that were not assigned to a worker in the database at the time of the data run.
[8] Prior to 1/1/18, Turning Points for Children 5 and 10 were managed by Wordsworth.
[9] Table 8 does not include Intake or Adoptions. Unlike Table 7, no cases or positions were excluded from the analysis.

✓ = Key Success ⓘ = Ongoing Challenge



CITY OF PHILADELPHIA
**DEPARTMENT OF
HUMAN SERVICES**

## Monthly Visitation

Pennsylvania State guidelines require that case management workers visit youth at least monthly. The following tables and figures show visitation rates for CUAs and DHS.[10]

Table 9 shows visitation for all dependent children, and Table 10 shows a subset of dependent children—those ages 5 and under. Figure 14 displays visitation rates for the last six months, and Figure 15 looks at visitation rates by CUA.

Table 9. Visitation for Dependent Children

|  | March 2017 | | March 2018 | |
|---|---|---|---|---|
|  | Total Children | Visitation Rate | Total Children | Visitation Rate |
| DHS | 903 | 93% | 704 | 91% |
| CUA | 10,016 | 94% | 10,599 | 92% |

- Compared to March 2017, CUA and DHS rates slightly declined (-2%).

Table 10. Visitation for Dependent Children Ages 5 and Under

|  | March 2017 | | March 2018 | |
|---|---|---|---|---|
|  | Total Children | Visitation Rate | Total Children | Visitation Rate |
| DHS | 205 | 95% | 147 | 88% |
| CUA | 3,500 | 96% | 3,568 | 94% |

- Compared to March 2017, DHS visitation rates for children ages 5 and under declined by 7% while the rate for CUAs declined by 2%.

Figure 14. DHS and CUA Visitation Rate, by Month



For the last 10 months, CUAs and DHS have maintained visitation rates in the low to mid-90s.

---

[10] Please note that per the CUA guidelines, CUAs are required to visit each child a minimum of once per month. DHS visitation rules vary by the age and type of service. For children not requiring monthly visits by DHS case managers, children are still being seen regularly and visits are documented by provider agencies.

= Key Success   = Ongoing Challenge

CITY OF PHILADELPHIA
**DEPARTMENT OF
HUMAN SERVICES**

Figure 15. CUA Visitation Rate, by CUA[11]



- From May 2017 to March 2018, five CUAs maintained at least a 90% monthly visitation rate, and eight CUAs had March visitation rates at 90% or above.

---

[11] Prior to 1/1/18, Turning Points for Children 5 and 10 were managed by Wordsworth.

✓ = Key Success  ! = Ongoing Challenge



CITY OF PHILADELPHIA
**DEPARTMENT OF HUMAN SERVICES**

## IV.   Permanency

Tables 11 and 12 shows permanency rates by CUA (Table 11) and DHS (Table 12) for FY18 Q1-Q2. The permanency rate is calculated by dividing the total number of children who achieved permanency (adoption, reunification, or PLC) by an unduplicated count of children in placement for the period under review. The total numbers of youth who achieved permanency system-wide (for both DHS and CUA) during FY15-FY18 are shown in Figure 16.[12] Figure 17 shows the timeliness of permanencies by permanency type for FY13-FY18, and Figure 18 looks at 12-month re-entry rates.

Table 11. FY18 Q1 and Q2 Permanency Rates by CUA[13]

| CUA | FY18 Q1-Q2 Permanency Rates |
|---|---|
| 01 – NET | 12.3% |
| 02 – APM | 15.0% |
| 03 – TPFC | 15.2% |
| 04 – CCS | 15.7% |
| 05 – TPFC | 10.5% |
| 06 – TABOR | 15.1% |
| 07 – NET | 11.6% |
| 08 – BETH | 17.0% |
| 09 – TPFC | 14.1% |
| 10 – TPFC | 11.6% |
| Permanency Rate | 13.6% |

Data run 2/7/18

- The CUAs' overall permanency rate for FY18 Q1-Q2 was 13.6%.
  - CUAs are on track to meet DHS' goal of 25% permanency by the end of the fiscal year.
  - CUAs' permanency rates ranged from 10.5% (Turning Points for Children- 5) to 17.0% (Bethanna-8).

Table 12. DHS FY18 Q1 and Q2 Permanency Rates[14]

| | FY18 Q1-Q2 Permanency Rate |
|---|---|
| DHS | 25.6% |

Data run 5/9/18

- 182 out of 712 youth (25.6%) achieved permanency during the first half of FY18.

