# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHARONELL FULTON, CECELIA PAUL, TONI LYNN SIMMS-BUSCH, AND CATHOLIC SOCIAL SERVICES, | : | |
| | : | |
| **Plaintiffs,** | : | Civil Action |
| | : | No. 18-cv-2075 |
| **v.** | : | |
| | : | |
| CITY OF PHILADELPHIA, DEPARTMENT OF HUMAN SERVICES FOR THE CITY OF PHILADELPHIA, and PHILADELPHIA COMMISSION ON HUMAN RELATIONS | : | |
| | : | |
| **Defendants.** | : | |

## THE CITY OF PHILADELPHIA'S
## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 2

    I.     State Foster Care Requirements ................................................................................2

    II.    DHS Custody and Placement ..................................................................................3

    III.   DHS's Relationship with CSS ...............................................................................5

        A.    The Current Contract ................................................................................. 6

        B.    Suspension of Referrals ............................................................................ 7

    IV.   Doe Foster Child #1 ...............................................................................................9

    V.    Future Contracts with CSS ...................................................................................11

LEGAL STANDARD........................................................................................................ 12

ARGUMENT ................................................................................................................. 12

    I.     CSS Is Not Likely to Succeed on the Merits of Its Constitutional Claims Because It Has No Constitutional Right to Compel the City to Contract on Terms That Conform to and Impose CSS' Religious Requirements Upon Prospective Foster Parents. ................................12

        A.    The Free Exercise Claim Fails Because the City's Fair Practices Ordinance Prohibiting Discrimination, As Well As the Establishment and Equal Protection Clauses, Are Generally Applicable Laws. ................................................................. 13

        B.    CSS' Free Exercise Claim Also Fails Because CSS Here Has Voluntarily Contracted to Provide Government Services, So Its Religious Rights Are Not Substantially Burdened by the Terms of Its Contract. ................................................................. 14

        C.    Contrary to CSS' Assertion, Strict Scrutiny Does Not Apply Because the City Has Not Granted Similar Secular Exemptions to Its Anti-Discrimination Law, Nor Has It Displayed Impermissible Religious Hostility in Applying This Neutral, Generally Applicable Law. ................................................................. 17

        D.    Even If Strict Scrutiny Did Apply, the City's Anti-Discrimination Law and Policy and Its Constitutional Obligations Are Compelling Interests, and the Least Restrictive Means to Serve Those Interests Is to Insist Upon Compliance. ............................. 20

        E.    The Individual Foster Parents Do Not Have Free Exercise Claims Based on CSS's Dispute with the City. ................................................................. 21

    II.    CSS Has Not Shown a Likelihood of Success on its RFPA Claim. ..............................22

    III.   CSS Has No Establishment Clause Claim. ...................................................................22

IV.    CSS Does Not Have a First Amendment Retaliation Claim...........................................23

V.    CSS's "Compelled Speech" Claim Also Fails................................................................25

VI.    Because Any Constitutional "Irreparable Harm" Is Nominal, Both the Balancing of Harms and the Public Interest Militate in Favor of Denial of the Requested Injunctions. ........26

    A.    There is no Irreparable Harm to Foster Care Children or to Foster Parents............... 27

    B.    The Balancing of the Equities Requires Denying CSS' Requested Relief................ 28

CONCLUSION.................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013) .......................................................................................................................... 25

*Am. Freedom Defense Initiative v. SEPTA*, 92 F. Supp. 3d 314 (E.D. Pa. 2015) ........................ 12

*Barron v. Washington County Children & Youth Social Servs. Agency*, No. 05-1517, 2006 WL 931678 (W.D. Pa. 2006) .......................................................................................................... 14

*Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004) ........................................................... 13

*Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687 (1994) .......................... 23

*Chosen 300 Ministries, Inc. v. City of Philadelphia*, No. 12–3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012) .......................................................................................................................... 15

*Combs v. Homer-Center School Dist.*, 540 F.3d 231 (3d Cir. 2008) ..................................... 13, 22

*Commonwealth v. Parente*, 956 A.2d 1065 (Pa. Cmwlth. 2008) .................................................. 22

*Cradle of Liberty Council, Inc. v. City of Philadelphia*, 851 F. Supp.2d 936 (E.D. Pa. 2012) .... 25

*Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917 (3d Cir. 1974) ...... 12

*Doe v. Banos*, 713 F. Supp. 2d 404, 415 n.15 (D.N.J. 2010) ....................................................... 29

*Donlan v. Ridge*, 58 F. Supp. 2d 604 (E.D. Pa. 1999) ................................................................. 14

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) ............... 15, 21

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ................................................................................... 26

*Emp't Div. v. Smith*, 494 U.S. 872 (1990) .................................................................................... 13

*EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, No. 05-5259, 2006 WL 892718 (D.N.J. Apr. 4, 2006) .............................................................................................................. 29

*Estate of Calder v. Thornton*, 472 U.S. 703 (1985) ..................................................................... 21

*Estate of Earp v. Doud*, No. CIV. A. 96–7141, 1997 WL 255506 (E.D. Pa. 1997) ................... 14

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) ................................................................................................................................................ 17

*Hohe v. Casey,* 868 F.2d 69, 73 (3d Cir. 1989) ........................................................................... 28

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011) .......................................................... 24

*lackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004) ............................................................. 17

*Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 126 (1982) ............................................................ 14

*Legal Services Corp. v. Velasquez*, 531 U.S. 533 (2001) ............................................................ 25

*Lighthouse Institute for Evangelism v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007) ......... 17

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, No. 16–111, 2018 WL 2465172 (U.S. June 4, 2018) ...................................................................................................... 16, 18, 20

*O'Malley v. Brierley*, 477 F.2d 785 (3d Cir. 1973) ...................................................................... 21

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) ............................................................................. 14

*Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017) ....................................................... 28

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d. Cir. 2017) ..................................................... 12, 28

*Ridley Park United Methodist Church v. Zoning Hearing Bd. Ridley Park Borough*, 920 A.2d 953 (Pa. Cmwlth. 2007)........................................................................................................... 22

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1986) .......................................................................... 20

*Sherbert v. Verner*, 374 U.S. 398 (1963) ................................................................................... 16

*Teen Ranch v. Udow*, 389 F. Supp. 2d 827 (E.D. Mich. 2005) ................................................. 16

*The Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000)................................................................ 12

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012 (2017)........................... 16

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)....................................................... 25

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ............................................................ 12

### Other

*Foster Care in Pennsylvania*, Pa. Dep't of Human Servs., http://www.dhs.pa.gov/citizens/ childwelfareservices/fostercareinpennsylvania/ ......................................................................... 2

**INTRODUCTION**

Plaintiff Catholic Social Services ("CSS") seeks a Temporary Restraining Order ("TRO") and Preliminary Injunction seeking to force the City of Philadelphia (the "City") to continue to contract with it to perform foster care services on behalf of the City's Department of Human Services ("DHS"), the City agency charged by law with the protection and safety of abused and neglected children within the City of Philadelphia.  CSS claims that, despite acting pursuant to a City contract which plainly prohibits discrimination on the basis of sexual orientation by those providing a governmental service on the City's behalf, and despite receiving substantial City payments of taxpayer dollars to perform this service, it must nevertheless be permitted to refuse to deal with and/or to certify as prospective foster parents well qualified, legally married families solely because the parties to that marriage are the same sex.

