# EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHARONELL FULTON, CECELIA PAUL, TONI LYNN SIMMS-BUSCH, AND CATHOLIC SOCIAL SERVICES,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF PHILADELPHIA, DEPARTMENT OF HUMAN SERVICES FOR THE CITY OF PHILADELPHIA, AND PHILADELPHIA COMMISSION ON HUMAN RELATIONS,<br><br>Defendants. | Civil Action No. 18-CV-2075 |

### DECLARATION OF CYNTHIA F. FIGUEROA

I, Cynthia F. Figueroa, declare as follows:

1. I am the Commissioner of the Department of Human Services ("DHS") for the City of Philadelphia. I was appointed to this position in July 2016, effective September 2016.

2. Prior to being appointed Commissioner, I was the Chief Executive Officer of Congreso de Latinos Unidos, a nonprofit focused on strengthening Latino communities through social, economic, education and health services.

3. From 2008 to 2011, I served as Deputy Commissioner for DHS and was responsible for the oversight of what was then known as the Division of Community Based Prevention Services. In that role, I oversaw all child welfare prevention services delivered by community based providers including development of the Education Support Center.

1

4. Prior to that, I was the Executive Director of Women Against Abuse, a nonprofit organization in Philadelphia that advocates against domestic violence and provides services to victims.

5. As the Commissioner of DHS, I supervise one of the largest child welfare agencies in the country. In my role, I serve as the County Administrator to deliver our Federal and State mandated child welfare service for Philadelphia. I have direct oversight of 1500 employees, a budget of over $600 million, and approximately 250 contractors. In this capacity, I am familiar with the Department's operations, policies, procedures, and contracts, including the practices that are the subject of this action.

6. The City of Philadelphia Department of Human Services is committed to providing and promoting safety, permanency, and well-being for children and youth at risk of abuse, neglect and delinquency.

7. DHS operates Philadelphia's child abuse hotline and investigates allegations of child abuse and neglect. To find placements for children who are not safe in their own homes, DHS contracts with state-licensed foster care agencies who recruit, certify, and service foster homes for these children. The goal of foster care is to reunite children with their families. DHS also manages Community Umbrella Agencies (CUAs), six private organizations that provide case management and other support services in 10 geographic regions throughout Philadelphia. CUAs serve children and families whose cases are accepted for service.

8. While agencies work with specific foster families to provide training and support, a CUA case manager coordinates the relationship between the foster family, the child, and the child's biological family with the goal of reunification.

2

9. The Archdiocese of Philadelphia operates a CUA and a foster care agency which is Catholic Social Services. Recently, the City began ranking CUAs. Catholic CUA was ranked second out of ten geographic regions. DHS does not currently rank foster care agencies and has not ranked Catholic Social Services in the last several years.

10. Currently, approximately 6,000 children in DHS's custody are in out-of-home placement. Approximately 86% of those are in family foster care and approximately 12% are in congregate care (i.e., group homes).

11. Approximately 54% of the children in family foster care are in kinship care, which is foster care with a relative or someone who has a significant relationship to the child. Approximately 45% are with families who have been certified as foster parents and who do not have a kinship relationship to the child.

12. In Fiscal Year '17, DHS reunified 1250 children with their families, finalized 636 adoptions and finalized 138 permanent legal custodianships.

DHS' Recruitment Drive

13. Recruitment and certification of new families are essential and integral parts of the work of the City's foster care agencies.

14. Each of the City's contracts includes these responsibilities.

15. Because it has the ultimate responsibility of children in its legal custody, DHS is always trying to identify new, qualified foster parents, including through its own recruitment efforts.

16. For example, this year DHS issued an "urgent call" to recruit new foster parents. DHS did this in order to build additional capacity into the system.

3

17. As part of this effort, DHS was trying to specifically recruit more families to serve children with special needs, older children, children with specialized behavioral health needs, and lesbian, gay, bisexual, transgender, and questioning (LGBTQ) youth, based in part on reports DHS received from LGBTQ youth who had negative experiences in homes that did not support them.

18. In addition, DHS' "urgent call" sought to recruit new foster parents to reduce the number of children in congregate care, and in particular, the number of older children in such care. DHS' experience is that there is a greater proportional number of LGBTQ youth in the population of older foster children. This also factored into DHS' recruitment efforts.

