**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                                          :
SHARONELL FULTON, *et al*.,                      :
                                                          :
                        Plaintiffs,                      :          No. 2:18-cv-02075
                                                          :
            v.                                              :
                                                          :
CITY OF PHILADELPHIA, *et al.*,              :
                                                          :
                        Defendants.                   :
_____:

**PROPOSED INTERVENORS' MEMORANDUM OF LAW, OR, IN THE
ALTERNATIVE, AMICUS BRIEF, IN OPPOSITION TO PLAINTIFFS' MOTION FOR
<u>A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 4

I.     Plaintiffs Have Failed to Demonstrate a Likelihood of Prevailing on Any of the Claims Upon Which They Moved for a Temporary Restraining Order and Preliminary Injunction. .......................................................... 4

     A.     Plaintiffs are unlikely to prevail on their claims based on the free exercise of religion. ..................................................................... 4

          1.     Plaintiffs have not shown that the City's enforcement of its non-discrimination requirement targeted CSS based on hostility toward its religious beliefs or constituted selective enforcement against religiously motivated conduct. ...................... 4

          2.     The City's enforcement of its non-discrimination requirement does not substantially burden Plaintiffs' religious exercise. ........................................................ 7

          3.     The City has a compelling interest in enforcing its non-discrimination requirement. ............................................ 9

     B.     Plaintiffs are unlikely to prevail on their Free Speech claims. ............... 10

II.     If the City Were to Allow CSS to Discriminate Against Prospective Families Headed by Same-Sex Couples, It Would Violate the Establishment Clause and the Equal Protection Clause. .................................... 11

     A.     Establishment Clause ............................................................ 11

     B.     Equal Protection Clause ........................................................ 14

III.     Neither the Balance of the Equities Nor the Public Interest Favor Granting the Relief Sought. ............................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Mass. v. Sebelius*,
   821 F. Supp. 2d 474 (D. Mass. 2012) ....................................................................12

*Agency for Int'l Dev.* v. *Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013)..................................................................................................7, 10

*Bd. of Educ. of Kiryas Joel Village Sch. Dist.* v. *Grumet*,
   512 U.S. 687 (1994)..................................................................................................12, 13

*Bowen* v. *Kendrick*,
   487 U.S. 589 (1988)..................................................................................................12

*Campaign for Southern Equality* v. *Mississippi Department of Human Services*,
   175 F. Supp. 3d 691 (S.D. Miss. 2016)................................................................14, 16

*Chosen 300 Ministries v. City of Philadelphia*,
   No. 12-3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012) ..................................8, 9

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)..................................................................................................6, 7

*City of Cleburne, Tex.* v. *Cleburne Living Ctr.*,
   473 U.S. 432 (1985)..................................................................................................14

*Cutter* v. *Wilkinson*,
   544 U.S. 709 (2005)..................................................................................................13

*Doe* v. *Porter*,
   370 F.3d 558 (6th Cir. 2004) ..................................................................................12

*Hively v. Ivy Tech Community College of Indiana*,
   853 F. 3d 339 (7th Cir. 2017) ................................................................................14

*Holt v. Hobbs*
   574 U.S. ___, 135 S. Ct. 853 (2015).......................................................................8

*Larkin* v. *Grendel's Den*,
   459 U.S. 116 (1982)..................................................................................................11, 12

*Larson v. Valente*,
   456 U.S. 228 (1982)..................................................................................................5

*Legal Services Corp. v. Velazquez*,
　531 U.S. 533 (2001)...............................................................................................10

*Lehr* v. *Robertson*,
　463 U.S. 248 (1983)...............................................................................................13

*Lemon* v. *Kurtzman*,
　403 U.S. 602 (1971)...............................................................................................11

*Masterpiece Cakeshop Ltd. v. Colo. Civil Rights Comm'n*,
　No. 16-111, 584 U.S. ___, 2018 WL 2465172 (June 4, 2018)......................2, 4, 5, 6

*McLaughlin* v. *Jones*,
　401 P.3d 492 (Ariz. 2017), *petition for cert. filed*, No. 17-878 (U.S. Dec. 18,
　2017) .....................................................................................................................15

*NutraSweet Co. v. Vit-Mar Enters., Inc.*,
　176 F.3d 151 (3d Cir. 1999).....................................................................................1

*Obergefell v. Hodges*,
　576 U.S. ___, 135 S. Ct. 2584 (2015) ...............................................................14, 15

*Opticians Ass'n of Am. v. Independent Opticians of Am.*,
　920 F.2d 187 (3d Cir. 1990).....................................................................................2

*Palmore v. Sidoti*,
　466 U.S. 429 (1984)...............................................................................................14

