IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHARONELL FULTON, CECELIA PAUL, TONI LYNN SIMMS-BUSCH, and CATHOLIC SOCIAL SERVICES, | : : : : | |
| | : | |
| Plaintiffs, | : : | Civil Action No. 18-cv-2075 |
| v. | : : | |
| CITY OF PHILADELPHIA, DEPARTMENT OF HUMAN SERVICES FOR THE CITY OF PHILADELPHIA, and PHILADELPHIA COMMISSION ON HUMAN RELATIONS | : : : : : | |
| | : | |
| Defendants. | : : | |

DEFENDANTS' PROPOSED FINDINGS OF FACTS
AND CONCLUSIONS OF LAW

Defendants, the City of Philadelphia, the City's Department of Human Services ("DHS"), and the Philadelphia Commission on Human Relations (together, the "City" or "Philadelphia") respectfully submit their proposed findings of fact in opposition and conclusions of law to Plaintiffs' claims for a temporary restraining order and preliminary injunctive relief.

## PROPOSED FINDINGS OF FACT

**I.      Philadelphia's Department of Human Services' Custodial Responsibility for Children in Foster Care.**

1.      Philadelphia's DHS has custodial responsibility for approximately 10,000 at-risk children, including approximately 6,000 children who have been removed from their homes.  *See infra* ¶¶ 7-8.  DHS is committed to placing children in the least restrictive appropriate environment, with kinship/family placement as the number-one priority—a priority reflected by the fact that DHS has placed over fifty percent of the children in its custody with kin.  *See infra* ¶ 10.  As discussed in more detail below, DHS's care for the children in its custody is conducted in part through the work of its staff, including the Central Referral Unit ("CRU"), that makes determinations regarding the level of care and appropriate placements.  DHS also contracts with outside Community Umbrella Agencies ("CUAs") and Foster Care Agencies to provide services, including group care, in home placements, and case management to these children.  *See infra* ¶¶ 14, 18.  Catholic Social Services ("CSS") contracts with DHS to provide services to at-risk children in DHS custody as a CUA, as a Foster Care Agency, and as a provider of congregate care in group homes.  *See infra* ¶¶ 42-45.  Each of DHS's decisions regarding care determinations for a child is guided by the best interests of that child, and many such decisions must be approved by the Philadelphia Family Court Dependency Court.  *See infra* ¶¶ 4, 16.

A.    **DHS's Custodial Responsibility for Children**

2.    State law requires that county children and youth agencies such as DHS provide services to children who have been abused or neglected.  June 18, 2018 Tr. at 82:2-7 (Ali); 23 Pa. C.S. §§ 6361 *et seq.*  This includes "[p]rovid[ing] temporary, substitute placement in a foster family home or residential child-care facility for a child in need of care."  23 PA. C.S. § 6373(a)(4).

3.    When DHS receives a report of abuse or neglect of a child, it investigates the allegations to determine if there is a present danger or active safety threat to the child.  June 18, 2018 Tr. at 82:9-17 (Ali).

4.    If there is such a danger or threat, DHS can remove the child from the home and seek a court order to place the child in DHS's protective custody.  June 18, 2018 Tr. at 82:12-17 (Ali); June 21, 2018 Tr. at 156:2-9 (Figueroa).

5.    The goal for all children and youth who come into DHS custody is to achieve "permanency," either reunification of the child with that child's original family or adoption by a new family if reunification is not possible.  June 18, 2018 Tr. at 78:21-79:8 (Ali).

6.    DHS has protective custody of roughly 10,000 Philadelphia children.  June 19, 2018 Tr. at 154:10-16 (Figueroa).

7.    Roughly 4,000 of those 10,000 children live with their legal parent(s) but receive in-home case management services.  June 19, 2018 Tr. at 154:11-13 (Figueroa).

8.    The remaining 6,000 children in DHS custody are in "placement."  June 19, 2018 Tr. at 82:9-17 (Ali); June 19, 2018 Tr. at 154:10-16 (Figueroa).

9.    A child can be placed in either a family or non-family placement.  Family placements include kinship care with relatives or close family friends, general foster care if the child has no special needs, or specialized behavioral health foster care if the child needs

therapeutic intervention.  June 18, 2018 Tr. at 80:6-15 (Ali).  Nonfamily settings include

congregate care (also called group homes) in the community, institutional placements (located on

a campus similar to a boarding school), and residential treatment facilities.  June 18, 2018 Tr. at

93:5-25 (Ali).

10.     When possible, DHS places a child in its protective custody in family foster care,

and in particular kinship care.  June 18, 2018 Tr. at 82:25-84:3 (Ali); June 19, 2018 Tr. at

154:21-155:2 (Figueroa).  Roughly half of children placed in family foster care are in kinship

care.  June 18, 2018 Tr. at 90:7-11 (Ali); June 19, 2018 Tr. at 154:24-155:2(Figueroa).

11.     Family placement is not appropriate for some dependent children for a variety of

reasons.  For instance, a child may require specialized treatment.  In other situations, finding an

appropriate family placement may take an extended period of time, such as where a child has

certain sexual behavioral issues that prevent DHS from placing him or her in a family setting

where other children are present.  June 19, 2018 Tr. at 160:2-21 (Figueroa); *see also* June 21,

2018 Tr. at 100:3-13 (Figueroa).

12.     On occasion when a child cannot be immediately placed with a family, they have

to stay overnight in DHS's childcare room.  June 21, 2018 Tr. at 99:22-25 (Figueroa).  Children

are not placed in DHS's child care room due to an insufficient number of foster families, June

19, 2018 Tr. at 46:17-23 (Amato), but rather because a child arrives late at night or because of

the difficulty of immediately placing children with particular and/or specialized needs, such as an

intellectual disability, significant violent behaviors, or sexual acting out, which may preclude a

general foster care placement.  June 21, 2018 Tr. at 99:22-100:13 (Figueroa).

13.     During the past year, the number of overnight stays in DHS's childcare room has, on the average, remained constant.  June 21, 2018 Tr. at 86:6-22 (Figueroa).  It has not increased as the result of the closure of intake referrals to CSS.  June 21, 2018 Tr. at 86:6-22 (Figueroa).

14.     When DHS assumes custody of a child and needs to locate a placement, the investigating DHS social worker completes a referral for the child as to the appropriate type of placement and level of care, June 18, 2018 Tr. at 94:1-4 (Figueroa), which goes to DHS's Central Referral Unit (CRU) and to a Community Umbrella Organization (CUA).  June 18, 2018 Tr. at 82:18-24 (Ali).

15.     The CRU considers a variety of factors—such as special medical needs, intellectual disabilities, and whether any siblings are already in placement—to determine the appropriate level of care and placement for the child.  June 19, 2018 Tr. at 156:16-157:5 (Figueroa).  In making placement decisions, DHS seeks to place children in the least restrictive environment.  June 19, 2018 Tr. at 154:21-155:2 (Figueroa).  As DHS Commissioner Cynthia Figueroa made clear, DHS is "always trying to ensure that [DHS is] making the best determination for that child."  June 19, 2018 Tr. at 160:2-161:1 (Figueroa).

16.     Occasionally, children in DHS custody have to be removed from the home in which they have been placed.  In such cases, they are placed in "respite care" until they can be returned to the prior home or until a new court approved placement can be obtained.  June 18, 2018 Tr. at 94:5-23 (Ali).

17.     Referrals for new placements must be made by the CRU.  June 18, 2018 Tr. at 95:10-14 (Ali).  Foster care agencies may not make referrals except for temporary respite care to a respite home serviced by that agency.  June 18, 2018 Tr. at 95:15-22 (Ali).

**B.**  **DHS Foster Care System Contracts with State Approved Agencies**

18.     As discussed herein, DHS contracts with private organizations to provide services to dependent children in institutional, residential, congregate, and kinship and family foster care as well as to provide case management services.

19.     Each of those private organizations providing services to children in family foster care must be licensed by the state and is subject to the laws and regulations of the Commonwealth of Pennsylvania.  *See, e.g.*, 23 Pa. C.S. §§ 6344, 6351(2); 55 Pa. Code §§ 3680.1, 3700.1 *et seq*.

20.     Since 2014, through DHS's Improving Outcomes for Children, DHS organizes and conducts its foster care through contracts with CUAs and Foster Care Agencies.  June 18, 2018 Tr. at 77:2-23 (Ali).  A goal of Improving Outcomes for Children is to provide more accessible, family centered services.  June 18, 2018 Tr. at 77:24-78:1 (Ali).

21.     As part of these goals, each DHS foster child's case is managed within one of ten geographical regions in the City by a CUA that has contracted with the City.  June 18, 2018 Tr. at 77:2-23 (Ali).

22.     DHS assigns each child's case to a CUA based on the location of the child's foster family.  June 18, 2018 Tr. at 84:9-23 (Ali).

23.     CUAs are responsible for ensuring the child's safety through visitation, developing a case plan for permanency, providing any assessments, service referrals or interventions the child and foster family need, and taking the child to school and medical appointments if the foster parent is unable.  June 18, 2018 Tr. at 85:7-86:14 (Ali).

24.     There are six CUAs managing the ten geographical regions of Philadelphia.  June 18, 2018 Tr. at 85:5-11 (Ali).

25.     Each CUA works with all foster care agencies that have placements in that CUA's geographical area.  June 19, 2018 Tr. at 163:3-17 (Figueroa); *see also* June 18, 2018 Tr. at 85:5-86:14 (Ali).

26.     Catholic Social Services separately contracts with the City as a CUA.  June 19, 2018 Tr. at 36:10-12 (Amato).

27.     In addition to the CUAs, DHS contracts with thirty foster care agencies that work directly with foster care families and/or operate residential and congregate care facilities.  June 18, 2018 Tr. at 84:4-6 (Ali).

28.     Catholic Social Services separately contracts with DHS as a foster care agency and to operate group homes and congregate care facilities.  June 19, 2018 Tr. at 35:22-9 (Amato), 161:12-20 (Figueroa).

**C.     DHS Places Children with Foster Parents Who Work with Agencies that Contract with DHS**

29.     When DHS's CRU places a child with a foster care family, the case is managed by the CUA responsible for the geographical area and the family works with the foster care agency.  *See supra* ¶¶ 21-25.

30.     The foster care agency is responsible for identifying and recruiting potential foster parents, for providing training of foster parents and kinship care parents, and for the initial and continuing certification of foster and kinship parents, according to standards set by the Commonwealth.  June 18, 2018 Tr. at 86:17-87:1 (Ali).

31.     An individual who is a prospective foster parent may become certified to be a foster parent by contacting a foster care agency.  June 18, 2018 Tr. at 80:20-23 (Ali).

32.     Under Pennsylvania law, foster care agencies can approve, disapprove, or provisionally approve prospective foster parents.  June 18, 2018 Tr. at 81:17-20 (Ali).

33.     The standards for review and certification of foster parents are set forth in State regulations and the City's contracts with its agencies.  June 18, 2018 Tr. at 86:24-87:1 (Ali); June 21, 2018 Tr. at 162:8-12 (Figueroa); *see also* Pltfs. Ex. 15 (Contract) (ECF 13-3 at 28-29).

34.     Once an agency certifies a foster parent, DHS issues a "provider code" to the agency and the CRU can make a placement to that household when appropriate.  June 18, 2018 Tr. at 88:17-23 (Ali).

35.     The foster parent works with the agency that certified him or her.  Decl. of Kimberly Ali ("Ali. Decl.") (ECF 20-1) ¶¶ 27-29; *see also* June 18, 2018 Tr. at 88:7-9 (Ali).

36.     Certified foster parents can also change foster agencies, usually if they are dissatisfied with the services that agency is providing, or if they are seeking to care for or are caring for a child with specialized needs that requires an agency with that specialized expertise. June 18, 2018 Tr. at 90:24-91:1, 91:22-92:16 (Ali).

