**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHARONELL FULTON, et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  18-2075 |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

**Tucker, J.**                                                      **July 13, 2018**

The gratitude we owe to all those working to better the lives of Philadelphia's most

vulnerable children is too great to convey in words.  While our gratitude is ultimately ineffable,

the Court still begins by recognizing the Parties in this case for their many years of sacrifice and

labor.  The Court thanks Sharonell Fulton, Cecelia Paul, Toni Lynn Simms-Busch, Catholic

Social Services ("CSS"), the City of Philadelphia, the Department of Human Services ("DHS"),

and the Commission on Human Relations for their individual sacrifices and contributions in

service of Philadelphia's children and its families.  As witnesses called to testify in this case have

made clear, fostering children is challenging work, but challenging work that can form part of a

full and good life.

Until recent events, the Parties have had a fruitful relationship; a relationship that has

benefited Philadelphia's children in immeasurable ways.  For this reason, the Court would prefer

that the Parties seek out some compromise to their current dispute without court intervention.

Creative problem solving through concerted and thoughtful discourse without court intervention

is often the best method to avoid what may appear to the parties, or to other persons in the

public, to be harsh legal results.  Still, when parties place a matter before the Court, the Court

must act pursuant to its obligations under the law. Accordingly, the Court turns to the legal matter presented in this case.

Before the Court are Plaintiffs' Motion For A Temporary Restraining Order And Preliminary Injunction ("Injunction Motion") (ECF No. 13),[1] The City Of Philadelphia's Memorandum Of Law In Opposition To Plaintiffs' Motion For Temporary Restraining Order And Preliminary Injunction (ECF No. 21), Proposed Intervenors' Memorandum of Law, Or, In The Alternative, Amicus Brief, In Opposition To Plaintiffs' Motion For A Temporary Restraining Order And Preliminary Injunction ("Amicus Brief") (ECF No. 34);[2] Defendants' Proposed Findings Of Facts And Conclusions Of Law (ECF No. 45), and Plaintiffs' Proposed Findings Of Fact And Conclusions of Law (ECF No. 46). Upon careful consideration of the foregoing and all the evidence presented by the Parties in their written submissions and the evidentiary hearing held on June 18, 2018, June 19, 2018, and June 21, 2018, for the reasons explained below, Plaintiffs' Injunction Motion (ECF No. 13) is **DENIED**.

## I.     PROCEDURAL BACKGROUND

On May 17, 2018, Plaintiffs asserted sixteen causes of action against Defendants related to, among other things, Defendants' suspension of referrals of new children to Plaintiffs' care and Defendants' alleged violations of Plaintiffs' religious and free speech rights. *See generally*

---

[1] On June 7, 2018, Plaintiffs filed an Amended Motion for Temporary Restraining Order and Preliminary Injunction because of the Parties' concern that the initial Motion may not have adequately protected the privacy interests of certain minor children identified in the initial Motion. *See* Jun. 20, 2018 Order, ECF No. 32 (dismissing as moot and sealing the initial Motion). Accordingly, unless otherwise noted, the Court's references to the Injunction Motion are references to Plaintiffs' Amended Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 13).

[2] On June 18, 2018, the Court accepted the Intervenors' Opposition Brief as an amicus brief. The Court's acceptance of the Amicus Brief is memorialized by order dated June 20, 2018. Jun. 20, 2018 Order, ECF No. 33.

Compl., ECF No. 1; *but see* Mem. of Law Supp. Pl.s' Injunction Mot. 8 (asserting that CSS

"filed a complaint in this Court on May 16, 2018"). Nineteen days later,[3] on June 5, 2018,

Plaintiffs filed their Injunction Motion seeking a court order to compel Defendants to resume

referrals of children to Plaintiffs' care in advance of the June 30 expiration of Plaintiffs' current

services contract with Defendants under which Plaintiffs provide various professional services in

exchange for public funds. In view of the urgency of the matter, the Court set an expedited

briefing schedule and ordered an evidentiary hearing. Jun. 6, 2018 Order, ECF No. 11. Less

than two weeks later, on June 18, 2018, the Court held an evidentiary hearing. The hearing

concluded on June 21, 2018.[4]

---

[3] If the Court accepts Plaintiffs' asserted date of May 16, 2018 as the filing date for the
Complaint, then Plaintiffs' Injunction Motion was filed twenty days after first filing suit.

[4] During the evidentiary hearing, testimony by James Amato, Secretary and Executive Vice
President of CSS, revealed that it is CSS policy to refuse to certify any prospective foster parent
without a "clergy letter" from a religious minister. *See* Jun. 19, 2017 Hearing Tr. 34–35 (Amato)
(testifying to Amato's title and responsibilities at CSS); Jun. 19, 2017 Hearing Tr. 95–96
(Amato) (explaining that a clergy letter is required for certification by CSS because the letter "is
a very good indication of [a prospective foster parent's] commitment to their faith" and
explaining that CSS will not, to Amato's knowledge, certify a prospective resource parent
without a clergy letter). While the religious affiliation of the minister writing the clergy letter
does not matter, Amato explained that the receipt of a clergy letter on behalf of a prospective
foster parent is an absolute condition to CSS's certification of that prospective foster parent. Jun.
19, 2017 Hearing Tr. 95:12–16, 95:21–23 (Amato). It appears, therefore, that CSS will not
certify prospective foster parents who are religious but whose religious exercise does not include
a relationship with a minister, prospective foster parents who choose not to associate with any
religious tradition, or prospective foster parents who associate with a religious tradition that does
not have religious ministers willing or able to provide a clergy letter.
This evidence is disconcerting to the Court because it raises serious constitutional as well as
contractual questions. Among other things, this policy appears to contravene CSS's contractual
obligations under its contract with DHS under Section 4.1(k). Section 4.1(k) prohibits CSS from
discriminating against individuals based on the individuals' religious beliefs. Section 4.1(k)
provides that CSS:

> shall inform all individuals to whom Services are provided,
> whether directly or indirectly, of the following: "The Philadelphia
> Department of Human Services' selection of a faith-based provider

## II. FACTUAL BACKGROUND[5]

### A. CSS's Services Contract With DHS And Philadelphia

It is an intractable tragedy that children in our community are sometimes unable to remain in their own homes. Pennsylvania has, in response to this tragic reality, charged individual county agencies with the duty of establishing a system to address the well-being of these children consistent with the best interests of each child. Jun. 19, 2018 Hr'g Tr. 152:18–24 (Figueroa). In Philadelphia County, the county agency charged with this duty is DHS. In performing its duty, DHS contracts with a number of private foster care agencies. Jun. 18, 2018 Hr'g Tr. 87:2–4 (Ali). Presently, DHS has contracts with thirty private foster care agencies. Jun. 19, 2018 Hr'g Tr. 155:14–16 (Figueroa). Each of these private foster care agencies is expected to provide foster care services consistent with a services contract with DHS. *See, e.g.*, Jun. 19, 2018 Hr'g Tr. 162:2 – 12 (Figueroa) (indicating that CSS's services, as a foster agency, are provided under contract with DHS and Philadelphia); Jun. 21, 2018 Hr'g Tr. 12:15–16

---

of social services is not an endorsement of the Provider's religious character, practices or beliefs. No Provider of social services may discriminate against you on the basis of religion, a religious belief or your refusal to actively participate in religious practices."

Decl. of James Amato Ex. B, ECF p. 29 of 39, ECF No. 13-4. Indeed, on June 25, 2018, Counsel for CSS delivered a letter to the Court representing that CSS "will agree not to require pastoral letters." Letter from Mark Rienzi, Attorney for Plaintiffs, to Chambers of Judge Petrese B. Tucker (Jun. 25, 2018), ECF No. 40.

Still, as the questions CSS's pastoral letter requirement poses are not squarely before the Court, the Court will, for purposes of the Injunction Motion, refrain from further discussion of the matter.

[5] The following findings of facts are set forth pursuant to Fed. R. Civ. P. 52(a)(2) (requiring that "[i]n granting or refusing an interlocutory injunction, the court must [] state the findings and conclusions that support its action.").

(Figueroa) (indicating that Bethany Christian Services, another foster agency, has a contract similar to the services contract between DHS and CSS).

In November 2015, DHS and CSS entered into Contract Number 16-20030 ("Services Contract") for certain professional services. Decl. of James Amato Ex. A, ECF p. 13 of 52, ECF No. 13-3 (showing that the original contract was executed in November 2015 and recounting the various amendments since initial execution); *see also* Decl. of James Amato Ex. A, ECF p. 39 of 52, ECF No. 13-3 (identifying the Services Contract as a "Professional Services Contract . . . for Department of Human Services Contracts"). As provided in the Statement of Purpose section of the Services Contract, the Services Contract was:

> made and entered into between Catholic Social Services (the Provider) and the Philadelphia Department of Human Services (DHS), and sets forth the services for general, kinship, and teen parent/baby resource home care.

Decl. of James Amato Ex. A, ECF p. 27 of 52, ECF No. 13-3. Under the Scope of Services section of the Services Contract, CSS was to ensure that, among other things, resource caregivers (foster parents) would be "screened, trained, and certified by the Provider [CSS]."[6] Decl. of James Amato Ex. A, ECF p. 28–29 of 52, ECF No. 13-3. The Services Contract reiterates that "[t]he specific issue to be addressed by [CSS] is to recruit, screen, train, and provide certified resource care homes." Decl. of James Amato Ex. A, ECF p. 28 of 52, ECF No. 13-3.

CSS was to provide the services set forth under the Scope of Services section of the Services Contract in accordance with certain criteria, including criteria under Section 3.21 of the

---

[6] Certification of prospective foster parents requires a licensed foster family care agency to evaluate prospective foster parents using the criteria set forth under 55 Pa. Code § 3700.64. *See e.g.*, *Hinnerschitz v. Dep't of Pub. Welfare*, No. 1977 C.D.2014, 2015 WL 5457824 (Pa. Commw. Ct. 2015) (not precedential) (concluding that Berks County Children and Youth Services' denial of prospective foster parents' application to become kinship foster parents was appropriate given the lower administrative courts' proper consideration of the § 3700.64 factors).

Services Contracts' General Provisions and Article XV: Additional Representations and Covenants of Provider Relating to Certain Applicable Laws.

Section 3.21 limits the reasons that CSS may refuse to provide the services required under the Services Contract. Section 3.21 provides that CSS:

> shall not reject a child or family for Services based upon the location or condition of the family's residence, their environmental or social condition, or for any other reason if the profiles of such child or family are consistent with Provider's Scope of Services or DHS's applicable standards as listed in the [Services Contract], unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion.

Decl. of James Amato Ex. B, ECF p. 14 of 39, ECF No. 13-4.

Article XV of the Services Contract further limits the reasons that CSS may refuse to provide the services required under the Services Contract by incorporating into the Services Contract various laws, ordinances, regulations, and executive orders. In particular, Article XV incorporates provisions of the Philadelphia Fair Practices Ordinance relating to non-discrimination and serving all-comers who might seek services from CSS. Article XV stipulates that:

> . . . . Provider further represents, warrants and covenants that . . . Provider is in compliance with the laws, ordinances, regulations and executive orders described below.
>
> 15.1 Non-Discrimination; Fair Practices. This Contract is entered into under the terms of the Charter, the Fair Practices Ordinance (Chapter 9-1100 of the Code) . . . . Provider shall not discriminate or permit discrimination against any individual because of race, color, religion or national origin. <u>Nor shall Provider discriminate or permit discrimination against individuals in . . . public accommodation[7] practices whether by direct or indirect practice of</u>

_____

[7] The term "public accommodation" is defined under the Philadelphia Fair Practices Ordinance as:

> exclusion, distinction, restriction, segregation, limitation, refusal, denial, differentiation or preference in the treatment of a person on the basis of . . . sex, sexual orientation, gender identity, marital status, familiar [sic] status . . . or engage in any other act or practice made unlawful under the Charter . . . .

Decl. of James Amato Ex. C, ECF p. 18–19 of 39, ECF No. 13-5 (emphasis added).  In the event of CSS's breach of its covenant under Article XV, DHS and Philadelphia would be permitted "in addition to any other rights or remedies available under this Contract, at law or in equity, [to] suspend or terminate this Contract forthwith."  Decl. of James Amato Ex. C, ECF p. 19 of 39, ECF No. 13-5.

In exchange for "the Services and Materials being provided under" the Services Contract, DHS and Philadelphia agreed to "set the amount of compensation payable to [CSS] for the current contract term at [$19,430,999.00]."  Decl. of James Amato Ex. A, ECF p. 15 of 52, ECF No. 13-3.  Despite this lump sum amount, as a matter of practice, payment to CSS was made on a per diem basis pegged to the number of children under its care.  *See* Jun. 21, 2018 Hr'g Tr. 11:4–7 (Figueroa) (testifying that many contractors are paid on a per diem basis); Jun. 21, 2018 Hr'g Tr. 139:20–24 (same) (Figueroa).  That CSS was receiving significant public funds to perform its public service functions under the Services Contract is underscored by Section 3.30 of the General Provisions that provides "[CSS] shall identify the Department as a funding source in all literature, documents[,] reports or pamphlets which Provider publishes develops or

---

Any [] provider, whether licensed or not, which solicits or accepts patronage or trade of the public or whose . . . services, facilities . . . are extended, offered [] or otherwise made available to the public; including all . . . services provided by any public agency or authority; any agency, authority or other instrumentality of . . . the City, its departments, boards and commissions.

Philadelphia Fair Practices Ordinance § 9-1102 (Definitions) at 4, Chapter 9-1100 of the Philadelphia Code.

produces in connection with this Contract." Decl. of James Amato Ex. B, ECF p. 21 of 39, ECF No. 13-4.

CSS and DHS proceeded under the Services Contract without dispute until March 2018, when DHS learned that it is CSS policy to not serve all-comers. In particular, it is CSS policy to refuse service to same-sex couples CSS services under the Services Contract.