---

[12] Table 11 and Figure 16 are based on reconciled data from the CUAs, while Table 12 and Figure 17 is based on unreconciled data from the FACTS2 database.
[13] Prior to 1/1/18, Turning Points for Children 5 and 10 were managed by Wordsworth.
[14] The DHS permanency rate only includes youth for whom DHS was providing case management services.

✓= Key Success   ❶= Ongoing Challenge

CITY OF PHILADELPHIA
**DEPARTMENT OF
HUMAN SERVICES**

Figure 16. System-wide (DHS and CUA) Permanency Totals by Permanency Type



■ Reunification  Adoption  ■ PLC

 Since FY13, permanencies have continued to increase.
  - The first two quarters of FY18 suggest this trend will continue—if permanencies continue at the same rate for FY18Q3 and Q4, then the total permanencies will exceed those in FY17.
     There were more adoptions in the first half of FY18 than there were in all of FY13, FY14, or FY15.
- Since FY13, reunifications have represented 61.3-67.6% of all permanencies.
  - The first two quarters of FY18 had a slightly lower proportion of reunifications—only 57%.
- Since FY13, adoptions have represented 26.0-31.4% of all permanencies.
  - The first two quarters of FY18 had a slightly higher proportion of adoptions—35.9%.
- Since FY13, PLCs have represented 6.2-10.7% of all permanencies.
  - The first two quarters of FY18 were within this range, representing 7.0% of permanencies.

= Key Success  = Ongoing Challenge



CITY OF PHILADELPHIA
**DEPARTMENT OF HUMAN SERVICES**

Figure 17 provides information about timeliness to permanency by permanency type, timeframe, and fiscal year.

Figure 17. Timeliness of Permanency for FY13 – FY18



Data run 2/14/18

- Reunification within one year of entering placement has remained fairly steady since FY13.
  - The first half of FY18 had a slightly higher one-year reunification rate than the previous five full fiscal years.
- The two-year adoption and PLC rates experienced significant drops between FY13 and FY15.
  - (!) While the 2-year adoption rate has remained steady since FY16 and into the first half of FY18, the 2-year PLC rate in FY18 is ten percentage points lower than the rates from FY15-17.
- (!) The 3-year adoption and PLC rates have continued to decline from FY13 through the first half of FY18.
  - The FY18 Q1-2 rates for 3-year adoption and PLC are nearly equivalent to the FY13 rates for 2-year adoption and PLC.
  - The 3-year adoption rate for the first half of FY18 is roughly half the FY13 rate.

⊘ = Key Success ① = Ongoing Challenge



CITY OF PHILADELPHIA
**DEPARTMENT OF
HUMAN SERVICES**

Figure 18 shows the percent of youth who re-entered placement within a year of reunification.

Figure 18. One Year Re-entry Rate FY13 - FY17[15]



Data run 2/14/18

✓ The one year re-entry rate for FY17 Q1-Q2 is lower than the past four full fiscal years.

---

[15] FY18 data is not included because a full year must elapse from the reunification date.

✓= Key Success ①= Ongoing Challenge


CITY OF PHILADELPHIA
**DEPARTMENT OF**
**HUMAN SERVICES**

## Appendix

This report was produced by the Data Analytics Unit within DHS' Performance Management and Technology division using data from the FACTS2 database. This database is a live system that updates daily to reflect the most up-to-date information for youth in DHS and CUAs' care.

### Timing of Analysis

The Data Analytics Unit does not analyze data until at least a week following the close of the quarter to allow time for CUA and DHS staff to upload documentation and finalize practice decisions, particularly related to case closure and permanency. The Data Analytics Unit also reconciles data with the CUAs when necessary. In almost all cases, the lag time and reconciliation process allow the Data Analytics Unit to use data that will not change over time. However, there may be some instances in which data uploaded at a later date have marginal impacts on overall rates. For example, some Q1-Q2 permanency rates by CUA (Table 10) may increase by a fraction of a percentage point if these rates are run at a later date.

### Projections

The Hotline and Investigation annual projections (Figures 1 through 4) are based off of the current fiscal year's Q1-Q2 rate and the proportion of Q1-Q2 totals to annual totals historically. For example, if Q1-Q2 Hotline totals historically represented half of the annual total, then the projection would be calculated by multiplying the Q1-Q2 total by two.

✅ = Key Success ⓘ = Ongoing Challenge

# Attachment U