CSS is wrong on the law and similarly wrong that the City is acting to the detriment of the children in its custody.  When CSS freely chooses to enter into a contract with the City and commits to contract terms to perform work on the City's behalf, it cannot thereafter alter those terms, or dictate others, in ways antithetical to established City law and policy prohibiting discrimination against residents in all its forms.  Outside of the contract, CSS is completely free to hold and espouse its religious beliefs, and it is also free not to enter into any contract which it perceives requires it to act contrary to those beliefs.  But the City cannot be compelled to financially support CSS's religious views, and may insist upon the same renewal contract terms upon expiration which it has offered to its other foster care agencies.

The City stopped intake to CSS, other than in instances where the best interests of a particular child require it, in March 2018, yet it was not until June that CSS moved for injunctive relief.  In an apparent effort to create a sense of urgency, CSS intertwined its dispute with the City with an individual placement decision for a particular dependent child, Doe Foster Child #1. Although that situation is now resolved, it would have been concluded sooner had it not been commandeered into this lawsuit.  DHS must be able to communicate freely with a foster child's caregivers and service providers in order to determine what is in that child's best interests, and

decisions for a child already in placement usually, as in Doe Foster Child #1's case, must be approved by Family Court, with input from court-appointed Child Advocates and the child's biological parents.  Characterizing this child's placement as an "intake refusal" to make it part of this lawsuit ignored DHS' legal obligations to this child and needlessly entangled necessary communications for several days.

At any rate, Doe Foster Child #1's situation is not an example of the City's cessation of new intake.  As the City repeatedly has informed CSS, the City has no intention of removing any children from CSS families, and has offered CSS a more limited contract to continue supporting all children in their current placements with CSS foster families.  And DHS leadership will continue to consider any request indicating that a placement with CSS is in a particular child's best interests, such as placing a sibling with a CSS foster family which is already caring for the rest of that sibling's family.

CSS's dire prediction that foster children will lack homes if it does not provide them is also unfounded, as the Declarations of DHS officials attest.

In sum, there is no emergency, no need for a TRO, and CSS wholly fails to meet the requirements to obtain a preliminary injunction. The status quo which has been in effect since March, ceasing new placements but retaining those already in place, should be continued.

## STATEMENT OF FACTS

**I.    State Foster Care Requirements**

State law requires county children and youth agencies like DHS to develop a plan for the provision of protective services for children, and to provide or purchase those services, including the provision of foster care services for children placed in its care. Declaration of Kimberly Ali Ex. 1 ("Ali Decl.") ¶ 8.  Foster care provides children who are unable to remain in their own homes and are placed by courts in the custody of DHS with temporary care by foster parents.[1] For at least the last 20 years, Philadelphia has contracted with private agencies to provide such

---

[1] *Foster Care in Pennsylvania*, Pa. Dep't of Human Servs., http://www.dhs.pa.gov/citizens/ childwelfareservices/fostercareinpennsylvania/ (last visited June 10, 2018).

mandated services to children and families involved with DHS.  *Id.* ¶ 9. There are currently 30 foster care agencies in Philadelphia. *Id.* ¶ 11.

Prospective foster parents must be approved by a foster agency licensed by the Pennsylvania Department of Human Services before the agency can place a foster child with them. *Id.* ¶ 13. Pennsylvania law sets the criteria for the certification of prospective adoptive and foster parents. *Id.* These criteria include passing child-abuse and criminal-history screenings; the prospective foster family's ability to provide care, nurturing, and supervision to children; their household composition and supportive community ties; their ability to work with a child with special needs; and their financial stability. *Id.* ¶ 14. If a foster family meets the criteria, the agency must certify them.[2] *Id.* ¶ 16.

## II.     DHS Custody and Placement

When DHS receives a report of alleged child abuse or neglect, it conducts a safety assessment of the situation and the child's environment. Ali Decl. ¶ 18.  If there is a present danger to the child, DHS obtains a court order to remove the child and place him or her in foster care. *Id.* Within 72 hours of removal, a Family Court hearing is held to determine if the removal was appropriate and whether the child will be committed to DHS' legal custody. *Id.* ¶ 19.

Each child in the legal custody of DHS receives case management services provided by one of six private Community Umbrella Agencies (CUAs) with whom DHS separately contracts. *Id.* ¶ 20.  Each CUA provides services in one or more of 10 geographic regions of Philadelphia. *Id.* DHS assigns children who need services to a CUA based on the foster family's location.  *Id.* ¶ 21. Approximately 6,000 children in DHS' custody are in out-of-home placement, 86% of whom are in foster care. Declaration of Cynthia F. Figueroa, Ex. 2 ("Figueroa Decl.") ¶ 10.

In order to identify the most appropriate placement, DHS first evaluates any relatives who could care for the child. *Id.* ¶ 24. If those relatives pass preliminary DHS history, child-

---

[2] Even after a foster care agency approves a family, DHS still can determine—pursuant to the terms of its contract with foster care agencies—that it does not want children placed in that home, such as when there are concerns about a foster family's prior or current involvement with DHS. Ali Decl. ¶ 17.

abuse, and criminal screenings and appear appropriate, DHS will place the child in the relatives' home and identify an agency to certify the home as an approved foster home. *Id.* ¶ 24. This is called kinship care. *Id.*  Half of all foster children in family foster care are in kinship homes. Figueroa Decl. ¶ 11.

If kinship care is not an option, DHS' Central Referral Unit (CRU) identifies a placement depending on the child's needs. Ali Decl. ¶ 25. There are several types of placements, including family foster care homes, congregate care facilities (i.e. group homes and institutions), and residential treatment facilities. *Id.*  Currently, approximately 6,000 children in DHS's custody are in foster care, and approximately 86% are in family foster homes.  Figueroa Decl. ¶ 10. Of the 86% in family foster care, approximately 45% are with families who have been certified as foster parents and who do not have a kinship relationship to the child.  *Id.* ¶ 11. Another 12% of foster children are in congregate care. *Id.* ¶ 10. A child also can be placed in a short-term, temporary placement called respite foster care when, for example, the foster parent is traveling or dealing with a medical issue or simply needs a break, or if a report of child abuse in the foster home is being investigated. Ali Decl. ¶ 31. Although referrals for new placements are made through the CRU, agencies may make internal referrals for respite care. *Id.* ¶ 32.

Because it has the ultimate responsibility for children in its legal custody, DHS is always trying to recruit new, qualified foster parents. Figueroa Decl. ¶ 13.  This March, as part of its recruitment strategy, DHS issued an "urgent call" for new foster families, with the specific aim of recruiting more families to serve older children, children with special needs or specialized behavioral health needs, and lesbian, gay, bisexual, transgender, and questioning (LGBTQ) youth. *Id.* ¶¶ 17-18. This is due in part to reports DHS has received from LGBTQ youth of foster homes that do not support them. *Id.* ¶ 17. As a result of the recruitment effort, 75 new families have been certified in the past month. *Id.* ¶ 20. At the same time, there are usually certified foster parents who do not have a foster child in their home at any given time, either because they are awaiting a placement, or because they have exercised their discretion not to take a particular child.  *Id.* ¶ 19.

4

Although many foster families stay with a single agency, some change agencies either due to dissatisfaction or because their foster child has a need higher than the original agency can serve, such as a child with a behavioral issue that requires particular expertise. Ali Decl. ¶ 27. In these instances, the CUA case worker makes a referral to the CRU, stating that the entire foster home wants to transfer to another agency. *Id.* ¶ 28.  When a family transfers, DHS arranges for the old agency to send over its files on the child and the family to the new one, which begins to serve the family as soon as it receives the referral. *Id.* The new agency must complete its own certification of the foster home within 60 days, but the child remains in the same foster home throughout the process so that the transfer is seamless. *Id.* ¶ 29.