19. This "urgent call", however, does not indicate that there is a "crisis" in identifying new homes. Nor does the fact that City seeks to expand its foster care resources indicate that there are not enough foster homes available. At any given time, there are certified foster parents associated with one of the City's foster care agencies who are willing to care for a new child in their home. These households may be awaiting a placement or have exercised their discretion not to take a child due to their own preferences and willingness to accept certain children due to the child's age or the needs of the child.

20. As a result of this recruitment effort, since January 75 new families have been certified.

21. On occasion, and usually for a short period of time, there are children who the City is unable to immediately place with a foster family or in congregate care. There can be many reasons for this, including that on occasion a child comes into the City's custody in the middle of the night.

22. The City's data regarding the placement of foster children reflects that over the past year, the congregate care rate has remained the same.

Closure of CSS Intake

23. On March 9, 2018, DHS was asked by a reporter for the *Philadelphia Inquirer* whether DHS was aware of any organizations discriminating against same sex couples. At that time, DHS was not aware of any such discrimination, but the reporter disclosed that a same-sex couple said they had been turned away by another foster care agency, Bethany Christian Services. The reporter indicated they reached out to CSS and were awaiting a comment.

24. DHS First Deputy Commissioner Jessica Shapiro and I then contacted CSS to determine whether the statements in the article were accurate. Jim Amato of CSS confirmed the CSS would not certify same-sex couples as foster homes or for adoptions.

25. On March 13, 2018, the *Philadelphia Inquirer* published a story titled "Two foster agencies in Philly won't place kids with LGBTQ people." According to the article, neither Bethany nor CSS would place children with LGBTQ couples. A copy of the story is attached here as Exhibit 2-B.

26. In the past, as DHS Commissioner, I have had to suspend referrals and close intake at agencies for a variety of programmatic and administrative reasons.

27. On or about March 14, 2018, I determined that Bethany and CSS's public position raised a concern that it would discriminate against same-sex couples in violation of their contract with the City and the City's Fair Practices Ordinance.

5

28. I determined that DHS would suspend referrals and close intake at both agencies as long as they refused to certify qualified same-sex foster parents. I did this because CSS told us it could not comply with its contract.

29. In making this decision, I determined based on my professional experience that DHS would continue to be able place children in appropriate family foster homes. It is important to note that roughly half of family foster home placements are kinship care, which do not strain existing foster care capacity. I also knew that there were currently a number of foster families' homes with other agencies willing to accept new foster children and anticipated that our recruitment drive would bring additional families into the system. And since then we have been able to certify 75 new families.

30. In addition, as CSS had communicated that it could not comply with the contract with the City and the City's Fair Practices Ordinance, I had to also consider the best interest of any children who might be placed with CSS in the future.

31. I was concerned that because CSS was in breach of the contract, placing additional children with them—except on an individual, case by case basis—would not be in those children's best interest because of the risk of disruption related to CSS' no longer being a foster care agency for the City.

32. The following day, March 15, 2018, First Deputy Commissioner Shapiro, Kimberly Ali, and I met with representatives of Bethany and CSS. Following the meeting with CSS, Deputy Commissioner of Child Welfare Operations Kimberly Ali called CSS to inform them that DHS was suspending referrals and closing their foster home intake.

33. Following this call, Jim Amato of CSS contacted leadership at DHS to request waivers related to specific children.

6

34. Since March 15, 2018, there have been at least two instances where CSS has requested waivers by contacting me to request those waivers. Kimberly Ali worked with CSS in both cases and the waivers were granted.

35. The closure of intake to CSS has had minimal impact on DHS operations. The percentage of children placed in congregate care (as opposed to family foster care) has remained consistent since the closure. Similarly, the number of childcare room overnight stays has actually decreased slightly from nine to eight per month since the closure.

36. I decided on this course of action with CSS with the consideration of arranging an interim contract that would permit CSS to continue to provide services to foster children and families it already had in its care. I continue to believe such an interim agreement is in the best interest of those foster children, however I also continue to believe that permitting CSS to continue to referrals and performing foster home intake services is not in the best interest of children.

Bethany

37. Since suspending referrals to Bethany, the City has been in discussions with Bethany to resolve the dispute.

38. While the City and Bethany are still negotiating a contract for the next fiscal year, the parties are close to a resolution and Bethany has agreed in principle to comply with the Fair Practices Ordinance and to institute a nondiscrimination policy.

39. I fully expect Bethany to enter into a full contract with the City for next fiscal year and that DHS will resume referrals and reopen intake at Bethany.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct, based upon my own knowledge and/or belief.

DATE: June 12, 2018

_____
Cynthia F. Figueroa

8