*Pavan* v. *Smith*,
　582 U.S. ___, 137 S. Ct. 2075 (2017).....................................................................15

*Roberts v. U.S. Jaycees*,
　468 U.S. 609 (1986).................................................................................................9

*Rust* v. *Sullivan*,
　500 U.S. 173 (1991).................................................................................................8

*Sherbert v. Verner*,
　374 U.S. 398 (1963).................................................................................................8

*Teen Ranch* v. *Udow*,
　389 F. Supp. 2d 827 (W.D. Mich. 2005), *aff'd*, 479 F.3d 403 (6th Cir. 2006).............8, 10, 12

*Tex. Monthly, Inc.* v. *Bullock*,
　489 U.S. 1 (1989)...................................................................................................13

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
　137 U.S. 2012 (2017)...............................................................................................8

*Ward v. Polite*,
    667 F.3d 727 (6th Cir. 2012) ..................................................................................7

*Whitewood v. Wolf*,
    992 F. Supp. 2d 410 (M.D. Pa. 2014) ...................................................................14

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013)...........................14

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...................................................................................................1

<u>INTRODUCTION</u>

Following a news report in which Catholic Social Services ("CSS") and another government-contracted foster care agency confirmed that they would not license prospective foster families headed by same-sex couples, regardless of the family's qualifications or the needs of the children in the agencies' care, the City of Philadelphia ("City") advised these agencies that they were in violation of the terms of their contracts and suspended referrals of children to these agencies until they agreed to abide by the non-discrimination requirements of their contracts. One of those agencies has agreed in principle to abide by the terms of its contract and comply with the Fair Practices Ordinance and is negotiating a contract with the City that would allow Philadelphia Department of Human Services ("DHS") to resume referrals to the agency. ECF 20-6, Declaration of Cynthia F. Figueroa ("Figueroa Decl.") ¶ 38. CSS, instead, asks this Court for the extraordinary relief of a preliminary injunction to force the City to give CSS a taxpayer-funded government contract to find families for children in the public child welfare system, but to allow CSS to turn away the families who don't meet its religious test. Intervenors Support Center for Child Advocates ("Child Advocates") and Philadelphia Family Pride ("PFP") urge the Court to deny Plaintiffs' motion because Plaintiffs cannot show a likelihood of success on their claims under the Constitution and Pennsylvania's Religious Freedom Act, because the requested relief would itself violate the Constitution, because the balance of the equities does not support such relief, and because the requested relief is not in the public interest.[1]

---

[1] "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The "failure to establish any element . . . renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999). The movant bears the burden of showing that these four factors

1

Plaintiffs cannot demonstrate a likelihood of prevailing on their claims under the Free Exercise Clause or Pennsylvania's Religious Freedom Protection Act.  Plaintiffs contend that the City's decision to enforce the terms of its contracts is invalid because the City was motivated by hostility toward CSS's religious position on same-sex marriage, citing to *Masterpiece Cakeshop Ltd. v. Colo. Civil Rights Comm'n*, No. 16-111, 584 U.S. ___, 2018 WL 2465172 (June 4, 2018). But there is no basis in fact to attribute the City's actions to religious hostility, rather than its interest in treating all families equally and ensuring the greatest variety of potential foster homes. More fundamentally, the right to free exercise of religion without interference by the government does not allow CSS to unilaterally alter the terms under which it offers the government services it has agreed to provide.  Finally, *if* the City were required to satisfy strict scrutiny to require its contractors to adhere to City non-discrimination policies, the City's interest in preventing discrimination would meet that test here, as it has in countless other contexts.  Plaintiffs' "compelled speech" claims fare no better, because the City's requirement that contract agencies issue certifications and home studies on a non-discriminatory basis does not compel private speech; rather, it regulates activity that is clearly within the scope of the contract to provide government services.

An additional reason that Plaintiffs cannot demonstrate a likelihood of success is the fact that the relief they request would violate the Constitution.  The Establishment Clause prohibits the use of religious eligibility criteria in the provision of a government service, whether that service is provided by government employees or organizations contracted by the government for that purpose.  DHS could not screen out prospective foster families based on failure to meet a

---

weigh in favor of granting the injunction. *See Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990).

religious test; therefore, the agencies it hires and pays with tax dollars cannot use such a screen. The Establishment Clause also prohibits the government from funding religious activity.  And it bars the government from privileging religion to the detriment of third parties.  Allowing contracted agencies that provide public child welfare services to turn away same-sex couples based on religious objections would also violate the Equal Protection Clause.  It would subject same-sex couples to unequal treatment by denying them the same options for fostering and adopting that are afforded to heterosexual couples and exposing them to the risk of discrimination in the process, while furthering no legitimate government interest, let alone a compelling one.