37.     While a foster parent may request information from one foster care agency about another agency, June 18, 2018 Tr. at 126:9-15 (Ali), DHS expects each foster care agency it contracts with to complete the certification process with each prospective foster parent that wishes to be certified by that agency.  June 18, 2018 Tr. at 121:23-122:21 (Ali).

38.     DHS actively seeks additional families to serve as foster parents so that it can place children in their communities in the least restrictive environments and to make sure that DHS has many options for children in its system.  June 19, 2018 at 158:15-21 (Figueroa).

39.     In particular, DHS has custody of a number of older youth that identify as LGBTQ who are difficult to place and wants to ensure that there are homes that are affirming to those individuals.  June 19, 2018 at 158:22-159:11 (Figueroa).

40.      That difficulty existed prior to this litigation while DHS was placing children in foster homes serviced by CSS.  *See* June 19, 2018 Tr. at 158:22-159:11 (Figueroa).

41.      The City's recent recruitment efforts have been highly successful, resulting in the identification and certification of over 200 new homes in the recent past.  June 21, 2018 Tr. at 90:19-24 (Figueroa).

## II.     CSS Provides Foster Care Services as a Foster Care Agency Through Contracts with Counties, Including Philadelphia

42.      CSS has various contracts with DHS to provide services to dependent children in Philadelphia, including residential care, congregate care, and foster care.  *See supra* ¶¶ 26, 28.

43.      The largest component of CSS's services to dependent children is through CSS's CUA, which serves approximately 800 foster children.  June 19, 2018 Tr. at 88:4-10 (Amato).

44.      CSS also contracts with the City to operate Residential Service Programs for approximately 345 children.  June 19, 2018 Tr. at 87:17-88:3 (Amato).

45.      CSS also operates a foster care agency that currently serves about 120 children. June 19, 2018 Tr. at 35:25-36:12 (Amato).

46.      CSS contracts with Montgomery and Bucks Counties to provide services to foster children in those counties.  June 19, 2018 Tr. at 88:25-89:9 (Amato).

47.      The City, through DHS, and CSS (the "Provider") entered into a one-year contract for in home foster care (the "2017 Contract") for the period beginning July 1, 2017 and ending June 30, 2018.  Pltfs. Ex. 15 (Contract) (ECF No. 13-3 at 13-14 § 1.3).  The relevant text of the 2017 Contract is contained in two parts: the Scope of Services and the General Provisions.

A.       **The City Has No Duty to Make Referrals to CSS**

48.     The 2017 Contract is a 'requirements contract,' meaning that while it permits placements with foster care families that work with CSS, no provision affirmatively requires the City to make any such referrals to CSS.

49.     General Provisions section 5.2, which governs the "Placement and Referral Process," specifies the information DHS must provide if it makes a referral and under what circumstances CSS can reject a referral for placement of a child, but does not require that the City make any referral.  Pltfs. Ex. 15 (ECF No. 13-4 at 31 § 5.2(b)(1)-(3)).

50.     The 2017 Contract is clear that "the City will be responsible for the determination of eligibility for public care and Services, and for the assumption of legal custody, if required, for all children provided Services under the Contract."  Pltfs. Ex. 15 (ECF No. 13-4 at 31 § 5.2(a)).

B.       **The Contract Requires CSS to Recruit and Certify Foster Prospective Parents**

51.     The importance to the City of expanding the network of individuals who step forward to become foster (sometimes referred to as "resource") parents is reflected in the Scope of Services to be provided under the 2017 Contract.  The Scope of Services "set(s) forth the Services to be rendered and Materials to be provided under this Contract, the time frames within which the Services are to be rendered and the Materials are to be provided, and other certain requirements Provider must satisfy in rendering the Services and providing the Materials."  Pltfs. Ex. 15 (ECF No. 13-4 at 1-2 § 1.71).

52.     The Scope of Services provision of the Contract repeatedly affirmatively states that recruiting and certifying foster parents is a primary purpose of the agreement between the parties.  *See* June 19, 2018 Tr. at 161:21-162:20 (Figueroa).

10

53.     Under the "Problems and Issues to be Addressed" heading, it states that "[t]he specific issue to be addressed by the Provider is to recruit, screen, train, and provide certified resource care homes for dependent children or youth[.]"  Pltfs. Ex. 15 (ECF No. 13-3 at 28).

54.     One of the "Program Objectives" is "to provide . . . placement resources via trained resource caregivers."  Pltfs. Ex. 15 (ECF No. 13-3 at 28).

55.     Moreover, the provision specifies that "[r]esource caregivers are screened, trained, and certified by the Provider," Pltfs. Ex. 15 (ECF No. 13-3 at 29), and that "Provider Staff is responsible for recruiting and certifying foster and kinship homes," Pltfs. Ex. 15 (ECF No. 13-3 at 27 n.1).

56.     The General Provisions also repeatedly address CSS's responsibility to recruit and certify foster parents.

57.     Section 3.31 requires CSS to "obtain Certifications as required by law and by DHS policy," including any "certification[s] requested by [DHS]," for a variety of individuals including "all prospective foster parent applicants [and] all prospective adoptive parent applicants."  Pltfs. Ex. 15 (ECF No. 13-4 at 21-22 § 3.31, 3.31(b)).

58.     The 2017 Contract also limits CSS's ability to certify foster parents in certain situations unless the DHS Commissioner grants a waiver.  *See* Pltfs. Ex. 15 (ECF No. 13-4 at 24-25 § 3.31(i)-(j), (p)).

59.     The 2017 Contract allows DHS "to reject the use of any . . . persons, families, or households, which, in the City's sole judgment, are determined not to be in the best interest of the child."  Pltfs. Ex. 15 (ECF No. 13-4 at 35 § 5.2).

11

60.     Finally, Section 5.1 notes that in addition to services provided to "children and their families," CSS must also provide additional "services, including consulting and training services."  Pltfs. Ex. 15 (ECF No. 13-4 at 31 § 5.1(a)-(b)).

61.     Although compensation under the 2017 Contract is calculated through child placements, the contract compensates CSS for the full range of services contracted for, including the recruiting and certification of foster parents.  *See* June 21, 2018 Tr. at 162:8-20 (Figueroa).

**C.     CSS May Not Discriminate When Providing Services Under the 2017 Contract**

62.     The 2017 Contract contains several nondiscrimination provisions.  Section 15.1 states that CSS shall not "discriminate or permit discrimination against individuals in employment, housing and real property practices, and/or public accommodation practices whether by direct or indirect practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, differentiation or preference in the treatment of a person on the basis of actual or perceived race, ethnicity, color, sex, sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, source of income, familial status, genetic information or domestic or sexual violence victim status, Human Immunodeficiency Virus (HIV) infection, or engage in any other act or practice made unlawful under the Charter, Chapter 9-1100, the Executive Order, or under the nondiscrimination laws of the United States or the Commonwealth of Pennsylvania."  Pltfs. Ex. 15 (ECF No. 13-5 at 18-19 § 15.1).

63.     CSS was also required to expressly represent that it would not "not provide religious instruction, conduct religious worship or services, or in any way proselytize any individual in connection with the Services provided, either directly or indirectly, under this Contract," and that it would inform individuals it served that CSS could not "'discriminate against you on the basis of religion, a religious belief or your refusal to actively participate in a

12

religious practice.'"  Pltfs. Ex. 15 (ECF No. 13-4 at 29 § 4.1(k)).  And CSS was prohibited from "reject[ing] a child or family for Services based upon the location or condition of the family's residence, their environmental or social condition, or for any other reason if the profiles of such child or family are consistent with Provider's Scope of Services."  Pltfs. Ex. 15 (ECF No. 13-4 at 14 § 3.21).

**III.  CSS Refuses to Follow the 2017 Contract's Non-Discrimination Policies, Will Not Agree to the City's Offer of a Full Contract to Continue to Act as a Foster Care Agency for DHS, but Will Agree to an Interim Contract.**

   **A.    DHS Learns for the First Time That CSS Refuses to Certify Same-Sex Couples as Foster Parents and Promptly Suspends Intake Acting in the Best Interests of the Children in DHS's Custody.**

64.    On March 9, 2018, DHS learned from a reporter with the Philadelphia Inquirer that two foster care agencies under contract with DHS, Bethany Christian Services ("Bethany") and CSS, were refusing to serve prospective same-sex foster parents.  June 19, 2018 Tr. at 164:1-10 (Figueroa); June 21, 2018 Tr. at 3:10-17 (Figueroa).

65.    Prior to receiving this phone call, DHS leadership had not been aware that any of its foster care agencies would not serve prospective same-sex foster parents.  Decl. of Cynthia Figueroa (ECF 20-6) ¶ 23.

66.    Following the call, Commissioner Figueroa and First Deputy Commissioner Jessica Shapiro called CSS and Bethany to follow up on the information learned from the Inquirer reporter and to inquire into their policies with respect to licensing same-sex couples as foster parents.  June 19, 2018 Tr. at 164:16-22 (Figueroa); June 21, 2018 Tr. at 3:12-17 (Figueroa).

67.    When Commissioner Figueroa and First Deputy Shapiro called James Amato of CSS to inquire as to CSS's position, Mr. Amato stated that for religious reasons CSS would not consider same-sex couples for certification as foster parents, nor perform adoption home studies

13

for such couples.  June 19, 2018 Tr. at 165:1-4 (Figueroa); June 21, 2018 Tr. at 3:21-24 (Figueroa).

68.     In response to DHS's inquiry, Bethany informed DHS that it had a similar religious objection to same sex marriage but had certified same-sex foster parents in the past and was determining its position going forward.  June 19, 2018 Tr. at 165:6-11 (Figueroa).

69.     After hearing that CSS and Bethany had religious objections to serving same-sex couples, June 21, 2018 Tr. at 2:21-3:9 (Figueroa), Commissioner Figueroa and First Deputy Commissioner Shapiro contacted a number of other faith-based agencies – a majority of the City's providers – to inquire into their policies with respect to licensing same-sex couples as foster parents.  June 19, 2018 Tr. at 164:16-22, 165:12-16 (Figueroa); June 21, 2018 Tr. at 3:10-17, 3:25-4:7 (Figueroa).  In addition, the City contacted a non-faith-based foster care agency, Northeast Treatment Center ("NET"), to similarly inquire into its practices with respect to certifying same-sex couples as foster parents.  June 21, 2018 Tr. at 103:6-14 (Figueroa).  The City did not contact other agencies because the reasons provided by both CSS and Bethany for refusing service was religious.  June 19, 2018 Tr. at 166:2-5 (Figueroa); June 21, 2018 Tr. at 3:6-4:7 (Figueroa).

70.     Following her conversations with CSS and Bethany, Commissioner Figueroa was concerned that those two agencies might be discriminating on the basis of sexual orientation in violation of their contracts with DHS.  June 19, 2018 Tr. at 166:8-11 (Figueroa); June 21, 2018 Tr. at 4:11-20 (Figueroa).  To more fully investigate this issue, Commissioner Figueroa determined that family foster care intake should be suspended at both agencies.  June 19, 2018 Tr. at 166:11-19 (Figueroa).

71.     Suspension of intake is referred to as an "administrative intake closure."  June 19, 2018 Tr. at 166:22-167:12 (Figueroa); June 21, 2018 Tr. at 6:24-7:11 (Figueroa).

72.     Commissioner Figueroa closed intake because she was concerned that if the agencies were violating their contracts with DHS or were unable to comply with the City's nondiscrimination policies going forward, placements with those agencies might be disrupted in the future.  June 21, 2018 Tr. at 5:18-6:23 (Figueroa); *see also* June 19, 2018 Tr. at 60:6-16 (Amato).