**B.     March 2018: DHS Learns Of CSS's And Another Foster Agency's Refusal To Comply With Services Contract's All-Comers Provisions**

On or about March 9, 2018, DHS Commissioner Figueroa came to believe that two of the foster care agencies with which DHS contracts, CSS and Bethany Christian Services, have policies that deny their publicly-funded services to married same-sex couples. Jun. 21, 2018 Hr'g Tr. 3 (Figueroa) (testifying that on March 9, 2010, a reporter contacted Figueroa and that Figueroa's discussions with the reporter led Figueroa to believe that CSS and Bethany Christian Services had certain policies of refusing service to same-sex couples). Jun. 19, 2018 Hr'g Tr. 164 (Figueroa). Commissioner Figueroa formed this belief after discussions with a *Philadelphia Inquirer* reporter who called Figueroa seeking comment ahead of the publication of an article on two DHS foster care agencies that reportedly maintained policies that would effectively permit these agencies to refuse services to same-sex couples. Jun. 19, 2018 Hr'g Tr. 164 (Figueroa). After Commissioner Figueroa's discussion with the reporter, Figueroa contacted Bethany Christian Services, CSS, various DHS's faith-based foster care agencies, and a nonfaith-based agency to determine what those agencies' policies are in connection with serving same-sex couples. Jun. 19, 2018 Hr'g Tr. 164:16–165:4 (Figueroa); Jun. 21, 2018 Hr'g Tr. 103:6–9 (testifying that Figueroa contacted a nonfaith-based foster care agency).

Commissioner Figueroa's phone call with James Amato at CSS provided greater clarity regarding what services CSS refused to provide to same-sex couples and why CSS refused to

provide those services. Jun. 21, 2018 Hr'g Tr. 3:18–24 (Figueroa). James Amato explained that there were two services that CSS would not provide to same-sex couples: (1) CSS would not certify same-sex couples as prospective foster parents even if the couples were otherwise eligible foster parents under state regulations, and (2) CSS would not provide a same-sex couple with a home study as part of a same-sex couple's application for adoption. Jun. 21, 2018 Hr'g Tr. 3:18–24 (Figueroa); *see also* Jun. 19, 2018 Hr'g Tr. 55:7–20 (Amato) (testifying that Commissioner Figueroa and another DHS officer asked Amato whether CSS would complete a home study for "a same-sex couple or individual" and that Amato confirmed that CSS would not complete such a home study for a couple and would only provide a home study for an individual if that individual was committed to living single). Amato explained that CSS would not provide these services on religious grounds. Jun. 21, 2018 Hr'g Tr. 3:18–24 (Figueroa). Amato recalled that DHS "said to me that you are discriminating. I said that I am following the teachings of the Catholic Church." Jun. 19, 2018 Hr'g Tr. 55:22–25 (Amato).

On March 13, 2018, the *Philadelphia Inquirer* published an article titled Two Foster Agencies in Philly Won't Place Kids with LGBTQ People.[8] The article recounted an incident in which a married same-sex couple traveled to a Bethany Christian Services informational event for prospective foster parents. On arrival, a Bethany Christian Services employee told the couple their attendance at the event would be a waste of time because Bethany Christian Services maintained a policy of refusing to serve same-sex couples. *See also* Jun. 19, 2018 Hr'g Tr. 164:5–10 (Figueroa). In the same story, the *Inquirer* reported that a representative for CSS confirmed that CSS maintained similar policies of refusing to serve same-sex couples.

---

[8] Julia Terruso, Two Foster Agencies in Philly Won't Place Kids with LGBTQ People, Philly.com (Mar. 13, 2018, 9:05 AM), http://www.philly.com/philly/news/foster-adoption-lgbtq-gay-same-sex-philly-bethany-archdiocese-20180313.html.

On March 15, 2018, after meeting with James Amato and CSS's legal counsel in person, Commissioner Figueroa "decided that it was in the best interest [of children] to close intake, so that [Figueroa] could look more deeply into" CSS's and Bethany Christian Services's policies. Jun. 19, 2018 Hr'g Tr. 166:6–21 (Figueroa); Figueroa Decl. ¶ 32, ECF No. 20-6; *see also* Jun. 18, 2018 Hr'g Tr. 96:2–3 (Ali) (testifying that, to Ali's knowledge, Commissioner Figueroa herself decided to close CSS's intake of new referrals). That day, Philadelphia City Council separately passed its own resolution authorizing the Committee on Public Health and Human Services to "investigate [DHS] policies on contracting with social services agencies that either discriminate against prospective LGBTQ foster parents and allow non-LGBTQ foster parents to discriminate against children." City Council Resolution No. 180252 at 2, ECF No. 10-9.

On March 27, 2018, Deputy Commissioner Ali emailed various community umbrella agencies—responsible for case management activities—to communicate that foster agencies should "refrain from making any foster care referrals to Bethany Christian Services and [CSS]," but "[i]f you have questions about a case, please contact me by phone or email." Ex. 1-E 3, ECF No. 10-12. Deputy Commissioner Ali further communicated that DHS is:

> Committed to the safety and stability of children in our care and must consider the needs of the children and youth ***currently*** served by foster families licensed by these organizations. Our goal is to minimize placement disruptions, and to ensure that a child's ability to reunify or to continue an adoption process is not delayed because of placement disruption.

Ex. 1-E 3, ECF No. 10-12.

### C. Doe Foster Child #1

Plaintiffs spent some time at the evidentiary hearing exploring a situation involving a minor child identified as Doe Foster Child #1. Plaintiffs point to the situation involving Doe Foster Child #1 as an "example of the harm that has resulted from the City's intake closure."

Pls.' Proposed Findings of Fact and Conclusions of Law 27, ECF No. 46. The circumstances surrounding Doe Foster Child #1 are, as is often the case for children in foster care, complex. The Court notes, however, that by the time of the evidentiary hearing, DHS and CSS, working together, successfully obtained a Philadelphia Family Court order permitting Doe Foster Child #1's removal from a different living situation and then placement with a CSS-certified foster parent. Ali Decl. ¶ 60, ECF No. 20-1. Through the concerted efforts of DHS and CSS staff, the situation involving Doe Foster Child #1 is now resolved.

Still, Plaintiffs contend that the situation with Doe Foster Child #1 would not have occurred but for DHS's closure of CSS's intake of new referrals, while DHS and Philadelphia contend that Doe Foster Child #1's unique situation was resolved in a timely manner considering the complexity of the case. As a factual matter, the situation with Doe Foster Child #1 is unlikely to occur again given that DHS and CSS are both now fully aware that exemptions from the intake closure have been and continue to be granted consistent with the best interests of individual children. *See, e.g.*, Jun. 19, 2018 Hr'g Tr. 84:2–9 (Amato) (testifying that he is aware that DHS will grant exceptions in some cases for placements with Catholic Social Services when such placements are in the best interests of the child); Jun. 19, 2018 Hr'g Tr. 86:8 – 11 (Amato) (testifying that CSS has, in fact, sought out and received placements for children despite the intake closure when placements were in the best interests of the child).

### D. Current Effects Of Closure Of CSS Intake Of New Referrals

In response to Plaintiffs' claims that CSS's intake closure has and will continue to negatively affect foster children, DHS offered evidence showing that the closure of CSS's intake of new referrals has had little or no effect on the operation of Philadelphia's foster care system. DHS Commissioner Figueroa testified that CSS's intake closure "has not resulted in a rise in

children placed in congregate care."[9]  Jun. 21, 2018 Hr'g Tr. 86:4–87:9 (Figueroa).  Further,

Figueroa testified that CSS's intake closure "has not resulted in a rise in children staying in

DHS's childcare room."  Jun. 21, 2018 Hr'g Tr. 86:4–87:9 (Figueroa).  Figueroa's testimony was

based on her review of "weekly data" that Figueroa receives from DHS's "performance and

technology team that . . . have . . . detailed data."  Jun. 21, 2018 Hr'g Tr. 86:16–87:11

(Figueroa).

That the effects of closing CSS's intake have been small relative to size and breadth of

the Philadelphia foster care system is, unfortunate, but unsurprising given Commissioner

Figueroa's explanation that:

> Kids are abused every day.  They are neglected every day.  They
> end up in [DHS's] placement, in [DHS's] care, because their
> families can't care for them.  We are incredibly fortunate that we
> have foster care agencies, but it's not a one to one.

Jun. 21, 2018 Hr'g Tr. 93:23–94:7 (Figueroa).  The number of cases and idiosyncrasies of each

child involved in each case means that the mere fact that there are empty, available foster homes

does not equate to fewer children in congregate care.  Figueroa explained that assuming that

"availability [at any one foster agency] [will] reduce the [use of] congregate care is an over

[simplification] of the complication of our work."  Jun. 21, 2018 Hr'g Tr. 93:23–94:7 (Figueroa).

That the negative effects of closing CSS's intake have been relatively slight is also supported by

the reality that, as of the evidentiary hearing date, at least three foster agencies had intake

closures in place and the foster system nevertheless remained stable.  *See* Jun. 21, 2018 Hr'g Tr.

5:14–15 (Figueroa) (testifying that "I have closed intake in other circumstances for other

providers."); Jun. 21, 2018 Tr. 8:24-25–9:1 (Figueroa) (testifying that the week before, DHS also

---

[9] Congregate care is a broad term used to describe a variety of "nonfamily-like [foster care] settings."  Jun. 18, 2018 Hearing Tr. 93:6 (Ali).

closed intake for another agency); Jun. 21, 2018 Hr'g Tr. 12:9–21 (Figueroa) (testifying that

Bethany Christian Services's intake remained closed as of June 21).

E.     **Defendants' Preference To Continue Work With CSS And Offer Of New Contracts**

DHS and Philadelphia have explicitly stated a preference for continuing their relationship

with CSS, despite CSS's religious nature, so long as CSS complies with its contract

responsibilities. *See, e.g.*, Jun. 21, 2018 Hr'g Tr. 9:18–24 (Figueroa) (indicating that DHS would

prefer to continue contracting with CSS); Jun. 19, 2018 Hr'g Tr. 120:7 – 11 (Amato) (testifying

that DHS and Philadelphia were clear that they did "not plan to agree to any further referrals to

CSS . . . absent assurances that CSS is prepared to adhere to contractual obligations). Indeed,

DHS and Philadelphia manifested their preference to continue working with CSS by offering

CSS two different renewal services contracts. *See, e.g.*, Jun. 21, 2018 Hr'g Tr. 10:1–10

(Figueroa). The first contract would be a renewal on the same terms as CSS's current Services

Contract. The second contract would be an alternate services contract to provide financial

support to CSS even if CSS could not agree to certify same-sex couples consistent with the all-

comers provisions of the standard services contract . *See, e.g.*, Jun. 21, 2018 Hr'g Tr. 10:5–10.

Such alternate contracts have been provided to other foster care agencies in the past to ensure the

best interest of foster children. *See, e.g.*, Jun. 21, 2018 Hr'g Tr. 10:20–11:16 (Figueroa). That

Defendants have offered two contracts to CSS despite the Parties' present dispute shows

Defendants' strong desire to keep CSS as a foster care agency.

III.    **STANDARD OF REVIEW**

A.     **Temporary Restraining Order and Preliminary Injunctive Relief Factors**

A preliminary injunction is "an extraordinary remedy never awarded as of right."

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (citing

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Preliminary injunctive relief is appropriate only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* (citing *Winter*, 555 U.S. at 22).  Ultimately, "the decision to grant or deny a preliminary injunction is committed to the sound discretion of the district court." *United States v. Price*, 688 F.2d 204, 210 (3d Cir. 1982) (citing *Stokes v. Williams*, 226 F. 148, 156 (3d Cir. 1915)).  In deciding whether to grant injunctive relief, the Court must consider whether: (1) Plaintiffs have demonstrated a likelihood of success on the merits; (2) Plaintiffs will be irreparably harmed by the denial of injunctive relief; (3) the balance of equities favors Plaintiffs; and (4) the public interest favors granting the injunction.  *See, e.g.*, *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015).[10]

The Third Circuit has explained that the first two factors of this analysis—likelihood of success on the merits, and irreparable harm—act as "gateway factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017).  Accordingly, when confronted by a motion for preliminary injunctive relief, a court must first determine whether the movant has met these two gateway factors before considering the remaining two factors—balance of harms, and public interest.  *Id.* at 179.  In short, "[i]f these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

Esteemed jurists have acknowledged that the existence of complex questions of law and disputed matters of fact at the preliminary injunction phase of a case may create "doubt about the probability of [a] plaintiff's success to justify denying a preliminary injunction." *Transcon. Gas*

_____

[10] The standard for issuing a temporary restraining order is the same as that for ordering a preliminary injunction. *Ride the Ducks, LLC v. Duck Boat Tours, Inc.*, No. CIV. A. 04-CV-5595, 2005 WL 670302, at *4 (E.D. Pa. Mar. 21, 2005).

*Pipe Line Co. v. Permanent Easements for 2.14 Acres & Temp. Easements for 3.59 Acres in Conestoga Twp., Lancaster Cty., Pa.*, No. 5:17-CV-00715, 2017 WL 1283948, at *5 (E.D. Pa. Apr. 6, 2017) (citing *St. John of Jerusalem-Knights of Malta v. Messineo*, 572 F. Supp. 983, 990 (E.D. Pa. 1983)).  Indeed, in *Transcon. Gas Pipe Line Co.*, the district court collected a number of cases supporting this general proposition.  2017 WL 1283948, at *5 (citing *La Chemise Lacoste v. General Mills, Inc.*, 53 F.R.D. 596, 605 (D. Del. 1971) for the proposition that "[a] Court should not decide doubtful and difficult questions on a motion for a preliminary injunction."); *see also id.* (citing *Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler*, 305 F. Supp. 1210, 1213 (N.D. Cal. 1969) for the proposition that "[o]n an application for a preliminary injunction the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact.").

Although there exists, in this case, a myriad of complex questions of law and a great number of disputed facts such that the Court could justifiably deny injunctive relief on these grounds alone, the Court nevertheless engages in the preliminary injunction analysis below to ensure that the reasons for the Court's decision are sufficiently articulated for the Parties.