On numerous occasions, DHS CRU—at the direction of the DHS Commissioner—has stopped referrals to particular agencies. *Id.* ¶ 33. Sometimes the suspension has been temporary due to a specific concern. *Id.* In other instances, such as when an agency decides to stop providing services or when DHS terminates a contract, the suspension is permanent. *Id*. In any case, DHS can always make exceptions to the suspension in specific cases. *Id.* ¶ 37.  For instance, in 2016 when Lutheran Children and Family Service of Eastern Pennsylvania decided to stop providing foster care services, DHS transitioned without incident over 100 children over a two month period by transferring their foster families to other agencies.  *Id.* ¶¶ 34-36.

## III.    DHS's Relationship with CSS

DHS has contracted with CSS for foster care for decades.  DHS also contracts with a separate division of CSS for CUA services.  Despite the City's addition of sexual orientation to the City's Fair Practices Ordinance in 1982 and the legalization of same sex marriage in Pennsylvania in 2014, the DHS Commissioner Cynthia Figueroa first learned in March 2018 that CSS would turn away otherwise qualified prospective same sex foster couples.  Figueroa Decl. ¶ 23-24.

**A. The Current Contract**

The Contract between the City and CSS that includes foster care services was first dated November 30, 2015, and has been amended several times. *See* Pltfs. Ex. 1-A (Dkt. 10-4) at 1[3] (the "Contract"). Among the services CSS is to provide is the screening, training, and certification of resource caregivers. *Id.* at 18. Furthermore, the Contract makes clear an "increased focus on recruiting resource caregivers who can manage adolescents . . . in order to reduce the use of congregate care." Indeed, the Contract expressly states that "homes for teens including pregnant teens and teen parents (teen parent/baby placements) are a priority in order to reduce the use of congregate care." *Id.* at 17.

The Contract includes several provisions directly relevant to this litigation. First, Section 3.21 of the General Provisions, titled "Rejection of Referral," states:

> Provider shall not reject a child or family for Services based upon the location or condition of the family's residence, their environmental or social condition, or for any other reason if the profiles of such child or family are consistent with Provider's Scope of Services or DHS's applicable standards as listed in the Provider Agreement, unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion.

Contract, (Dkt. 10-6) at 25 (General Provisions Section 3.21). This includes the intake and registration of new, prospective foster parents. *See, e.g.,* Contract (Dkt. No. 10-4) at 17 (identifying the screening, training, and certification of "resource caregivers" as among the services to be provided under the Contract). DHS's applicable standards do not provide that being in a same sex marriage is a reason to reject a prospective foster parent family.

Second, the Contract sets forth express and detailed requirements that CSS adhere to the City's Fair Practice Ordinance, including that CSS may not:

> "discriminate or permit discrimination against individuals in . . . public accommodation practices whether by direct or indirect practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, differentiation or preference in the treatment of a person on the basis of actual or perceived race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin,

---

[3] All pincites are to the ECF page number.

> ancestry, age, disability, marital status, source of income, familiar status, genetic information or domestic or sexual violence victim status, Human Immunodeficiency Virus (HIV) infection, or engage in any other act or practice made unlawful under the [Fair Practices Ordinance]."

Contract (Dkt. 10-7) at 23-24 (Section 15.1).  The Contract also grants the City the right to terminate or suspend the Contract "for any reason, including, without limitation, the convenience of the City."  *Id.* at 21 (General Provisions Section 14.2).  And it states that in the event of a breach of Section 15.1 related to the Fair Practices Ordinance, the City may "suspend or terminate this Contract forthwith."  *Id.* at 24 (Section 15.1).

**B.  Suspension of Referrals**

On March 13, 2018, the *Philadelphia Inquirer* published a story titled "Two foster agencies in Philly won't place kids with LGBTQ people." Pltfs. Ex. 1-W.  The story reported that two married women attempted to attend an orientation for new foster parents held by foster care agency Bethany Christian Services ("Bethany"), which also has a contract with the City.  *Id.* at 2. However, the couple was told before the orientation even started that the "organization has never placed a child with a same-sex couple," and the couple left. *Id.* at 2-3.  In a follow-up call with Bethany administrators, the couple was told that Bethany does not work with LGBTQ people because of its views on homosexuality, but instead referred them to other foster agencies. *Id.* at 3.  The article also reported that a spokesman for the Archdiocese of Philadelphia said CSS would not work with interested LGBTQ people if approached and that "'CSS would not be able to consider foster care placement within the context of a same-sex union.'" *Id.* at 6.

Commissioner Figueroa determined that DHS would suspend referrals at CSS (and Bethany[4]) as long as they refused to certify qualified same sex foster parents. Figueroa Decl. ¶ 28. Her decision was based on her professional experience and included consideration of DHS' ability to place children in foster homes as well as the best interests of the children in DHS' custody. *Id.* ¶¶ 28-31

---

[4] DHS understands that Bethany intends to comply with the Fair Practices Ordinance and enter into a full contract with the City for the next year. Figueroa Decl. ¶¶ 37-39.

Two days later, on March 15, 2018, Philadelphia City Council passed a resolution calling on the Philadelphia Commission on Human Relations (PCHR) to investigate the claims in the Inquirer article.  Pltfs. Ex. 1-B.  The same day, DHS and CSS met and, following the meeting, DHS Deputy Commissioner Kimberly Ali called CSS to inform it that DHS was suspending new referrals to CSS.  Figueroa Decl. ¶ 32.  Deputy Commissioner Ali later emailed the City's other foster agencies to request that they "refrain from making any foster care referrals to "Bethany and CSS" but that agencies should contact her with any questions about a specific case. Pltfs. Ex. 1-E at 3.  She stressed that DHS's "goal is to minimize placement disruptions, and to ensure that a child's ability to reunify or to continue an adoption process is not delayed because of placement disruption." *Id.* The following day, Staci Boyd, DHS's Operations Director, reiterated Deputy Commissioner Ali's message to the agencies. *Id.* at 2.

In the interim, on March 16, 2018, PCHR sent a letter to Bethany and to CSS regarding the claims in the article. Pltfs. Ex. 1-C. The letter noted that discrimination on the basis of sexual orientation would violate each agency's contract with the City, and requested additional information. *Id.* at 2-3.  The letter requested that each organization state whether it would deny services to LGBTQ persons on the basis of their sexual orientation and whether the organization had ever done so in the past. *Id.* at 3. It also requested that after providing the information, each organization meet with PCHR to address any potential remedies so that the organizations could comply with their contracts. *Id.* at 4.