The harm that would result from Plaintiffs' requested injunction—the harms that bring Intervenors to this Court—is the final reason why Plaintiffs' motion should be denied. Allowing discrimination by agencies that have religious objections to same-sex couples would harm the at-risk children that the foster care system is meant to protect by reducing the number of qualified families available to foster.  In addition to the stigma that same-sex couples who wish to foster would suffer if CSS and other like-minded agencies were allowed to turn them away, the recognition of a "right" to pick and choose potential foster parents based on religious standards would create additional barriers to fostering children at a time when Philadelphia's children cannot afford to lose any qualified families.  For these reasons, neither the balance of equities nor the public interest favor the requested relief.

# ARGUMENT

I. **Plaintiffs Have Failed to Demonstrate a Likelihood of Prevailing on Any of the Claims Upon Which They Moved for a Temporary Restraining Order and Preliminary Injunction.**

  A. Plaintiffs are unlikely to prevail on their claims based on the free exercise of religion.

Plaintiffs claim that the City's suspension of referrals to CSS for failure to comply with its non-discrimination requirement violate the Free Exercise Clause of the Constitution and the Pennsylvania Religious Freedom Act.  These claims are meritless.  There is no basis for Plaintiffs' assertion that the City's action was based on hostility toward CSS's religious beliefs or selective enforcement against religiously motivated contract violations.  Nor is there any substantial burden on Plaintiffs' free exercise rights because there is no right to government contracts that conform to one's religious beliefs.  Even if there were any burden on Plaintiffs' free exercise rights, the City has a compelling interest in enforcing its requirement of non-discriminatory treatment of prospective foster parents.

  1. Plaintiffs have not shown that the City's enforcement of its non-discrimination requirement targeted CSS based on hostility toward its religious beliefs or constituted selective enforcement against religiously motivated conduct.

  *There is no showing that enforcement was motivated by hostility toward religion.*

Plaintiffs contend that the City's decision to enforce its non-discrimination requirement against CSS and, thus, suspend referrals of foster cases, was motivated by hostility toward CSS's and the individual Plaintiffs' faith, in violation of the Free Exercise Clause, citing *Masterpiece Cakeshop*, 2018 WL 2465172.  However, they offer no evidence that supports this accusation. There is nothing hostile to religion about the statement that "we cannot use taxpayer dollars to fund organizations that discriminate against people because of their sexual orientation or same-sex marriage status. . . .  It's just not right."  CSS Br. at 19.  If mere disagreement with permitting government funding of discrimination constituted impermissible hostility toward religion, that

would preclude any enforcement of non-discrimination requirements against government contractors who refused to comply based on religious objections. *Masterpiece* certainly does not stand for so broad a proposition.

Nor does the City's statement that "[w]e would not allow such discrimination against, for example, Catholic couples or 'mixed-race' couples, and we cannot allow it with respect to same-sex couples, either" (City Br. at 19, quoting Ex. 1(F)) constitute hostility toward religion. Contrary to Plaintiffs' suggestion, *Masterpiece* does not mean that referencing other forms of discrimination, including race discrimination, in a discussion of religiously motivated sexual orientation discrimination constitutes impermissible hostility toward religion. Indeed, in *Masterpiece*, in discussing religiously motivated sexual orientation discrimination by a business owner, the Court cited a race discrimination case in support of the proposition that religious objections generally "do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Id.* at *7 (citing *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400 (1968)).[2]

Finally, comments from the mayor in past years expressing disagreement with the Archdiocese on other extraneous issues provide no basis to infer that the City enforced its contract with CSS out of hostility toward CSS's faith. Indeed, the City maintained its contracts

---

[2] Plaintiffs' characterization of this statement from the City as "comparing CSS's religious beliefs to racist discrimination" (Br. at 19), and suggestion that any such comparison is inappropriate, seems to be an acknowledgement that it would be improper to allow religiously affiliated agencies to exclude prospective families based on a religious objection to interracial couples. Yet they seem to be suggesting that the City should grant preferential treatment to CSS's religious beliefs by permitting religiously-based discrimination based on sexual orientation. Of course, the Establishment Clause prohibits the government from preferring some religious beliefs over others. *See, e.g. Larson v. Valente*, 456 U.S. 228, 244 (1982).

with CSS for years after the mayor's comments.  Plaintiffs' attempt to tie the City's decision to enforce its contracts to these past statements is, thus, illogical.  And *Masterpiece* does not support such a leap.  In that case, the Court found that statements made by commissioners in the course of adjudicating a complaint against a business evidenced hostility toward the business owner's faith that could have affected the neutrality of the proceedings.  *Masterpiece Cakeshop*, 2018 WL 2465172, at \*12-13.  The Court in no way suggested that if Colorado officials ever expressed disagreement with the leadership of the business owner's faith community, then enforcement of state laws against the business or organizations affiliated with the owner's faith would be forever assumed to be based on hostility toward the faith.