73.     Reflecting this concern, Commissioner Figueroa determined that it was in the best interests of DHS's dependent children not to place them with CSS or Bethany until the issue was resolved, except in exceptional circumstances—such as placing siblings together.  June 19, 2018 Tr. at 166:17-167:23 (Figueroa); June 21, 2018 Tr. at 9:9-17 (Figueroa).

74.     The Commissioner did not discuss suspending intake at CSS and Bethany with Mayor Kenney prior to making the decision, and did not know the Mayor's position on the intake closure when she made the decision.  June 21, 2018 Tr. at 108:11-20 (Figueroa).

**B.     DHS Attempts to Work with CSS to Resolve the Issue Regarding CSS's Refusal to Certify Same-Sex Couples as Foster Parents and at the Hearing Learns of a New Issue Impeding a Contract.**

75.     After the initial phone calls, DHS held a follow-up meeting with CSS to reiterate its "great concerns" about the agency refusing to perform certification evaluations and home studies for people in same-sex relationships.  June 19, 2018 Tr. at 56:3-10 (Amato); June 21, Tr. at 4:13-20 (Figueroa); *see also* June 19, 2018 Tr. 166:6-21 (Figueroa).

76.     CSS reiterated at this meeting that it "would not move forward with a home study for a same-sex couple[.]"  June 19, 2018 Tr. at 60:23-61:2 (Amato).

77.     At this meeting, DHS did not express concerns about anything else related to CSS's mission or practices other than its stated policy of refusing to certify people in same-sex relationships as foster parents.  June 19, 2018 Tr. at 57:19-23 (Amato).

78.     In response to CSS officials commenting that they had been providing services to at-risk children for 100 years, Commissioner Figueroa commented that 100 years ago, women and African Americans didn't have basic civil rights, and that times had changed.  June 21, 2018 Tr. at 104:22-105:6 (Figueroa).

79.     Reflecting on her own Catholic background and faith, Commissioner Figueroa also quipped that "it would be great if we would listen to the teachings of Pope Francis" in relation to treatment of same-sex foster parents.  June 21, 2018 Tr. at 106:1-3, 141:20-22 (Figueroa); June 18, 2018 Tr. at 56:18-21, 58:9-21 (Amato).

80.     In the meeting DHS explained in "clear and crisp" terms that it would renew CSS's contract if CSS would agree to perform home studies for prospective foster parents in same-sex relationships, but that if the agency refused to serve same-sex couples, the City would "gradually" discontinue its relationship with CSS as a foster care agency.  June 19, 2018 Tr. at 65:1-11 (Amato); *see also id.* 66:7-23, 105:22-106:10 (Amato).

81.     DHS promptly notified CSS (and Bethany) of the intake suspensions.  June 19, 2018 Tr. at 58:1-8 (Amato).

82.     The City has not stopped working with CSS.  Indeed, even after the intake suspension the City continued to work with CSS in several ways:

> a.   The City offered and continues to offer CSS the opportunity to enter into a full foster care contract for the next year if CSS is able to agree to abide by the City's non-discrimination policies, including in the certification of new

16

foster parents. June 19, 2018 Tr. at 104:19-106:10 (Amato); June 21, 2018

Tr. at 9:18-25 (Figueroa); *see also* Defs. Ex. 2 (Janiszewski email).

b. In the alternative, the City offered CSS a contract to continue caring for the
children currently placed in CSS homes, both to protect the best interests of
those children and to provide CSS with the resources it needs to serve those
children. June 21, 2018 Tr. at 10:1-10 (Figueroa); *see also* Defs. Ex. 2
(Janiszewski email); Defs. Ex. 3 (Notice of Award letter).

c. DHS referred four new children to CSS family foster homes because of
special circumstances for each child that meant placement with CSS was in
each child's best interests. June 19, 2018 Tr. at 25:14-22 (Ali).

d. The City offered CSS renewed multi-million-dollar contracts for the other
functions that CSS performs, including its services as a CUA and for
congregate care foster care services, that are unaffected by CSS's refusal to
license same-sex couples as foster parents. June 19, 2018 Tr. at 111:25-
112:23 (Amato).

83.    Since that meeting, through email and letter correspondence, the City has
repeatedly restated the hope that CSS will sign a full contract with the City and, in the
alternative, has expressed its willingness to negotiate an interim agreement. *See* Defs. Ex. 2
(Janiszewski email) ("Please know that DHS values its historic relationship with CSS and if CSS
is able to find a way to approve same-sex foster and adoptive parents consistent with current law
and City policy, DHS will offer CSS a new contract that allows CSS to continue to select and
recruit new foster parents and continue to receive new referrals."); June 21, 2018 Tr. at 9:18-24
(Figueroa); *see also* Defs. Ex. 3 (Notice of Award letter).

84.     The City has offered CSS a full contract for CSS's congregate care and CUA operations.  June 19, 2018 Tr. at 103:23-104:3, 111:25-113:2 (Amato); June 21, 2018 Tr. at 13:5-16 (Figueroa).

85.     DHS also has offered to enter into a limited contract with CSS under which the City would pay CSS for services provided to children placed with foster families served by CSS but intake would remain closed.  June 21, 2018 Tr. at 10:1-10 (Figueroa).

86.     The City also offered to award CSS a full contract for family foster care services provided CSS is able to approve same-sex foster and adoptive parents consistent with current law and City policy.  June 19, 2018 Tr. at 104:4-106:10 (Amato); Defs. Ex 2 (Janiszewski email).  However, CSS has stated that it will not sign such a contract because it believes doing so would require it to certify qualified same-sex foster parents in violation of its religious beliefs.  *See* June 19, 2018 Tr. at 90:5-8, 108:14-16 (Amato).

87.     Mr. Amato stated that CSS plans to enter into a new contract with the City that does not provide for new referrals "for the sake of the children that are currently" being served by CSS while CSS foster care operations wind down.  June 19, 2018 Tr. at 108:8-111:14 (Amato); *see also* June 19, 2018 Tr. at 106:18-21 (Amato) ("CSS will enter a contract with the City under the 290 contract with the idea that our -- that our withdrawal from the contract and the overall -- and the contract could be within just a matter of months.").

88.     DHS also expressed willingness to alter its normal funding formulas in order to ensure that CSS can continue to provide the same level of services to the children with CSS foster families.  June 21, 2018 Tr. at 10:20-12:12 (Figueroa).

89.     At the hearing on CSS's injunction requests, DHS learned for the first time that CSS also required a "pastoral reference" in order to certify any foster home.  June 21, 2018 Tr. at

143:21-144:3 (Figueroa).  The required letter must attest that the applicants are regular participants in some form of religious worship, and thus effectively bars prospective foster parents who do not participate in religious warship from being certified.  June 19, 2018 Tr. 96:5-8, 42:9-15, 95:7-96:4 (Amato).

90.      Neither applicable state laws and regulations nor the 2017 Contract reference a religious letter or evaluation of any sort and the contract expressly prohibits religious discrimination.  *See* 23 Pa. C.S. § 6344; 55 Pa. Code 3680.28, 3700.62; Pltfs. Ex. 15 (Contact) (ECF 13-4 at 29 § 4.1(k), 13-5 at 18-19 § 15.1).

91.      CSS now claims to have discontinued this requirement.  June 25, 2018 Pltfs. Ltr. (ECF 40).

C.      **DHS Successfully Works with Bethany to Resolve the Issue Regarding Bethany's Certification of Same-Sex Couples as Foster Parents.**

92.      Around the same time that it suspended referrals to CSS, the City also suspended referrals to Bethany Christian Services because Bethany had admitted that it was "unclear" whether it would be able to license a same-sex couple as foster parents consistent with Bethany's religious beliefs.  June 19, 2018 Tr. at 165:6-11 (Figueroa); *see also* June 21, 2018 Tr. at 12:9-18 (Figueroa).

93.      Following continued discussions with Bethany, Bethany indicated to the City that, going forward, it will serve people in same-sex relationships, and the City therefore expects to resume referrals to Bethany, and to enter into a new contract with Bethany for full foster care services.  June 21, 2018 Tr. at 12:21-13:13 (Figueroa).

94.      DHS has offered Bethany a full contract and expects that Bethany will agree to it. June 21, 2018 Tr. at 12:21-13:3 (Figueroa).

**D.     DHS Does Not Grant Exceptions to the Requirement that Foster Care Agencies Serve Prospective Foster Parents.**

95.     CSS claimed in its papers that "the City permits exceptions for proximity, expertise in medical needs, expertise in behavioral needs, specialization in kin care, and other specialties or unique agency focuses." Pltfs. Br. (ECF 13-2 at 26).

96.     DHS expects each foster care agency it contracts with to complete the certification process with each prospective foster parent that wishes to be certified by that agency. June 18, 2018 Tr. at 121:23-122:21 (Ali). While an agency may determine that, under the state criteria, a prospective foster parent is not qualified, the agency may not refuse to perform the evaluation in the first place or find the parent unqualified for a discriminatory reason. *See* Pltfs. Ex. 15 (Contract) (ECF 13-5 at 18-19 § 15.1)

97.     In some instances, an agency may provide information about other foster care agencies. For instance, if a prospective foster parent is interested in working with children with special medical needs and the approached agency does not serve those children, the agency is permitted to provide information about other agencies that do serve that population. June 19, 2018 Tr. at 126:9-15, 129:11-20 (Ali). Or if a prospective foster parent speaks only Spanish, a foster care agency could provide information about other agencies that specialize in serving Spanish-speaking families. June 19, 2018 Tr. at 133:16-24 (Ali). Merely providing such information, however, does not require, and does not constitute, an exception to the non-refusal requirement of the contract. June 19, 2018 Tr. at 128:2-8 (Ali). If the prospective foster parent ultimately decides to work with another agency that serves children with special needs, that would not constitute a refusal. June 19, 2018 Tr. at 126:18-127:4 (Ali).

98.     Under current and future contracts, if the prospective foster parent decides that, rather than work with special needs children at another agency, he or she would prefer to work

with the agency he or she is speaking to, that agency may not refuse to evaluate the prospective

foster parent for certification.  *See* June 18, 2018 Tr. at 129:15-20 (Ali).  Similarly, an agency

may not refuse to serve a prospective foster parent who wishes to work with an agency even if

the agency is not located near the prospective foster parent's home.  June 19, 2018 Tr. at 137:1-7

(Ali).

   99. Foster care agencies may target their outreach toward particular communities.

*See* June 19, 2018 Tr. at 50:25-51:14 (Amato).  But agencies may not refuse to evaluate a

prospective foster parent for certification because the person is not within the community the

agency is targeting, and may only refuse to certify the parent if he or she does not meet the

requirements set forth by the state.  *See* June 18, 2018 Tr. at 122:4-8 (Ali).

   100. By contrast, if an *already-certified* foster parent has a foster child who needs

specialized care that the family's current foster care agency cannot provide, DHS may authorize

the family to switch to another foster care agency.  June 18, 2018 Tr. at 91:21-92:4 (Ali).  Such a

transfer is not a refusal to evaluate because the parent is *already certified* and the transfer is

being made for the best interests of the child, not because of any attribute of the parent.

**IV.** **Neither CSS Nor Anyone Else Will Suffer Imminent or Irreparable Harm.**

  **A.** **There Is No Threat of Imminent or Irreparable Harm to Any Child**
    **Resulting from DHS's Closure of CSS's Intake.**

    **1.** **The Suspension of Intake at CSS Has Not Increased the Number of**
     **Foster Children Who Are Not in Family Foster Homes.**

   101. The suspension of intake at CSS has not resulted in a rise in children placed in

congregate care.  June 21, 2018 Tr. at 86:4-87:9 (Figueroa).

   102. The closure of intake at CSS has not resulted in a rise in children staying in

DHS's childcare room.  June 21, 2018 Tr. at 86:4-87:9 (Figueroa).

### 2.  Doe Foster Child #1

103.    CSS alleged in its TRO papers that DHS had refused to place a child, Doe Foster

Child #1, with a foster parent affiliated with CSS against that child's best interests.  Pltfs. Br.