## IV.    DISCUSSION AND CONCLUSIONS OF LAW[11]

### A.    Factual Precedent: Faith-Based Foster Agencies In Other Jurisdictions

At the outset, the Court notes that while precise legal precedent on the issues raised in this case is absent, there exists some factual precedent.  In 2006, for example, in the wake of Massachusetts's legalization of same-sex marriages, Catholic Charities in Boston shut down its

---

[11] The following discussion and conclusions of law are set forth pursuant to Fed. R. Civ. P. 52(a)(2).

foster care agency after it unsuccessfully sought permission from Massachusetts to withhold its services from legally married same-sex couples.[12]

In 2010, Catholic Charities in Washington, DC, like Catholic Charities in Boston, ended its foster care program in response to Washington, DC's legislation to legalize same-sex marriage.[13]  As a result, "Catholic Charities' caseload of 43 children and 35 foster families was transferred, along with seven staffers, to the Bethesda, Md.-based National Center for Children and Families so as not to disrupt client care."[14]

In 2011, Catholic Charities in Illinois sued, among others, the State of Illinois after the State indicated that it would not renew its foster care contract with Catholic Charities because Catholic Charities' "failure to provide services to unmarried cohabiting couples was in direct violation of" state law.  Summary Judgment Order 2, *Catholic Charities of the Diocese of Springfield v. Madigan*, No. 2011-MR-254 (Ill. Cir. Ct. Aug. 18, 2011).  The Sangamon County Circuit Court granted the State's Cross Motion for Summary Judgment on grounds that Catholic Charities had no cognizable right to a state government services contract.  The court reasoned that Catholic Charities did "not have a legally recognized protected property interest in the renewal of its contracts for foster care and adoption services . . . . [and] [t]he fact that [Catholic Charities] have contracted with the State to provide foster care and adoption services for over forty years does not vest the Plaintiffs with a protected property interest." *Id.*  After the Sangamon County Circuit Court's decision, Catholic Charities in Illinois ended its foster care

---

[12] Patricia Wen, Catholic Charities Stuns State, Ends Adoptions, boston.com (Mar. 11, 2006), http://archive.boston.com/news/local/articles/2006/03/11/catholic_charities_stuns_state_ends_ad options/.
[13] Julia Duin, Catholics End D.C. Foster-Care Program, (Feb. 18, 2010), https://www.washingtontimes.com/news/2010/feb/18/dc-gay-marriage-law-archdiocese-end-foster-care/.
[14] *Id.*

and adoption services and agreed to transfer "more than 1,000 foster care children and staff to other agencies in their regions."[15]

In 2006, in contrast to the decisions by Catholic Charities in Boston, Washington, DC, and Illinois to end its foster care services, Catholic Charities in San Francisco chose to end its full service adoption agency to avoid providing services to same sex couples, but otherwise planned to "provide staff and financial resources to connect needy children to adoptive parents," and formally collaborate with other adoption agencies who can provide full services to all-comers without violating San Francisco's anti-discrimination efforts.[16]

Against this backdrop, the Court turns to the Parties' legal arguments.

**B.    Services Contract Requires Contractors To Provide Services Consistent With Fair Practices Ordinance**

**1.    The Unambiguous Terms Of The Services Contract Evinces The Parties' Intent That The Fair Practices Ordinance Apply To CSS's Services**

As a threshold matter, the Parties disagree on whether the Services Contract requires CSS to provide its services to all-comers in accordance with the Fair Practices Ordinance because such services may or may not constitute a "public accommodation." While briefing on this issue is scant, the Parties expended significant time arguing this issue at the evidentiary hearing. *See,e.g.*, Jun. 18, 2018 Hr'g Tr. 9:17–12:14 (Plaintiffs' Opening Statement); *see also* Pls.' Proposed Findings of Fact and Conclusions of Law ¶¶ 61–65. In view of the plain terms of

---

[15] Manya A. Brachear, <u>3 Dioceses Drop Foster Care Lawsuit—Catholic Charities To End Service Rather Than Work With Parents In Civil Unions</u>, ChicagoTribune.com (Nov. 15, 2011), http://articles.chicagotribune.com/2011-11-15/news/ct-met-catholic-charities-foster-care-20111115_1_civil-unions-act-catholic-charities-religious-freedom-protection.

[16] Elizabeth Fernandez, <u>Catholic Agency Finds Way Out Of Adoption Ban/Alliance With other Groups Gets Around Same-Sex Parent Issue</u>, SFGate.com (Aug. 27, 2006, 4:00 AM), https://www.sfgate.com/bayarea/article/SAN-FRANCISCO-Catholic-agency-finds-way-out-of-2470402.php.

CSS's covenant to be bound by the Fair Practices Ordinance as set forth in the Services Contract, and in view of the expansive, but plain, definition of "public accommodations" under the Fair Practices Ordinance, the Court concludes that the Fair Practices Ordinance applies to CSS's provision of services under the Services Contract.

It is well-established that:

> [c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*Old Summit Mfg., LLC v. Pennsummit Tubular, LLC (In re Old Summit Mfg., LLC)*, 523 F.3d 134, 137 (3d Cir. 2008) (citing *Dep't of Transp. v. Pa. Indus. for the Blind and Handicapped*, 886 A.2d 706, 711 (Pa. Commw. Ct. 2008)); *see also D&M Sales, Inc. v. Lorillard Tobacco Co.*, No. CIV.A.09-2644, 2010 WL 786550, at *3 (E.D. Pa. Mar. 8, 2010) (providing that "the court's goal is 'to ascertain and give effect to the intent of the contracting parties,'" and "[w]hen the words of an agreement are clear and unambiguous, the court will ascertain the intent of the parties from the language used in the agreement.").

In this case, the Parties' intent that the Fair Practices Ordinance apply to CSS's services is manifest by the clear and unequivocal terms of the Services Contract. In entering into the Services Contract, CSS agreed to the provisions enumerated under Article XV. CSS explicitly "represent[ed], warrant[ed], and covenant[ed] that . . . [CSS was] in compliance with . . . . the Fair Practices Ordinance." Decl. of James Amato Ex. C, ECF p. 18–19 of 39, ECF No. 13-5. Accordingly, the plain terms of the Services Contract manifest the Parties' intent that CSS be

bound by the Fair Practices Ordinance by expressly incorporating the Fair Practices Ordinance into the Services Contract.

Having concluded that the Services Contract evinces the Parties' intent that the Fair Practices Ordinance apply to CSS's services rendered under the Services Contract, the Court turns to the issue of whether the Fair Practices Ordinance would require CSS to provide foster parent certifications and home visits for prospective parents in accordance with the all-comers/nondiscrimination provisions of the Fair Practices Ordinance. The resolution of this issue turns on two questions: (1) whether CSS's scope of services includes the provision of certification and home visits in connection with certification in the first instance, and (2) if so, whether those services fall within the meaning of a public accommodation under the Fair Practices Ordinance.

### 2. CSS's Scope Of Services Requires CSS To Recruit, Screen, Train, And Certify Resource Caregivers

Here, as with all questions of parties' obligations under a contract, the Court must look to the intent of the parties as embodied in the plain and unambiguous terms of the contract. In agreeing to perform the Scope of Services under the Services Contract, CSS agreed to "recruit, screen, train, and provide certified resource care homes." Decl. of James Amato Ex. A, ECF p. 28 of 52, ECF No. 13-3. Indeed, CSS's obligation to recruit, screen, train, and certify resource caregivers is emphasized elsewhere in the Scope of Services. Decl. of James Amato Ex. A, ECF p. 28–29 of 52, ECF No. 13-3 (providing that "resource caregivers are screened, trained, and certified by [CSS]"); *see also* Decl. of James Amato Ex. A, ECF p. 27 of 52 n.1, ECF No. 13-3 (providing under the "Statement of Purpose" that "Provider Staff is responsible for recruiting and certifying foster and kinship homes"). The Court concludes that CSS's certification of prospective foster parents and CSS's provision of home studies "to assure [that prospective

foster parents] are qualified and well prepared for the responsibility of foster care"[17] are services that CSS agreed to provide under the Services Contract.

Having determined that certification and home studies are services that CSS was hired to provide under the Services Contract, the Court turns to whether these services constitute "public accommodations" under the Fair Practices Ordinance such that CSS's provision of these services must be rendered in accordance with the all-comers, anti-discrimination provision of the Fair Practices Ordinance.

### 3. The Services That CSS Provides Are Public Accommodations Within The Meaning Of The Fair Practices Ordinance

In interpreting a municipal ordinance, a court must employ the same analysis that the court employs when interpreting a statute. *Tri-Cty. Landfill, Inc. v. Pine Twp. Zoning Hearing Bd.*, 83 A.3d 488, 509 (Pa. Commw. Ct. 2014); *see also Diehl v. City of McKeesport*, 432 A.2d 288, 290 (Pa. Commw. Ct. 1981) (providing that "[t]he rules of statutory construction are applicable to statutes and ordinances alike"). Accordingly, when interpreting an ordinance, a court must determine, as it must when interpreting a statute, the intent of the legislative body that enacted the ordinance. *See Tri-Cty. Landfill, Inc.*, 83 A.3d at 509 (citing 1 Pa. Cons. Stat. § 1921). Generally, the best indicator of the legislative body's intent is the plain language of the ordinance. *Id.*

The Fair Practices Ordinance provides an expansive, but plain definition of the term "public accommodation." Under the Fair Practices Ordinance, a public accommodation is:

> Any [] provider, whether licensed or not, <u>which solicits or accepts patronage</u> or trade <u>of the public or whose</u> . . . <u>services, facilities</u> . . . <u>are extended, offered [] or otherwise made available to the public</u>; including all . . . services provided by any public agency or

---

[17] Foster Care & Adoption Services, https://cssphiladelphia.org/adoption/ (last visited Jul. 1, 2018).

> authority; any agency, authority or other instrumentality of . . . the
> City, its departments, boards and commissions.

Philadelphia Fair Practices Ordinance § 9-1102 (Definitions) at 4, Chapter 9-1100 of the

Philadelphia Code.

In this case, CSS's provision of services meets the definition of public accommodations

and, therefore, CSS must provide its services in accordance with the Fair Practices Ordinance as

incorporated by Article XV, § 15.1 of the Services Contract. CSS is a "licensed" "provider"

under the Services Contract. CSS publicly solicits prospective foster parents and advertises to

attract new foster parents.[18] CSS provides professional "services" to the public. In return for its

services, CSS receives public funds and the source of those funds are to be disclosed to the

public when CSS disseminates information relating to its services under the Services Contract.[19]

CSS operates and maintains facilities that are used by staff and members of the public to carry

out CSS's work under the Services Contract. Jun. 19, 2018 Hr'g Tr. 36:18–22 (Amato). The

Court concludes, therefore, that CSS's services are public accommodations to be provided

consistent with CSS's covenant under Article XV, § 15.1, which requires CSS to serve all

Philadelphians who seek out its services.

### C. Likelihood of Success on the Merits

Having determined that the terms of the Services Contract, including the all-comers,

nondiscrimination provisions of the Fair Practices Ordinance incorporated into the Services

Contract under Article XV, § 15.1, apply to CSS's provision of services, the Court turns to

---

[18] *See* Jun. 18, 2018 Hearing Tr. 65:17 (Fulton) (testifying to seeing a television commercial about foster care); Foster Care & Adoption Services, https://cssphiladelphia.org/adoption/ (last visited Jul. 1, 2018) (soliciting prospective foster parents through a website).

[19] Decl. of James Amato Ex. B, ECF p. 35 of 39, ECF No. 13-4 (Services Contract providing that "[CSS] shall identify the Department as a funding source in all literature, documents reports or pamphlets which Provider publishes develops or produces in connection with this Contract.").

CSS's argument that it nevertheless need not comply with these all-comers, nondiscrimination provisions because compliance would violate CSS's rights under the Free Exercise and Establishment Clauses of the First Amendment, the Pennsylvania Religious Freedom Act ("RFPA"), and the Free Speech Clause of the First Amendment.

### 1. Free Exercise Clause Claim

#### i. The Services Contract And Fair Practices Ordinance Incorporated In The Services Contract Is A Neutral Law Of General Applicability Subject To Rational Basis Review

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002) (quoting U.S. Const. amend. I.) (alteration in original). The strictures of the Free Exercise Clause apply to state and local government under the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (holding the religious protections under the First Amendment apply to the states through the Due Process Clause of the Fourteenth Amendment). "Depending on the nature of the challenged law or government action, a free exercise claim can prompt either strict scrutiny or rational basis review." *Tenafly Eruv Ass'n, Inc.*, 309 F.3d at 165.

When a challenged law "is 'neutral' and 'generally applicable,' and burdens religious conduct only incidentally, the Free Exercise Clause offers no protection." *Id.* at 165 (citing *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)); *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 364 (3d Cir. 1999) (explaining that in cases involving state laws affecting religious freedoms, *Smith* is the appropriate framework for analysis because the federal Religious Freedom Restoration Act of 1993, passed by Congress in response to *Smith*, does not apply to state actions). Thus, the constitutionality of a neutral and

generally applicable state or local law under the Free Exercise clause is evaluated using the rational basis standard.[20]

By contrast, "if a law is not neutral . . . or is not generally applicable . . . strict scrutiny applies and the burden on the religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest." *Tenafly Eruv Ass'n, Inc.*, 309 F.3d 144 at 165 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 542 (1993)). "A law is not neutral if it has as its 'object . . . to infringe upon or restrict practices because of their religious motivation.'" *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 275 (3d Cir. 2007) (citing *Lukumi*, 508 U.S. at 533). "A law is not generally applicable when it 'proscribes particular conduct only or primarily when religiously motivated.'" *Id.* at 275 (citing *Tenafly*, 309 F.3d at 165).

Even if a law is neutral and generally applicable on its face, if "government officials exercise discretion in applying a facially neutral law, so that whether they enforce the law depends on their evaluation of the reasons underlying a violator's conduct, they contravene the neutrality requirement if they exempt some secularly motivated conduct but not comparable religiously motivated conduct." *Tenafly Eruv Ass'n, Inc.*, 309 F.3d 144 at 165–66. Unless there is evidence of government targeting of religious conduct "for distinctive treatment" then the framework for analysis under *Smith*, 494 U.S. 872, will govern the review of a challenged law or action. *Tenafly Eruv Ass'n, Inc.*, 309 F.3d 144 at 167 (quoting *Lukumi*, 508 U.S. at 534).

In the absence of case law directly addressing the factual circumstances presented in this case, the Court finds the Supreme Court's decision in *Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 698 (2010) instructive. In

---

[20] "[R]ational basis review requires merely that the action be rationally related to a legitimate government objective." *Tenafly Eruv Ass'n, Inc.*, 309 F.3d 144 at 165 n.24.