Rather than provide the requested information, a full month later CSS's counsel responded to PCHR's letter by accusing the City of breaching the contract and discriminating against CSS on the basis of religion by suspending referrals. Pltfs. Ex. 1-D at 2,8.  CSS argued that it was free to discriminate against LGBTQ persons because it was not bound by the City's Fair Practices Ordinance and was not paid to accept new foster parents.  *Id.* at 6.  CSS made no mention of any harm to CSS from the suspension or any inability for CSS to continue servicing its existing foster parent base without new referrals.  *See id.*

The City responded on May 7, 2018, reiterating its position that it could not allow a contractor providing governmental services to discriminate on the basis of sexual orientation or any other protected characteristic. *See* Pltfs. Ex. 1-F at 2-3. Nonetheless, the City made explicitly clear that, even if CSS would not agree not to discriminate, the City nevertheless would "enter into an interim, contractual relationship with CSS in order for CSS to continue to supervise the foster children in its care properly with the least amount of disruption for them." *Id.* at 5. In addition, the City stated that where the best interest of a child required it, the City had made and would continue to make exceptions to the nonreferral policy. *Id.*[5]

Ten days later, on May 17, 2018, CSS and the three individual plaintiffs filed this lawsuit, alleging fourteen different causes of action.

## IV.    Doe Foster Child #1

████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████

---

[5] Contrary to CSS' assertions, Pltfs. Br. at 8-9, while there has been some confusion on the ground from both CSS and lower level DHS workers, whenever CSS has brought a situation to the attention of DHS leadership, a waiver has been granted, although sometimes a court order has been required by law for non-emergency moves. *See* Ali Decl. ¶ 38.





## V.      Future Contracts with CSS

On June 11, 2018, the City sent a Notice of Intent to Award a more limited contract to

CSS, to continue the support of all foster children currently in CSS homes. *See* Exhibit 3-B.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs the Court's authority to enter preliminary injunctions. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary and drastic remedy," *Am. Freedom Defense Initiative v. SEPTA*, 92 F. Supp. 3d 314, 321 (E.D. Pa. 2015) (citations omitted), which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. The preliminary injunction test is well-established:

> [T]he moving party must generally show: (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured *pendente lite* if relief is not granted to prevent a change in the status quo. . . . Moreover, this court has repeatedly stated that in considering whether to grant a preliminary injunction, a trial court should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974) (citations omitted); *see also The Pitt News v. Fisher*, 215 F.3d 354, 365-366 (3d Cir. 2000) (denying request for preliminary injunction pursuant to First Amendment). In the Third Circuit, furthermore, "a movant for preliminary equitable relief must meet the threshold for the first two "most critical" factors," and if those are met "a court then considers the remaining two factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d. Cir. 2017).

## ARGUMENT

**I.     CSS Is Not Likely to Succeed on the Merits of Its Constitutional Claims Because It Has No Constitutional Right to Compel the City to Contract on Terms That Conform to and Impose CSS' Religious Requirements Upon Prospective Foster Parents.**

CSS is not likely to succeed on the merits of its constitutional claims. This is not a case where the City has reached into the private sphere to mandate conduct that clashes with private religious beliefs. Rather, CSS seeks to enter into the sphere of public services contracting and to fulfill the City's obligation to select, recruit, and provide foster parents to children committed to its custody. As previously described, the Commonwealth charges the City with responsibility for children who need foster care, and licenses both DHS and the foster care agencies to whom the

City delegates some of its responsibility.  The Commonwealth lays out the criteria for the evaluation and approval of suitable foster homes.

CSS has no religious right to compel the City to enter into a contract that would allow CSS to provide those public services using religious criteria for who can serve as foster parents. Nor do protections for religious liberty require the City to allow CSS to impose eligibility standards rooted in religious doctrine for individuals who seek to care for children in the City's custody.  While we respect CSS' religious beliefs, they conflict with the City's legal commitment and obligation to treat all families equally in the provision of City services, as well with the City's own constitutional obligations not to provide City services according to religious criteria.  By insisting that CSS adhere to the same obligations when contracting with us to provide social services, we are neither punishing CSS for its speech, nor compelling it to speak. Respectfully, we also ask that in analyzing likelihood of success, the Court take notice that there has been no factual development, and that the City has had scant opportunity to address this complex area of the law prior to hearing.  Should the Court have particular concerns, the City would appreciate the opportunity to address them with additional briefing.

### A. The Free Exercise Claim Fails Because the City's Fair Practices Ordinance Prohibiting Discrimination, As Well As the Establishment and Equal Protection Clauses, Are Generally Applicable Laws.

Application of a valid neutral law of general applicability does not violate the Free Exercise Clause.  *See Emp't Div. v. Smith*, 494 U.S. 872, 878-82 (1990).  A court applies rational basis review to any application of such a law.  *See Combs v. Homer-Center School Dist.*, 540 F.3d 231, 242 (3d Cir. 2008).  By contrast, if a law burdens religious exercise but is not neutral or generally applicable, the government must show that the law serves a compelling government interest and must be narrowly tailored to serve that interest.  *See Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).

CSS' Free Exercise claim is not likely to succeed because the City's Fair Practices Ordinance applies to religious and secular persons alike to prohibit discrimination on the basis of sexual orientation.  It is a valid, neutral law of general applicability.

13

Further, the Establishment and Equal Protection Clauses similarly are valid, neutral laws of general applicability that do not allow CSS to claim an impermissible burden here.  Under the Establishment Clause, the City could not impose religious criteria in the provision of child welfare services, and this includes the criteria set for serving as a foster parent.[6]  By refusing to consider same sex couples to serve as foster parents, CSS is impermissibly imposing its own religious criteria as to what constitutes an acceptable home for children in the legal custody of DHS.  That is particularly clear now that *Obergefell v. Hodges*, 135 S. Ct. 2584, 2607-08 (2015), has mandated that same sex couples have the right to a civil, legal marriage.

Indeed, *Obergefell* mandates that the City cannot allow discrimination against legally married same sex couples in the administration of governmental services.  *Obergefell* held that government cannot "deny gays and lesbians the many rights and responsibilities intertwined with marriage" without running afoul of the Equal Protection Clause.  *Id*. at 2606.  Therefore, the City cannot provide CSS with City funds and allow it to perform our duty to provide foster care in a manner that does not treat same sex married couples equally.

## B.   CSS' Free Exercise Claim Also Fails Because CSS Here Has Voluntarily Contracted to Provide Government Services, So Its Religious Rights Are Not Substantially Burdened by the Terms of Its Contract.

Even if *Smith* did not apply, CSS would still be unlikely to succeed on its Free Exercise Claim because when it voluntarily chose to enter into a government contract to provide

---

[6] While we have delegated to CSS our duty to select and supervise care for children in our custody, delegation of government authority to a religious entity must respect the core rationale underlying the Establishment Clause: preventing "a fusion of governmental and religious functions."  *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 126 (1982).  In *Grendel's Den*, for example, the Supreme Court invalidated a municipal ordinance that delegated a veto power to churches regarding liquor license applications, because the relevant provision "could be employed for explicitly religious goals."  *Id.* at 125.