Plaintiffs have alleged no facts that raise even an inference that the City's enforcement of its non-discrimination requirement was based on anything other than its desire to enforce its contracts and ensure that contract agencies welcome all qualified families to best meet the needs of children.

> *There is no showing of selective enforcement against religiously motivated discrimination.*

Plaintiffs attempt to shoehorn this case into *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), asserting that the City grants secular exemptions from a government policy while denying religious exemptions and, thus, strict scrutiny should apply.  The City says it does not allow <u>any</u> exemptions from its non-discrimination requirements, *see* The City of Philadelphia's Memorandum of Law in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("City Br."), at 17, and Plaintiffs offer no evidence to the contrary.  Plaintiffs instead point to the fact that agencies are permitted to refer families to other agencies that have special expertise in working with particular classes of youth.  These are not exemptions from the City's non-discrimination requirement.  The City does

not prohibit agencies from making referrals to other agencies; it prohibits agencies from discriminating against families by refusing to accept them because of their race, religion, sexual orientation and other enumerated characteristics.[3]  This case simply does not involve a preference for secular exemptions over religious-based exemptions as condemned in *Lukumi*.

And contrary to Plaintiffs' suggestion, the fact that the City has not suspended referrals to all religious groups that operate foster care agencies does not constitute a preference for some religious groups over others.  The City suspended referrals to agencies that violate its non-discrimination requirement, regardless of their religious affiliation or beliefs.

2.   The City's enforcement of its non-discrimination requirement does not substantially burden Plaintiffs' religious exercise.

The City of Philadelphia does not substantially burden plaintiffs' free exercise of religion by requiring that CSS—like all other contracted agencies—comply with DHS's contract requirements that bar discrimination against prospective families based on sexual orientation.

CSS is not required to enter into contracts with the City to provide government services in exchange for taxpayer dollars.  Thus, it is under no compulsion to engage in any conduct that it deems to be in conflict with its religious beliefs.  *See Agency for Int'l Dev.* v. *Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of [government] funding, its recourse is to decline the funds.").

---

[3] *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012), cited by Plaintiffs, illustrates the problem with their argument.  In *Ward*, the court held that a university violated a counseling student's free exercise rights by prohibiting her from referring gay patients to other counselors when such counseling would conflict with her religious beliefs.  The court's decision was based on the fact that although the university relied on the ethics code, the code permits other values-based referrals; thus, this constituted an "exception-ridden policy" that is "the antithesis of a neutral and generally applicable policy."  *Id.* at 739-40.  Here, there is no allegation that the city grants any secular-based exemptions from its non-discrimination requirement.

Moreover, the right to free exercise does not entitle a religious organization to accept government contracts to perform government services, and then unilaterally alter the services provided to conform to its religious beliefs.  The right to free exercise does not include the right to government funding of one's religious exercise.  *Rust* v. *Sullivan*, 500 U.S. 173*, 193 (1991) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity.") (citing *Harris* v. *McRae*, 448 U.S. 297, 317, n.19 (1980)); *Id.* ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.") (citing *Regan* v. *Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983)).

The fact that CSS's desire to violate the City's non-discrimination requirement is based on its religious beliefs does not excuse it from compliance any more than a religious belief in favor of corporal punishment would excuse an agency from complying with state child abuse laws.  When a private agency chooses to contract with the government to provide a government service, it must follow the same rules applied to all other contractors.

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 U.S. 2012 (2017), does not support Plaintiffs' extraordinary claim.  This case establishes that the government cannot disqualify religious organizations from a public benefit because of their religious identity.  *Id.* at 2021.  A government contract to perform a government service is not a "public benefit" (*Id.* at 2024 n.3).[4]  But even if it could be considered a public benefit, the City has not denied CSS a contract or referrals of children because it is Catholic or because it holds particular religious beliefs.  It suspended referrals because of its refusal to comply with its non-discrimination

---

[4] *See Teen Ranch* v. *Udow*, 389 F. Supp. 2d 827, 840 (W.D. Mich. 2005), *aff'd*, 479 F.3d 403 (6th Cir. 2006) ("Unlike unemployment benefits or the ability to hold office, a state contract for youth residential services is not a public benefit.").  For this reason, *Sherbert v. Verner*, 374 U.S. 398 (1963), which involves unemployment benefits, offers no support to Plaintiffs.