(ECF 13-2 at 8-9).

104.    The Court finds that the intake closure had nothing to do with any perceived delay

in placing Doe Foster Child #1 with Doe Foster Parent #1.  Mr. Amato testified that he had been

aware since March 2018 that CSS needed to contact DHS leadership to request exceptions to the

intake suspension, June 19, 2018 Tr. at 82:2-86:10, but he did not testify that he requested an

exception for Doe Foster Child #1 prior to June 1, 2018, *see* June 19, 2018 Tr. at 86:12-87:1.

Once DHS leadership was notified, they acted as promptly as they were permitted to speak to the

former foster mother and CUA case managers to determine the child's best interest, given that

the child had previously been removed from the former foster mother's home after she had

decided not to adopt him.  June 19, 2018 Tr. at 138:17-24; *see also*  Ali Decl. ¶¶ 39-62.

105.    As soon as DHS was able to make the determination that Doe Foster Child #1

should be placed with Doe Foster Mother #1 since she had a change of heart and now wished to

adopt him, DHS secured the Family Court's permission for the move and effected it.

### 3.  When Intake to an Agency Is Closed, DHS Still Makes Exceptions in the Best Interest of the Child.

106.    DHS has closed intake at agencies in the past for many reasons.  June 21, 2018

Tr. at 6:24-7:1 (Figueroa).

107.    "Closing intake" at an agency means that the CRU no longer sends new referrals

to that agency.  But if an agency previously served a child or if the child has siblings placed with

a family served by the agency, then DHS leadership will grant an exception to the intake closure.

June 18, 2018 Tr. at 96:4-16 (Ali), June 21, 2018 Tr. at 7:12-8:3 (Figueroa).

108.    DHS has granted such exceptions for CSS.  June 18, 2018 Tr. at 96:11-23 (Ali).

109.    When intake is closed at a particular agency, the children already being served by that agency stay with their families and continue to be served by that agency.  June 18, 2018 Tr. at 97:4-7 (Ali).

110.    When intake is closed, the CRU remains in contact with DHS leadership regarding particular cases where an exception might be appropriate, particularly when sibling placements are possible.  June 21, 2018 Tr. at 8:13-9:4 (Figueroa).

111.    DHS has applied the same exceptions policy to CSS during the current intake closure.  June 18, 2018 Tr. at 96:17-20 (Ali); June 21, 2018 Tr. at 7:22-24 (Figueroa).

112.    CSS has been aware since at least March 25, 2018 that DHS would make exceptions to the intake closure and that it could request such exceptions by communicating with DHS leadership.  June 19, 2018 Tr. at 61:3-7 (Amato); *see also* Pltfs. Ex. 8 (email from Amato to Figueroa dated March 23, 2018).

113.    On March 23, 2018, Mr. Amato emailed Commissioner Figueroa to inform her that CSS CUA had placed a child with a CSS foster family because that family was already caring for the child's sibling.  June 19, 2018 Tr. at 61:3-7 (Amato); Pltfs. Ex. 8.  Although CUAs are not permitted to make referrals for non-respite care, June 18, 2018 Tr. at 94:20-95:3 (Ali), Commissioner Figueroa retroactively approved the placement because it was in the best interests of the child, Ali Decl. ¶ 38.

114.    Unless there is a situation such as those described, DHS has concluded that it is not in the best interests of a child to be placed with CSS going forward because CSS has indicated it will not sign a full ongoing contract with the City.  June 21, 2018 Tr. at 5:18-6:23, 9:9-17 (Figueroa).

23

B.     **CSS Can Continue to Care for At-Risk Children Pursuant to Its Avowed Religious Mission and Its Business Will Not Be Irreparably Harmed.**

115.     In this litigation, CSS claims that part of its religious mission is providing "foster-care services" and "car[ing] for orphans . . . and at-risk children." June 19, 2018 Tr. at 37:13-24 (Amato).

116.     CSS's "foster-care department" provides services to family foster homes, residential services to adjudicated youth, and operates group homes such as St. Francis and St. Vincent's.  June 19, 2018 Tr. at 35:22-36:9 (Amato).

117.     CSS's foster care activities include its CUA and congregate care as well as family foster care services.  June 19, 2018 Tr. at 161:12-20 (Amato).  Through congregate care, CSS serves approximately twice as many foster care children as it does through family foster care services.  *See* June 19, 2018 Tr. at 35:25-36:12, 87:17-88:3 (Amato).

118.     CSS intends to continue as a CUA for DHS and to continue providing foster care services for the City such as congregate care.  *See* June 19, 2018 Tr. at 118:8-11 (Amato).

119.     The only issue is whether CSS will sign a full contract for the coming year for family foster care services.  Since late March, up through and including the hearing, CSS repeatedly has affirmed that it is not willing to sign a new contract with the City that includes a contractual requirement that it conduct home studies for prospective same sex foster parents.  *See* June 19, 2018 Tr. at 90:5-8, 108:14-16 (Amato).

120.     CSS and the City are both willing to negotiate and sign an interim contract for family foster care services.   June 19, 2018 Tr. at 108:8-111:14, 106:18-21 (Amato); June 21, 2018 Tr. at 10:5-10 (Figueroa).

121.     CSS also provides foster care services to at least two other counties.  June 19, 2018 Tr. at 88:25-89:9 (Amato).

24

122.    If CSS cannot continue to provide family foster care services to children in the custody of Philadelphia's DHS, it will still be able to provide services as a CUA and other foster care services such as congregate care to "at-risk children" in accordance with the religious mission it has identified.

123.    DHS's intake closure does not significantly constrain or inhibit CSS's ability to care for children in the foster care system.

**C.      Foster Parents Have Not Testified to Imminent or Irreparable Harm.**

124.    None of the foster parents who testified stated that they would only work with CSS or that they would not work with other agencies if CSS ceased to offer in family foster care services in Philadelphia.  June 18, 2018 Tr. at 53:2-11 (Simms-Busch), 63:11-17 (Paul), 68:20-23 (Fulton).  CSS's claim that these foster parents would prefer to stop fostering their current foster children rather than transfer to another agency is purely speculative.

125.    There is no evidence in the record that, but for the closure of intake at CSS, any foster child currently in DHS custody would be placed with any of the foster parents working with CSS.  *Cf.* June 21, 2018 Tr. at 93:23-94:7 (Figueroa) ("[I]t's not widgets.  It's not one for one.  Kids are abused every day.  They are neglected every day.  They end up in our placement, in our care, because their families can't care for them.  We are incredibly fortunate that we have foster care agencies, but it's not a one to one.  So to assume that because there is availability will reduce the congregate care is an over[-]exaggeration of the complication of our work.").

**V.     The City Would Be Irreparably Harmed If DHS Cannot Continue to Act on Its Determinations Regarding the Best Interests of Children and CSS Is Allowed to Discriminate on DHS's Behalf.**

126.    DHS determined that intake closure of further placements with CSS was in the best interests of the foster children in its custody.  June 19, 2018 Tr. at 166:17-21 (Figueroa).

127.    This determination included assessing DHS's responsibility to all children in its care, as well as its responsibility to the residents of Philadelphia whom it serves.  June 19, 2018 Tr. at 166:22-167:6 (Figueroa).

128.    DHS determined that allowing a foster care agency to discriminate against same sex couples would harm children.  June 21, 2018 Tr. at 5:2-7 (Figueroa).

129.    As Mr. Cervone testified, permitting such discrimination would make it more difficult for LGBTQ children, who are often already the victims of discrimination, to safely interact with the foster care system.  *See* June 21, 2018 Tr. at 175:1-19 (Cervone).

130.    DHS also determined that permitting such discrimination would negatively impact the diversity of foster parent families available to children in its custody.  *See* June 21, 2018 Tr. at 4:21-5:2 (Figueroa).

131.    Furthermore, the City has a compelling interest in preventing discrimination against its residents through laws and policies which have been in place for over half a century generally, and have included prohibitions on sexual orientation discrimination for more than 35 years.

132.    CSS has questioned the City's commitment to LGBTQ equality, suggesting that its reasoning for ending the foster care contract with CSS is a mere pretext for religious animus. The Court disagrees.

133.    In 1948, Philadelphia became one of the first cities in the United States to include in its Home Rule Charter a provision for an official human relations agency, the Philadelphia Commission on Human Relations (PCHR), to protect the civil rights of residents.  *See* Ordinance of the City of Philadelphia, March 12, 1948.

134. In 1963, the City charged the PCHR with enforcement of the newly-passed Fair Practices Ordinance (FPO). *See* Phila Code § 9-1100 et seq.

135. In a landmark 1982 amendment, the City made discrimination illegal in all areas on the basis of sexual orientation. *See* 1982 Ordinances at 1476.

136. In 1987, the mayor issued Executive Order 4-86, which prohibited discrimination based on AIDS in the delivery of City services.

137. In 2002, Philadelphia once again broke historic ground by amending the FPO to add Gender Identity as a protected class. *See* Phila. Bill No. 010719 (approved May 29, 2002).

138. Even before the LGBTQ community achieved marriage equality, the City enacted an Ordinance that allowed for City employees to obtain benefits for their same sex partners. *Devlin v. City of Philadelphia*, 862 A.2d 1234, 1236-37 (Pa. 2004).

139. These policy interests of the City are sufficiently important that DHS includes a lengthy nondiscrimination provision in its contracts.

140. The requested injunction would compel DHS to enter into a new contract with CSS that would be contrary to all of the above-identified interests, and one which it is unwilling to enter into with any other foster care service provider.

141. To the extent that an injunction would require DHS to resume intake to CSS, something not even guaranteed by the terms of the 2017 Contract, it would supplant the Commissioner's determination of what is in the best interests of the children in DHS's custody pursuant to orders of the Dependency Court.

142. Additionally, although CSS has now represented that it will cease requiring pastoral letters of foster parent applicants, if DHS enters into an ongoing contract with CSS it

may be exposed to claims against it based on CSS's testimony both as to its certification

practices and use of a pastoral letter that CSS's activities violate the Establishment Clause.

143.    The Commissioner's responsibility to determine the best interests of children in

DHS's care should not be supplanted.

## VI.    The Public Interest Requires That the Injunction Be Denied.

### A.    Antidiscrimination Policies and Interests

144.    As set forth above in paragraphs 131 to 139, the City and DHS have compelling

antidiscrimination policy interests that have been the subject of Philadelphia law for many

decades.

145.    As already described, CSS's refusal to certify same sex couples operates against

the interests of the children in DHS's care, particularly LGBTQ children.  It also harms current

LGBTQ foster parents, LGBTQ prospective foster parents, and LGBTQ affirming foster parents

by conveying the message that being LGBTQ is not acceptable for the care of children, and

harms all those both in and out of Philadelphia's foster care system by promoting intolerance of a

protected class.

### B.    Slippery Slope

146.    Should CSS be permitted to vary the terms of its contracts with the City to

accommodate its religious beliefs, this will open the door to any other City contractor to argue

that it too should be able to avoid the City's antidiscrimination laws or other contract provisions

for religious reasons.  Thus, for example, a faith-based contractor could argue that a belief that

inter-racial marriage was sinful justified a refusal to certify inter-racial couples.

**PROPOSED CONCLUSIONS OF LAW**

**I.      Legal Standard for Injunctive Relief**

147.     "A preliminary injunction is an 'extraordinary and drastic remedy,'" *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted), which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008).  The preliminary injunction test is well-established:

> [T]he moving party must generally show: (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured pendente lite if relief is not granted to prevent a change in the status quo.  Moreover, this court has repeatedly stated that the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974) (citations omitted); *see also Pitt News v. Fisher*, 215 F.3d 354, 365-366 (3d Cir. 2000) (denying request for preliminary injunction pursuant to First Amendment).  In the Third Circuit, furthermore, "a movant for preliminary equitable relief must meet the threshold for the first two "most critical" factors," and if those are met "a court then considers the remaining two factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d. Cir. 2017).