*Martinez*, the Supreme Court reviewed a law school's policy requiring student groups who wished to take advantage of the benefits of official recognition by the law school to comply with an all-comers/nondiscrimination policy. A faith-based student group argued that the University's insistence that the student group comply with the all-comers policy violated, among other things, the group's right to the free exercise of religion. *Id.*

A group of law students at a public law school formed a chapter of the Christian Legal Society ("CLS") that required its members to sign a "Statement of Faith" and adhere to bylaws that would "exclude from affiliation anyone who engages in 'unrepentant homosexual conduct.'" *Id.* at 672. CLS applied for registered student organization ("RSO") status with the law school. RSO status would confer on CLS various benefits including subsidies of CLS's events with funds originating from the school-wide mandatory student-activity fee, use of certain law school facilities, and the ability to advertise events to the student body using the law school's communication channels and the use of the law school's name and logo in advertising. *Id.* at 669–70. To qualify for RSO status, the law school required applicants to agree to a nondiscrimination policy that would prohibit the applicant from discriminating against prospective members on the basis of "race, color, religion, national origin, ancestry, disability, age, sex or sexual orientation." *Id.* at 671. CLS would not adopt the nondiscrimination policy and, accordingly, the school withheld RSO status and its attending benefits from CLS. *Id.* at 673.

In upholding the law school's conditioning of RSO status and attending benefits on CLS's acceptance of the nondiscrimination policy, the Supreme Court reasoned that the law school's policy was, in essence, a neutral "all comers" policy and that the law school, "caught in the crossfire between a group's desire to exclude and students' demand for equal access, may

reasonably draw a line in the sand permitting *all* organizations to express what they wish but *no* group to discriminate in membership." *Id.*at 694. The Supreme Court continued stating that:

> [t]he question here . . . is not whether [the law school] *could*, consistent with the Constitution, provide religious groups dispensation from the all-comers policy by permitting them to restrict membership to those who share their [sincerely held religious belief]. It is instead whether [the law school] *must* grant that exemption. This Court's decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, . . . unequivocally answers no to that latter question.

*Martinez*, 561 U.S. at 694 n.24. The Supreme Court further considered the fact that RSOs "are eligible for financial assistance drawn from mandatory student-activity fees . . . the all-comers policy ensures that no [law] student is forced to fund a group that would reject her as a member." *Id.* at 688. Ultimately, the Supreme Court held that the law school's policy was constitutional despite its incidental effect on CLS and its ability to receive RSO benefits, including financial support for its activities. *Id.* at 698.

The Court also considers the U.S. District Court for the Western District of Michigan's decision in *Teen Ranch, Inc. v. Udow*, 389 F.Supp.2d 827 (W.D. Mich. 2005), which was affirmed by the Sixth Circuit in *Teen Ranch, Inc. v. Udow*, 479 F.3d 403 (6th Cir. 2007), because the court's rationale in *Teen Ranch* provides some analytical assistance on the present facts.

In *Teen Ranch*, a faith-based residential home for troubled youth, Teen Ranch, sued a state agency, charged with placing troubled youth in protective care, after the state agency issued a moratorium against further placements of children with Teen Ranch due to Teen Ranch's policies and practices that violated laws prohibiting the use of state funds for sectarian activities. 389 F.Supp.2d at 829–32. Teen Ranch argued that the state's moratorium on new placements with Teen Ranch "violate[d] the Free Exercise Clause because it conditions the receipt of a governmental benefit on Teen Ranch's surrender of its religious beliefs and practices and

burdens the free exercise of Plaintiff's religious beliefs without satisfying the strict scrutiny standard." *Id.* at 837. In rejecting Teen Ranch's free exercise challenge, the district court reasoned that "[u]nlike [cases involving] unemployment benefits or the ability to hold office, <u>a state contract for youth residential services is not a public benefit</u>." *Id.* at 838 (emphasis added). The district court relied on the Supreme Court's decision in *Locke v. Davey* and explained that in *Locke*:

> where the [Supreme] Court reviewed a state scholarship program that excluded any student who was pursuing a degree in devotional theology . . . [a]lthough the law was not facially neutral with respect to religion, the [Supreme] Court held that it did not violate the Free Exercise Clause [because the law] 'imposes neither criminal nor civil sanctions on any type of religious service or rite . . . . And it does not require students to choose between their religious beliefs and receiving a government benefit. The State has merely chosen not to fund a distinct category of instruction.

*Teen Ranch*, 389 F. Supp. 2d at 838 (citing *Locke v. Davey*, 540 U.S. 712, 720–21 (2004)). The district court in *Teen Ranch*, thus, recognized that the context in which a purported burden on religious expression occurs is critical in determining whether the state has violated the Free Exercise Clause. There is a difference between fundamental benefits such as unemployment compensation and voluntary contracts for the provision of government services. *Id.* at 838 (stating that there is no support for the proposition that "the State can be required under the Free Exercise Clause to contract with a religious organization").[21] On appeal, the Sixth Circuit stated

---

[21] The state court in *Catholic Charities of the Diocese of Springfield, et al. v. Madigan, et al.* similarly focused on context in granting summary judgment for the State of Illinois in a factually analogous dispute to the dispute in this case. *See* Section IV.A for a summary of the case in *Madigan*; *see also* Summary Judgment Order 2, *Catholic Charities of the Diocese of Springfield, et al. v. Madigan, et al.*, No. 2011-MR-254 (Ill. Cir. Ct. Aug. 18, 2011) (concluding that despite Catholic Charities' long history of participation in foster care, it did not have a right to a state contract for foster care).

"[a]fter thoroughly reviewing the record, we believe that the district court was correct in reaching its conclusions." *Teen Ranch*, 479 F.3d at 410.

In this case, the Services Contract and the Fair Practices Ordinance incorporated into the Services Contract is, on its face, a neutral law of general applicability under *Smith*, therefore, the Court applies the rational basis test to determine the constitutionality of the Services Contract and its application to CSS.

First the Court concludes that the Services Contract and Fair Practices Ordinance are neutral with respect to religion because there is no evidence that the Services Contract or Fair Practices Ordinance were drafted or enacted with the object "to infringe upon or restrict practices because of their religious motivation." *Lighthouse Inst. for Evangelism, Inc.*, 510 F.3d at 275 (quoting *Lukumi*, 508 U.S. at 533) (emphasis added). The plain language of the Services Contract and the plain language and history of the Fair Practices Ordinance as incorporated into the Services Contract demonstrate neutrality. Article XV, § 15.1 of the Services Contract makes no reference to religion except that § 15.1 would protect individuals receiving services under the Services Contract from religious discrimination. Decl. of James Amato Ex. C, ECF p. 18–19 of 39, ECF No. 13-5 ("Provider shall not discriminate or permit discrimination against any individual because of . . . religion."). The plain language of the Fair Practices Ordinance likewise supports a finding of neutrality. The Fair Practices Ordinance makes no reference to religion except that it, again, prohibits service providers from discriminating on the basis of religion. Philadelphia Fair Practices Ordinance § 9-1106, Chapter 9-1100 of the Philadelphia Code.

The legislative history and intent of the Fair Practices Ordinance similarly supports a finding of neutrality. Philadelphia City Council first enacted the Fair Practices Ordinance in

1963 long before the present dispute between the Parties. Philadelphia City Council amended

the Fair Practices Ordinance in 1982, thirty-six years before the events relevant to this case, to

broaden the scope of its inclusion policy to protect Philadelphians on the basis of, among other

things, sexual orientation. Indeed, the Legislative Findings section of the Fair Practices

Ordinance explained the reasons for its enactment. The Fair Practices Ordinance provides that

Philadelphia's population:

> Consists of people of every race, ethnicity, color, religion, national
> origin, sex, sexual orientation, gender identity, ancestry, age,
> disability, marital status, and familial status . . . . [and]
> [d]iscrimination in places of public accommodation causes
> embarrassment and inconvenience to citizens and visitors of the
> City, creates breaches of the peace, and is otherwise detrimental to
> the welfare and economic growth of the City.

§ 9-1101. The history and text of the Fair Practices Ordinance provide no basis to conclude that

the Fair Practices Ordinance has as its object the infringement of religious rights. Accordingly,

the Fair Practices Ordinance, as incorporated by the Parties into the Services Contract, is neutral.

The Services Contract and the Fair Practices Ordinance are also generally applicable. In

this case, the Services Contract was, in fact, applied generally. The general applicability of the

Services Contract and Fair Practices Ordinance is not only evident from the text of the Services

Contract, but also from the actions DHS and Philadelphia took in this case. First, the Services

Contract and Fair Practices Ordinance do not "proscribe particular conduct only or primarily

when religiously motivated;" they proscribe only CSS's ability to turn away qualified

Philadelphians on the basis of particular character traits without regard to secular or religious

reasons. *Lighthouse Inst. for Evangelism, Inc.*, 510 F.3d at 275 (citing *Tenafly*, 309 F.3d at 165).

Among the character traits that CSS may not consider when refusing to serve qualified

Philadelphians are "perceived race, ethnicity, color, sex, sexual orientation, religion, national

origin, ancestry, age, disability, marital status, source of income, familiar [sic] status . . . ." Article XV, § 15.1.

As applied in this case, the Services Contract and Fair Practices Ordinance were, in fact, implemented in a general manner. Not only has DHS confirmed that it would not permit any foster agency under contract, faith-based or not, to turn away potential foster parents for the foster parents' characteristics under the Services Contract and Fair Practices Ordinance, DHS also closed intake of new referrals by CSS and Bethany Christian Services for the same reason. This evidence supports the conclusion that DHS and Philadelphia are not applying the Services Contract or the Fair Practices Ordinance to target particular religious denominations for any religious reason.[22]

Having concluded that the Services Contract and Fair Practices Ordinance are apparently facially neutral and generally applicable and appear to have been neutrally and generally applied in this case, the Court concludes that Defendants' enforcement of the Services Contract and Fair Practices Ordinance is rationally related to a number of legitimate government objectives. While the standard for rational basis review is well known, it bears repeating:

> Under rational basis review, '[a] statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not that basis has a foundation in the record.' . . . . The regulation must be reasonable and not arbitrary and it must bear 'a rational relationship to a [permissible] state objective.'"

*Lighthouse Inst. for Evangelism, Inc.*, 510 F.3d at 278 (internal citation omitted). While not directly applicable to the local contracting practices at issue in this case, the imposition of

---

[22] This fact contradicts Plaintiffs' argument that DHS and Philadelphia specifically targeted CSS for its Catholic practices and association with the Archbishop of the Philadelphia Archdiocese. *See* below Section IV.C.2.ii addressing Plaintiffs' argument that strict scrutiny should apply in reviewing Defendants' actions because Defendants purportedly targeted Plaintiffs for Plaintiffs' religious beliefs.

contractual conditions in government services contracts has a long and well-established history. Indeed, the courts, in reviewing federal contracts, have frequently upheld conditions placed on contractors through federal executive orders. *See, e.g.*, Exec. Order No. 8802, 6 F.R. § 3109 (Jun. 25, 1941) (requiring "[a]ll contracting agencies of the Government of the United States . . . include in all defense contracts . . . a provision obligating the contractor not to discriminate against any worker because of race, creed, color, or national origin" even before the enactment of the Civil Rights Act of 1964); PA Exec. Order 2016-05 (Apr. 7, 2016), https://www.governor.pa.gov/executive_orders/executive-order-2016-05-contract-compliance/ (prohibiting "discrimination by reason of race, gender, creed, color, sexual orientation, or gender identity or expression" in the "award, selection, or performance of any contracts or grants issued by Commonwealth agencies").

Here, Defendants have at least six permissible governmental objectives that are furthered by seeking CSS's compliance with the Services Contract. First, DHS and Philadelphia have a legitimate interest in ensuring that when contractors agree to terms in a government contract, the contractors adhere to those terms. Second, DHS and Philadelphia have a legitimate interest in ensuring that when its contractors voluntarily agree to be bound by local laws, the local laws are enforced. Third, DHS and Philadelphia have a legitimate interest in ensuring that when they employ contractors to provide governmental services, the services are accessible to all Philadelphians who are qualified for the services. Fourth, in the context of foster care and adoption, DHS and Philadelphia have a legitimate interest in ensuring that the pool of foster parents and resource caregivers is as diverse and broad as the children in need of foster parents and resource caregivers. Fifth, DHS and Philadelphia have a legitimate interest in ensuring that individuals who pay taxes to fund government contractors are not denied access to those

services.[23]  Sixth, DHS and Philadelphia have an interest in avoiding likely Equal Protection

Clause and Establishment Clause claims that would result if it allowed its government

contractors to avoid compliance with the all-comers, nondiscrimination provisions of the Fair

Practices Ordinance by discriminating against same-sex married couples.[24]

That Defendants have legitimate objectives in this case is clearer still in view of the

Supreme Court's decision in *Martinez*, 561 U.S. 661 and the decision in *Teen Ranch*, 389 F.

Supp. 2d 827.  In *Martinez*, the Supreme Court explained that where a public law school was

"caught in the crossfire between a group's desire to exclude and [an interest in] equal access, [the

---

[23] *See Martinez*, 561 U.S. at 688 (concluding that the fact that where University organizations may receive funding derived from a mandatory student-activity fee, that the University has an interest in ensuring that no student "is forced to fund a group that would reject her as a member.").

[24] *See, e.g.*, *Campaign for Southern Equality v. Mississippi Dep't of Human Servs.*, 175 F.Supp.3d 691 (S.D. Miss. 2016) (granting injunction to same-sex couples against state department of human services on basis that state law prohibiting adoption by same-sex couples violated federal equal protection under *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015)).

The Court notes that while the Third Circuit rejected "avoiding 'an Establishment Clause controversy'" as a government interest in *Tenafly*, in that case, the Third Circuit concluded that strict scrutiny applied and, thus, a "possible" Establishment Clause controversy could not meet the exacting requirements of a "compelling" government interest.  309 F.3d at 172.  Further, in *Tenafly*, the Third Circuit concluded that the existence of an Establishment Clause controversy was, in essence, impossible.  Here, faced with the Supreme Court's ruling in *Obergefell*, recognizing marriage for same-sex couples and marriage's attending benefits, and faced with the fact that CSS conditions the provision of its services on prospective parents' procurement of a clergy letter, the possibility of an Equal Protection and Establishment Clause claim is not as remote a possibility as was the case in *Tenafly*.