Indeed, in selecting and supervising foster parents, CSS is likely a "state actor" under federal law.  *See, e.g.*, *Barron v. Washington County Children & Youth Social Servs. Agency*, No. 05-1517, 2006 WL 931678, at *4 (W.D. Pa. 2006) (foster care agency is a state actor under Section 1983); *Donlan v. Ridge*, 58 F. Supp. 2d 604, 609-10 (E.D. Pa. 1999) (same); *Estate of Earp v. Doud*, No. CIV. A. 96–7141, 1997 WL 255506, at *2-*3 (E.D. Pa. 1997) (same).  Therefore, CSS likely has its own constitutional duty as a state actor in this field to comply with the Establishment and Equal Protection Clauses.

government services, compliance with terms it freely agreed to does not substantially burden its religious rights.  The City is not reaching into the private sphere to require CSS to recognize same sex marriages as valid under Catholic canon law.  Rather, the City is only asking CSS to recognize that these families are qualified under secular governmental standards to care for children in the City's legal custody.  It is not a substantial burden to require CSS to apply secular criteria when it chooses to act pursuant to a government contract to perform a delegated governmental duty.[7]

As an initial matter, CSS defines the religious activity at issue too broadly by asserting that the City is interfering in its charitable mission to care for children.  Pltfs. Br. at 14-15.  But the City has not imposed *any* mandates upon CSS to the extent it seeks to provide such services on its own in the private sphere.  The City has only imposed equal treatment requirements with respect to the contract between the City and CSS to care for children in the City's legal custody.  For this reason, *Chosen 300 Ministries, Inc. v. City of Philadelphia*, No. 12–3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012), is inapposite.  That case concerned the City's regulation of entirely private outdoor feeding groups, which claimed no religious entitlement to City subsidization of their activities, and certainly were not acting pursuant to a City contract.  *Id.* at *6-*9.  In addition, they asserted that their feeding activities had explicit religious components.  *See id.* at *4 to *8 (feeding sessions begin with prayer, scripture readings, Gospel message, invitation to Christian discipleship, communion, religious counseling, etc.).  By contrast, services provided by the City or on its behalf must remain separate from religious observance and practice.  *See* Contract (Dkt. No. 10-6) at  20-21 (Section 4.1(k)).  Thus, CSS simply cannot

---

[7]  *See EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 588 (6th Cir. 2018) ("Most circuits, including this one, have recognized that a party can sincerely believe that he is being coerced into engaging in conduct that violates his religious convictions without actually, as a matter of law, being so engaged.").  Thus, while the defendant employer sincerely believed that being required by Title VII to retain a transgendered employee violated the employer's religious rights, the *Harris Funeral* Court could determine as a matter of law that retention did not in fact violate those religious beliefs.  *Id.*  Similarly here, there is no evidence that the City is requiring CSS to act inconsistently with its religious beliefs.  CSS must merely certify that same sex couples meet secular criteria to care for foster children.

claim a right under its City contract to compel the inclusion of religious criteria simply because CSS has a sincere religious motivation to perform foster care services.

CSS further asserts that it has shown a substantial burden because having to abide by a contract's anti-discrimination provisions means that it must "choose" between free exercise and a public benefit, invoking cases such as *Sherbert v. Verner*, 374 U.S. 398 (1963).  Pltfs. Br. at 15-16, 18, 25.  However, although courts have found that free exercise may be implicated when an individual's religious practice or beliefs prevent him from obtaining a public benefit such as unemployment benefits, voluntary participation in a government contract is not a public benefit.  *See Teen Ranch v. Udow*, 389 F. Supp. 2d 827, 838 (E.D. Mich. 2005), *aff'd*, 479 F.3d 403 (6th Cir. 2007).  The *Sherbert v. Verner* line of cases "does not stand for the proposition that the State can be required under the Free Exercise Clause to contract with a religious organization."  *See Teen Ranch*, 389 F. Supp. 2d at 838.

What those cases do stand for is that the government cannot "exclude [a religious organization] from a government benefit program because it is religious."  *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2025 (2017).  *Trinity Lutheran* addressed the limited circumstance of an express state constitutional prohibition upon grants to private religious organizations for playground materials.  *Id*. at 2024 n.3.  The Court did not suggest that when religious organizations contract to provide government services, as opposed to merely seeking a grant to subsidize private activity, the government is compelled to accept whatever terms those organizations require.[8]

---

[8]As the Supreme Court recently noted in *Masterpiece Cakeshop,* religious liberty is not absolute, particularly where the civil rights of another group are negatively impacted.  As the Court observed, while it is generally recognized that the State cannot compel a member of the clergy who objects to gay marriage on moral and religious grounds to perform a marriage ceremony, "if that exception were not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations."  *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, No. 16–111, 2018 WL 2465172, at *7 (U.S. June 4, 2018)

This case does not concern a grant program to subsidize private activity.  It concerns a contract by which the City has delegated to a private agency its state-mandated duty to select, supervise, and certify foster parents.  That agency is not entitled to insist that it be permitted to impose its religious beliefs upon or discriminate against foster parents, who are compensated by the government and who take care of children in the government's legal custody.

**C.  Contrary to CSS' Assertion, Strict Scrutiny Does Not Apply Because the City Has Not Granted Similar Secular Exemptions to Its Anti-Discrimination Law, Nor Has It Displayed Impermissible Religious Hostility in Applying This Neutral, Generally Applicable Law.**

CSS makes two arguments asserting that strict scrutiny applies to its free exercise claim. Pltfs. Br. at 20-28.  Neither of these arguments can succeed.

**1.  The Exemptions Cases Do Not Apply.**

CSS incorrectly suggests that because foster care agencies permissibly refer families to one another for reasons of expertise or geographic proximity to a child, these are somehow "secular exemptions" that entitle CSS to get its own religious "exemption" to refuse to work with same sex families and refer them to other agencies.  CSS distorts the appropriate frame of reference here and misreads the case law.

As the Third Circuit explained in *Lighthouse Institute for Evangelism v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007) and *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004), when the government exempts secular conduct that "undermines the purposes of [a] law," but then refuses to exempt religious conduct that undermines that stated policy or statute to the same degree, its conduct is constitutionally suspect.  *Blackhawk*, 381 F.3d at 209.  This usually means the law is not neutral to religion under *Smith*, and it is therefore subject to strict scrutiny. *See id.* at 209; *Lighthouse Institute*, 510 F.3d at 265-66.  For example, in *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999), the Newark Police Department prohibited officers from wearing beards so as to maintain a uniform appearance for the police force.  The Department granted a medical exemption to the policy for officers who had a skin condition exacerbated by shaving, but refused to grant a religious

exemption for Muslim officers who were religiously mandated to wear a beard.  *See id.*  Because both exemptions undermined the Department's desire for uniformity to the same degree, the Third Circuit held that the policy was constitutionally suspect.  *See id.*  The Court distinguished an exemption for undercover officers because that exemption, unlike the others, did not undermine the need for uniformity. *See id.*

The City's anti-discrimination law and policy is the law at issue here for purposes of examining exemptions. The City does not grant secular exemptions to this law and policy, and CSS does not so allege.  In any event, even using CSS' flawed frame of reference to the use of referrals, CSS' attempted analogy to the exemption cases does not work.  To the extent that agencies refer families to other agencies for reasons of expertise or geographic proximity, they make those referrals to improve service to the children in DHS's care.  In contrast, allowing an agency to refer a family because of its sexual orientation would <u>not </u>improve a child's service. There is nothing to raise the specter that our refusal to grant CSS an exemption from the City's anti-discrimination law targets religious conduct.[9]

### 2.   CSS's Claims of "Targeting" Fail as Well.

CSS calls upon the Supreme Court's just-issued *Masterpiece Cakeshop* ruling to claim it has been subject to "discriminatory targeting."  Pltfs. Br. at 21-23.  There is no evidence of such targeting here.  CSS' sole evidence is that the City has informed CSS that its refusal to certify and work with same sex families violates City anti-discrimination law and policy, and imposes impermissible religious criteria upon a public services contract.  The mere fact that the City objects to CSS' refusal to work with otherwise qualified same sex families cannot indicate hostility, and CSS stunningly overreads *Masterpiece Cakeshop* in suggesting as much.