requirement. *Trinity Lutheran* in no way suggests that a contracting agency's religious beliefs give it the right to dictate *how* it provides contracted government services.[5]

      3.   The City has a compelling interest in enforcing its non-discrimination requirement.

Even if the City's enforcement of its contract's non-discrimination requirements could be deemed to burden Plaintiffs' exercise of religion, the City has a compelling interest in prohibiting its contract agencies from turning away prospective families based on religious criteria that have no bearing on their ability to care for a child.  It also has a compelling interest in prohibiting its contract agencies from discriminating against classes of prospective foster families based on characteristics such as race, religion and sexual orientation to ensure that families from excluded groups are not subjected to discrimination or deterred from coming forward to become foster parents for children in need.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1986) (compelling government interest in non-discrimination laws).  Just as it would compromise the City's interest in finding families for children to allow contract agencies to turn away any other group covered by its non-discrimination requirement, it compromises this interest when an agency will not accept families headed by same-sex couples.

There is no less restrictive means of achieving the City's interest in ensuring that contract agencies welcome all potential prospective foster parents than barring discrimination.  Plaintiffs

---

[5] Plaintiffs' reliance on *Holt v. Hobbs*, 574 U.S. ___, 135 S. Ct. 853 (2015), and *Chosen 300 Ministries v. City of Philadelphia*, No. 12-3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012), is also misplaced because neither case involves government-contracted government services.  In *Holt*, the Court struck down a prison grooming regulation barring beards after holding that the regulation substantially burdened prisoners' exercise of religion.  In *Chosen 300 Ministries*, the court held that a city ban on distributing food to the homeless in certain locations substantially burdened the religion of groups called by their faith to feed the homeless.  *Id*. at *56-57.  Those ministries were not operating under government contracts; they were independently engaging in food distribution.  Had the ministries' food distribution program been a government service provided under city contract, the Free Exercise Clause would not have given them the right to dictate the operation of the program.

claim that a less restrictive alternative is to allow CSS to "refer" same-sex couples to other agencies.  Br, at 17.  Using the term "referral" doesn't change the fact that CSS is not accepting same-sex couples.  This constitutes discrimination in violation of the City's contract just as it would constitute discrimination for an agency to turn away non-Christians or interracial couples and call it a "referral" to another agency.

      B.   <u>Plaintiffs are unlikely to prevail on their Free Speech claims</u>.

Plaintiffs contend that the City is compelling CSS to engage in speech by barring it from discriminating against same-sex couples.  They assert that providing certifications and endorsements of same-sex couples would constitute compelled speech in violation of their religious beliefs about marriage.  This argument fails because when a private agency provides public services pursuant to a government contract, its services under the contract are not private speech but rather "instances in which the government uses private speakers to transmit information concerning the government's own program."  *Teen Ranch*, 389 F. Supp. 2d at 840. *Agency for Int'l Dev. v. All. For Open Society Int'l, Inc.*, 570 U.S. 205 (2013), cited by Plaintiffs, expressly distinguished between "conditions that define the limits of the government spending program—those that specify the activities [the government] wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." 570 U.S. at 214–15.  Here, any requirement to issue certifications or home studies on a non-discriminatory basis would go to the heart of the services under contract with the City and would not regulate the speech of foster care agencies outside of the performance of the contracted-for services.[6]

---

[6] *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), does not support Plaintiffs' argument because that case involved a contract for lawyers that was "designed to facilitate private speech" as opposed to a government message.  Home studies and family certifications of prospective foster families to care for children in the public child welfare system are not private speech.

Plaintiffs argue that certifications and home studies constitute private speech because, they say, such activity is not expressly funded under the contract, which they say pays CSS on a per diem basis for children placed in foster care. Regardless of the payment arrangements for the contract, it is clear that without the contract, CSS could not be certifying foster parents; this activity is part of its work as a contracted foster care provider.

II.    **If the City Were to Allow CSS to Discriminate Against Prospective Families Headed by Same-Sex Couples, It Would Violate the Establishment Clause and the Equal Protection Clause.**

Plaintiffs' claims fail for all of the reasons discussed above. They also fail because the policy they are seeking—permission to use religious screening standards in the public child welfare system to exclude same-sex couples—would violate the Establishment Clause and Equal Protection rights of Proposed Intervenors and the children and families they represent.

A.    Establishment Clause

Allowing a government-contracted, taxpayer-funded foster care agency to use religious criteria to exclude prospective foster parents for children in government custody would violate the Establishment Clause. It would constitute the endorsement and promotion of religion, *see Lemon* v. *Kurtzman*, 403 U.S. 602 (1971), for at least three reasons: (1) the State may not delegate a public function and allow it to be performed using religious standards; (2) the government may not fund religious activity; and (3) the government may not privilege religion to the detriment of third parties.