**II.     CSS Has Not Demonstrated a Likelihood of Success on the Merits.**

148.     At the preliminary injunction stage, when examining likelihood of success, the Court tracks the applicable burdens under the law at issue.  *See Reilly*, 858 at 180, *citing Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

149.     Therefore, CSS bears the initial burden of proving the likelihood of success on its claims.

150.     Under both the Free Exercise Clause and Pennsylvania Religious Freedom Protection Act (RFPA), 71 P.S. § 2401 *et seq.*, CSS has the initial burden of proving that its

religious exercise was substantially burdened; the burden shifts to the City only if CSS satisfies

that burden.  *Wilson v. Block*, 708 F.2d 735, 740 (D.C. Cir. 1983) (free exercise), *citing Sch.*

*Dist. of Abington v. Schempp*, 374 U.S. 203, 223 (1963)).

151.    Under RFPA, CSS has an even greater initial burden.  CSS must demonstrate a

substantial burden by clear and convincing evidence.  71 P.S. §§ 2403, 2405(f), 2405; *Brown v.*

*City of Pittsburgh*, 586 F.3d 263, 285 (3d Cir. 2009) (RFPA sets a "'higher threshold'" for

proving substantial burden than other religious freedom laws (citation omitted)).

152.    Under the First Amendment's Speech Clause, CSS must establish a prima facie

case that its speech is protected and that the City has restricted that speech.  *See Reilly*, 858 F.3d

at 180 & n.5.  Only if CSS makes out that prima facie case does the burden shift to the City to

prove that restrictions on protected speech were justified.  *See id*.

153.    For the reasons set forth below, CSS has not demonstrated a likelihood of success

on the merits.

**A.     CSS Has Not Established a Substantial Burden Under Its Free Exercise and**
**RFPA Claims.**

154.    Where governmental action "does not coerce . . . individuals to violate their

religious beliefs or deny them the 'rights, benefits, and privileges enjoyed by other citizens,'" no

substantial burden exists.  *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.,* 867

F.3d 338, 357-58 (3d Cir. 2017), *citing Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S.

439, 449 (1988).

155.    RFPA defines a "substantial burden" as agency action that does any of the

following:  (1) Significantly constrains or inhibits conduct or expression mandated by a person's

sincerely held religious beliefs; (2) Significantly curtails a person's ability to express adherence

to the person's religious faith; (3) Denies a person a reasonable opportunity to engage in

activities which are fundamental to the person's religion; or (4) Compels conduct or expression which violates a specific tenet of a person's religious faith.  71 P.S. § 2403.

### 1. CSS's Beliefs Are Not Substantially Burdened Because It Can Choose Not to Contract.

156.    CSS contends that under these standards, its religious exercise is substantially burdened because if it were required to certify same sex couples as foster parents, that would violate its religious beliefs against same sex marriage.  Pltfs. Br. (ECF 20-2 at 32).

157.    Because CSS has voluntarily reached into the public sphere to contract with the City to provide government social services, the Court concludes that there is no evidence, and certainly no clear and convincing evidence, that the City is coercing or compelling CSS to violate its religious beliefs by enforcing a contractual non-discrimination clause that only applies to services provided under the contract.  If CSS chooses not to accept the City's terms, it can walk away from the contract and continue to exercise and express its beliefs.  *See Agency for Int'l Dev. v. Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013 ("As a general matter, if a party objects to a condition on the receipt of [government] funding, its recourse is to decline the funds.").

### 2. A Foster Care Contract Is Not a Public Benefit.

158.    One's free exercise of religion might also be substantially burdened if one is forced to choose between the free exercise of religion and obtaining a generally available public benefit.  *Sherbert v. Verner*, 374 U.S. 398 (1963) (unemployment benefits).  The government cannot "exclude [a religious organization] from a government benefit program because it is religious."  *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2025 (2017) (court struck down statute prohibiting religious groups from receiving otherwise generally available grant to purchase playground material).

31

159.    But voluntary participation in one of many government contracts is not a public

benefit.  *See Teen Ranch v. Udow*, 389 F. Supp. 2d 827, 838 (E.D. Mich. 2005), *aff'd*, 479 F.3d

403 (6th Cir. 2007).  In *Udow*, the state had refused to continue its contractual relationship with

Teen Ranch because the residential housing provider conducted religious services and

encouraged conversion to Christianity as part of its therapeutic program.  *Id.* at 830.  Citing

*Sherbert*, Teen Ranch asserted that the state had violated its free exercise rights to obtain the

public benefit of a government contract, but the court strongly rejected the analogy, holding that

the *Sherbert* line of cases "does not stand for the proposition that the State can be required under

the Free Exercise Clause to contract with a religious organization."  *Id.* at 838.

160.    The public benefits cases apply where government reaches out to provide benefits

or subsidies in the private sphere, like the unemployment benefits in *Sherbert*, or the playground

materials in *Trinity Lutheran*.

161.    Those cases do not require that a public contract to perform government services

be unilaterally rewritten to add a religious exception to important governmental policies and

laws.  *See Sherbert,* 374 U.S. at 412 (1963) (Douglas, J., concurring) ("[T]he Free Exercise

Clause is written in terms of what the government cannot do to the individual, not in terms of

what the individual can extract from the government.").

162.    *Trinity Lutheran* is further distinguishable because that case concerned an express

prohibition on religious groups.  The City has not excluded religious providers from participation

in public contracts.  Indeed, CSS and other religious entities still hold contracts.  *See supra* ¶¶ 46,

82, 84.  Rather, the City has applied civil rights law and policy requirements in its contracts that

CSS claims it cannot comply with because of its religion.

### 3. The City Is Not Required to Conform Its Contracting Needs to CSS's Beliefs.

163.    Generally, the government's constitutional obligations in many arenas, including free exercise, are lessened when government is not regulating private behavior, but rather is acting as proprietor of its own affairs.  S. REP. 103-111, 9, 1993 U.S.C.C.A.N. 1892, 1898 (Senate Report on Religious Freedom Restoration Act ("RFRA")[1] ("And, while the committee expresses neither approval nor disapproval of that case law, pre-Smith case law makes it clear that strict scrutiny does not apply to government actions involving only management of internal Government affairs or the use of the Government's own property or resources."  (citing *Lyng* , 485 U.S. 439 (where government granted permission for private activity on federal land, Native Americans whose worship on those sacred lands was impinged upon had no claim); *Bowen v. Roy*, 476 U.S. 693 (1986)); *see also Comsys, Inc. v. Pacetti*, No. 17-2053, 2018 WL 3045312, at *2 (7th Cir. June 20, 2018) (applying law concerning government employees to find that, consistent with First, Ninth, and Eleventh Circuits, public contractors do not engage in protected speech when the speech is part of their contracted duties); *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review [under the First Amendment] to which its actions as a lawmaker may be subject."  (citations omitted)).

164.    Thus, when the government serves not as a regulator or benefactor in the private sphere, but rather as a contracting party, it is not required to accommodate a contractor's sincere

---

[1]  "Although there are differences among the various federal and state religious protection statutes, most contain, at their core, the same fundamental structure and purpose."  *Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 261–62 (3d Cir. 2008).

religious beliefs when those beliefs conflict with the government's laws, polices and constitutional obligations. *See Udow*, 389 F. Supp. 2d at 838.

165.   CSS cites to nothing that requires the City, in managing its own affairs and bidding out its work, to give up its commitment to its anti-discrimination laws and policy because a contractor objects to those laws and policy. Indeed, enforcement of anti-discrimination laws is considered to be a compelling governmental interest. *See infra* Section B.3 (compelling interest).

### 4. CSS Is Not Being Asked to Marry Prospective Parent Couples, But to Perform Secular Obligations Under Its City Contract.

166.   *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018), is also distinguishable in this regard. In its closing argument to this Court, CSS cited *Masterpiece Cakeshop*'s observation that the state cannot compel church officials to perform a religious wedding ceremony for a same sex couple, and suggested that this passage broadly applies to CSS's contracting work for the City. CSS claimed that it "is precisely in that situation" here. June 21, Tr. at 218:17-18.

167.   CSS misinterprets the cited passage. *Masterpiece Cakeshop* immediately pivoted to note that if such "exception" to the state's ability to apply its anti-discrimination laws was "not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations."[2] *Id*. at 1727.

---

[2] The passage reads in full as follows:

> When it comes to weddings, it can be assumed that a member of the clergy who objects to gay marriage on moral and religious grounds could not be compelled to perform the ceremony without denial of his or her right to the free exercise of

168.    Thus, a comparison to what the City could compel within the Basilica of Saints Peter and Paul is inapt in considering whether the City can apply its anti-discrimination laws and policies when CSS contracts to do government work for the City.  Requiring the Church to observe City non-discrimination requirements inside its own basilica, with respect to its own followers, is a vastly different situation than the one in which CSS now seeks an exception concerning its performance of a contract to serve the general public.

169.    Mr. Amato testified that Catholic doctrine essentially views same sex couples as unqualified to take care of children.  June 19, 2018 Tr. at 92:16-93:1 (CSS believes that foster parent in a same sex relationship "is in a lifestyle that cannot be accepted . . . via the teachings of the Catholic Church.").

170.    While the City does not and should not tell the Catholic Church that it should not teach this doctrine, what CSS seeks here is the unfettered right to apply that doctrine outside of the Church, to its work with the general public on behalf of the City.  Thus, CSS claims the right not merely to tell Catholics that same sex couples are not qualified parents, but to impose this religious belief into a term of a government contract that applies to people of all faiths.  The law neither permits nor requires CSS to impose its religious criteria in the public sphere this way.

---

religion.  This refusal would be well understood in our constitutional order as an exercise of religion, an exercise that gay persons could recognize and accept without serious diminishment to their own dignity and worth.  Yet if that exception were not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations.

*Id.* at 1727.

171.     In sum, it is not a substantial burden to require CSS to apply secular criteria and conform with City anti-discrimination law and policy when it chooses to act pursuant to a City-funded contract to provide government social services.

172.     For this reason, *Chosen 300 Ministries, Inc. v. City of Philadelphia*, No. 12–3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012), is inapposite.  That case concerned the City's regulation of entirely private outdoor feeding groups who claimed no religious entitlement to City subsidization of their activities, and were not acting pursuant to a City contract.  *Id.* at *6-*9.[3]

### 5.   Providing Foster Care Services Does Not Implicate a Fundamental Religious Belief Under RFPA.

173.     CSS's claim also fails because providing foster care services does not implicate a fundamental religious belief under RFPA under the prong defining a substantial burden for purposes of that statute as when an agency "[d]enies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion."  71 P.S. § 2403.  Pennsylvania courts have made clear that although charitable activities can be religious activities, they are not necessarily "fundamental" religious exercise.  *See Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 253 & n.32 (3d Cir. 2008) (quoting *Ridley Park United Methodist Church v. Zoning Hearing Bd. Ridley Park Borough*, 920 A.2d 953, 960-61 (Pa. Cmwlth. 2007) (operation of day care center not fundamental religious activity for church) ("For example, ministering to the sick can flow from a religious mission, but it is not a fundamental religious activity of a church because a hospital may be built to satisfy that mission")).

---

[3] In addition, the groups in *Chosen 300* engaged in religious activity such as prayer services and communion in conjunction with their feeding.  *Id.* at *6.

174.    Although CSS testified that its foster care work is a religious mission, it did not

contend that this work is fundamental to the Church's religious activities.  As in the case of a day

care center or a religious hospital, foster care is not a fundamental religious activity.  *Id.*

> **6.  CSS's Belief That a Same Sex Couple Is Unqualified to Raise
> Children Under the Teachings of the Catholic Church Creates a
> Conflict with the Contract's Non-Discrimination Requirements.**

175.    The Court finds that CSS has articulated how compliance with the contract's non-

discrimination requirements conflicts with its religious beliefs, but only with respect to one of its

asserted conflicts.