The Court also notes here that although CSS has disclaimed responsibility as a government actor in connection with some aspects of its claims, CSS, otherwise has urged the Court to consider CSS as a government contractor "akin to a government employee" in connection with its argument on Free Speech grounds.  Pls.' Br. 26, ECF No. 10-2.  The Court need not decide whether CSS would qualify as a state actor at this time in connection with any possible Equal Protection or Establishment Clause claim.

law school] may reasonably . . . permit[] *all* organizations to express what they wish but *no* group to discriminate in membership." 561 U.S. at 694. In this case, DHS and Philadelphia are in much the same position as the law school in *Martinez* and, like the law school in *Martinez*, they may permit government contractors to express what the contractors wish but may also insist that their contractors adhere to contractual obligations to serve all-comers and not discriminate. To permit a contractor to avoid a contractual provision requiring the contractor to accept all those who seek their services unilaterally would permit what the Supreme Court explained could not be permitted in *Martinez*.[25]

In this case, as in *Teen Ranch*, context matters. In *Teen Ranch*, the district court aptly drew a distinction between cases involving essential government benefits such as unemployment compensation or the ability to hold office, and "a state contract for youth residential services, which is not a public benefit." 389 F. Supp. 2d at 838; *see also* Summary Judgment Order 2, *Catholic Charities of the Diocese of Springfield, et al. v. Madigan, et al.*, No. 2011-MR-254 (Ill. Cir. Ct. Aug. 18, 2011) (granting summary judgment for State of Illinois reasoning that Catholic Charities did "not have a legally recognized protected property interest in the renewal of its contracts for foster care and adoption services"). There is no support for the proposition that "the State can be required under the Free Exercise Clause to contract with a religious organization." *Id.* at 838. Here, CSS seeks, as the plaintiff in *Teen Ranch* sought, a government services contract on terms that it deems acceptable, but unlike those cases where the government withheld essential benefits on religious grounds, CSS is not entitled to a government services contract to perform governmental work. It further bears repeating that there is no evidence in the

---

[25] When asked whether the public law school was required to exempt a faith-based student group's decision from an all-comers/nondiscrimination policy, the Supreme Court answered that "[t]his Court's decision in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, . . . unequivocally answers no to that . . . question." *Martinez*, 561 U.S. at 694 n.24.

record that either DHS or Philadelphia has withheld a new contract or contractual compensation to CSS on religious grounds. The Court concludes that the terms of Services Contract, as applied by Defendants in this case, would likely survive rational basis review.

### ii. No Evidence Of Targeting To Trigger Strict Scrutiny

Although the Court concludes that rational basis review applies in this case, the Court addresses Plaintiffs' argument that strict scrutiny review should apply instead.

At the outset, the Court acknowledges the Parties' varying citations to the recent Supreme Court case, *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719 (2018). *Masterpiece Cakeshop*, however, has little bearing on this case in view of *Masterpiece Cakeshop*'s narrow holding. Among other narrow propositions, *Masterpiece Cakeshop* stands for the unfortunately now-remarkable proposition that disputes such as the one before this Court "must be resolved with tolerance." *Id.* at 1732.

In an attempt to show that Defendants' actions are subject to strict scrutiny despite the facial neutrality and general applicability of the Services Contract provisions at issue, and DHS's and Philadelphia's expressed preference to continue contracting with CSS, Plaintiffs allege that Defendants have targeted CSS "purely based on its religious beliefs." Pls.' Br. 17, ECF No. 13-2. In support of their claim of targeting, Plaintiffs point to (1) anti-Archdiocese of Philadelphia and anti-Archbishop of Philadelphia comments made by the Mayor of Philadelphia to show that DHS and Philadelphia intentionally sought to penalize CSS for its religious beliefs and exercise, and (2) the purported selective, discretionary enforcement of "laws or legal instruments in a way that burdens conduct for religious reasons but not secular reasons." Pls.' Br. 21, ECF No. 13-2. Plaintiffs draw too strong a conclusion from the Mayor's comments and misapprehend the way

in which "secular exemptions" might show a government's actions are not neutral or generally applied so as to trigger strict scrutiny.

First, contrary to Plaintiffs' contentions, the Mayor's comments do not support the conclusion that DHS targeted CSS for its Catholic beliefs because (a) there was insufficient evidence at the preliminary injunction phase to show that the Mayor had any influence in DHS's decisions in this case, thereby rendering the comments irrelevant to these proceedings, and (b) even comments the Mayor made relating to Catholicism do not demonstrate targeting in light of the fact that DHS also closed Bethany Christian Services's referrals intake, a non-Catholic agency, that similarly would not comply with its obligation to serve all-comers under its foster agency contract.

Plaintiffs cite four comments involving the Mayor of Philadelphia that purportedly show that DHS closed CSS's intake due to CSS's Catholic beliefs.[26]  First, Plaintiffs cite a nearly three-year-old *Philadelphia Magazine* article about then mayoral candidate Jim Kenney in which Kenney appeared critical of policies of the Archdiocese of Philadelphia and the Archbishop of Philadelphia, but appeared otherwise approving of Pope Francis, Catholic sisters, and other Catholic orders and programs.[27]  Second, Plaintiffs cite a nearly two year old *Philadelphia Inquirer* article in which Mayor Kenney was quoted as saying that Philadelphia Archbishop

---

[26] The difficulty in Plaintiffs relying on the Mayor's statements, in part, stems from the fact that the Mayor himself was raised Catholic and, therefore, it is conceivable that when the Mayor has commented on Catholicism in the past, he was commenting on Catholic ideas as they related to his own faith.  The Supreme Court has recently reminded the courts that they are to "take care not to engage in [] any judicial psychoanalysis" of lawmakers.  *Trump v. Hawaii*, No. 17-965, 2018 WL 3116337, at *37 (U.S. June 26, 2018) (Sotomayor, J., dissenting).  This is why the courts, when determining the intent of legislators, generally confine their review to statements made contemporaneously with the legislation in question.  *Id.*

[27] Patrick Kerkstra, <u>Jim Kenney's Long War With The Archdiocese</u>, Phillymag.com, (July 9, 2015, 11:23 PM), https://www.phillymag.com/citified/2015/07/09/jim-kenney-catholic-archdiocese-charles-chaput/.

Chaput's guidelines on the implementation of a Catholic text, *Amoris Laetitia*, were "not Christian."[28] Third, Plaintiffs cite a March 16, 2018 comment by the Mayor where the Mayor stated "we cannot use taxpayer dollars to fund organizations that discriminate against people because of their sexual orientation or because of their same-sex marriage status . . . . It's just not right."[29] Fourth, Plaintiffs cite a May 7, 2018 letter indicating that the Philadelphia Commission on Human Relations was investigating CSS's policy of turning away certain persons based on their status as same-sex and married at "the request of the Mayor." *See* (initial) Injunction Motion Ex. 1-G (sealed), ECF No. 10-14.

Plaintiffs rely too heavily on these four citations to draw a sweeping conclusion that CSS has suffered impermissible hostility at the hands of the Mayor. The evidence submitted at the three-day evidentiary hearing is insufficient to draw the conclusion Plaintiffs would have the Court draw. There was no evidence to show that the Mayor directed DHS to close CSS's intake of new referrals or to insist that CSS comply with its contractual obligation to serve all Philadelphians. *See* Jun. 19, 2018 Hr'g Tr. 166:6–21 (Figueroa) (testifying that Commissioner Figueroa herself "decided that it was in the best interest [of children] to close intake, so that [Figueroa] could look more deeply into" CSS's and Bethany Christian Services's policies); Figueroa Decl. ¶ 32, ECF No. 20-6 (same); Jun. 18, 2018 Hr'g Tr. 96:2–3 (Ali) (testifying that, to Ali's knowledge, Commissioner Figueroa herself decided to close CSS's intake of new

---

[28] David O'Reilly, <u>Chaput Edict Draws Mixed Reviews; Kenney Calls It 'Not Christian'</u>, Philly.com, (Jul. 6, 2016, 11:04 PM), http://www.philly.com/philly/news/20160707_Chaput_edict_draws_mixed_reviews__Kenney_calls_it__not_Christian_.html. *See* Mot. for Temporary Restraining Order or Preliminary Injunction Ex. 1-J, ECF No. 10-17.

[29] Tom MacDonald, <u>Philly Halts Foster Placements With 2 Faith-Based Agencies Shutting Out LGBT Couples</u>, WHYY.com, (Mar. 16, 2018), https://whyy.org/articles/philly-halts-foster-placements-2-faith-based-agencies-shutting-lgbt-couples/. This article was cited in Plaintiffs' Brief and is attached as Exhibit 1-U to Plaintiffs' initial Injunction Motion. *See* Mot. for Temporary Restraining Order or Preliminary Injunction Ex. 1-U, ECF No. 10-28.

referrals); Jun. 21, 2018 Hr'g Tr. 108:11–13, 108:18–20 (Figueroa) (testifying that Commissioner Figueroa did not know the Mayor's views on CSS when Figueroa met with CSS, nor did Figueroa "discuss cutting off intake with the Mayor's office").

That DHS made its own decision to close intake is supported by the fact that DHS has closed intake for other foster care agencies in the past for a number of reasons and, thus, intake closure is a relatively unremarkable DHS administrative action that may be taken to address a number of agency concerns. *See, e.g.*, Jun. 21, 2018 Hr'g Tr. 5:14–15 (Figueroa) (testifying that "I have closed intake in other circumstances for other providers."); Jun. 21, 2018 Tr. 8:24-25–9:1 (Figueroa) (testifying that the week before, DHS also closed intake for another agency).   In short, there is insufficient evidence in the record to show that the Mayor was involved in DHS's decision to close CSS's and Bethany Christian Services's intake of new referrals.   Therefore, the Mayor's comments are irrelevant to this case and cannot support Plaintiffs' claim of religious hostility and intentional targeting.

Each of Plaintiffs' four citations purportedly showing DHS's intentional targeting of CSS on religious grounds cannot support Plaintiffs' conclusion for a number of other reasons. Plaintiffs' first two citations are three and two years old, respectively.  The events that precipitated this case occurred in March 2018.  These first two citations, as a matter of timeliness, if not substance, are irrelevant.  Plaintiffs' third citation to the Mayor's comment that "we cannot use taxpayer dollars to fund organizations that discriminate against people because of their sexual orientation or because of their same-sex marriage status . . . . It's just not right" is, by its plain terms, not about religious views, but about whether publicly funded service providers may refuse to serve all Philadelphians, including those that are in same-sex marriages.  Plaintiffs' fourth citation, to a May 7, 2018 letter in which the Philadelphia Commission on Human

Relations indicated that the Commission would undertake an investigation, in part, at the request of the Mayor, was sent after DHS made an independent decision to close CSS and Bethany Christian Services's intake. The letter, therefore, cannot support a conclusion that the Mayor was involved in DHS's decision.

Plaintiffs also have pointed to Commissioner Figueroa's statement at the May 15 meeting between DHS officers and CSS management that "it would be great if we listened to the teachings and the words of our current Pope Francis" as another ground on which to rest its targeting and preference allegations. Jun. 21, 2018 Hr'g Tr. 106:1–3 (Figueroa). As with the Mayor's comments, Plaintiffs draw too broad a conclusion from the Commissioner's statement. The fact remains that DHS closed intake for both CSS and Bethany Christian Services, a non-Catholic organization. This fact undercuts Plaintiffs' position that DHS has targeted CSS for its Catholic beliefs. Further, Commissioner Figueroa's words themselves are unclear whether references to "we" and "our current Pope Francis" were references to her own beliefs as a Catholic who was educated by the Jesuit order, or as a representative of DHS. Jun. 19, 2018 Hr'g Tr. 149:5–18. As cautioned by Justice Sotomayor, the Court will not engage in judicial psychoanalysis on these facts. *Trump v. Hawaii*, No. 17-965, 2018 WL 3116337, at *37.

In an another attempt to show that DHS has targeted CSS on religious grounds, Plaintiffs argue that DHS has granted secular exemptions to the Services Contract's fair practices provisions, but now refuse a religious exemption to CSS. Plaintiffs, however, misapprehend how religious targeting may be proven through the government's provision of "secular exemptions." On this issue, the Third Circuit's decision in the case *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, provides the framework for determining whether the government is impermissibly providing secular exemptions to a regulation, and not providing

comparable religious exemptions to the same regulation in violation of the First Amendment. 170 F.3d 359 (3d Cir. 1999).

In *Fraternal Order of Police*, the Third Circuit considered a police department regulation that prohibited its officers from wearing beards to maintain uniformity among the officers. 170 F.3d at 361. The regulation applied generally to all officers, but the police department carved out a categorical exemption for officers who had medical reasons <u>for keeping a beard</u>. *Id.* By contrast, the police department refused to carve out a categorical exemption for officers who had religious reasons <u>for keeping a beard</u>. *Id.* Then Circuit Judge Alito wrote for the Third Circuit that the police department's exemption from the <u>no-beard policy</u> on medical grounds "raise[d] concern because it indicate[d] that the [police department] ha[d] made a value judgment that secular (i.e., medical) motivations <u>for wearing a beard</u> are important enough to overcome its general interest in uniformity but that religious motivations are not." *Id.* at 366 (emphasis added). The focus of analysis must be on whether the government exempts activities that would violate <u>the policy at issue</u> for secular reasons, but not for religious reasons. Thus, in *Fraternal Order of Police*, the focus was on the police department's provision of a secular exemption <u>from the no-beard policy</u>.

Here, the policy at issue is the fair practice provisions of CSS's Services Contract, that is the all-comers, nondiscrimination provisions. The question is whether DHS grants exemptions to the fair practice provisions of foster agency contracts for secular reasons, but denies CSS an exemption for religious reasons thereby evidencing an impermissible governmental value judgment that secular motivations for violating fair practice provisions are more important than religious motivations. The answer to this question is no. There is no evidence in the record to show that DHS has granted any secular exemption to the requirement that its foster care agencies

provide their services to all comers. Plaintiffs have not alleged, nor have Plaintiffs presented, any evidence that DHS has granted exemptions to any secular agency to permit a secular agency to refuse its services to all comers in contravention of any fair practices provisions of any foster services contract.