---

[9] CSS also cites to a contract provision which allows the City to permit providers to refuse service to families and children in the "sole discretion" of the City.  CSS asserts that this is an impermissible "ad hoc" exception policy.  Pltfs. Br. at 26.  But the City did not rely on an exercise of unquestionable discretion here.  The City gave CSS a reason for not granting an exemption—that an exemption would violate our anti-discrimination law and policy.

CSS first asserts it was suspicious that we suspended referrals in the absence of an actual complaint about denial of service.  But this is hardly evidence of hostility.  CSS had stated that it *would* refuse to comply with its contract and serve same sex couples.  Pltfs. Ex. 1-W at 5 ("CSS would not be able to consider foster care placement within the context of a same-sex union.").  The City did not need to wait for an actual denial of required service to take action.  Further, CSS ignores that DHS did not suspend new referrals in order to punish CSS.  Rather, as the City explained to CSS, DHS suspended new referrals because, given CSS' announced refusal to comply with a mandatory term of its City contract, DHS sought to minimize disruption if the parties could not agree on a new contract.  *See* Pltfs. Ex. 1-F at 4.  It would have been irresponsible for the City to continue to send new placements to CSS that it might later have to transfer if the City and CSS could not come to terms.  Figueroa Decl. ¶¶ 30-31.

CSS also points to statements by City Council and the Mayor that amount to nothing more than disagreement with CSS's refusal to serve same sex married couples, and the observation that the refusal to serve those families on equal terms as other couples constitutes discrimination under the City's Fair Practices ordinance.[10]  *See* Pltfs. Exs. 1-B; 1-W.

Finally, CSS points to a letter from the Law Department which merely sought to explain the importance of the City's law and policy requiring equal treatment of same sex couples.  *See* Pltfs. Ex. 1-F.  The letter merely explained that just as the City could not permit or exempt discrimination by providers against Catholic or mixed-race couples, likewise we could not permit discrimination against same sex couples either.  *See id.* at 2 ("We would not allow such discrimination against, for example, Catholic couples [by a religiously affiliated agency antagonistic to Catholicism] or "mixed-race" couples, and we cannot allow it with respect to same-sex couples, either.")

None of these statements are remotely on par with the hostility which was integral to the *Masterpiece Cakeshop* decision.  *Masterpiece Cakeshop* pointed to statements made by

---

[10] City Council, being part of the legislative branch, had nothing to do with the decision made by the executive branch at issue here.  Accordingly, its commentary should not be considered.

adjudicators in what was supposed to be a neutral adjudicatory proceeding, including a statement that the baker's religious justification was "one of the most despicable pieces of rhetoric that people can use" to justify "hurting others." *Masterpiece Cakeshop,* 2018 WL 2465172, at *9. The adjudicator also invoked the Holocaust and slavery as comparable examples where religious freedom had been invoked as a justification.

No one involved in this matter has made any similarly disrespectful statements. Indeed, our letter expressed that we were "genuinely appreciative of the invaluable services that CSS provides on the City's behalf" and expressed regret that we cannot reach consensus. Pltfs. Ex. 1-F at 2. Nothing in *Masterpiece Cakeshop* suggests that, in order to be permitted to apply an otherwise neutral, generally applicable anti-discrimination law, we cannot observe that a refusal to serve same sex couples on equal terms, even when religiously motivated, violates that law. Further, the Court in *Masterpiece Cakeshop* was concerned because the Commissioners made their problematic statements in the context of a neutral adjudicatory proceeding while serving as adjudicators. The statements pointed to by CSS were made by parties to a contract. Parties to a contract (unlike neutral adjudicators) are certainly permitted to advocate for their respective positions.

In sum, the mere fact that we have pointed out to CSS that its refusal to serve same sex couples violates our anti-discrimination law and policy falls far short of the mark that *Masterpiece Cake* sets for establishing hostility so great that it overcomes application of an otherwise neutral, generally applicable anti-discrimination law.

**D. Even If Strict Scrutiny Did Apply, the City's Anti-Discrimination Law and Policy and Its Constitutional Obligations Are Compelling Interests, and the Least Restrictive Means to Serve Those Interests Is to Insist Upon Compliance.**

Finally, even if strict scrutiny did apply, CSS' free exercise claim would still fail because the City's actions are justified by a compelling interest and are the least restrictive means of achieving that interest.

First, respecting and following the City's anti-discrimination law is a compelling interest. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1986).

Second, insisting upon compliance is the least restrictive means of addressing the anti-discrimination mandate of the Fair Practices Ordinance (FPO). *See, e.g.*, *EEOC v. R.G. and G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 588 (6th Cir. 2018) (rejecting federal Religious Freedom and Protection Act defense by religious funeral home regarding transgender employee, because compliance with anti-discrimination law was the least restrictive way to further compelling government interest in fighting discrimination).

This Court should reject CSS's claim that the City must allow CSS to send prospective foster parents that do not comport with its religious beliefs to some other agency, and that this will be the "least restrictive means." Pltfs. Br. at 7, 20.  A religious entity cannot elect an accommodation that will harm third parties.  *See Estate of Calder v. Thornton*, 472 U.S. 703, 707-08 (1985).  Sending someone away based on a protected category under the FPO—a woman, a person who is not Christian, or a same-sex couple—is still contrary to the FPO, and contrary to the City's compelling interest in remedying discrimination.

### E. The Individual Foster Parents Do Not Have Free Exercise Claims Based on CSS's Dispute with the City.

CSS mistakenly asserts that by violating CSS' free exercise rights, the City is also violating the free exercise rights of CSS *foster parents* to care for foster children.  Pltfs. Br. at 9, 15, 17-18, 28, 36.  However, "a litigant may only assert his own constitutional rights or immunities," and "one cannot sue for the deprivation of another's civil rights." *O'Malley v. Brierley*, 477 F.2d 785, 789 (3d Cir. 1973) (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)); C. Antieau, Federal Civil Rights Acts, Civil Practice, § 31 at 50-5).

In *O'Malley*, where a prison suspended clerics' privileges to conduct religious services at the prison, the suspended clerics were not entitled to bring free exercise claims even though their exclusion may have violated *inmates'* free exercise rights.  Similarly here, foster parents cannot assert a claim that their purported religious right to serve as foster parents has been impaired because the City allegedly violated *CSS's* free exercise rights.  Since the foster parents' claim is derivative of CSS's claim, it cannot stand.

## II.      CSS Has Not Shown a Likelihood of Success on its RFPA Claim.

CSS's Religious Freedom Protection Act (RFPA) claim fails because CSS cannot meet its initial burden of proof under this statute. To bring a RFPA claim, CSS must show by clear and convincing evidence that CSS is engaged in the "practice or observance of religion" under Art. I, § 3 of the Pennsylvania Constitution, and that the City has placed a "substantial burden" on that religious practice or observance. 71 P.S. §§ 2403, 2404(a), 2405; *see also Combs*, 540 F.3d at 253. CSS cannot sustain this burden.

As explained above, CSS's assertion that it is entitled to a government contract on its own terms to perform its religious mission of caring for foster children is overbroad. RFPA case law only makes that clearer. As Pennsylvania's Commonwealth Court has explained, educating children or ministering to the sick may flow from a religious mission, but it is not a fundamental religious activity of a church to have a day care center or a hospital to accomplish that mission. *See Commonwealth v. Parente*, 956 A.2d 1065, 1076-77 (Pa. Cmwlth. 2008); *Ridley Park United Methodist Church v. Zoning Hearing Bd. Ridley Park Borough*, 920 A.2d 953, 960-61 (Pa. Cmwlth. 2007). A foster care contract with the City is not a fundamental religious activity under RFPA either. *See Ridley Park*, 920 A.2d at 960-61.