> *Delegation of a government function to be performed using religious criteria would violate the Establishment Clause.*

The Establishment Clause forbids the government from delegating a government function to a religious organization and then allowing that government function to be performed using religious criteria. In *Larkin* v. *Grendel's Den*, 459 U.S. 116 (1982), the Supreme Court

invalidated a municipal ordinance that gave churches discretion to veto a liquor license

application for any premises located within 500 feet of a church.  The ordinance at issue

"delegate[d] to private, nongovernmental entities . . . a power ordinarily vested in agencies of

government."  459 U.S. at 122.  There, the Court concluded that the relevant provision merely

"*could* be employed for explicitly religious goals."  *Id.* at 125 (emphasis added).  The Court

invalidated the ordinance, reasoning that vesting governmental power in a religious organization

to be exercised pursuant to religious strictures presents the "danger of political oppression

through a union of civil and ecclesiastical control" that motivated the Framers to draft the

Establishment Clause.  *Larkin*, 459 U.S. at 127 n.10.  If the City delegated public child welfare

services to agencies with permission to use religious eligibility criteria, it would violate the

Establishment Clause principle that "civil power must be exercised in a manner neutral to

religion."  *Bd. of Educ. of Kiryas Joel Village Sch. Dist.* v. *Grumet*, 512 U.S. 687, 704 (1994)

(religious community's control over public education policy violated Establishment Clause).[7]

> *Allowing government-funded agencies to use religious criteria in screening
> prospective families would constitute impermissible government funding of religious
> activity.*

The Supreme Court has made clear that the Establishment Clause prohibits recipients of

government funds from using those funds for religious purposes.  While mere participation of

faith based organizations in government funded programs does not violate the Establishment

Clause, when such organizations do receive government funds, they may not use those funds to

advance religion.  *See, e.g. Bowen* v. *Kendrick*, 487 U.S. 589, 608-609 (1988); *Teen Ranch*, 389

---

[7] *See also Doe* v. *Porter*, 370 F.3d 558, 564 (6th Cir. 2004) (school board violated Establishment
Clause by "ced[ing] its supervisory authority over [certain] classes to Bryan College, which
requires its students and faculty to subscribe to a sectarian statement of belief"); *ACLU of Mass.
v. Sebelius*, 821 F. Supp. 2d 474, 486-88 (D. Mass. 2012) (permitting religious organization to
disburse taxpayer-funded services according to religious criteria violated Establishment Clause).

F. Supp. 2d 827.  The Supreme Court recognized that religious discrimination in the provision of government-funded services is one form of impermissible advancement of religion with government funds.  *Bowen*, 487 U.S. at 609.

> *Allowing government-contracted foster care agencies to use religious criteria in screening prospective families would violate the Establishment Clause by privileging religious exercise to the detriment of others.*

The Establishment Clause forbids "accommodations" of religion that impose substantial burdens on third parties.  In *Estate of Thornton* v. *Caldor, Inc*., the Supreme Court struck down a statute requiring that "those who observe a Sabbath . . . must be relieved of the duty to work on that day, no matter what burden or inconvenience this imposes on the employer or fellow workers." 472 U.S. 703, 708-09 (1985).  The Court rejected the notion that the government can accommodate religion even when it causes harm to third parties.[8]

Allowing government-contracted child placing agencies to use religious eligibility criteria when performing public child welfare services runs afoul of the Establishment Clause because it imposes a significant burden on children, who lose out on qualified families, and the families who are turned away.

For all of the above reasons, if the City were to agree to allow contracted agencies to exclude prospective families based on religious criteria, it would violate the Establishment Clause.

---

[8]  *See also Kiryas Joel*, 512 U.S. at 722 (Kennedy, J., concurring) ("[A] religious accommodation demands careful scrutiny to ensure that it does not so burden nonadherents . . . as to become an establishment."); *Tex. Monthly, Inc.* v. *Bullock*, 489 U.S. 1, 15, 18 n.8 (1989) (plurality opinion) (invalidating tax exemption for religious periodicals that "burden[e]d nonbeneficiaries markedly"); *Cutter* v. *Wilkinson*, 544 U.S. 709, 720 (2005) ("[C]ourts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries.").