176.    The Court accepts that CSS honestly believes that placing children with same sex

couples would violate Catholic beliefs.  However, the Court is permitted, and indeed required, to

evaluate objectively whether that belief is substantially burdened by the contractual terms and

regulatory measures at issue.  *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778

F.3d 422, 436 (3d Cir. 2015) (court can evaluate self-certification workaround for contraceptive

mandate), *vacated and remanded on other grounds*, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016);

*Equal Emp't Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560,

590 (6th Cir. 2018).

177.    CSS articulates two potential conflicts.  First, it asserts that state regulations

require it to "provide written endorsement" of same sex relationships and "a validation of the

relationships in that home" through the certification process in violation to Catholic Church

doctrine that "marriage to [sic] a sacred bond between a man and a woman."  June 19, 2018 Tr.

at 42:24-43:4, 64:14-17, 90:24-25 (Amato).

178.    The Court concludes that the regulation cited by CSS as the basis of this conflict

does not require the affirmation of any marriage or a "written endorsement" of a romantic

relationship or marriage or "a validation of the relationship" in a home in order for a couple to be

certified as foster parents.  *See* 55 Pa. Code § 3700.64.  The regulation requires the assessment of

"[e]xisting family relationships" only to the extent that they relate to the family's ability to

provide "care, nurturing and supervision" to children," and to the "stable emotional and mental

adjustment" of family members.  *Id.*  It contains no requirement that foster care agencies

recognize a marriage to certify a foster family.  In fact, Amato testified on further questioning

that CSS does not believe that state law and regulations require that foster parents be married,

June 19, 2018 Tr. at 98:13-1 (Amato), and it does in fact certify unmarried individuals,[4] June 19,

2018 Tr. at 91:21-23 (Amato).

179.    *Harris Funeral Homes* is instructive here.  In that case, the funeral home brought

a federal RFRA defense to an employment discrimination claim brought by a transgender former

employee.  884 F.3d at 566-67.  The employer asserted that it engaged in religious exercise by

ministering to grieving people, and that employing a transgender person conflicted with its

beliefs because it required the employer to be "'directly involved in supporting the idea that sex

is a changeable social construct rather than an immutable God-given gift.'"  *Id.* at 590.  The

Court examined the facts of the case and held that, "as a matter of law, tolerating [the

employee's understanding of her sex and gender identity is not tantamount to supporting it."  *Id.*

180.    Similarly here, being required to work with same sex couples and certify that

under secular criteria provided by the Commonwealth, those couples are capable caretakers, is

not tantamount to endorsing the marriage or the romantic nature of the couple's relationship.

---

[4] Mr. Amato also testified that in refusing to conduct a home study to certify a same sex couple,
CSS would "refer" that couple to another foster care agency.  June 19, 2018 Tr. at 60:23-61:2.
Thus CSS recognizes that under state law such couples can meet the state requirements to be
certified as foster parents.

181.     Second, as already stated, Mr. Amato testified that Catholic doctrine essentially

views same sex couples as unqualified to take care of children.  When the City's counsel asked if

Mr. Amato believed that a same sex couple was not "qualified to raise a foster child," Mr. Amato

answered: "It is my belief that that foster parent is in a lifestyle that cannot be accepted by the –

via the teachings of the Catholic Church."  June 19, 2018 Tr. at 92:21-26.

182.     The Court finds that with this testimony Mr. Amato did assert conflict between

CSS's religious beliefs and its ability to perform the contract under City non-discrimination

requirements because Mr. Amato testified that pursuant to Catholic teachings, CSS could not

allow same sex couples to care for children.  While the Court must accept this assertion, it has

troubling implications with respect to the stigma attached to CSS's rejection of same sex

couples, and how that stigma might negatively impact LGBTQ youth.

### B.     The Free Exercise Clause Exempts Neutral and Generally Applicable Laws Such as the City's Antidiscrimination Laws.

183.     A valid neutral law of general applicability does not violate the Free Exercise

Clause.  *See Emp't Div. v. Smith*, 494 U.S. 872, 878-82 (1990).

184.     When a law is neutral toward religion, rational basis review applies.  *See Combs*,

540 F.3d at 242-43.

185.     Non-discrimination requirements are valid, neutral laws that governments may

enact. *Masterpiece Cakeshop*, 138 S. Ct. at 1727 ("Nevertheless, while those religious and

philosophical objections are protected, it is a general rule that such objections do not allow

business owners and other actors in the economy and in society to deny protected persons equal

access to goods and services under a neutral and generally applicable public accommodations

law.").

186.    When the City informed CSS that in order to be awarded a new full contract to provide family foster care services, CSS must agree to accept all qualified prospective foster parents, including same sex couples, the City cited to its anti-discrimination law, the Fair Practices Ordinance, as well as to City policy that foster care providers must treat all families equally.  *See* Pltfs. Ex. 13 at 2-3 (ECF 13-6 at 28, 13-7 at 1); Defs. Ex. 2 (Janiszewski email).

187.    CSS's Free Exercise claim is not likely to succeed because the City's Fair Practices Ordinance and its policy of non-discrimination with respect to the selection of foster parents applies to religious and secular persons alike to prohibit discrimination on the basis of sexual orientation as well as on the basis of marital status.

188.    The Court finds that the anti-discrimination law and policy here have a rational basis.

189.    CSS explained that it will not approve unmarried couples to serve as foster parents at all, because their "lifestyles" are not acceptable under Catholic doctrine.  June 19, 2018 Tr. at 92:21-26.

190.    Because there is no marriage requirement under state law for individuals to serve as foster parents, this constitutes discrimination on the basis of marital status under the Fair Practices Ordinance.  Phila. Code, § 9-1106(1).  It also unconstitutionally incorporates religious criteria into CSS's City-funded work.  *See Torcaso* v. *Watkins*, 367 U.S. 488, 495 (1961).

191.    Similarly, CSS has indicated that it will certify married heterosexual couples, but not married same sex couples, apparently because their "lifestyle" is not acceptable for raising children.  June 19, 2018 Tr. at 92:21-26 (Amato).

192.    This policy constitutes discrimination on the basis of sexual orientation.  Phila. Code § 9-1106(1).  It similarly impermissibly incorporates religious criteria into CSS's City-

funded work, and it also constitutes a violation of the equal protection rights of same sex married couples to have their marriages treated equally under the law.

### 1. The Free Exercise Exception to *Smith* Where Secular Exemptions Are Granted Is Not Implicated Here.

193.     CSS contends that foster care agencies sometimes steer foster parent applicants to certain agencies for reasons of geographic convenience or because the prospective foster parents want to serve a particular community in which a particular agency has a specialty, and that as a result its request not to serve same sex couples must also be honored. This is factually incorrect: DHS policy is that it is for the prospective foster parent, not the foster care agency, to decide whether to undergo the certification process with that agency. *See supra* ¶¶ 95-100. And when DHS allows an agency to send a foster family to another agency because of a child's medical needs, that means that the foster parents *are already certified*, and thus not being refused service at all. *See supra* ¶ 100.

194.     Moreover, in making this argument, CSS cites inapposite case law that concerns situations in which the state grants secular exemption requests from a particular law or policy, yet refuses to grant an exemption for a comparable religious reason. Sending prospective foster parents to another agency in order to better serve the parents' needs or to take advantage of their skills or interests would not be the same as sending prospective foster parents to another agency because the original agency does not want to work with that group of parents. While the former validates the prospective parents' ability and seeks to maximize their contribution, the latter stigmatizes and denigrates.

195.     When the government exempts secular conduct that "undermines the purposes of [a] law," but then refuses to exempt religious conduct that undermines that stated policy or statute to the same degree, its conduct is constitutionally suspect. *Blackhawk v. Pennsylvania*,

381 F.3d 202, 209 (3d Cir. 2004); *accord Lighthouse Institute for Evangelism v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007); *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999).

196.    For example, in *Blackhawk*, officials required a Lakota Indian to pay a permitting fee to keep wildlife required to practice his religion, but the law lifted the fee requirement for many other situations even though the Commonwealth claimed that it maintained the fee because it disapproved generally of keeping wild animals in captivity.  381 F.3d at 211.  And in the *Newark* case, the City prohibited officers from wearing beards in order to promote uniformity. 170 F.3d at 366.  While the City exempted officers with a skin condition from the ban, it refused to grant religious exceptions for Muslim officers on religious grounds even though both exceptions would undermine the City's interest in uniformity to the same degree.  *Id.*

197.    In this case, the City's law and policy against discrimination on the basis of a protected status is undermined by CSS's request that it be permitted not to serve same sex foster couples.  CSS has not cited any secular exception that the City has made to this law or policy for another foster care agency.

198.    Further, none of the cited situations undermine the purposes of the City's anti-discrimination law and policy.  None of them permit foster agencies to refuse to work with prospective foster parents on the basis of a protected status.  All of the cited situations concern attempts to better serve children and prospective foster parents.  Therefore, the Court rejects this argument.

2. **The Free Exercise Exception to *Smith* for Discriminatory Targeting Is Not Implicated Here.**

199.    Under *Masterpiece Cakeshop*, when applying a generally applicable, neutral anti-discrimination law, adjudicators must give religiously neutral and respectful consideration to claims they adjudicate under such laws.  138 S.Ct. at 1729.

200.    *Masterpiece Cakeshop* found that hearing adjudicators in that case displayed hostility to Masterpiece's request for a religious exception.  *See id.*

201.    The Court pointed to disparaging comments made by adjudicators, and it also pointed to the fact that the Colorado Human Rights Commission had treated another conscience claim made on non-religious grounds more favorably.  *Id.* at 1729-30.

202.    CSS adduced no evidence that the City has treated a non-religious objector to the City's anti-discrimination laws more favorably.

203.    Further, there is no evidence that the City sought to cease its contractual relationship with CSS as to any of the many other contracts it holds with the City.  *See supra* ¶¶ 82, 84.

204.    Unlike *Masterpiece Cakeshop*, this case did not concern a neutral adjudication proceeding.  CSS sought an exemption in the context of contract negotiations.  CSS points to no statements made by any adjudicator who was presumed to be neutral.

205.    CSS points to a City Council resolution.  City Council was not serving as a neutral adjudicator.  In addition, CSS produced no evidence that City Council, a legislative body, played any role in the executive decision at issue here.

206.    CSS also points to a statement in a letter from the City's Law Department to CSS that DHS could not exempt CSS from City anti-discrimination law and policy because the City would not grant such an exemption to allow a contractor to discriminate on the basis of race or

religion.  Pltfs. Br. (ECF 13-2 at 22) (citing Pltfs. Ex. 13 (ECF 13-6 at 27) ("We would not allow
such discrimination against, for example, Catholic couples [by a religiously affiliated agency
antagonistic to Catholicism] or "mixed-race" couples, and we cannot allow it with respect to
same-sex couples, either.").  The Letter was also "genuinely appreciative of the invaluable
services that CSS provides on the City's behalf" and expressed regret that the parties could not
reach consensus on this issue.  Pltfs. Ex. 13 (ECF 13-6 at 27).

207.    Finally, CSS cites to Commissioner Figueroa's statements urging CSS to follow
the teachings of Pope Francis, and pointing out that times have changed over the last 100 years.
See June 21, 2018 Tr. at 212:5-12 (CSS Summation); *see also supra* ¶ 79.[5]

208.    None of the statements evince hostility under *Masterpiece Cakeshop*.  They are
completely different in character from the disparaging comments made by the adjudicators in
*Masterpiece Cakeshop*.  *See* 138 S. Ct. at 1729-30 (baker's religious justification was "one of the
most despicable pieces of rhetoric that people can use" to justify "hurting others" and invoking
the Holocaust and slavery as comparable examples where religious freedom had been invoked as
a justification).  They were also not made by neutral adjudicators at a hearing, but rather, by
parties to a contract negotiation (and City Council had no role in the matter).  *See id*. at 1730
(noting disagreement among Justices of the Supreme Court as to whether decisionmaker's
comments are relevant, but "[i]n this case, however, the remarks were made in a very different
context—by an adjudicatory body deciding a particular case.").