The purported secular exemptions to which Plaintiffs point to show religious targeting are not, in fact, exemptions to the fair practices requirements and, as such, cannot be considered evidence of targeting. CSS complains that DHS has permitted "referrals of families for a variety of secular reasons, including proximity, expertise in caring for medical needs, expertise in addressing behavioral needs, ability to find foster placements for pregnant youth, expertise working in a 'kin care' program, and other specialties or areas of focus." Pls.' Br. 21, ECF No. 13-2. These "secular reasons," however, are not exemptions from fair practices requirements. DHS permits agencies to "refer" prospective foster parents to specialty agencies equipped to handle certain special needs, but nowhere is there evidence in the record that DHS permits agencies to refuse to provide their services to prospective foster parents in violation of the fair practices policies contained in government contracts or local law. While CSS has represented that it would euphemistically "refer" same-sex couples to other foster agencies willing to serve same-sex couples, CSS's "referral" to another agency would nevertheless amount to CSS's refusal to serve that same-sex couple.

As there is insufficient evidence to support the conclusion that DHS has explicitly targeted CSS for religious reasons, strict scrutiny is inapplicable in this case.

### 2. Establishment Clause Claim

Plaintiffs also assert a claim under the Establishment Clause based on Defendants' alleged "engag[ment] in denominational preference and targeting." Pls.' Br. 24, ECF No. 10-2.

The First Amendment to the U.S. Constitution provides that "there should be 'no law respecting an establishment of religion.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (quoting the First Amendment)). The Supreme Court has provided two tests for deciding whether government action runs afoul of the Establishment Clause: the "endorsement test" and the *Lemon* test. *Doe v. Indian River School Dist.*, 653 F.3d 256, 282–83 (3d Cir. 2011). Plaintiffs have not articulated how, if at all, Defendants' actions fit under either test. Instead, Plaintiffs have simply asserted that Defendants have "demonstrate[d] a preference for some religious groups over CSS." Pls.' Br. 24, ECF No. 13-2. The Court cannot conclude that Plaintiffs have met their burden of showing entitlement to relief under the Establishment Clause. The Court will, nevertheless, address Plaintiffs' Establishment Clause arguments as they have articulated them below, despite Plaintiffs' failure to articulate a claim under the endorsement test or the *Lemon* test.

In support of Plaintiffs' Establishment Clause claim, Plaintiffs cite to the same purported evidence of religious targeting that they cited in connection with their free exercise claim, that is, evidence of the Mayor's alleged bias against the Archdiocese of Philadelphia and the Archbishop of Philadelphia. Plaintiffs argue that the Mayor's comments in tandem with DHS's actions "demonstrate an intent to target Catholic Social Services based upon disagreement with [CSS's] religious beliefs." Pls.' Br. 25, ECF No. 10-2. As discussed in connection with Plaintiffs' religious targeting argument, above, the evidence does not support Plaintiffs' sweeping conclusion.

In pursuing its Establishment Clause claim, CSS glosses over the fact that it has not been singled out for its policy of refusing to serve all qualified Philadelphians. DHS closed Bethany Christian Services's intake of new referrals for the same reason DHS closed CSS's intake. Jun. 21, 2018 Hr'g Tr. 12:9–23 (Figueroa) (testifying that DHS closed Bethany Christian Services's

intake and that its intake remains closed, however, Bethany Christian Services has represented

that it will enter into a new contract with the DHS for the coming year and comply with the fair

practices requirements under its contract). That DHS closed intake for CSS, which operates

under the command of the Archdiocese of Philadelphia, and also closed intake for Bethany

Christian Services, not associated with the Archdiocese of Philadelphia, militates against

concluding that DHS has engaged in denominational preference and targeting. The Mayor's

allegedly anti-Archdiocese of Philadelphia and anti-Archbishop of Philadelphia comments offer

no support to Plaintiffs' argument of denominational preference and targeting because DHS also

closed Bethany Christian Services's intake, which is not associated with the Archdiocese of

Philadelphia or the Archbishop of Philadelphia.

Plaintiffs have not demonstrated entitlement to relief under the Establishment Clause.

### 3. Pennsylvania Religious Freedom Act Claim

Plaintiffs' next lodge a statutory claim under the Pennsylvania Religious Freedom Act

("RFPA"). 71 Pa. Cons. Stat. Ann. §§ 2401–2407. Before turning to the substance of Plaintiffs'

claim, the Court emphasizes that Plaintiffs' claim is a <u>state</u> law claim. Under certain

circumstances a district court may abstain from ruling on a state law issue, such as the issue in

this case, in favor of allowing the state courts an opportunity to address the issue. Indeed, in

*Combs v. Homer-Center School Dist.*, the Third Circuit vacated a district court order awarding a

defendant summary judgment on a RFPA claim and ordered the district court to remand the

matter to the appropriate state court for adjudication. 540 F.3d 231, 253–254 (3d Cir. 2008).

The Third Circuit explained in *Combs*, that "[b]ecause all federal issues have been decided on

summary judgment and since [the plaintiffs'] RFPA claim raises a novel and potentially complex

issue of State law, we will decline to exercise supplemental jurisdiction over [the plaintiffs']

pendent state law claim." 540 F.3d at 254. Notwithstanding the Third Circuit's guidance that the district courts remain wary of intruding upon state law matters, the Court will address Plaintiffs' RFPA claim in view of the procedural posture of this case.

At the preliminary injunction stage, the Third Circuit has advised that considerations of the novelty and potential complexity of a state law question "have very little weight." *New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Bd. of Higher Educ.*, 654 F.2d 868 (3d Cir. 1981) (concluding that the concerns implicated by the *Pullman* doctrine, which permits courts to abstain from deciding certain complex state law matters are of less import at the preliminary injunction stage). While the state law matters presented in this case are complex, the Court finds that state court precedent provides a sound basis for a decision on Plaintiffs' RFPA claim at the preliminary injunction stage.

Section 2401 of RFPA provides:

> (a) General rule.  Except as provided in subsection (b), an agency shall not <u>substantially burden</u> a person's <u>free exercise of religion</u>, including any burden which results from a rule of general applicability.
>
> (b) Exceptions.  An agency may substantially burden a person's free exercise of religion if the agency proves, by a preponderance of the evidence, that the burden is all of the following:
>
>> (1) In furtherance of a compelling interest of the agency.
>>
>> (2) The least restrictive means of furthering the compelling interest.

71 Pa. Cons. Stat. Ann. § 2404 (emphasis added).

While RFPA would appear, on its face, to protect a wide range of religious activity, the Third Circuit has noted that "[s]ignificantly, not all burdens on the exercise of religion trigger the RFPA's heightened scrutiny." *Brown v. City of Pittsburgh*, 586 F.3d 263, 285 (3d Cir. 2009).

The Third Circuit has explained that the nature of our society is such that "virtually all legislation . . . imposes an incidental burden at some level by placing indirect costs on an individual's activity." *Id.* at 285 (internal quotation omitted) (alteration in original). When the costs of legislation may affect religious freedoms, the Pennsylvania General Assembly has "identified a substantiality threshold as the tipping point for requiring heightened justifications for governmental action." *Id.* at 285 (citing *Combs v. Homer-Center School Dist.*, 540 F.3d 231, 262 (3d Cir. 2008) (Scirica, C.J., concurring)). RFPA further "requires 'as a threshold matter' that persons invoking its protections 'prove . . . that their free exercise of religion has or will likely be substantially burdened' by 'clear and convincing evidence'." *Id.* at 285 (citing *Combs*, 540 F.3d at 253 (per curiam)) (emphasis added). The Third Circuit has quoted Chief Judge Scirica's concurring opinion in *Combs* for the proposition that "by requiring proof of 'a substantial burden' by clear and convincing evidence, Pennsylvania appears to have set a higher threshold than other religious restoration statutes." *Id.* at 285 (citing *Combs*, 540 F.3d at 262 (Scirica, C.J., concurring)) (emphasis added).

Under RFPA, a law substantially burdens a person's fundamental religious exercise if it:

(1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs.
(2) Significantly curtails a person's ability to express adherence to the person's religious faith.
(3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion.
(4) Compels conduct or expression which violates a specific tenet of a person's religious faith.

71 Pa. Cons. Stat. Ann. § 2403. In determining whether the government substantially burdens a person's free exercise of religion under RFPA, a state law, the Court looks to the way in which the state law has been interpreted and applied by state courts.

In *Ridley Park United Methodist Church v. Zoning Hearing Bd. Ridley Park*, 920 A.2d 953 (Pa. Commw. Ct. 2007), the Commonwealth Court reviewed a church's claim that a town zoning ordinance prohibiting the operation of a church-run religious childcare center on the church's property violated the church's free exercise under RFPA. The Commonwealth Court framed the issue presented as "whether the Church would be 'substantially burdened' if it was precluded from operating a daycare center because it would lose 'a reasonable opportunity to engage in activities which are fundamental to [its] religion.'" 920 A.2d at 960 (quoting 71 Pa. Cons. Stat. Ann. § 2403). The Commonwealth Court resolved the issue by concluding that:

> nothing here impinges on the religious activities of the Church. While it aided in carrying out the Church's religious mission, the daycare is not a fundamental religious activity of a church. For example, ministering to the sick can flow from a religious mission, but it is not a fundamental religious activity of a church because a hospital may be built to satisfy that mission.

*Id.* at 960. Thus, the Commonwealth Court concluded the zoning ordinance "does not violate the RFPA" because "the [c]hurch failed to meet its burden of proving that it was substantially denied a reasonable opportunity to engage in activities that were fundamental to its religion." *Id.*

In *Staple v. Dep't of Corrections*, the Commonwealth Court considered a situation in which the Pennsylvania Department of Corrections confiscated religious texts from an inmate. 2014 WL 2927286 at *4 (Pa. Commw. Ct. 2014) (not precedential). While *Staple* involved the application of a specific carve out under RFPA that grants correctional facilities greater authority to burden inmates' religious freedoms, the case, nevertheless, provides some insight into the limits of RFPA. A person's access to religious texts would ostensibly be one of the most fundamental religious rights, and yet, even under RFPA, a state agency may confiscate and prohibit an individual's access to such texts. *Id.* at 4. The result in *Staple*, thus, would confirm the Third Circuit's observation in *Brown* that "Pennsylvania appears to have set a higher

threshold than other religious restoration statutes" and that RFPA does not provide protection in many circumstances. *Id.*at 285 (citing *Combs*, 540 F.3d at 262 (Scirica, C.J., concurring)); *see also Brown*, 586 F.3d at 288 (holding that RFPA provides only as much protection to religiously motivated expression as the First Amendment's Free Speech Clause).

In *Commonwealth v. Parente*, the Commonwealth Court addressed a defendant's assertion that a city noise control ordinance prohibiting the defendant's use of a hand-held microphone with speakers to "exercise his religious beliefs" in accordance with "the dictates of his conscience and serv[ing] God by peacefully preaching and counseling people," violated his rights under RFPA. 956 A.2d 1065, 1073 (Pa. Commw. Ct. 2008). The Commonwealth Court held that the application of the ordinance and the defendant's conviction thereunder did not violate the defendant's rights under RFPA because "the defendant failed to establish that the activities he engaged in were fundamental to his religion." *Id.*at 1074. Instead, the defendant proved only that "he engaged in these activities based upon his religious beliefs or that [the activites] flowed from a religious mission." 956 A.2d at1074 (emphasis added). In so holding, the Commonwealth Court drew a distinction between those activities that are fundamental to a person's religion and those activities that may be inspired by or flow from a religious mission.

These state court decisions interpreting RFPA highlight what the Third Circuit has noted in other cases: the analytical framework established by RFPA "appears to create some tension between state and federal law." *Combs*, 540 F.3d at 258. While the "United States Supreme Court has cautioned against making religious interpretations in the First Amendment context," the Pennsylvania General Assembly and the Commonwealth's courts appear to require courts to "inquire into . . . whether an activity is fundamental to a person's religion." *Id.*

In this case, Plaintiffs have articulated their fundamental religious exercise as "providing foster care to Philadelphia children." Pls.' Br. 13, ECF No. 13-2; *see also* Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 120, ECF No. 46 (stating that "[c]aring for foster children is a fundamental religious exercise for Plaintiffs); Jun. 19, 2018 Hr'g Tr. 37 (Amato) (testifying that "the church's care for orphans . . . at-risk children . . . [is] intrinsic to who we are and what we do."). Although the decision in *Ridley Park* raises significant doubt about whether Pennsylvania courts would consider foster care to be a fundamental religious exercise,[30] the Court will assume, for purposes of the Injunction Motion, that "providing foster care to . . . children" constitutes a fundamental religious exercise under RFPA. Pls.' Br. 13, ECF No. 10-2.

Assuming that providing foster care to children constitutes a fundamental religious exercise, the next question under RFPA analysis is whether holding CSS to its obligations under the Services Contract, in particular its obligation to provide its services to all-comers in accordance with the Fair Practices Ordinance, substantially burdens CSS's provision of foster care to children. The Court concludes that CSS's provision of foster care to children is not substantially burdened in this case because CSS is not reasonably likely to show by clear and convincing evidence that its fundamental religious exercise has been substantially burdened under any of the four definitions of "substantial burden" provided under RFPA.[31] Requiring

---

[30] As discussed in detail above, the Commonwealth Court held that childcare "is not a fundamental religious activity of a church" even if childcare may "aid[] in carrying out the Church's religious mission." *Ridley*, 920 A.2d at 960. Indeed, the Commonwealth Court reasoned that while "ministering to the sick can flow from a religious mission . . . it is not a fundamental religious activity of a church." *Id.* at 960. There is little question that "providing foster care to . . . children" likely flows from and aides CSS's religious mission, but it is not as clear, that foster care is a fundamental religious exercise under *Ridley Park*.

[31] Plaintiffs claim that "all four types of burden" considered "substantial" under § 2403 of RFPA are implicated in this case. Plaintiffs assert that DHS's actions "[s]ignificantly constrain[] or inhibit[] conduct or expression mandated by [Catholic Social Services'] religious beliefs" and "[d]en[y] [CSS] a reasonable opportunity to engage in activities which are fundamental to the

CSS's compliance with the terms of the Services Contract does not: constrain or inhibit CSS from conduct or expression mandated by its religious beliefs, curtail CSS's ability to express adherence to CSS's religious faith, deny CSS a reasonable opportunity to "provide foster care to children," or compel CSS to engage in conduct or expression that violates a "specific tenet" of CSS's religious faith.