Even if CSS could meet its initial burden under RFPA, that claim still would fail because the City's actions are justified by a compelling interest and are the least restrictive means of achieving that interest. *See* 71 P.S. § 2404(b). For the reasons already set forth in section I.D above, the City's anti-discrimination laws are a compelling interest, and requiring compliance with those laws is the least restrictive means to further them.

Therefore, this Court should reject CSS's claim that allowing CSS to refuse to deal with prospective foster parents who do not comport with its religious beliefs by permitting CSS to send them away to another agency is the "least restrictive means" under RFPA.

## III.     CSS Has No Establishment Clause Claim.

CSS also tries to claim that the City engaged in improper "religious preferences" under the Establishment Clause because "[o]nly two religious foster care agencies" have been subject

22

to review for failure to comply with the FPO.  Pltfs. Br. at 27.  Merely because the two agencies that expressed their objection to serving same sex foster parents are religiously affiliated does not permit the inference that the City has favored or disfavored different belief systems.  CSS has not alleged that a secular agency has expressed similar objections to serving prospective foster parents equally.

As noted above, what CSS wants here would create its own Establishment Clause problems.  A civil power such as foster care "must be exercised in a manner neutral to religion."  *See Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 704 (1994).  Using religious criteria to reject a same-sex married couple, or any prospective foster care parent, is not neutral at all.  *See id.*

**IV.     CSS Does Not Have a First Amendment Retaliation Claim.**

CSS argues that the City engaged in First Amendment retaliation by responding to CSS's public comment that it would not certify or work with a same-sex married couple under its foster care contract with the City.  Pltfs. Br. at 28-29.

But it is simply not possible to draw an inference that the City sought to punish CSS for conveying a message as opposed to acting to ensure that CSS comply with anti-discrimination law.  As CSS alleges, the City and the Mayor have known the Church's position on gay marriage and sexual orientation for many years.  Compl. ¶ 42.  And yet the City took no action to stop contracting with CSS annually until CSS expressly stated it would refuse to certify and work with same sex couples.  Indeed, even after CSS stated its views in the newspaper, the City was still willing to offer it a new full contract so long as it would agree to comply with the anti-discrimination requirements.  *See* Pltfs. Ex. 1-F at 4.

Further, Bethany set forth the same views as CSS did in the newspaper article, but Bethany (unlike CSS) has now confirmed that it will comply with the City's anti-discrimination requirements.  The City immediately resumed referrals to Bethany and has noticed its intent to enter into a new full contract with that agency.  Figueroa Decl. ¶ 39.

CSS's interpretation of protected speech here is also, to put it mildly, overbroad.  If a foster care agency told the newspaper that it intended to stop training prospective foster parents before placing children in their homes, and based upon that article, we chose not to contract with that agency anymore, we would not be disagreeing with their speech about foster parent supervision.  We would be acting out of concern for the agency's ability to perform its contractual duties.  Similarly here, we chose to stop contracting with CSS because it announced in no uncertain terms that it could not comply with mandatory contract terms.

The fact that CSS' unwillingness to abide by the terms of its contract became apparent through public statements does not "cloak it in First Amendment protection." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 878 (11th Cir. 2011).  *Keeton* is directly on point, involving a counseling student at Arizona State University who held the religious view that "it is not okay to be gay," and that conversion therapy should be used to change the sexual orientation of LGBTQ individuals. *See id.*  The University required that she participate in a Remediation Plan because her views on counseling did not comport with a counseling code of ethics requiring non-discrimination on the basis of sexual orientation.  Keeton unsuccessfully alleged that the University imposed this requirement in retaliation for her protected speech concerning her views of the LGBTQ population.  The Court held that because Keeton had expressed an intent to impose her personal religious views on her counseling clients, in violation of the ACA Code of Ethics, there was no factual basis to conclude that the University had ordered her to complete a Remediation Plan because it disagreed with her views. *Id.* at 872.

As in *Keeton*, according to the facts that CSS would not dispute, nothing would support a conclusion that the City decided to stop contracting with CSS because it disagreed with CSS's views on same sex marriage. Rather, the City decided not to contract with CSS because CSS could not comply with our mandatory anti-discrimination requirements and constitutional obligations.

**V.      CSS's "Compelled Speech" Claim Also Fails.**

Finally, CSS cannot show a likelihood of success on its "compelled speech" claim.  Br at 28-30.  CSS voluntarily chose to contract with the City, so it does not now have a constitutional right to refuse to comply with the contractual condition that it comply with the Fair Practices Ordinance.  *See, e.g.*, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 631-32 (1943) (distinguishing "compelled" speech from speech of persons who voluntarily enroll in a program, because "those who take advantage of . . . opportunities may not on grounds of conscience refuse compliance with such conditions")

CSS unsuccessfully tries to call for support upon *Legal Services Corp. v. Velasquez*, 531 U.S. 533 (2001), and *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013).  Pltfs. Br. at 31-33.  In *Velasquez,* the government compelled attorneys who accepted government subsidies for indigent clients to refrain from challenging the constitutional or statutory validity of welfare laws.  This constituted a substantial restriction on attorney speech in court.  *See* 531 U.S. at 543-44.

By way of contrast, a contract to provide City foster care services is not a contract for speech, nor does that contract subsidize private speech.  *See id.*; *see also Teen Ranch*, 389 F. Supp. 2d at 840 (moratorium on placement of troubled youth in faith-based programs did not create forum for private speech).

*Agency for International Development* is distinguishable as well, because in that case, the Supreme Court explained that conditions placed within the limits of the government's own program – the activities the government wanted to subsidize—are constitutionally acceptable. *See* 570 U.S. at 214-15.  In contrast, conditions "that seek to leverage funding to regulate speech outside the contours of the program itself" are not.  *See id.*  Here the City's requirement that CSS evaluate and select foster parents on an equal, non-discriminatory basis goes to the heart of CSS's contract to provide foster care services.

*Cradle of Liberty Council, Inc. v. City of Philadelphia*, 851 F. Supp.2d 936, 943-44 (E.D. Pa. 2012), is distinguishable for the same reason.  The District Court found that the City could

not impose a requirement on the Boy Scouts to deny gay boys membership because that requirement was unrelated to the contract between the City and the Scouts to provide a City-owned building for the Scouts to use.  *See id*. at 943-44.

Trying to shoehorn itself into these cases, CSS asserts that because the City pays it on a per diem basis, CSS is not really engaging in services under the contract when it evaluates prospective foster parents.  Pltfs. Br. at 32-33.  But this is simply not the case.  Evaluating, certifying and selecting prospective foster parents is a key component of the contract. *See* Contract (Dkt. No. 10-4) at 17.  CSS must be able to perform those functions in a non-discriminatory manner, using only secular criteria.  Certifying and selecting foster parents is clearly within the "contours" of a foster care agency's program.  By requiring CSS to comply with the City's non-discrimination law and policy and recognizing the fitness of otherwise qualified same sex couples to serve as foster parents, we are not requiring CSS to recognize their marriages as valid under Church doctrine. We are simply requiring CSS to apply secular governmental criteria to certify such couples.  CSS has ample ability outside of this contract to express its objection to same sex marriage.