B.  Equal Protection Clause

The Equal Protection Clause requires the government to treat all similarly situated persons alike.  *City of Cleburne, Tex.* v. *Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  At a minimum, this prohibits the government from making "distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective."  *Lehr* v. *Robertson*, 463 U.S. 248, 265 (1983).  The Equal Protection Clause also prohibits the government from deferring to the disapproval of others.  *See Palmore v. Sidoti*, 466 U.S. 429 (1984) (in reversing child custody order transferring custody away from mother because of social disapproval of her interracial marriage as violation of equal protection); *Cleburne Living Center* 473 U.S. at 439 (in striking down special zoning restriction on homes for developmentally disabled adults, court rejected asserted interest in avoiding negative reaction from community members).

If the City were to allow its contract agencies to turn away same-sex couples based on religious objections to such families, that would violate the Equal Protection Clause.  As an initial matter, such a policy would have to be evaluated under heightened scrutiny because it would subject families to unequal treatment based on sexual orientation.  *See, e.g.*, *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd on other grounds*, 570 U.S. 744 (2013); *Hively v. Ivy Tech Community College of Indiana*, 853 F. 3d 339 (7th Cir. 2017); *Whitewood v. Wolf*, 992 F. Supp. 2d 410 (M.D. Pa. 2014).  But a policy of permitting discrimination against same-sex couples based on agency religious objection would fail any level of equal protection scrutiny.

First, as the Supreme Court recognized in *Obergefell* v. *Hodges*, the government cannot "deny gays and lesbians [the] many rights and responsibilities intertwined with marriage"— expressly including "adoption rights."  576 U.S. ___, 135 S. Ct. 2584, 2601, 2606 (2015).

14

Allowing contract agencies to exclude same-sex couples from fostering would deny married same-sex couples "all the benefits afforded to opposite sex couples" with respect to the related area of foster care. *Id.* at 2604. *See Campaign for Southern Equality* v. *Mississippi Department of Human Services*, 175 F. Supp. 3d 691, 710 (S.D. Miss. 2016) (enjoining state's practice of excluding same-sex couples from adopting out of the foster care system because it "interfer[ed] with the right to marry" and thereby "violate[d] the Equal Protection Clause.").[9]

Moreover, allowing contract agencies to cast aside a class of families based on reasons unrelated to their ability to care for a child would advance no legitimate child welfare interest. Indeed, it would undermine the City's acknowledged need for more families to meet the needs of children in foster care.

### III.    Neither the Balance of the Equities Nor the Public Interest Favor Granting the Relief Sought.

Proposed intervenors do not have knowledge of facts regarding Plaintiffs' alleged irreparable harm stemming from their allegations related to the well-being of particular children in DHS custody and, thus, do not address those alleged harms.  However they have the experience to speak to harms to third parties—specifically children and prospective foster families—that would result if the injunctive relief sought by Plaintiffs is granted.

As is explained in the Declaration of Frank Cervone in support of the Motion to Intervene, the relief requested by CSS conflicts with the mandate that the best interests of the child be the paramount consideration in all decisions regarding children under the care of the

---

[9] Courts around the country have similarly applied *Obergefell* to many aspects of childrearing and parenting.  *See, e.g.*, *Pavan* v. *Smith*, 582 U.S. ___, 137 S. Ct. 2075, 2077 (2017) (both spouses in same-sex couples must be permitted on children's birth certificates); *McLaughlin* v. *Jones*, 401 P.3d 492, 498 (Ariz. 2017) (presumption of parenthood for spouse of woman who gives birth must apply equally to same-sex couples), *petition for cert. filed*, No. 17-878 (U.S. Dec. 18, 2017).

City.  ECF 27-2, Declaration of Frank P. Cervone ("Cervone Decl.") ¶ 14.  Turning away

qualified foster parents based on religious criteria conflicts with professional and accepted child

welfare practice standards that exist to protect children.  *Id*. at ¶ 17.  Moreover, because each

child's needs are unique, meeting the best interests of a particular child requires having as large a

pool as possible of qualified, licensed foster parents to choose from to optimize the "fit" between

the child and the home.  *Id*. at ¶ 18.  And, achieving a foster care placement in the best interests

of a particular child also requires having a diverse a pool of qualified, licensed foster parents,

including LGBT parents.  *Id*. at ¶ 19.  Indeed, for some LGBT youth, having an LGBT foster

parent may be vital to the child's wellbeing.  *Id*.  Especially given the current shortage of

qualified, licensed foster parents in Philadelphia, it is contrary to the interests of Philadelphia

foster children and, by extension, the public interest, for the City's subcontracting agencies to

refuse to accept qualified parents for reasons unrelated to the best interests of children.  *Id*. at ¶¶

20-22.