209.    The statements speak to the secular context of the City's commitment to LGBTQ
rights and equality, as opposed to speaking to the religious character of that objection.  *See*

---

[5]  CSS also attempts to argue from tweets attributed to now-Mayor Kenney years before he
became Mayor, which the Court excluded.  June 21, 2018 Tr. at 114:13-14.

*Catholic League for Religious & Civil Rights v. City & County of San Francisco*, 567 F.3d 595 (9th Cir. 2009), *on reh'g en banc*, 624 F.3d 1043 (9th Cir. 2010) (no hostility toward religion violative of Establishment Clause where Board of Supervisors called upon Catholic Church to rescind its directive prohibiting social services agency from placing children with same sex adoptive households).

210.    Further, Commissioner Figueroa's statements merely indicated, as Justice Kennedy indicated in the *Masterpiece* opinion, that since CSS began to provide foster care, times and the status of LGBTQ citizens really have changed. *See* 138 S.Ct. at 1727 ("Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth. For that reason, the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts."). It is up to CSS to decide whether such changes warrant a change in its sincere religious beliefs, but the Commissioner's observation was neither untrue nor impermissibly hostile.

211.    Finally, CSS points to the fact that DHS closed intake for CSS before an actual complaint by denied applicants had been made.

212.    The Court finds that this closure was not suspiciously hostile toward religion.

213.    CSS specifically had affirmed that it was not willing to accept a contractual requirement that it accept same sex foster parents. *See supra* ¶ 119.

214.    The Commissioner testified that, on the basis of the uncertainty of the relationship going forward, she suspended intake to minimize disruption in the best interests of the children in DHS's custody, not to punish CSS for its religious beliefs. *See supra* ¶¶ 70-73.

215.     At the hearing, CSS seemed to suggest that the City had "invented" the argument that CSS is a public accommodation under the FPO as a pretext for discriminating against CSS on the basis of its religion.

216.     The Court rejects this pretext argument.  As the evidence reflects, the City did not close intake in order to punish CSS.  As the City's May 7 letter expressly noted, the City did not declare CSS to be in default.  Pltfs. Ex. 13 at 2 (ECF 13-6 at 28).  Rather, as the Commissioner explained, she closed intake to avoid disruption because it appeared as though the parties would not be able to continue their relationship in the long term because of the disagreement over application of anti-discrimination laws and principles.  *See supra* ¶¶ 70-73.

217.     Thus, it is immaterial whether the anti-discrimination provisions contained in the 2017 Contract put CSS on notice that it was required to serve all prospective foster parents or not.  The City made clear that as it moved into the new contract year, it expected CSS, as a matter of law and policy, to avoid discriminating against prospective foster parents on the basis of sexual orientation.  Pltfs. Ex. 13 at 2-3 (ECF 13-6 at 28, 13-7 at 1); Defs. Ex. 2 (Janiszewski email); *see also supra* ¶¶ 83, 86.  This proposed contractual term was not negotiable, and it was not dependent upon whether certification of prospective foster parents is a public accommodation under the Fair Practices Ordinance or not.

218.     CSS cannot claim it lacked notice that it was required to agree to a non-discrimination policy with respect to the selection of foster parents going forward.  Therefore, whether it understood previously that the FPO required such conduct is irrelevant.

219.     In any event, the Court finds that the selection and recruitment of foster parents is a public accommodation under the Fair Practices Ordinance.

220.    The Ordinance defines a "public accommodation" as

Any place, provider or public conveyance, whether licensed or not, which solicits or accepts the patronage or trade of the public or whose goods, services, facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise made available to the public; including all facilities of and services provided by any public agency or authority; any agency, authority or other instrumentality of the Commonwealth; and the City, its departments, boards and commissions.

Phila. Code § 9-1102(w).

221.    By its own terms, the Ordinance applies to "services," and it is not limited to services offered by private businesses, but rather explicitly indicates it applies in the public services realm as well.

222.    CSS provides services in connection with the certification and selection of foster parents and homes.  It recruits foster families.  It processes foster families and their homes under the certification requirements of the law.  It provides ongoing services to foster families in support of their foster care of children.  Foster care agencies also typically pay the foster families the "maintenance" payments to which they are entitled by law for the foster care they provide. These are services provided to prospective and current foster families that are public accommodations.

223.    In sum, the mere fact that the City pointed out to CSS that its refusal to serve same sex couples violates our anti-discrimination law and policy does not constitute hostility toward religion in violation of the Free Exercise Clause.

### 3.  Strict Scrutiny Standard

224.    The City's anti-discrimination law and policy is a compelling interest.  *See, e.g., Roberts v. U.S. Jaycees,* 468 U.S. 609, 623 (1986) (state's compelling interest in eradicating sex discrimination overrode private club's associational rights and required it to accept women);

*Harris Funeral Homes*, 884 F.3d at 590 (EEOC had compelling interest in eradicating employment discrimination in case of transgender employee).

225.    The Supreme Court has recognized that preventing discrimination is a compelling interest because discrimination and a refusal to serve all members of the public equally results in a loss of participation in society and causes degradation and humiliation.  *Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964).

226.    The Court rejects CSS's contention that it is significant that no applicants have come forward to complain that CSS rejected them.  CSS has announced that it will refuse to serve an entire category of willing, able prospective foster parents both on the basis of their sexual orientation and on the basis of CSS's religious criteria.  The stigma is already present. According to CSS's flawed logic, if a Jewish foster care agency notified the City that it would not serve Muslim children, the City could take no action unless the agency had actually turned a child away at the door.  This makes no sense.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.  The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

227.    Further, even though CSS asserts that it would not outright reject same sex couples, but rather would send them elsewhere, a refusal to work with a couple solely on the basis of their "lifestyle" is still discriminatory and stigmatizing.

48

228.     The Court rejects CSS's contention that the City is not committed to LGBTQ equality such that its interest would not be compelling.  *See supra* ¶ 144.

229.     Insistence upon compliance is the least restrictive means of addressing this anti-discrimination mandate.  *See, e.g., Harris Funeral Homes*, 884 F.3d at 588.

230.     The Court rejects CSS's contention that it should be permitted to reject and send same sex couples to other providers.  Such involuntary "referrals" would still constitute an unlawful and unacceptable refusal to serve a willing prospective foster family.

231.     For these reasons, the City's insistence that CSS comply with its anti-discrimination law and policy satisfies the strict scrutiny standard under both the Free Exercise Clause and RFPA.

**C.     CSS's Establishment Clause Claim**

232.     The Establishment Clause prohibits government action that has the principal effect of advancing or inhibiting religion.  Therefore, the Court looks at whether government action could be construed as sending a message of endorsement or disapproval of religion.  *See McCreary County v. ACLU*, 545 U.S. 844, 860-61 (2005).

233.     For the reasons set forth above, no inference of disapproval, as CSS alleges, is permissible here.  *See supra* ¶¶ 132-139.  The City's well-established commitment to LGBTQ equality is part of the context of this case that cannot be ignored.  *See supra* ¶ 144*; Catholic League*, 567 F.3d at 606-07.

234.     Merely because the two agencies that expressed their objection to serving same sex foster parents (CSS and Bethany) are religiously affiliated does not permit the inference that the City favored or disfavored different belief systems.  *See id.* at 604 ("San Francisco should not be hamstrung in its public policy simply because its secular position was at odds with certain religious views; that some perspectives on gay and lesbian issues are rooted in religious belief

cannot overwhelm the fact that gay and lesbian issues are also secular policy matters." (citing *Am. Family Ass'n, Inc. v. City & Cty. of San Francisco*, 277 F.3d 1114, 1123 (9th Cir. 2002)).

235.    The Court rejects CSS's assertion that because the Commissioner called all religious agencies and asked only one non-religious agency about its family equality policy, she demonstrated disapproval of religion.  As she testified, the two agencies written about in the *Inquirer* article cited their religious beliefs as their reason for refusing to serve same sex couples. In light of this fact, there was no cause for the Commissioner to contact other agencies.

236.    In contrast, the Court recognizes that the City must insist on equal treatment for same sex couples in the performance of this City-funded contract because the City has obligations under both the Equal Protection and Establishment Clauses.

237.    Under the Establishment Clause, the City could not impose religious criteria in the provision of child welfare services, and this includes the criteria set for serving as a foster parent.  The evidence demonstrated that CSS refuses to serve same sex families because its religious doctrine does not recognize same sex marriage.  By refusing to consider same sex couples to serve as foster parents, CSS is impermissibly imposing its own religious criteria as to what constitutes an acceptable home for children in the legal custody of DHS.

238.    The Court rejects CSS's contention that its conduct could not be considered attributable to the City under the Establishment Clause.  CSS is a government-contracted, taxpayer-funded agency.  Two government agencies, DHS and the PA DHS, have delegated to CSS the selection of individuals to care for children in the City's legal custody.  In delegating and paying for those services, the City cannot allow CSS to use religious criteria to select those parents. *Larkin v. Grendel's Den*, 459 U.S. 116 (1982) (ordinance permitted churches to veto liquor license application made for any property within 500 feet of church); *ACLU of Mass. v.*

*Sebelius*, 821 F. Supp. 2d 474, 486-88 (D. Mass. 2012) (permitting religious organizations to disburse taxpayer funds according to religious criteria violated Establishment Clause), *vacated on other grounds*, 705 F.3d 44 (1st Cir. 2013).

239.    CSS cites to a contractual provision stating that CSS is an independent contractor, but the Court finds that this provision cannot negate the City's constitutional obligations. Further, a contractual term describing the relationship differently from what it actually is would not allow the City to avoid liability where it has clearly paid for and delegated the selection of foster parents to CSS.  *See Donlan v. Ridge*, 58 F. Supp. 2d 604, 609 (E.D. Pa. 1999) ("[F]oster care agencies are different from other state contractors . . . because they perform a function that is exclusively the prerogative of the state . . . ."  (citing *Estate of Earp v. Doud*, No. CIV. A. 96–7141, 1997 WL 255506 *2 (E.D. Pa. 1997)).

240.    CSS is also impermissibly using its ability to select foster parents, an ability delegated by the Commonwealth and the City and paid for by the City, to violate the Equal Protection Clause.

241.    The Equal Protection Clause requires government to treat all similarly situated individuals alike.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1983).  Under this principle, with respect to eligibility for marriage, same sex couples and heterosexual couples are similarly situated.  *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2607-08 (2015).  Because they are similarly situated to heterosexual couples, government cannot "deny gays and lesbians the many rights and responsibilities intertwined with marriage" without running afoul of the Equal Protection Clause.  *Id.* at 2606.  Therefore, CSS cannot deny same sex married couples the ability to serve as foster parents while allowing heterosexual married couples to serve without exposing the City to liability under the Equal Protection Clause.

### D.      First Amendment Retaliation

242.     The Court rejects CSS's allegation that the City acted because of the views CSS expressed to the newspaper, as opposed to acting because CSS had stated that it would refuse to serve all prospective foster parents equally.

243.     The fact that CSS's unwillingness to abide by the terms of its contract became apparent through public statements does not "cloak it in First Amendment protection." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 878 (11th Cir. 2011).  Where the plaintiff, Ms. Keeton, had expressed an intent to impose her personal religious views on her counseling clients, in violation of the ACA Code of Ethics, there was no factual basis to conclude that the University ordered her to complete a Remediation Plan because it disagreed with her views.  *Id.* at 872.