Resolution of the issue of "substantial burden" requires the Court to focus on what precisely CSS has been asked to do in this case and whether doing it necessarily results in a conflict with CSS's religious beliefs. CSS has been asked, and indeed CSS agreed when it entered into the Services Contract, to serve all persons who seek CSS's services consistent with the all-comers provisions of the Fair Practice Ordinance. Compliance with the all-comers provisions would, as discussed above, require CSS to provide certification services to prospective parents regardless of, among other things, religion, race, marital status, sexual violence victim status, sex, sexual orientation, gender identity, or age. CSS contends that compliance with the all-comers provision of the Services Contract necessarily compels it to engage in "conduct and expression contrary to Catholic teaching," in particular, Catholic teaching about marriage. Pls.' Br. 14, ECF No. 10-2.

CSS contends that the provision of certification services for same-sex couples would require CSS to express its religious approval of same-sex relationships in contravention of Catholic teaching about marriage. This is not the case. To illustrate this point, if, for example, CSS were to certify a couple where one spouse is previously divorced, CSS's certification would

_____

[agency's] religion." Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 126, ECF No. 46 (alterations in original); *see also* Pls.' Br. 12, ECF No. 10-2 (asserting same burdens using verbatim language). Elsewhere, Plaintiffs also state that DHS's actions "curtail . . . Catholic Social Services' 'ability to express adherence' to its faith, and attempt to '[c]ompel[] conduct or express which violates a specific tenet of [Catholic Social Services'] religious faith.'" Pls.' Br. 14, ECF No. 10-2 (alterations in original).

not suggest that CSS approved of divorce as a religious matter. In short, CSS was hired to provide a scope of services to the citizens of Philadelphia that is narrower than CSS contends.

The Services Contract requires CSS to "recruit, screen, train, and provide certified resource care homes" consistent with the all-comers provisions of the Fair Practices Ordinance Decl. of James Amato Ex. A, ECF p. 28 of 52, ECF No. 13-3. The Services Contract does not require CSS to do anything in connection with prospective foster parents but certify prospective foster parents as meeting state guidelines for foster care. CSS is imbuing its certifications with meaning that is not required or compelled by the Services Contract. The Services Contract does not require CSS to express its religious approval or disapproval of persons seeking out its services. The Services Contract does not require CSS to do or say anything else in connection with CSS's religious views.

With this understanding in mind, the Court concludes that DHS has not and is not constraining Plaintiffs' ability to engage in the provision of foster care to children by imposing on CSS a contractual condition that would require CSS to violate its religious beliefs or curtail CSS's ability to express its religious beliefs. In essence, if CSS provides its services consistent with the minimal requirements of the all-comers provisions of the Fair Practices Ordinance, then CSS may continue to provide foster care to children. This does not constitute a substantial burden on CSS's religious exercise of providing foster care to children. As to the individual Plaintiffs, as discussed in detail below and in connection with the irreparable harm prong, the individuals are not constrained by Defendants' actions in connection with CSS in their fostering of children because the individual Plaintiffs are, as they always have been, entitled to be foster parents with any of the thirty foster care agencies with whom DHS has contracted.

### 4. Free Speech Claims

Plaintiffs allege two claims under the Free Speech Clause of the First Amendment. First, Plaintiffs allege that the services CSS provides under the Services Contract relating to certification of prospective foster parents are services for which CSS is not paid, therefore, by requiring CSS to provide certifications DHS is compelling CSS to engage in unpaid for speech. Second, Plaintiffs contend that DHS and Philadelphia retaliated against CSS for CSS's comments published in the March 13 *Philadelphia Inquirer* article in violation of the Free Speech Clause. The Court rejects both claims. First, in hiring CSS to perform services under the Services Contract, DHS and Philadelphia did not seek to create a forum for private speech nor did they seek to promote speech at all. Rather, DHS contracted for specific services relating to DHS's responsibility of providing foster care services to the citizens of Philadelphia, including certification services and home visits for prospective foster parents. This is the case whether CSS was paid in a lump sum or per diem as CSS contends. Second, there is insufficient evidence to conclude that DHS retaliated against CSS for CSS's religious views as opposed to CSS's confirmation that its policies directly contradict the Services Contract.

### i. Compelled Speech

In resolving Plaintiffs' claim that DHS and Philadelphia are impermissibly conditioning CSS's contract on unconstitutionally compelled speech, the Court begins by identifying the purpose of the contract because the purpose of the contract is the springboard for analysis.[32]

---

[32] The Court disagrees that DHS and Philadelphia are conditioning the grant of a contract to CSS on CSS's agreement to "adopt [a] particular belief." Pls.' Proposed Findings of Fact and Conclusions of Law 67, ECF No. 46. DHS and Philadelphia ask only what they would ask of any contracting party, that CSS enter into the contract consistent with the duty of good faith and fair dealing. DHS and Philadelphia have asked CSS to confirm that, to the extent CSS would enter into an agreement that CSS could perform in accordance with the contract's fair practices provisions.

The U.S. Supreme Court's decision in *Legal Services Corp. v. Velazquez* advised courts to look to the purpose of a government program when analyzing whether a government condition to participation in the program is constitutional under the First Amendment. 531 U.S. 533 (2001). In *Legal Services Corp.*, a group of lawyers employed by the New York City Legal Services Corp., sought a declaration that Congress's imposition of a funding condition on legal services under the Legal Services Corporation Act was an unconstitutional restriction of their freedom of speech. *Id.* at 536. Congress's funding condition prohibited legal services corporations' use of federal funds to "amend or otherwise challenge existing welfare law." *Id.* In ruling that the funding condition of the Legal Services Corporation Act was unconstitutional, the Supreme Court focused on the purpose of the law. The law was "designed to facilitate private speech, not promote a governmental message." *Id.* at 542. Indeed, advice from legal services corporation attorneys to their clients, the Supreme Court concluded, "cannot be classified as governmental speech even under a generous understanding of the concept." *Id.* at 543.

As the Legal Services Corporation Act's purpose was to facilitate private speech, and as the speech in which legal services corporation attorneys were engaged was not governmental speech, the Supreme Court held that the law's funding condition was unconstitutional. In so holding, the Supreme Court, however, also acknowledged that "[w]hen the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." *Legal Servs. Corp.*, 531 U.S. 533, 541–42 (2001) (quoting *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833 (1995)) (emphasis added).

In this case, DHS's purpose in entering into the Services Contract with CSS and its other foster care agencies is for CSS and the other twenty-nine foster care agencies to provide foster care services. The Services Contract is not intended here, in contrast to the Legal Services Corporation Act in *Legal Servs. Corp.*, to create a forum for private speech or to facilitate private speech. CSS and its sister agencies were hired to perform governmental functions for DHS and Philadelphia. That CSS's services under the Services Contract parallel many of DHS's own, provides support for the conclusion that CSS is performing governmental work, including the dissemination of governmental messages. For example, CSS is required under the Services Contract to recruit prospective foster parents, and, in fact, CSS has recruited prospective foster parents in much the same way that DHS has recruited prospective foster parents. *Compare* Jun. 18, 2018 Hr'g Tr. 65:14–19 (testifying that she saw television commercials soliciting prospective foster parents)) and Foster Care & Adoption Services, https://cssphiladelphia.org/adoption/ (last visited Jul. 1, 2018) (advertising CSS's foster care and adoption services to members of the public through a website) *with* Jun. 18, 2018 Hr'g Tr. 101:19–101:2 (Ali) (describing phone bank recruiting event) and Jun. 19, 2018 Hr'g Tr. 161:23–162:1 (Figueroa) (describing recruitment as a general foster-care responsibility). That CSS's work under the Services Contract was governmental in nature, is further supported by the fact that the Services Contract stipulated that written materials published by CSS relating to services rendered under the Services Contract were to identify DHS as a funding source. CSS's work under the Services Contract is, thus, an extension of DHS's own work and CSS's speech, to the extent any is required under the Services Contract, constitutes governmental speech under *Legal Servs. Corp.*

As CSS's speech, to the extent any is required under the Services Contract, constitutes governmental speech, DHS is permitted to "take legitimate and appropriate steps to ensure that

its message," that foster care services in Philadelphia are provided to all Philadelphians consistent with the all-comers provision of the Fair Practices Ordinance, was and is "neither garbled nor distorted by" CSS. *Legal Servs. Corp.*, 531 U.S. 541–42.

Plaintiffs rely on *Cradle of Liberty Council, Inc. v. City of Philadelphia*, in support of their argument that Defendants have impermissibly conditioned CSS's public contract on compelled speech. 851 F. Supp. 2d 936, 948 (E.D. Pa. 2012). Plaintiffs' reliance on *Cradle of Liberty*, however, is misplaced for at least two reasons. First, *Cradle of Liberty* is not binding on this Court. Second, *Cradle of Liberty* is otherwise not persuasive because the facts at issue in that case are not analogous to the facts at issue here. *Cradle of Liberty* concerned a Boy Scout troop that was using a city-subsidized building to carry out youth activities, all while refusing membership to prospective gay Boy Scouts. The City attempted to change the Boy Scout troop's general policy on membership for prospective gay Scouts by conditioning the lease of the building on a policy change. Ultimately, the district court concluded that the City could not use the lease to change the tenant Boy Scout troop's general policies when the policies were not related to the use of the building.

The critical difference between *Cradle of Liberty* and this case is that in *Cradle of Liberty*, the City attempted to use a lease agreement to change a tenant's policy that was unrelated to the lease. *See id.* at 943 (emphasis added) (providing that the City had informed the tenant that "it had to completely abandon its practice of denying membership to homosexuals, even in contexts unrelated to the subsidized building"). In this case, by contrast, Defendants' insistence that CSS serve all-comers consistent with the Services Contract is central to the purpose of the Services Contract. Defendants have not conditioned CSS's Services Contract on CSS changing its activities, views, opinions outside the context of the Services Contract. CSS

may continue to refuse its private services to same sex couples outside the confines of the Service Contract and outside of CSS's role as a DHS foster care agency.

## ii.        Retaliation

CSS concedes that "[a]s a contractor, Catholic Social Services is treated as 'akin to a government employee' addressing matters of 'public concern.'" Pls.' Br. 26, ECF No. 13-2. For a public employee, to prevail on a retaliation claim, the employee must show that "(1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015). The Third Circuit has noted that the "second and third stages of this analysis present questions for the fact finder and are not subject to review. *Baldassare v. New Jersey*, 250 F.3d 188, 194–95 (3d Cir. 2001) (citations omitted).

Plaintiffs' retaliation claim fails on elements two and three. There is no evidence that it was CSS's viewpoint, as opposed to CSS's verbal and written confirmation that its policies directly conflicted with the Services Contract, that motivated DHS to close CSS's intake of new referrals. Even if CSS's engagement in protected activity, namely CSS's commenting to the *Philadelphia Inquirer* about CSS's policies in connection with a public services contract, was a substantial or motivating factor for DHS's alleged retaliation, the Court concludes that DHS would likely prevail in establishing that it would have taken the same action had CSS not spoken with the *Philadelphia Inquirer* about its policies.

For purposes of this analysis, the Court assumes that CSS's statements to the *Philadelphia Inquirer* and the publication of those statements constitute constitutionally-

protected activity. Assuming that CSS has engaged in constitutionally-protected activity, the next analytical step is determining whether CSS's protected activity was a substantial or motivating factor in the alleged retaliatory action. While CSS would have the Court conclude that the evidence in the record shows that DHS closed CSS's intake of new referrals because of CSS's viewpoint as communicated to the *Philadelphia Inquirer*, in fact, the evidence shows that DHS closed CSS's intake of new referrals because CSS confirmed that its policies violate CSS's contractual obligations under the Services Contract. On this issue, the Eleventh Circuit's decision in *Keeton v. Anderson-Wiley* is instructive. 664 F.3d 865 (11th Cir. 2011).

In *Keeton*, the Eleventh Circuit confronted a situation in which the plaintiff, a graduate student in the Counselor Education Program at Augusta State University, sued the University for First Amendment violations after the faculty asked the plaintiff to complete a remediation plan before she could participate in the University's clinical practicum. 664 F.3d at 867. The faculty required the plaintiff to complete the remediation plan as a condition to her actively counseling students as part of a clinical practicum because the faculty learned that the plaintiff intended to "convert students from being homosexual to heterosexual" once the plaintiff obtained access to the clinic. *Id.* at 868–69. University officials concluded that the plaintiff's intended actions would violate various provisions of the American Counseling Association's Code of Ethics, a mandatory code of ethics for all universities providing counseling programs. *Id.* at 869. Ultimately, the plaintiff confirmed that she would not participate in any "remediation plan that I already know I won't be able to successfully complete." *Id.* at 871. The University then withdrew the plaintiff from the counseling practicum and the plaintiff filed suit. *Id.*

In concluding that the plaintiff's free speech rights had not been violated, the Eleventh Circuit focused on the evidence of why the University asked the plaintiff to engage in a

remediation plan and why the University ultimately withdrew the plaintiff from the counseling practicum.  *Id.*  The Eleventh Circuit explained that the plaintiff "confuse[d] her viewpoint-based objections to ASU's officials' actions with viewpoint discrimination."  *Id.* at 875.  In other words, the mere fact that the plaintiff disagreed with the legitimate reasons for the University's actions did not transform the University's legitimate actions into illegitimate retaliatory actions.  Indeed,

> the evidence shows that, in requiring Keeton to learn about and interact with the GLBTQ population, to read articles in counseling or psychological journals about counseling the GLBTQ population, and to become familiar with the ALGBTIC Competencies for Counseling Gays and Transgender clients, ASU's officials sought to teach her how to effectively counsel GLBTQ clients in accordance with the ACA Code of Ethics.

*Keeton*, 664 F.3d at 874.  The Eleventh Circuit reiterated elsewhere that:

> the record shows that ASU's officials imposed the remediation plan, <u>not because she expressed her personal religious views regarding homosexuality, but because she was unwilling to comply with the ACA Code of Ethics</u>. That this unwillingness to abide by ASU's curriculum and her chosen profession's ethical standards initially became apparent through her writings and class discussions does not cloak it in First Amendment protection.

*Id.* at 878 (emphasis added).  Accordingly, the decision in *Keeton* demonstrates that a plaintiff lodging a First Amendment retaliation claim must establish a causal link between the alleged retaliation and that plaintiff's alleged protected activity.  *See also Briscoe v. City of Philadelphia*, 1996 WL 684316 (E.D. Pa. Nov. 27, 1996) (concluding that a contractor who was not offered a new contract was not retaliated against as result of the contractor's testimony in court against a city program because the contractor failed to prove that decision not to offer her a new contract was causally linked to her protected activity).