**VI.    Because Any Constitutional "Irreparable Harm" Is Nominal, Both the Balancing of Harms and the Public Interest Militate in Favor of Denial of the Requested Injunctions.**

For the purposes of this hearing only, the City concedes that to the extent CSS establishes a likelihood of success on the merits, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) supports a holding that the irreparable harm prong is satisfied because CSS's alleged loss of First Amendment rights constitutes irreparable harm.  But the other irreparable harms CSS claims – such as "to needy children and foster parents across Philadelphia," Pltfs. Br. at 35, do not support the issuance of a TRO or Preliminary Injunction.  In fact, these alleged harms, properly understood, are not harms at all but instead relate to complex, multi-layered issues that DHS has the responsibility and obligation to consider and address – *i.e.* the best interests of children in foster care.  Once the variety of harms CSS has tried to include in its Motion are disaggregated,

the balancing of CSS's' First Amendment rights against the City's responsibility to ensure the best interest of all the foster children in its custody, while also enforcing its Fair Practices Ordinance and contract requirements, militates in favor of this Court denying the requested injunctions.

### A. There is no Irreparable Harm to Foster Care Children or to Foster Parents.

CSS' Brief seeks to leverage an alleged emergency regarding Doe Foster Child #1 to create the urgency necessary for a TRO. But that situation has been addressed in the best interest of the child and is therefore moot. Of equal import are the facts that this situation was not related to the issues CSS has raised in this litigation, was not the emergency CSS represented, required additional time to resolve because CSS entangled the issue with this lawsuit, and is the subject of ongoing Family Court jurisdiction.

CSS, through its litigation counsel, raised the issue of Doe Foster Child #1 with the City on Friday, June 1, 2018 at 5:09 PM. Ex. 3-A. Yet that morning CSS had emailed the CUA requesting that the child be relocated and providing information regarding the child's situation. Pltfs. Ex. 1-M at 2. Rather than contacting DHS leadership immediately, as in normal course, CSS and the CUA instead worked through litigation counsel. *See* Ex. 3-A. But because this matter was not an emergency, DHS had a responsibility to obtain information not only from the CUA case team but also from the child advocate and Foster Mother #1 to evaluate the child's best interests. It did so promptly, but was hampered by the inability, because of the litigation, to communicate directly with the CUA and foster mom. Ali Decl. ¶ 59; Ex 3-A. In any event, the record clearly demonstrates that the City acted promptly to ensure the best interests of Doe Foster Child #1 and is best able to do so when issues related to individual children—issues that are the subject of ongoing Family Court jurisdiction—are not made part of this litigation.

The other alleged harms CSS cites—"preventing foster parents from living out their religious commitment," harm to "untold other" foster children, and to CSS' employees are similarly unavailing as they relate to CSS's TRO/PI request. Pltfs. Br. at 34-35. As the City has already explained, the parents' alleged rights are derivative of those of CSS. *See* section I.E,

*supra* at 21.  And the best interest of "untold other" foster children is the subject of a detailed statutory framework, the jurisdiction of Family Court, and the responsibility of DHS.  DHS has concluded that the right decision is to cease referrals and new placements with CSS as a general matter but to make exceptions if in the best interest of an individual child.  CSS may disagree with the City's determination, but that determination does not equate to irreparable harm to CSS warranting injunctive relief in this matter.  Lastly, the alleged harm to CSS' employees and business is not the type of harm that supports injunctive relief.[11]  *Hohe v. Casey,* 868 F.2d 69, 73 (3d Cir. 1989).

### B.  The Balancing of the Equities Requires Denying CSS' Requested Relief.

"'Balancing the equities' is jurisprudential 'jargon for choosing between conflicting public interests.'" *Pennsylvania v. Trump*, 281 F. Supp. 3d 553 (E.D. Pa. 2017) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring)).  "'[C]ourts must *balance* the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Reilly*, 858 F.3d at 177–78 (emphasis in original) (quoting *Winter*, 555 U.S. at 24), *as amended* (June 26, 2017).

The harm to the City of a grant of relief here would be significant.  The City suspended CSS intake and referrals because it determined it to be in the best interest of the children and necessary to protect its residents from discrimination.  CSS has indicated that if it is not successful in this litigation, its ability to provide foster care services might rapidly fall apart.  Br. at 32.  With that in mind, DHS rightly determined that it is not in the best interest of children in its care to place them with CSS during this litigation (unless specific circumstances such as familial relationships warrant such a placement).  Granting an injunction would displace DHS's determination regarding the best interest of children in foster care and require DHS to support the placement of children in a manner contrary to its determinations.  Furthermore, the City's

---

[11] This alleged harm would also be of CSS' own making as the City has attempted to negotiate an agreement with CSS for a relationship that continues beyond June 30, 2018, to ensure that children currently being serviced are able to continue receiving care.

ability to protect all of its residents from discrimination by requiring the City's agents to adhere to its Fair Practices Ordinance would be undermined by injunctive relief.  At a time when the City is in particular need of LGBTQ-affirming foster homes, CSS would propose to refuse those among the most likely to help based on their sexual orientation.  Lastly, in permitting one of the City's agents to impose religious values while acting as a state actor, an injunction would open up the City to liability that is the inverse of this lawsuit.

In contrast, CSS's harm is limited to whether or not it can recruit additional foster care families and receive additional foster care placements during the duration of this suit.  CSS's actions demonstrate that its own alleged irreparable harm was not of the urgency requiring a TRO as it waited nearly three months before seeking emergency relief.  *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, No. 05-5259, 2006 WL 892718, at *12 (D.N.J. Apr. 4, 2006) (citing *New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) ("[W]here a [movant] delays in seeking preliminary injunctive relief, such delay is evidence that speedy relief is not needed."); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998); *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309, 312 (E.D. Pa. 1993))).  This is true even in the First Amendment context. *See Doe v. Banos*, 713 F. Supp. 2d 404, 415 n.15 (D.N.J. 2010) ("John Doe's lack of urgency as reflected in how this motion was brought before the Court undermines his claim of immediate and irreparable harm to his First Amendment rights . . . ."), *aff'd*, 416 Fed. App'x 185 (3d Cir. 2010)).  CSS waited over two months before filing the Complaint and then waited an additional two and a half weeks before filing for a TRO.  Its conduct highlights that it concluded that any alleged harm did not require immediate relief.

## **CONCLUSION**

For all the reasons set forth above, the City respectfully requests that this Court deny the Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.


Respectfully submitted,

CITY OF PHILADELPHIA LAW DEPARTMENT
Marcel Pratt, City Solicitor

Date: June 12, 2018            By: /s/ Diana Cortes
                                   DIANA CORTES (PA ID No. 204274)
                                   Chair, Litigation Group

                                   ELEANOR N. EWING (PA ID No. 28226)
                                   Chief Deputy City Solicitor, Affirmative &
                                   General Litigation

                                   BENJAMIN H. FIELD (PA ID No. 204569)
                                   Deputy City Solicitor, Affirmative & General
                                   Litigation

                                   CITY OF PHILADELPHIA LAW DEPARTMENT
                                   1515 Arch Street, 16th Floor
                                   Philadelphia, PA 19102
                                   Phone:  (215) 683-5014
                                   *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin H. Field, hereby certify that on June 12, 2018, I caused a true and correct copy of the foregoing Memorandum of Law in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, to be served via CM/ECF filing upon counsel for all parties.

By: /s/ Benjamin H. Field

Benjamin H. Field

31