The relief requested by CSS would deter some same-sex couples from becoming foster

parents, even if there remained other agencies who would work with them.  As is explained in

the Declaration of Stephanie Haynes in support of the Motion to Intervene, the risk of

discrimination in the process can be intimidating to same-sex couples and would likely deter

some families from pursuing their desire to become foster parents.  ECF 27-3, Declaration of

Stephanie Haynes ("Haynes Decl.") ¶ 14.   The concerns of many LGBTQ+ people about

whether or not they will be welcomed as foster parents in the system is already an impediment to

PFP's efforts to recruit foster parents.  *Id*. at ¶ 9.  Becoming a foster parent is not a fast or simple

decision for many families.  Nor is becoming a foster parent a quick or easy process.  The foster

care system is highly complex, and it can be difficult to understand and navigate the

bureaucracy.  *Id.* at ¶ 10.  In addition to these hurdles faced by everyone considering becoming a foster parent, same-sex couples who are considering becoming foster parents often have additional concerns about the risk of discrimination in the foster and adoption process.  These couples are aware of discrimination against other same-sex couples in the foster care system in the past, and many have faced discrimination in other aspects of their lives because of their sexual orientation or relationship.  *Id.* at ¶ 11.  A ruling in favor of Plaintiffs would send the message to PFP's members that the City's contractors are free to reject them as foster parents because of religious objections to their sexual orientation and relationships.  The prospect of facing such discrimination is intimidating, and the sting of rejection from one agency could deter some couples from taking the risk of approaching another agency.  *Id.* at ¶¶ 13-15, 17.  This would harm children in need of foster parents and it would harm same-sex couples and their families subject to the stigma of discrimination or the fear of facing discriminatory treatment.  *Id.* at ¶¶ 14, 18.

Losing any good families would be harmful to children in the foster care system, particularly given the DHS's "urgent call" to recruit new foster parents.  Haynes Decl. ¶ 6.  In addition, losing out on LGBTQ+ foster parents, who are well-positioned to provide supportive homes for LGBT youth, will undermine the City's efforts to recruit more families to serve LGBT youth.   Figueroa Decl. ¶¶ 17-18; Cervone Decl. ¶ 19.

In addition, if Plaintiffs were to prevail, creating a system in which all agencies are open to heterosexual couples but same-sex couples are limited to a smaller subset of agencies, it is possible that that subset of agencies will not be well matched for all same-sex couples' circumstances.  *See* ECF 20-1, Declaration of Kimberly Ali ("Ali Decl.") ¶ 27 (noting that some agencies have special expertise, e.g. with behavioral issues).  For example, Plaintiffs allege in the

Complaint that other agencies are not able to provide the support for medically needy children and their caregivers that is provided by CSS.  Complaint ¶¶ 7-9.  Yet if Plaintiffs were to prevail, same-sex couples caring for medically needy children would not have the option of working with this agency and accessing such support for themselves and the children in their care.

Finally, it is important to recognize that if CSS is entitled to refuse to accept same-sex prospective foster parents based on its religious beliefs about marriage, then CSS and other faith-based agencies will be able to turn away prospective families who fail to conform to any other religious beliefs they hold.  Some denominations do not view marriages between people of different faiths to be valid unions.  Others don't recognize second marriages after divorce.  A religiously affiliated agency might object to foster parents (single or married) who work on the Sabbath (as defined by that agency), or who eat pork, or who allow their children to attend public school or receive medical treatment if sick or injured.  Requiring the City to allow each foster care agency to implement its own religious criteria for foster families could result in a patchwork of such exclusions, creating even more barriers to increasing the pool of qualified foster homes.

Because the public has a strong interest in children in the foster care system having the best possible options for foster placement, as well as in non-discrimination, the balance of equities and the public interest require denial of Plaintiffs' requested injunction.

Dated: June 18, 2018                              */s/ Catherine V. Wigglesworth*
                                                  Molly Tack-Hooper (PA 307828)
                                                  Mary Catherine Roper (PA 71107)
                                                  AMERICAN CIVIL LIBERTIES UNION OF
                                                  PENNSYLVANIA
                                                  P.O. Box 60173
                                                  Philadelphia, PA 19102
                                                  Tel.: (215) 592-1513 ext. 113
                                                  Fax: (215) 592-1343
                                                  mtack-hooper@aclupa.org

mroper@aclupa.org

Leslie Cooper*
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2584
lcooper@aclu.org
*Admitted pro hac vice

Fred T. Magaziner (PA 23332)
Catherine V. Wigglesworth (PA 314557)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Phone:  (215) 994-4000
Fax:  (215) 994-2222
fred.magaziner@dechert.com
catherine.wigglesworth@dechert.com

Frank P. Cervone (PA 37338)
Support Center for Child Advocates
1617 John F. Kennedy Blvd., #1200
Philadelphia, PA 19103
(267) 546-9202
fcervone@SCCAlaw.org

19