244.     Similarly here, where CSS expressed its intent to discriminate against prospective foster parents on the basis of sexual orientation, there can be no inference that the City was retaliating on the basis of protected speech.  The Court notes that Bethany expressed the same viewpoint as CSS did, and yet, because Bethany agreed that it would serve same sex families, the City is preparing to resume a full relationship with Bethany.  *See supra* ¶¶ 92-94.  The City has made the same offer to CSS.  *See supra* ¶ 86.

245.     Further, to the extent CSS might argue that the home studies it prepares to certify foster parents are protected speech, they are not.  As a public contractor performing work for the City, the same rules apply for speech purposes as those that apply to public employees.  *Comsys, Inc. v. Pacetti*, No. 17-2053, 2018 WL 3045312, at *2 (7th Cir. June 20, 2018) (listing cases).

246.     Because home studies are part of CSS's duties under the contract to select and certify foster parents, they do not constitute speech on a matter of public concern, and therefore are not protected under *Garcetti v. Ceballos*, 547 U.S. 410, 422-23 (2006); *see also Comsys*, 2018 WL 3045312 at *2-*3 (applying *Garcetti* to public contractors).

### E.    Compelled Speech

247.    Requiring CSS to select and certify same sex prospective foster parents does not compel CSS to engage in any protected speech.

248.    CSS has voluntarily contracted with the City to recruit, select, and certify prospective foster parents.  To the extent it must engage in speech in order to perform those services, it has agreed to engage in that speech.  *See, e.g., W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 631-32 (1943) (distinguishing "compelled" speech from speech of persons who voluntarily enroll in a program, because "those who take advantage of . . . opportunities may not on grounds of conscience refuse compliance with such conditions").

249.    While speech that takes place outside the contours of a contract is protected, the speech at issue here, home studies that an agency must perform in order to certify foster parents, is within the contours of the contract between the parties.  *See supra* ¶¶ 51-61.

250.    CSS cites cases where the speech at issue was not made pursuant to fulfilling contractual duties.  *See Legal Servs. Corp. v. Velasquez*, 531 U.S. 533, 547-48 (2001) (government could not compel attorneys who served indigent clients to refrain from challenging constitutional or statutory validity of welfare laws because such speech related to separate attorney-client relationship formed with clients); *Cradle of Liberty Council, Inc. v. City of Philadelphia*, 851 F. Supp. 2d 936, 943-44 (E.D. Pa. 2012) (City could not impose requirement on Boy Scouts to deny gay boys membership because that requirement was unrelated to building lease contract between City and the Scouts).

### F.    Foster Parents' Claims

251.    "'A litigant may only assert his own constitutional rights or immunities,'" and "'one cannot sue for the deprivation of another's civil rights.'"  *O'Malley v. Brierley*, 477 F.2d 785, 789 (3d Cir. 1973), *quoting United States v. Raines*, 362 U.S. 17, 22 (1960); *McGowan v.*

*Maryland*, 366 U.S. 420, 429 (1961), *and* C. Antieau, Federal Civil Rights Acts, Civil Practice, § 31 at 50-51.

252.    The foster parents' allegations regarding their own right to free exercise occur only because the City is allegedly violating CSS's right to operate as a foster care agency.

253.    The parents put forth no evidence that the City has directly violated their right to free exercise.  Foster parents put on no evidence that the City's policy of equal treatment for LGBTQ individuals directly impacted them.

254.    Because the foster parents' claims are derivative of CSS's claims, they cannot stand.

## III.    CSS Has Not Suffered Irreparable Harm.

255.    Although under *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the loss of First Amendment freedom can constitute irreparable harm, "the assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits."  *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989).  Rather, a plaintiff must show "'a chilling effect.'"  *Id.* at 73, *quoting Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

256.    CSS did not demonstrate that the City's insistence upon contractual compliance with the City's non-discrimination policy and law has had a chilling effect on CSS's assumed right to provide foster care services pursuant to government contract.

257.    As the evidence demonstrated, the City has offered CSS a full contract to continue to provide care to children in group settings, and a contract to CSS's CUA to continue to perform, in part, case management services for foster children.

258.    Further, CSS testified that it was willing to enter into a more limited contract for family foster care so that its current foster parents could continue to care for their foster children

under the auspices of CSS and has offered CSS an unchanged per diem rate in order to care for those children.

259.    While the City has closed intake to CSS, any immediate harm from the closure is speculative.  CSS testified that the number of children in its care will eventually recede through attrition, rendering it unable to shoulder the necessary administrative costs; but DHS witnesses testified that in similar situations, the City has offered agencies concessions to address these administrative burdens, and would be willing to offer the same concessions to CSS.  *See supra* 88.

260.    In sum, the other contracts for foster care services between the City and CSS, together with the compensation offered via a limited contract to CSS to continue to care for its existing family foster children, allow for CSS to continue its mission to provide foster care while this case is litigated.  Any financial loss or loss of staff CSS suffers is not appropriately addressed with a preliminary injunction.  *See Hohe*, 868 F.2d at 73.

261.    Because CSS's rights are not chilled, and it will not suffer irreparable harm, injunctive relief is inappropriate.

262.    CSS also claims foster children and parents are being harmed by the intake closure.  Pltfs. Br. (ECF 13-2 at 34).  However, this is not harm to CSS, and for the reasons set forth below, even if were, CSS's assertions of harm to parents and foster children are either speculative or incorrect.

## IV.    Balancing of Harms and the Public Interest

263.    "'Balancing the equities' is jurisprudential 'jargon for choosing between conflicting public interests.'"  *Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 584 (E.D. Pa. 2017), *quoting Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring), *appeal docketed,* No. 18-1253 (3d. Cir. Feb. 15, 2018).  "'[C]ourts must *balance* the

competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Reilly*, 858 F.3d at 177–78 (emphasis in *Reilly*), *quoting Winter*, 555 U.S. at 24.

264.    For the reasons set forth above, CSS's interests will only be nominally impacted if this Court denies the injunction.  *See supra* ¶¶ 101-125.

265.    CSS will continue to provide foster care and receive compensation that will allow it to operate.  Its harm is limited to whether or not it can recruit additional foster care families and receive additional foster care placements during the duration of this suit.

266.    Further, because CSS waited nearly three months before seeking emergency relief, its actions demonstrate that its own alleged irreparable harm was not of the urgency requiring a Temporary Restraining Order or Preliminary Injunction.  *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, No. 05-5259, 2006 WL 892718, at *12 (D.N.J. Apr. 4, 2006), *citing New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) ("[W]here a [movant] delays in seeking preliminary injunctive relief, such delay is evidence that speedy relief is not needed."); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998); *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309, 312 (E.D. Pa. 1993).

267.    Even in the First Amendment context, such delay is relevant.  *See Doe v. Banos*, 713 F. Supp. 2d 404, 415 n.15 (D.N.J. 2010) ("John Doe's lack of urgency as reflected in how this motion was brought before the Court undermines his claim of immediate and irreparable harm to his First Amendment rights . . . ."), *aff'd*, 416 Fed. App'x 185 (3d Cir. 2010)).  CSS waited over two months before filing the Complaint and then waited an additional two and a half

weeks before filing for emergency relief.  Its conduct highlights that it concluded that any alleged harm did not require immediate relief.

268.    By way of contrast, if the injunction were to be granted, the City's interests would be significantly harmed.  The City's interest in protecting all of its residents from discrimination would be undermined by an injunction, as would its efforts to recruit more LGBTQ-affirming family foster homes.

269.    It would also harm, and not help, the children in DHS's custody if the Court were to require the City to resume intake with CSS because, if the City ultimately prevails and CSS decides to cease providing family foster care services while there are still children in its foster homes, there would be more children in CSS's care whose families would need to transition to another provider, or who might even have to move to another family if their foster parents refused to work with another agency.

270.    Finally, in permitting one of the City's foster care services contractors to impose religious values while using City funds and performing government work, an injunction would open the City up to liability that is the inverse of this lawsuit.

271.    Specifically, the City notes that if the Court requires it to contract fully with CSS, the City could be in violation of the Establishment Clause, not only through its refusal to serve and certify same sex couples as foster parents but also from any other religious criteria which CSS may have imposed upon the performance of its duties.  CSS testified at the hearing that it requires the submission of a pastoral reference letter attesting to the applicant's active participation in a faith community, *see* June 19, 2018 Tr at 42:9-15, 95:7-96:8 (Amato), which—regardless of whether CSS's conduct is attributable to the City or not—violates state, federal, and local prohibitions of discrimination on the basis of religion while performing a contract funded

by the City.  *See Torcaso,* 367 U.S. at 495 (government cannot "constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different belief); Pltfs. Ex. 15 (Contract) (ECF 13-4 at 29-30 § 4.1(k)) (CSS not permitted to ""discriminate . . . on the basis of . . . refusal to actively participate in a religious practice.").

272.    CSS does not appear to recognize that by requiring individuals to be persons of faith, CSS is itself discriminating on the basis of religion.  Instead it has agreed to stop requiring such letters, while asserting that the requirement is legally permissible because its conduct is not attributable to the City for Establishment Clause purposes.  June 21, 2018 Defs Ltr. (ECF 36).

273.    The City's Contract, Fair Practices Ordinance, state law, and federal law as incorporated into the contract require CSS not to discriminate in the provision of services on the basis of religion.  Pltfs. Ex. 15 (Contract) (ECF 13-4 at 18-29 § 15.1); *see Mathis v. Christian Heating & Air Conditioning, Inc*., 158 F. Supp. 3d 317, 329 (E.D. Pa. 2016) (because "[u]nder Title VII, atheists are entitled to the exact same protection as members of other religions," employer that required employees to wear ID badge containing religious mission statement violated Title VII when it terminated atheist employee who taped over mission statement).

274.    Under these circumstances, it would harm the City and the general public to require the City to contract with CSS.  Where CSS does not seem to acknowledge its legal obligation to refrain from using religious criteria while providing City-funded social services to the general public, the interests of the general public and the City militate against requiring the City to contract with CSS.

275.    The interests of LGBTQ citizens and foster children also militate in favor of denying the requested relief and requiring the City to allow CSS to refuse to serve prospective LGBTQ couples on the basis of their "lifestyle."

276.    As noted above, CSS's refusal to work with same sex couples is stigmatizing, and it sends a harmful message to LGBTQ youth that the agency taking care of them would find them to be unsuitable parents when they grow up.  June 21, 2018 Tr. at 4:21-5:7.

277.    It would also harm the public interest to grant an injunction because these stigmatizing effects undermine participation in the system by LBGTQ individuals at a time when DHS has a particular need for affirming foster parents to serve LGBTQ youth.  *See supra* ¶ 134

Date: June 28, 2018                  Respectfully Submitted,

                                     By: /s/ Diana Cortes
                                         DIANA CORTES (PA ID No. 204274)
                                         Chair, Litigation Group

                                         ELEANOR N. EWING (PA ID No. 28226)
                                         Chief Deputy City Solicitor, Affirmative &
                                         General Litigation

                                         JANE LOVITCH ISTVAN (PA ID No. 66634)
                                         Chief Deputy City Solicitor, Appeals

                                         BENJAMIN H. FIELD (PA ID No. 204569)
                                         Deputy City Solicitor, Affirmative & General
                                         Litigation

                                         CITY OF PHILADELPHIA LAW DEPARTMENT
                                         1515 Arch Street, 15th Floor
                                         Philadelphia, PA 19102
                                         Phone:  (215) 683-5014
                                         *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Eleanor N. Ewing, hereby certify that on June 28, 2018, I caused a true and correct copy of the foregoing Proposed Findings of Fact and Conclusions of Law, to be served via CM/ECF filing upon counsel for all parties.

By: <u>/s/ Eleanor N. Ewing_____</u>
Eleanor N. Ewing