Here, the evidence shows that DHS's closure of CSS's intake of new referrals was not based on CSS's viewpoint as expressed in the *Philadelphia Inquirer* article, but instead, based on CSS's admission that it would not comply with the all-comers provisions of the Services Contract. CSS misperceives the closure of its intake as having to do with its viewpoint in the same way the plaintiff in *Keeton* misperceived "her viewpoint-based objections to [the university's] officials' actions with viewpoint discrimination." 664 F.3d at 875. Although CSS expressed its position on same-sex relationships, it was not that expression that motivated DHS's actions. Instead, it was CSS's indication that it maintains a policy in direct conflict with its obligations under the Services Contract. *See, e.g.*, Jun. 19, 2018 Hr'g Tr. 120:7–11 (Amato) (emphasis added) (quoting from Defendants' letter indicating that Defendants do "not plan to agree to any further referrals to CSS . . . absent assurances that CSS is prepared to <u>adhere to contractual obligations</u>.").

Testimony established DHS's reason for closing intake. Commissioner Figueroa testified that she "decided that it was in the best interest [of children] to close intake, so that [Figueroa] could look more deeply into" CSS's and Bethany Christian Services's policies. Jun. 19, 2018 Hr'g Tr. 166:6–21 (Figueroa); Figueroa Decl. ¶ 32, ECF No. 20-6; *see also* Jun. 18, 2018 Hr'g Tr. 96:2–3 (Ali) (testifying that, to Ali's knowledge, Commissioner Figueroa herself decided to close CSS's intake of new referrals). CSS witness James Amato further testified that he understood that DHS's position was that CSS was "not complying with the public accommodation requirements" under the Services Contract. Jun. 19, 2018 Hr'g Tr. 60:11–13 (Amato); *see also* Jun. 19, 2018 Hr'g Tr. 56:9–13 (Amato) (testifying that he understood DHS's concerns were about CSS "not completing home studies for same-sex individuals and couples").

CSS is not reasonably likely to show that DHS retaliated against CSS for its religious views and comments relating to those views.

Even if CSS could establish that its engagement in protected activity was a substantial or motivating factor for DHS's decision to close intake and not offer CSS a new services contract, DHS would likely meet its burden under the third prong of the retaliation claim that it would have taken such action in the absence of CSS's protected activity. In addition to testimony that DHS would not permit any agency to refuse service to qualified Philadelphians protected by the all-comers provisions of the Fair Practices Ordinance, perhaps the strongest evidence that DHS would have taken the same course of action even in the absence of CSS's purported protected activity is the fact that DHS, indeed, took the same course of action in connection with Bethany Christian Services—who also made comments to the *Philadelphia Inquirer*, that has similar policies in contravention of its services contract. DHS also called all other faith-based agencies and a non faith-based agency to examine their policies on same-sex couples.

### D.      Irreparable Harm

Plaintiffs have identified five purported irreparable harms that will result absent injunctive relief: (1) violations of Plaintiffs' religious rights will result in irreparable harm as a matter of law, (2) violations of Plaintiffs' free speech right will result in irreparable harm as a matter of law, (3) without a new government services contract CSS will be forced to lay off staff and possibly shut down its operations entirely, (4) with the closure of CSS, the individual Plaintiffs and other CSS-certified foster parents will not be able to use their skills to foster children, and (5) the closure of CSS will result in a rise in the number of children in congregate care or DHS's overnight foster care room. The Court disagrees because these alleged harms are

either not present on these facts or are otherwise not irreparable for purposes of preliminary injunction analysis.

The first two harms to which Plaintiffs point are harms that would occur only if Plaintiffs First Amendment rights have been violated. As the Court explained at length above, Plaintiffs are unlikely to prevail on the merits of their First Amendment claims. Accordingly, while a loss of First Amendment freedom may be considered irreparable[33] these alleged harms are not present on the facts before the Court.

Plaintiffs' third alleged irreparable harm is the possibility that CSS, without a new government services contract, may lay off staff or shut down its operations. It is hornbook law that the "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages . . . this is not an easy burden." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000) (internal citations omitted); *see also Lehigh Valley Cmty. Mental Health Ctrs., Inc. v. Pa. Dep't of Human Servs.*, 2015 WL 6447171 at * 3 (E.D. Pa. Oct. 26, 2015) (concluding that "going out of business" and "thousands of clients . . . left without proper mental health care" did not meet the standard for irreparable harm). That this burden is particularly exacting was made clear in the Third Circuit's decision in *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).

In *Air Freight*, the Third Circuit reversed a district court injunction prohibiting the respondent from terminating a pivotal contract with petitioner. *Id.* at 798. The contract

---

[33] *See McTernan v. City of York*, 577 F.3d 521, 528 (3d Cir. 2009) (noting that the district court "acknowledged that loss of First Amendment freedom for any period of time can be considered irreparable harm," but holding no First Amendment violation occurred where police arrested religiously motivated protesters who blocked access to a public performance stage and other facilities).

accounted for eighty percent of petitioner's business and, thus, the termination of the contract would have caused the petitioner to "lose the main portion of its business, many if not all of its employees, and its goodwill and reputation." *Id.* at 799. Termination of the contract, the petitioner claimed would "undoubtedly . . . force[] [the petitioner's] shutdown or significantly curtail its operation." *Id.* In reversing the district court's injunction order, the Third Circuit reviewed the petitioner's allegations of irreparable harm including the potential that it would lay off its employees, and close its operations. *Id.* at 802. The Third Circuit, however, was unconvinced that such harms could not be compensated by money damages since possible damages could be calculated with relative precision. *Id.*

As to CSS's claim it will be forced to lay off staff and close its operation unless the Court issues an injunction, the Court finds these harms are economic harms that are insufficient to meet the irreparable harm standard for a preliminary injunction. Evidence shows that CSS is compensated by DHS under the Services Contract and that CSS is paid on a per diem basis. *See* Decl. of James Amato Ex. A, ECF p. 15 of 52, ECF No. 13-3; Jun. 21, 2018 Hr'g Tr. 11:4–7 (Figueroa) (testifying that many contractors are paid on a per diem basis); Jun. 21, 2018 Hr'g Tr. 139:20–24 (same) (Figueroa); Jun. 19, 2018 Hr'g Tr. 41:5–6 (Amato) (testifying that CSS "subsidized [foster care] services to the tune of $3.8 million"). Given the Parties' familiarity of their financial relationship, the Court concludes that CSS's possible harm in the form of lost revenue under the Services Contract can be quantified and may be fully compensable through money damages.

Plaintiffs have also not established the imminence of their financial collapse in the absence of injunctive relief because CSS has testified that it also has foster care contracts with Montgomery County, PA and Bucks County, PA. Jun. 19, 2018 Hr'g Tr. 89:3–9 (Amato).

There are also interim financial arrangements that are available to CSS. DHS Commissioner Figueroa explained that in the past, when foster care agencies have shut down, DHS, in fact, has provided temporary funding to those foster care agencies to ensure smooth transitions of their staff, foster parents, and the children. Jun. 21, 2018 Hr'g Tr. 10:23–11:9 (Figueroa). Accordingly, the economic harms to which Plaintiffs point in support of injunctive relief are insufficient to meet the exacting standard of irreparable harm.

Plaintiffs' fourth alleged irreparable harm is the purported inability of CSS-certified foster parents to continue providing foster care services if CSS closed its operations and the foster parents were forced to transfer to other agencies. To prove this point, Plaintiffs called each of the four individual plaintiffs in this case to testify to the harms that they would expect to suffer if CSS closed its operations. Ms. Simms-Busch testified that if CSS closed its foster program that she, as of the time of the hearing, had "no idea" how she or her foster children would be impacted. Jun. 18, 2018 Hr'g Tr. 52:16–23 (Simms-Busch). Ms. Simms-Busch also was unsure whether she could or could not transfer to another foster care agency. Jun. 18, 2018 Hr'g Tr. 53:2–7 (Simms-Busch). Ms. Paul likewise was unsure what impact CSS's closure would have on her ability to provide foster care and was unsure whether she could or could not transfer to another foster care agency. Jun. 18, 2018 Hr'g Tr. 63:11–25 (Paul). Ms. Fulton was similarly unsure what impact CSS's closure would have on her provision of foster care, though she would be emotionally devastated. Jun. 18, 2018 Hr'g Tr. 68:20–23 (Fulton). Each of the individual plaintiffs expressed that CSS's closure would be emotionally burdensome.

While transferring to another agency may be difficult, uncertain, and emotionally challenging, transferring to other agencies is neither impossible nor unlikely to be successful.

Decl. Kimberly Ali ¶¶ 27–29, ECF No. 20-1 (explaining the process by which resource parents transfer from one agency to another); Decl. Kimberly Ali ¶¶ 34–36, ECF No. 20-1 (describing how Lutheran Children and Family Service of Eastern Pennsylvania's voluntary closure was handled and explaining that there were no significant issues in transferring families to other agencies). The Third Circuit, although acknowledging how individuals can suffer mental anguish in connection with litigation, has held that emotional difficulty alone cannot justify the imposition of an injunction.

In *Adams*, the Third Circuit concluded that even where the denial of injunctive relief would force patients to switch doctors and medical providers and that such a switching of doctors would prove "emotionally draining" and could present some medical risk, such harms were not the type of irreparable harm "contemplated by the preliminary injunction standard." 204 F.3d at 489. The Third Circuit continued stating that "injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Id.* at 490. In this case, in the event CSS closes its operations, the individual plaintiffs and other non-party CSS-certified resource parents may transfer to other agencies and continue using their skills to provide foster care to children, even though such transfers may be challenging.

Finally, Plaintiffs argue that in the event CSS closes its operations, the number of children in congregate care living situations will increase or the number of children in DHS's overnight foster care room will increase. As provided above, in connection with the factual background of this case, DHS has shown that the closure of CSS's intake of new referrals has had little or no effect on the operation of Philadelphia's foster care system. DHS Commissioner Figueroa testified that CSS's intake closure "has not resulted in a rise in children placed in congregate care." Jun. 21, 2018 Hr'g Tr. 86:4–87:9 (Figueroa). Further Commissioner Figueroa

testified that CSS's intake closure "has not resulted in a rise in children staying in DHS's childcare room." Jun. 21, 2018 Hr'g Tr. 86:4–87:9 (Figueroa). Figueroa's testimony was based on her review of "weekly data" that Figueroa receives from DHS's "performance and technology team that . . . have . . . detailed data." Jun. 21, 2018 Hr'g Tr. 86:16–87:11 (Figueroa). To the extent CSS closes its operations, it would not be the first foster agency to do so in Philadelphia. Decl. Kimberly Ali ¶¶ 34–36, ECF No. 20-1 (explaining that Lutheran Children and Family Service of Eastern Pennsylvania closed its operations in March 2016 and its over 100 foster children were transferred to other foster agencies over a three-month period). Plaintiffs have not established with sufficient evidence that irreparable harm in the form of increased use of congregate care or the DHS overnight foster care room will result absent an injunction.

### E.     Balancing Of The Harms And The Public Interest

As the Court has concluded that Plaintiffs are not likely to succeed on the merits of their claims and have presented insufficient evidence of irreparable harm, the Court need not spend undue time analyzing the remaining two factors of the preliminary injunction standard—balancing of the equities, and the public interest. *See Reilly*, 858 F.3d at 180 (providing that the first two factors of the preliminary injunction standard are gateway factors).

In connection with the balancing of harms prong of the analysis, Defendants called Frank Cervone as an expert to testify to the harms that might occur if the Court granted injunctive relief.[34] The Parties disagree on whether Cervone's testimony should be considered for a variety of reasons. The Court, however, need not, and has not relied on Cervone's testimony in deciding

---

[34] Cervone serves as the executive director of the Center for Child Advocates. Jun. 21, 2018 Hr'g Tr. 153:5–9 (Cervone). Cervone has had, and continues to have, a long and distinguished career in advocating for children. The Court thanks Mr. Cervone for his dedication to a life of public service.

the Injunction Motion, and therefore, the Court will not address the Parties' arguments on the propriety of Cervone's testimony.

Here, even in the absence of Cervone's testimony, the balance of the equities tilts in favor of Defendants. If the Court were to grant Plaintiffs' Injunction Motion, the Court would, in essence, cast aside DHS's and Philadelphia's reasonable objectives in seeking the enforcement of the Services Contract and the Fair Practices Ordinance incorporated into the Services Contract. As discussed in connection with Plaintiffs' claim under the Free Exercise Clause, Defendants' interests in this case are manifold, but at a minimum, include six important governmental objectives.

First, DHS and Philadelphia have a legitimate interest in ensuring that when contractors agree to terms in a government contract, the contractors adhere to those terms. Second, DHS and Philadelphia have a legitimate interest in ensuring that when its contractors voluntarily agree to be bound by local laws, the local laws are enforced. Third, DHS and Philadelphia have a legitimate interest in ensuring that when they employ contractors to provide governmental services, the services are accessible to all Philadelphians who are qualified for the services. Fourth, in the context of foster care and adoption, DHS and Philadelphia have a legitimate interest in ensuring that the pool of foster parents and resource caregivers is as diverse and broad as the children in need of foster parents and resource caregivers. Fifth, DHS and Philadelphia have a legitimate interest in ensuring that individuals who pay taxes to fund government contractors are not denied access to those services. Sixth, DHS and Philadelphia have an interest in avoiding likely Equal Protection Clause and Establishment Clause claims that would result if

it allowed its government contractors to avoid compliance with the all-comers, nondiscrimination provisions of the Fair Practices Ordinance by discriminating against same-sex married couples.[35]

Granting an injunction in the face of the foregoing legitimate interests would be in direct conflict with the balance of harms and the public interest. Accordingly, the Court concludes that the balance of harms and the public interest militate in favor of denying the Injunction Motion.

## V. CONCLUSION

For the reasons set forth above, and having considered all four factors implicated by the preliminary injunction standard, Plaintiffs' Amended Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 13) is **DENIED**. An appropriate Order follows.

---

[35] Preventing discrimination in the provision of public services is undeniably a legitimate interest. As the Supreme Court in *Heart of Atlanta Motel, Inc. v. United States* proclaimed:

> Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his race or color. It is equally the inability to explain to a child that regardless of education, civility, courtesy, and morality he will be denied the right to enjoy equal treatment, even though he be a citizen of the United States and may well be called upon to lay down his life to assure                    this                    Nation                    continues.

379 U.S. 241, 292 (1964).